## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRITT A. SHAW, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-1138 (GK) |
| v. | ) | Status Conference 11/15/05 |
| | ) | |
| MARRIOTT INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
### IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
### <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

**Of Counsel:**

**Mark W. Borghesani, Esq**
**D.C. Bar No. 426734**
**19 Sivtsez Vrazhek Per., kv. 10**
**Moscow 119003 Russia**
**+7-916-640-0290 (Telephone)**

**Paul D. Cullen, Sr.**
**Daniel E. Cohen**
**Susan Van Bell**
**THE CULLEN LAW FIRM, PLLC**
**1101 30th Street, N.W., Suite 300**
**Washington, D.C. 20007**
**(202) 944-8600 (Telephone)**
**(202) 944-8611 (Telecopier)**
*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ......................................................................................... 1

   A.    Statement of the Case ......................................................................... 1

     1.    Plaintiffs' Claims ......................................................................... 1

     2.    Defendant's Position .................................................................... 3

   B.    Legal Standard .................................................................................... 3

     1.    Standard of Review for Motion to Dismiss ................................ 3

     2.    Effect of Submissions Outside the Pleadings ............................ 4

   C.    Issues Presented .................................................................................. 5

II.   ARGUMENT ................................................................................................ 6

   A.    Plaintiffs Have Alleged a Good Cause of Action Under the CPPA that is Actionable Without Reference to Russian Law ........................................................ 6

   B.    The District of Columbia Has a Compelling Interest in Applying its Laws to Marriott's Conduct ............................................................................... 10

     1.    Marriott's Representations that it is Headquartered in Washington, D.C. Provides the District with a Compelling Interest in Applying D.C. Law ...................... 10

     2.    Application of the Choice of Law Standard Calls for Application of D.C. Law ... 12

     3.    The Consumer Protection Procedures Act is a Regulatory Statute. ..................... 14

     4.    Marriott is Estopped From Denying it is Subject to the Laws of the District of Columbia. ...................................................................................... 15

   C.    Marriott's Attempt to Deny Non-Resident Plaintiffs Protection Under the CPPA Thus Throwing Them to the Mercy of Russian Courts Should be Soundly Rejected ...... 16

     1.    Extending the Protections of the CPPA to Plaintiffs Residing Abroad (Including Absent Class Members) Is Mandated By International Law and Treaty .................... 17

     2.    The Language of the CPPA is Consistent with Our International Obligations and Does Not Limit Its Protections to District of Columbia Residents .............................. 19

     3.    Courts Apply the CPPA to Nonresident Claims ........................ 20

   D.    Marriott's Forum Non Conveniens Argument Is Without Merit ............................. 23

**E.   Plaintiffs' Unjust Enrichment Claim Should Not Be Dismissed Under the Voluntary Payments Doctrine** ................................................................................................................ 25

**III.  CONCLUSION** .............................................................................................................. 26

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRITT A. SHAW, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-1138 (GK) |
| v. | ) | Status Conference 11/15/05 |
| | ) | |
| MARRIOTT INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
## FIRST AMENDED CLASS ACTION COMPLAINT

## I.    INTRODUCTION

### A.  Statement of the Case

#### 1.    Plaintiffs' Claims

Plaintiffs, a resident of Washington, D.C., a New Yorker currently living in London,

U.K. and a resident of Michigan, allege that Marriott has made misrepresentations of material

facts, failed to disclose a material fact which has a tendency to mislead and has offered services

without the intent to sell them as offered, all in violation of D.C.'s Consumer Protection

Procedures Act (the "CPPA" or "statute").[1]  In substance, Plaintiffs allege that Marriott's false

and misleading representations have created expectations for guests at its Moscow, Russia hotel

properties that they would be charged for rooms and services in U.S. dollars or dollar equivalents

at official exchange rates.  In fact, those expectations have not been met because final bills for

rooms, taxes, hotel services, and amenities are converted into Russian rubles at an inflated

exchange rate.  Marriott knew or should have known that this would happen.  Under Plaintiffs'

---

[1] D.C. Code §28-3901, *et seq.*

theory of the case, it is immaterial whether the use of an inflated currency conversion rate is lawful under Russian law.  The only question presented is whether Marriott can be held accountable under the CPPA for its false and misleading representations made here to potential guests.

Defendant's legal status within the District of Columbia was pleaded with considerable particularity in the First Amended Complaint.  Marriott International, Inc. is a large multinational corporation in the hospitality industry with over 2,600 lodging properties located in the United States and in 65 other countries including Russia.[2]  Plaintiffs make two separate allegations respecting the location of Marriott's headquarters.  First, Plaintiffs allege that Marriott is "headquartered in the District of Columbia."[3]  Second, Plaintiffs allege that Marriott has engaged in a "longstanding, widely circulated and unambiguous promotion" of its roots in the District of Columbia and has made numerous public declarations to the press, the general public, the traveling public, investors, potential employees, and the legal community that its headquarters are located in the District of Columbia.[4]

As the First Amended Complaint makes clear, the representation that Marriott's corporate headquarters is located in Washington, D.C. is made in several places in Marriott's website.  It appears in the "Corporate Information," "Careers," "Investor Relations," and "Our Brands" sections of the website.  The representation is also made in Marriott's press releases, which are accessible on the website.  This is the same website where guests make hotel reservations.  Thus,

---

[2] First Amended Complaint ("Am. Compl.") ¶ 16.
[3] *Id.* ¶ 15.
[4] *Id.* ¶¶ 17, 23-33.

the numerous representations about Marriott's location in the District made in the website

provide a link between those representations and the transactions at issue.[5]

### 2.    Defendant's Position

In its Motion to Dismiss under Fed. R. Civ. P.12(b)(6), Marriott advances four basic

contentions.  First, Marriott denies Plaintiffs' allegation that it is headquartered in Washington,

D.C. and tenders to the Court a sworn declaration that it is really headquartered in Bethesda,

Maryland.  Marriott then argues that since it is not headquartered in Washington, D.C., there is

an insufficient nexus to make it accountable under the CPPA.  Second, it argues that the CPPA

does not protect the rights of those who reside outside of the District of Columbia.  Third, it

urges that this matter should be dismissed under the doctrine of *forum non conveniens* because

Russia has a greater interest in regulating Marriott's conduct than does the District of Columbia.

Finally, Marriott argues that the unjust enrichment claims are unenforceable under the voluntary

payment doctrine.

### B.  Legal Standard

### 1.    Standard of Review for Motion to Dismiss

"A motion to dismiss for failure to state a claim upon which relief can be granted is

generally viewed with disfavor and rarely granted."[6]  "For the purposes of such a motion, the

factual allegations of the complaint must be taken as true, and any ambiguities or doubts

concerning the sufficiency of the claim must be resolved in favor of the pleader."[7]  A complaint

should only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff

---

[5] The physical location where Marriott's website is hosted, whether in Frederick, Maryland or India is not transparent to the consumer and is entirely immaterial.

[6] *F.T.C. v. Capital City Mortgage Corp.*, 321 F. Supp. 2d 16, 18, 20 (D.D.C. 2004)(Kessler, J.)(denying motion to dismiss and refusing to consider "issues of proof and fact that do not weigh in a court's decision regarding a motion to dismiss")(citing *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1102 (D.C. Cir.1985)).

[7] *Id.*

can prove no set of facts in support of his claim which would entitle him to relief."[8]
"Accordingly, the factual allegations of the complaint must be presumed true and liberally
construed in favor of the plaintiff."[9]

### 2.    Effect of Submissions Outside the Pleadings

Marriott has attached affidavits and documentary evidence to its motion to dismiss under

Rule 12(b)(6).  When a party attaches such evidence, a court may construe the motion as a Rule

56 motion for summary judgment.[10]  Specifically, Marriott attaches testimony that its

headquarters are located in Bethesda and a web site printout purporting to support Marriott's

speculation that one of the plaintiffs does not live in the District.  Since Marriott's sworn

declaration challenges a factual allegation in the First Amended Complaint, it has, in effect,

converted its Rule 12(b)(6) motion into a motion for summary judgment on this issue.[11]  Should

the Court be inclined to consider Marriott's submissions outside the pleadings, Plaintiffs oppose

by filing their own declaration authenticating documents identified in the First Amended

Complaint in which Marriott admits that its headquarters is located in the District of Columbia.[12]

Plaintiffs also submit the declaration of an expert witness who testifies that Marriott's public

statements that its headquarters are located in Washington, D.C. are highly relevant to the

promotion and positioning of its brand image.[13]

Marriott's evidence that it is located in Bethesda does nothing more than to establish that

Marriott has made false representations of fact to the public, as Plaintiffs allege.  Marriott does

not challenge the assertions contained in the First Amended Complaint that it has repeatedly held

---

[8] *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

[9] *Id.* (citing *Shear v. Nat'l Rifle Ass'n of Am*., 606 F.2d 1251, 1253 (D.C. Cir.1979)).

[10] *See e.g., Torres v. Mineta*, No. 04-0015, 2005 WL 1139303*3, n.3 (D.D.C.)(Kessler, J.)("Since the Court has
considered facts outside the First Amended Complaint to reach its conclusions, 'the motion shall be treated as one
for summary judgment").

[11] Fed.R.Civ.P. 12(b).

[12] *See* Declaration of Jonathan Colson and attached documents, attached hereto as Exhibit 1.

[13] *See* Declaration of Chekitan S. Dev, attached hereto as Exhibit 2.

itself out to the public as a D.C. company. Similarly, with respect to the web printout regarding the District resident plaintiff, Marriott's "evidence" simply fuels an erroneous speculation, provides no contrary evidence regarding Plaintiff's residence, and should be disregarded by the Court.

On the current state of the record there appears to be an issue of fact with respect to where Marriott's headquarters is located, but no genuine issue of fact with respect to Marriott's long-standing practice of *representing* to the public that its headquarters is in Washington, D.C.[14] If Marriott prevails in proving that its headquarters is in Bethesda, Maryland, one must then add Marriott's public representations that it is headquartered in Washington D.C. to a growing list of *false and misleading representations* under the CPPA. In either event, however, there is a sufficient nexus for D.C. law to be applied to Marriott's conduct.

### C. Issues Presented

1. Plaintiffs allege that Marriott, through its domestically maintained reservation system, has misled potential guests of its Moscow hotel properties by encouraging them to believe that final hotel bills will be payable in dollars or dollar equivalents when it knows that final bills will be rendered in rubles at an inflated exchange rate. Do Plaintiffs allege a good cause of action under the CPPA where they do not also allege that Marriott's actions violate Russian law?

2. For years Marriott has boasted in annual reports, SEC filings, press releases and on the same Internet site where it books rooms for its Moscow hotel properties that it is headquartered in Washington, D.C. Such claims are an important component of Marriott's worldwide brand image. Can Marriott avoid accountability under the CPPA for making false and misleading representations by repudiating prior admissions of its ties to Washington, D.C.?

3. Numerous treaties ratified by the Senate grant national treatment (including equal access to our courts) to citizens of our principal trading

---

[14] Summary Judgment is appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). In ruling on a motion for summary judgment, the court must draw all justifiable inferences in non-moving party's favor and accept its evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

partners.  Neither the statutory language nor the legislative history of the CPPA restricts its terms to residents.  Should the CPPA be interpreted as circumscribing formal treaty obligations absent express language limiting it to residents?  Can individuals living abroad be barred from participating in this proceeding without violating important international commitments?

## II.    ARGUMENT

### A.  Plaintiffs Have Alleged a Good Cause of Action Under the CPPA that is Actionable Without Reference to Russian Law

Marriott's claim that Plaintiffs do not have a cause of action under the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.*, raises three issues: (1) whether Plaintiffs' allegations properly fall within the actionable elements of the CPPA; (2) whether Marriott has sufficient contact with the District of Columbia to be held accountable here; and (3) whether the Plaintiffs are proper persons to allege a cause of action under the CPPA.  This section addresses the first of those issues.

Plaintiffs have made legal and factual allegations, fully set forth in the First Amended Complaint, supporting claimed violations of the CPPA.  Plaintiffs claims can, and should be, decided without reference to Russian law.  Whether or not Marriott's conduct is legal under Russian law is not relevant to Plaintiffs' claims, which are based solely on violations of the D.C. statute.

The CPPA provides a list of actions deemed to be "unlawful trade practices."[15]  The enumerated unlawful trade practices include:

- Misrepresent[ation] as to a material fact which has a tendency to mislead;

- Fail[ure] to state a material fact if such failure tends to mislead;

- Advertis[ing] or offer[ing] goods or services . . . without the intent to sell them as advertised or offered.[16]

---

[15]  D.C. Code § 28-3904.
[16]  *Id.* § 28-3904 (e), (f), (h).

Plaintiffs have alleged that Marriott has engaged in unlawful trade practices in each of these three areas.[17]  Specifically, Marriott has engaged in unlawful practices in the representations made, and not made, to prospective guests during the reservations process.

Marriott has made the following misrepresentations of material facts which have a tendency to mislead, in violation of D.C. Code § 28-3904(e):

- Marriott provides confirmed quotes for room rates in U.S. dollars or dollar equivalents.[18]

- Marriott's website contains a currency converter that a guest may use to determine the amount that would be charged in local currency.[19]

- The currency converter utilizes official exchange rates.[20]

These are misrepresentations and they tend to mislead because Marriott knows that bills for hotel accommodations and amenities in Russia are never, in fact, paid in the quoted U.S. dollar amount.  The presence of the currency converter, which utilizes official exchange rates, misleads potential guests by providing a reasonable expectation that any dollar conversion to local currency will be at official exchange rates.

Marriott fails to state the following material facts, thereby misleading the consumer:

- The confirmed quoted U.S. dollar rate is not what the consumer will be charged at the Moscow hotels.[21]

- The amount that will be charged at the Moscow hotels will be in Russian rubles at a rate unrelated to any official exchange rate.[22]

- The amount that will be charged at the Moscow hotels will be upwards of 18% more than the rate quoted in US dollars.[23]

---

[17] Am. Compl. ¶¶ 4, 5, 38, 72-78.
[18] Id. ¶¶ 38(a), 40, 47.
[19] Id. ¶¶ 38(b), 40, 48.
[20] Id.
[21] Id. ¶  38(d).
[22] Id. ¶¶ 38(b), 38(d), 42.
[23] Id. ¶¶ 38(d), 41, 42, 57.

All of these items are material facts.  By failing to disclose them, Marriott's guests are misled.
This constitutes a violation of D.C. Code § 28-3904(f).

Finally, Marriott has offered goods or services without the intent to sell them as offered
because Marriott quotes and confirms prices when guests make their reservations that Marriott
knows are not the prices that the guests will pay.[24]  This constitutes a violation of D.C. Code
§ 28-3904(h).

In sum, Plaintiffs have alleged facts showing that Marriott misleads potential guests into
believing that (1) the confirmed reservation rate is the rate that would be charged at the hotel,
and (2) any conversion to local currency would be at the official exchange rate.  Further, the fact
that guests will actually pay their bill in Moscow at an inflated currency conversion rate, a fact
which is known by Marriott, is withheld.   These misrepresentations and omissions constitute
unlawful trade practices under D.C. Code § 28-3904 (e), (f) and (h).  Plaintiffs have clearly
alleged a valid cause of action under the CPPA.

Marriott repeatedly and erroneously suggests that this litigation focuses on the
transactions that occurred at the hotels in Moscow.[25]  Essentially, Marriott is trying to limit this
action to the hotel checkout transaction, which is a fundamental misreading of Plaintiffs'
allegations.  Consequently, Marriott contends that "[t]he rationale behind any pricing policy with
respect to Moscow hotels and the adequacy of related disclosures to potential guests will turn on
the requirements of Russian law to which Marriott is subject in order to lawfully conduct

---

[24] Am. Compl., ¶¶ 38(e), 58.

[25] *See* e.g. Memorandum of Points and Authorities in Support of Motion to Dismiss First Amended Complaint
("Marriott Mem.") at 3 ("The Amended Complaint is based on purported 'undisclosed upcharges' Marriott billed for
stays at Marriott hotels in Moscow, Russia"); 3 ("the hotel bills' disclosures were misleading"); 7 ("Plaintiffs'
attempt to expand the reach of the CPPA to business transactions that occurred in a foreign country . . . ");
10 ("The transaction of which Ms. Paliashvili complains . . . was a transaction that occurred within Russia . . . "); 13
("Amended Complaint is based on alleged 'upcharge' practices occurring in Marriott's Moscow, Russia hotels . .
."); 15 ("Plaintiffs' claims arise out of actions or conduct allegedly occurring in Moscow. . .").

business in Russia."[26]  Marriott completely ignores the allegations related to its reservation practices, which are the actions that form the basis for the violations of the CPPA claimed by Plaintiffs.  Marriott fails to acknowledge that its own website states that, "This is a United States website and will be governed by United States law."[27]  Thus, Marriott has essentially provided a choice of law for its reservations transactions which is United States law.

Marriott's efforts to focus this litigation solely on the Plaintiffs' transactions with the hotels in Moscow is a red herring.  This litigation is properly focused, not on the transactions at the Moscow hotels, but on the *representations made by Marriott* to Plaintiffs when they made their reservations.  Plaintiffs are not alleging a cause of action based on the hotels' actions in charging 32 Russian rubles per dollar, but upon *Marriott's failure to make complete and accurate representations with respect to those actions.*  The real issue is not that the Moscow hotels charged Plaintiffs an inflated rate, but that Marriott never informed its guests that this practice would take place.  On the contrary, Marriott's website encourages potential guests to believe that their bills will be converted to rubles at the official exchange rate.  Thus, Plaintiffs were misled by Marriott's misrepresentations and omissions, when the reservations were initially made, into believing that they would be paying an amount in U.S. dollars that they were quoted when the reservation were made.  This issue is based on Marriott's policies and practices with respect to its reservations.  Those policies and practices are formulated here, not in Russia.[28]

Whether or not the actual hotel practices are legal in Russia, or whether or not Marriott is satisfying the requirements of Russian law in its business practices in Russia, are irrelevant to this litigation.  Marriott's claims that most of the potential witnesses and evidence will be located

---

[26]  Marriott Mem. at 16.
[27]  *See* Exhibit 1J.
[28]  Marriott's contentions that this matter should be dismissed on *forum non conveniens* grounds are discussed fully in Section II.D., *infra*.

in Russia is specious.  The witnesses and evidence related to Marriott's reservations practices

and policies are where those practices and policies are formulated, which is likely to be

Marriott's headquarters.

This cause of action has been properly alleged based on the law of the District of

Columbia, which has been violated by Marriott.  There is no need to address Russian law to

adjudicate this cause of action. [29]

### B.  The District of Columbia Has a Compelling Interest in Applying its Laws to Marriott's Conduct

#### 1.  Marriott's Representations that it is Headquartered in Washington, D.C. Provides the District with a Compelling Interest in Applying D.C. Law

Marriott contends that there is an insufficient nexus between Plaintiffs' allegations and

the District of Columbia to support application of the CPPA.  Notably, however, Marriott does

not deny the allegations made in the Complaint with respect to its numerous and wide-ranging

representations that its corporate headquarters are located in the District. The Stant Declaration

now shows these representations to be false. These representations include the following:

> The "Corporate Information" section of Marriott's website provides "Contact Information" as "Corporate Headquarters, Marriott International, One Marriott Drive, Washington, D.C.  20058."[30]

> The "Careers" section of Marriott's website states, "The company is headquartered in Washington, D.C." and provides the following address:

---

[29]  Marriott makes much of the issue of extraterritoriality.  With respect to Marriott as a Defendant, there is no issue of extraterritoriality.  Marriott does not contend that this Court does not have personal jurisdiction over Marriott, and Plaintiffs have made their claims based upon transactions located in the District, not upon "business transactions in a foreign country," as claimed by Marriott.  (Marriott Mem. at 7).  Thus, Marriott's citation to the *Goshen* case as an analogy, for the proposition that the New York Consumer Protection Act "was not intended to police out-of-state transactions of New York companies" is inapposite.  The ruling in *Goshen*, moreover, was based on the language of the New York statute, which is restricted to transactions "in this state." The D.C. statute does not contain such restrictive language.  In addition, the *Goshen* court noted that its analysis "does not turn on the residency of the parties" and that the New York statute was not intended to "function as a *per se* bar to out-of-state plaintiffs' claims of deceptive acts leading to transactions within the state."  *Goshen v. Mutual Life Ins. Co. of New York*, 774 N.E.2d 1190, 1196 (N.Y. 2002).  The issue of extraterritoriality with respect to non-resident Plaintiffs is further discussed in section II.C., *infra*.

[30] *See* Exhibit 1A.

Marriott International, Marriott Drive, Washington, D.C.  20058.[31]

The "Investor Relations" section of Marriott's website states that Marriott is headquartered in Washington, D.C.[32]

The "Our Brands" section of Marriott's website contains a "Marriott International Factoid," which states: "Did you know Marriott International: Is headquartered in Washington, D.C."[33]

Marriott's press releases, which are available on its website, contain a final paragraph of summary information about Marriott, which says "The company is headquartered in Washington, D.C."[34]

Marriott's Annual Reports to shareholders for 2000 – 2004, which are all available on Marriott's website, provide its Corporate Headquarters address as "Marriott International, Inc., Marriott Drive, Washington, D.C.  20058."[35]

Marriott International's Form 8-K Report, submitted to the United States Securities and Exchange Commission on February 8, 2005, shows the Corporate Headquarters address as Marriott Drive, Washington, D.C.  20058.[36]

Marriott's representations that it is headquartered in Washington, D.C. appear repeatedly in the same website that potential guests use to make their reservations.  Consumers using the website are led to believe that Marriott is headquartered in the District.  Thus, the representations about Marriott's location, appearing on the same website where the reservations are made, provide a nexus between the transactions and the jurisdiction in which Marriott holds itself out as being located.

Marriott attempts to explain away all of these representations by saying that it "maintains a mailing address in the District of Columbia for business purposes."[37]  The actual address used by the Defendant is "Marriott Drive, Washington, D.C.  20058" which seems to point to a physical location not a Post Office Box.  Further, none of the website representations noted

---

[31] *See* Exhibit 1B.
[32] *See* Exhibit 1C.
[33] *See* Exhibit 1D.
[34] *See* Exhibit 1E.
[35] *See* Exhibit 1F.
[36] *See* Exhibit 1G.
[37] Marriott Mem. at 4.

above state that "Marriott Drive" is only a mailing address. As explained by Professor Dev, Marriott's "business purpose" in representing to the public that its Corporate Headquarters is in the District is to enhance its brand name status by having a location in the Nation's Capital.[38]

Marriott's repeated representations to its worldwide audience that it is headquartered in Washington, D.C. carries a simple message: Marriott may be found in Washington, D.C. where it enjoys all of the privileges and protections available in the capital of the world's superpower and where it may be held accountable for its actions.

Marriott suggests that "[p]olicy considerations militate strongly against giving this allegation the importance and weight that the Plaintiffs ask be accorded to it."[39] We disagree. For years, Marriott has wrapped itself in the District of Columbia flag for all to see. Policy considerations require that this Court hold Marriott accountable for its conduct under D.C. law.

> ### 2. Application of the Choice of Law Standard Calls for Application of D.C. Law

Marriott removed this matter from D.C. Superior Court to this Court based on diversity jurisdiction under the Class Action Fairness Act of 2005.[40] In *Williams v. First Government Mortgage and Investors Corp.,* the D.C. Circuit set forth the standard to be applied with respect to choice of law in a case involving the CPPA in a diversity action:

> Under D.C. law, courts must 'evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review.' *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995). 'Where each state would have an interest in the application of its own law to the facts . . .the law of the jurisdiction with the stronger interest will apply.' *Bledsoe v. Crowley*, 849 F.2d 639, 641 (D.C. Cir. 1988). 'If the interests of the two jurisdictions in the application of their law are equally weight, the law of the forum will be applied.' *Id.* at 641 n. 1 (citation omitted).[41]

---

[38] *See* Exhibit 2.
[39] *Id.* at 9.
[40] 28 U.S.C. § 1332(d).
[41] *Williams v. First Gov't Mortgage and Investors Corp.,* 176 F.3d 497, 499 (D.C. Cir. 1999). In *Wiggins v. Avco Financial Services,* this Court noted that the same principles apply in a CPPA case removed on federal question

The D.C. Circuit affirmed the District Court's ruling that the CPPA was the applicable law.  In *Williams,* a District resident sued a Maryland mortgage corporation.  The mortgage transaction had occurred in Maryland.  The District Court found that, even though Maryland had an interest in the case, the District of Columbia's interest in protecting its citizens from predatory loan practices was greater than the interest of Maryland.  The D.C. Circuit quoted the District Court's conclusion, that

> [B]y issuing a loan to a D.C. resident and taking his D.C. home as collateral, First
> Government *availed itself of and subjected itself to*, the consumer protection laws
> of the District of Columbia.[42]

Here, there are even stronger considerations mandating that the law of the District be applied.  First, with regard to a choice of law between U.S. law and Russian law, Marriott's website provides a choice of U.S. law.[43]  Second, the law of Russia is irrelevant with respect to Plaintiffs' claims.  Russia has absolutely no interest in Marriott's misrepresentations and omissions to its guests in the reservation process.  Third, as discussed below, the CPPA is a regulatory statute and Marriott is engaging in the types of practices that the CPPA is directed toward stopping.  Finally, and of most critical importance, Marriott, by its longstanding, widespread, and unambiguous representations that its corporate headquarters is located in the District, has "availed itself of and subjected itself to" the consumer protection laws of the District of Columbia.  Marriott's repeated representations that its headquarters are in the District, on the same website where reservations are made, provides a nexus between the transactions and this jurisdiction.  Moreover, the fact that Marriott makes these representations to obtain a business advantage provides a compelling reason for the District to enforce its law in this case.  Marriott

---

grounds.  62 F. Supp. 2d 90, 98 (D.D.C. 1999) (Finding that the CPPA applied to a loan transaction secured by the borrower's residence in the District, even though the transaction was consummated in Maryland).

[42]  176 F.3d at 499, quoting *Williams v. Cent. Money Co.,* 974 F. Supp. 22, 27 (D.D.C. 1997) (emphasis added).

[43]  *See* Exhibit 1J.

cannot have it both ways by using the District to gain an advantage while trying to thwart the District's laws.

### 3.    The Consumer Protection Procedures Act is a Regulatory Statute.

The purposes of the CPPA are to :

    (1)   assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices;

    (2)   promote, through effective enforcement, fair business practices throughout the community; and

    (3) educate consumers to demand high standards and seek proper redress of grievances.[44]

In addition, the statute provides that engaging in the enumerated unlawful trade practices "shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived, or damaged thereby . . ." [45]   This clearly shows that regulation of business practices is a major purpose of the statute given that it is the conduct itself that constitutes a violation, whether or not a consumer is actually deceived or misled.

Commenting on the regulatory purpose of the statute, the Court in *Williams* noted that "[i]f the CPPA did not apply to cases like this one, loan and mortgage companies could defeat those statutory purposes and evade D.C. consumer protection laws by locating themselves just across the District line from the D.C. citizens they seek as customers."[46]

Similarly, in this instance, Marriott is seeking to have it both ways.  Marriott wishes to gain a benefit from representing that it is headquartered in the District: the enhancement of its brand image by an association with the Nation's capital.[47]   This representation is part and parcel

---

[44]   D.C. Code § 28-3901.
[45]   D.C. Code § 28-3904.
[46]   974 F. Supp at 27.
[47]   *See* Declaration of Chekitan Dev, attached as Exhibit 2.

of the misrepresentations Marriott makes to consumers in the District and elsewhere.[48]   Marriott

has affiliated itself with the District in such a way that it should not be allowed to evade the

District's consumer protection laws by locating itself just across the District line.   Marriott

should not be permitted to pick and choose the ramifications of its representations that it is

headquartered in the District.   Marriott has, as this Circuit has observed in *Williams*, "*availed*

*itself of and subjected itself to the consumer protection laws of the District of Columbia*" by

those representations.[49]

Moreover, the District of Columbia has a compelling interest in regulating the conduct of

any corporation that professes such a close connection with the District, particularly when the

representation itself is false and misleading.   The fact that Marriott makes a false and misleading

representation about its location in the District provides the District with a greater interest than

any other jurisdiction in enforcing its law and policy with respect to consumer protection.

### 4. Marriott is Estopped From Denying it is Subject to the Laws of the District of Columbia.

Principles of equitable estoppel mandate that Marriott should be held accountable under

D.C. law.   "Equitable estoppel may be invoked only where there is a showing of conduct

amounting to a false representation or concealment of a material fact which was made with

knowledge of the actual facts and of the intent to induce the other party to act."[50]   Here, Marriott

has knowingly made false representations about its corporate headquarters location.   As is

discussed in the Affidavit of Chekitan S. Dev, Marriott's representation that it is headquartered

---

[48]   Among the unlawful trade practices listed in D.C. Code 28-3904 are representing that goods or services have a source that they do not have, and representing that the person has an affiliation or connection that the person does not have.   Plaintiffs have not alleged these unlawful practices in the First Amended Complaint.   However, now that Marriott's denial that it is headquartered in the District makes it clear that it has made false representations in that regard, Plaintiffs will likely wish to amend the Complaint to conform to the evidence.

[49]   176 F.3d at 499.

[50]   *Duke v. Am. Univ.,* 675 A.2d 26, 28 (D.C.C.A. 1996) (citation omitted).

in Washington, D.C. is designed to enhance its brand image. [51]  Thus, Marriott seeks to induce

consumers to choose Marriott properties based on a brand image which is enhanced by the false

representations Marriott has made about its relationship with the District of Columbia.

Under these circumstances, the elements for application of equitable estoppel are

satisfied.  Marriott should be held accountable for its false representations to consumers under

D.C. law.

### C.  Marriott's Attempt to Deny Non-Resident Plaintiffs Protection Under the CPPA Thus Throwing Them to the Mercy of Russian Courts Should be Soundly Rejected

Plaintiffs filed this case as a putative class action seeking recovery on behalf of

"themselves and all others similarly situated who have been harmed as a result of the actions of

Marriott, which constitute violations of the [CPPA]."[52]  Defendants challenge the extraterritorial

application of the CPPA to nonresident plaintiffs Shaw and Charness.[53]  Marriott contends,

without explanation or citation to authority, that Plaintiffs cannot properly bring a claim on

behalf of out-of-state and international plaintiffs because to do so would "undermine the

authority of other states and jurisdictions to enforce their own consumer protection laws."[54]

Marriott's preference, however, is to have its valued guests seek justice in Russian courts.  It is

clear, however, that the CPPA's protections are not limited to residents of the District of

Columbia and that it is entirely proper for the putative class to include both out-of-state and

international plaintiffs.  Moreover, barring individuals residing abroad would raise serious

problems under longstanding treaty obligations entered into by the United States.  We start with

---

[51] *See* Exhibit 2.
[52] Am. Compl. ¶ 63.
[53] Ms. Paliashvili is a permanent resident of the District.
[54] Marriott Mem. at 9-10.

those treaty obligations because their existence will inform the Court later when it examines the specific language of the CPPA.

> 1. **Extending the Protections of the CPPA to Plaintiffs Residing Abroad (Including Absent Class Members) Is Mandated By International Law and Treaty**

Marriott objects to what it contends is Plaintiffs' attempt to give extraterritorial effect to the CPPA. It asserts that individual plaintiffs (including one who is a permanent resident of the District) have inadequate contact with the District of Columbia to warrant protection under the CPPA.[55]

Marriott's attempt to read protection of non-residents out of the CPPA is seriously misplaced. Any reading of the CPPA must be informed by reference to the international treaty obligations of the United States. The United States has entered into bilateral treaties of Friendship, Commerce and Navigation with its principal trading partners. These treaties provide nationals of both countries access to each country's courts on terms no less favorable than those applicable to the nationals of the forum country. Under these treaties, a foreign plaintiff's right to pursue or have its rights pursued in a United States forum is equal to that of a United States citizen.

For example, Article IV.1 of the Treaty of Friendship, Commerce and Navigation with Japan[56] provides:

> Nationals and companies of either Party shall be accorded national treatment and most-favored nation treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the other Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights. It is understood that companies of either Party not engaged in activities

---

[55] Plaintiff Paliashvili is a D.C. resident, whose home and business address are the same. Plaintiffs will be prepared to offer proof at trial that she is a green card holder. Plaintiffs do not believe Marriott is supporting that the protections of the CPPA would not extend to D.C. residents who are green card holders.
[56] Treaty of Friendship, Commerce and Navigation, April 2, 1953, U.S.-Japan, 4 U.S.T. Art VI.1.

within the territories of the other Party shall enjoy such access therein without registration or similar requirements.

Article XXII (1) defines national treatment:

The term "national treatment" means treatment accorded within the territories of a Party upon terms no less favorable than the treatment accorded therein, in like situations, to nationals, companies, products, vessels or other objects, as the case may be, of such Party.[57]

Treaties of Friendship, Commerce and Navigation between the United States and numerous other countries include substantially similar provisions granting national treatment and thereby mandating equal access to courts.[58]

A number of reported class actions include foreign plaintiffs among the absent class members.[59]  Under our treaty obligations, it is immaterial that foreign plaintiffs may have little or no connection with the situs of the litigation beyond the litigation itself.  Further, the presence of these plaintiffs in the putative class does not present a jurisdictional problem.  In *Phillips*

---

[57] *Id*., Art XXII (1).

[58] *See* Treaty of Friendship, Commerce and Navigation, Jan. 21, 1950, U.S.-Ir. (Ireland), Art. VI, 1 U.S.T. 785; Treaty of Friendship, Commerce and Navigation, Oct. 29, 1954, U.S.-F.R.G. (Federal Republic of Germany), Art. VI, 7 U.S.T. 1839; A Convention to Regulate Commerce between the Territories of the United States and of his Britannick Majesty, July 3, 1815, U.S.-Gr. Brit. (Great Britain), Art. 1, 8 Stat. 228; Treaty of Friendship, Commerce and Navigation, July 27, 1853, U.S.-Arg. (Argentina), Art. VIII, 10 Stat. 1005; Treaty of Friendship, Commerce and Consular Rights, June 19, 1928, U.S.-Aus. (Austria), Art. I, 47 Stat. 1876; Treaty of Friendship, Establishment and Navigation, Feb. 21, 1961, U.S.-Belg. (Belgium), Art. 3, 14 U.S.T. 1284; Treaty of Friendship Commerce and Navigation, Nov. 4, 1946, U.S.-P.R.C. (Peoples Republic of China), Art. VI.4, 63 Stat. 1299; Treaty of friendship, Commerce and Navigation, July 10, 1851, U.S.-Costa Rica, Art. VII, 10 Stat. 916; Treaty of Friendship, Commerce and Consular Rights, Feb. 13, 1934, U.S.-Fin. (Finland), Art. I, 49 Stat. 2659; Convention of Establishment, Nov. 25, 1959, U.S.-Fr. (France), Art. III, 11 U.S.T. 2398; Treaty of Amity, Economic Relations and Consular Rights, Aug. 15, 1955, U.S.-Iran, Art. III, 8 U.S.T. 899; Treaty of Friendship, Commerce and Navigation, Aug. 23, 1951, U.S.-Isr. (Israel), Art. V, 5 U.S.T. 550; Treaty of Friendship, Commerce and Navigation, Nov. 28, 1956, U.S.-Korea, Art. V, 8 U.S.T. 2217; Treaty of Friendship, Commerce and Navigation, Aug. 8, 1938, U.S.-Liber. (Liberia), Art. I, 54 Stat. 1739; Treaty of Friendship, Establishment and Navigation, Feb. 23, 1962, U.S.-Lux. (Luxemburg), Art. III.2, 14 U.S.T. 251; Treaty of Friendship, Commerce and Navigation, March 27, 1956, U.S.-Neth. (Netherlands), Art. V.1, 8 U.S.T. 2043; Treaty of Friendship, Commerce and Navigation, June 5, 1928, U.S.-Nor. (Norway), Art. I, 47 Stat. 2135; Treaty of Amity, Economic Relations and Consular Rights, Dec. 20, 1958, U.S.-Oman, Art. III.2, 11 U.S.T. 1835; Treaty of Friendship and Commerce, Nov. 12, 1959, U.S.-Pak. (Pakistan), Art. V, 12 U.S.T. 110; Treaty of Friendship, Commerce and Navigation, Feb. 4, 1859, U.S.-Para. (Paraguay), Art. IX, 12 Stat. 1091; Treaty of Friendship and General Relations, July 3, 1902, U.S.-Spain, Art. VI, 33 Stat. 2105; Convention of Friendship, Reciprocal Establishments and Commerce, Nov. 25, 1850, U.S.-Switz. (Switzerland), Art. I, 11 Stat. 587; Treaty of Friendship, Commerce and Navigation, Feb. 2, 1948, U.S.-Italy, Art. Art. V.4, 63 Stat. 2255.

[59] *See Infra* n. 82.

18

*Petroleum v. Shutts*,[60] the Supreme Court held that "a forum state may exercise jurisdiction over the claims of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant."[61]   The *Shutts* opinion is also relevant because it addressed another challenge raised by Marriott, the inclusion of international plaintiffs in the putative class.  In *Shutts*, the Supreme Court noted that the class members resided "in all 50 States, the District of Columbia, and several foreign countries."[62]

>        **2.     The Language of the CPPA is Consistent with Our International
>                Obligations and Does Not Limit Its Protections to District of
>                Columbia Residents**

The CPPA creates a cause of action to be brought by "[a] person, whether acting for the interests of itself, its members, or the general public."[63]   The statute defines "person" without reference to residency, as "an individual, firm, corporation, partnership, cooperative, association, or other organization, legal entity, or group of individuals however organized."[64]   Nothing in either the language of the statute, or its application by courts, supports the conclusion that its protections are only afforded to D.C. residents. To the contrary, the CPPA provides that it "shall be construed and applied liberally to promote its purpose."[65] The objectives of the Statute are laid out as follows:

>        (1) assure that a just mechanism exists to remedy all improper trade practices and
>        deter the continuing use of such practices;
>
>        (2) promote, through effective enforcement, fair business practices throughout the
>        community; and

---

[60] 472 U.S. 797 (1985).

[61] *Id.* at 811.

[62] *Id.* at 799.

[63] D.C. Code § 28-3901.

[64] *Id.* 28-3901(a)(1).

[65] *Id.* § 28-3901(c). This language was added in the changes made to the CPPA by D.C. Law 13-172, October 2000, specifically to "provide a rule of statutory construction for the consumer protection law."

> (3) educate consumers to demand high standards and seek proper redress of grievances.[66]

The language does not mandate, encourage, or even suggest preferential treatment for District residents. Two of the three stated objectives focus on regulating business conduct rather than on consumers directly. Further, Marriott's argument cannot withstand even a common sense analysis. Every day, thousands of people from all over the United States and the world come to the District for work or tourism, or conduct business with District businesses from points near and far. If the Statute was meant to protect only actual residents of the District of Columbia, it would say so, and there would not be caselaw applying the CPPA to nonresident claims.[67] Most importantly, the language of the CPPA is in complete harmony with our nation's international obligations described above.

### 3. Courts Apply the CPPA to Nonresident Claims

Perhaps the simplest proof that the CPPA is not limited to D.C. resident plaintiffs can be found in the reported decisions of CPPA cases that have been brought by nonresident plaintiffs.[68] Marriott's interpretation of the statute to exclude non-resident plaintiffs flies in the face of not only the statutory language itself, but the judicial application of the law. The only case Marriott points to for support of its position is the first of two Court of Appeals decisions in *Jackson v. Culinary School of Washington*.[69] In *Culinary School*, the trial court held that the students'

---

[66] *Id.* § 28-3901(b)(1)-(3).

[67] Marriot has provided the Court with a copy of a 1976 Committee Report on Bill 1-253, the enabling legislation for the CPPA, which states that the bill is "to provide consumers in the District with procedures for the redress of improper trade practices, and other purposes." This language, however, does not appear in the codified version of the statute and, as noted above, neither the "purpose" or "definitions" in the statute contain any limiting language with respect to D.C. residents. Moreover, cases have been brought under the statute in which Plaintiffs were non-residents, as discussed herein.

[68] *See, e.g. Kopff v. World Research Group LLC*, 298 F. Supp. 2d 50 (D.D.C. 2003)(diversity jurisdiction); *Dorn v. McTigue*, 157 F. Supp. 2d 37 (D.D.C. 2001)(same); *Jackson v. Culinary School of Washington*, 788 F. Supp. 1233 (D.D.C. 1992)(putative class action).

[69] 27 F.3d 573 (D.C. Cir. 1994).

claims presented a sufficient nexus to assert a claim under the CPPA.[70]  Marriott's analysis of the *Culinary School* decisions is misleading by omission.  The plaintiffs in *Culinary School* were students from all over the country who enrolled in a school that closed down after engaging in unscrupulous business practices.  The students sued the school and their various lenders that provided loans to students to attend the school. The loan companies were in Virginia, Ohio, Nebraska, Wisconsin and Texas.[71]  Neither panel of the Court of Appeals held that the CPPA did not apply to non-resident plaintiffs.  Instead, they held that declaratory relief on the issue was not appropriate because of the fact-specific issues involved.  Both panels refrained from deciding whether the CPPA covered a certain of the students' claims against the lenders.  In the panel opinion cited by Marriott, before the case went up to the Supreme Court, the panel noted: "we find it inadvisable to make pronouncements on the scope or application of D.C. law."[72] Similarly, when the case came back from the Supreme Court on remand, the second panel held that it could not decide whether D.C. law applied to the claims against the lenders, many of which had forum selection clauses in their contracts, because the district court had not fully adjudicated the issue at that point in the case: "a declaration of District Columbia law on the current record of this case borders dangerously on an advisory opinion."[73] While the Court of Appeals criticized the trial court's truncated analysis of the choice of law issues presented in the case, *Culinary Institute* does not stand for the proposition that nonresident plaintiffs are excluded from the CPPA's protection.  Indeed, in *Culinary Institute*, the putative class was composed of

---

[70] *Culinary School*, 788 F. Supp. 1233, 1252 (D.D.C. 1992).
[71] *Culinary School*, 59 F.3d 254, 256 (D.C. Cir. 1995).
[72] *Culinary School*, 27 F.3d at 575
[73] *Culinary School*, 59 F.3d 254, 256 (D.C. Cir. 1995).

students from Virginia, Florida, Maryland, Arkansas, Utah, Kentucky, Georgia, the District and elsewhere.[74]

Applying the protections of the CPPA to nonresident plaintiffs is also consistent with the approach taken by numerous courts in other states, which have certified classes consisting of nonresidents in consumer protection cases, including cases in New York,[75] California[76] and Illinois.[77] For example, recently in *O'Neill v. St. Jude Med., Inc.,*[78] the court denied a motion to dismiss a class action with international plaintiffs brought under Minnesota's consumer protection laws.

As discussed above, the inclusion of nonresident plaintiffs also does not present a jurisdictional problem.[79] In *Shutts*, the Supreme Court held that notice and failure to opt out were sufficient to exercise personal jurisdiction over nonresident absent class members.[80] The court further held that it was necessary to fashion safeguards for the absent plaintiffs' rights, including adequate representation, adequate notice, and an opportunity to opt out.[81]

The same rationale applied to the inclusion of international plaintiffs. There is no rule of law prohibiting the inclusion of international putative class members. In fact, a number of reported class actions include foreign plaintiffs among the absent class members and, to the contrary, international plaintiffs are often included in class actions.[82]

---

[74] *Culinary School*, 27 F.3d 573, 581 (D.C. Cir. 1994).

[75] *Weinberg v. Hertz Corp.*, 116 N.Y. App. Div. 2d 1 (1986)(Class certification granted in case brought against Hertz for overcharges under New York consumer protections statute).

[76] *Wershba v. Apple Computer*, 91 Cal. App. 4th 224 (6th Dist. 2001)(Certifying nationwide class under California consumer protection law for all consumers affected by Apple's breach of promise to provide technical support).

[77] *Bunting v. Progressive Corp.*, 809 N.E.2d 225, (2004)(Applying Illinois consumer protection statute to non-residents but noting some Illinois caselaw refusing to do so); *see also Tykla v. Gerber Products*, 182 F.R.D. 573 (N.D.Ill.1998)(Certifying class and refusing to limit to state residents).

[78] No. C8-04-126 2005 WL 1114469 (Minn. Dist. Ct. Apr. 28, 2005), attached as Exhibit 3

[79] *See Shutts*, 472 U.S. 797 (1985).

[80] *Id.*

[81] *Id.*

[82] *See e.g.*, *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779 (6th Cir. 1996)(noting in appeal on attorneys' fees that appeals arose from "worldwide class-action settlement involving an allegedly defective heart valve implant"); *In re Royal*

### D.  Marriott's Forum Non Conveniens Argument Is Without Merit

This case should not be dismissed in favor of a Russian forum under the *foreign non conveniens* doctrine.  In support of its argument, Marriott contends that the case centers around up-charges to hotel bills in Russia.  This is simply incorrect.  The crux of Plaintiffs' claims is that Marriott, acting as D.C.-based company, told prospective guests that they would pay certain rates for accommodations at its Moscow hotels, intending that these guests would rely on that information.  Marriott made these representations with full knowledge that they were false and that, in fact, these guests would pay *significantly more* for their rooms, services, food, and taxes at the Marriott hotel properties.  Not only did Marriott make these false representations, but it profited from them, in the form of revenues derived from the operations of the Moscow hotel properties.  The location of the hotel is frankly irrelevant to this dispute.  It is Marriott's deception, made as a D.C. company, which led to this litigation.

Turning to the elements of a *forum non conveniens* analysis, Marriott has not met its burden.  Marriott has the burden of showing that there is another forum adequate to Plaintiffs' case.  *TMR Energy LTd. V. State Property Fund of Ukraine.* [83]  In *TMR Energy*, the Court held that the trial court did not err when it refused to dismiss a case against a Ukrainian state agency under the doctrine of *forum non conveniens*.  The Court held that the proposed international fora

---

*Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 355 (D. Md. 2004)(denying motion to dismiss claims of foreign class members who purchased on foreign exchange); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 126 (S.D.N.Y. 2001)(jurisdiction proper where named plaintiffs were foreign and it was possible that entire class would be foreign)*; In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 9 n.11 (D.D.C. 2000)(holding that defendants could not challenge subject matter jurisdiction over foreign class members who purchased securities on American exchanges); *In re Holocaust Victims Asset Litig.*105 F. Supp. 2d 139 (E.D.N.Y. 2000)(approving worldwide settlement); In *re Michael R. Milken and Assoc. Sec.*, No. 92 Civ. 1151, 1993 WL 413673 (S.D.N.Y. Oct. 07, 1993)(approving settlement of worldwide class); *In re Pizza Time Theatre Sec. Litig.,* 112 F.R.D. 15, 20 (N.D. Cal. 1986)(applying *Shutts* analysis to *class* including members from 28 states and 15 foreign countries); *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. 24, 32 (S.D. Cal. 1975)(named plaintiff class reps are "foreign entities that operate abroad.").
[83] 411 F.3d 296, 303 (D.C. Cir. 2005).

were not adequate because only a court of the United States could attach property of a foreign nation which is located in the United States.[84]  This case presents an even clearer issue. Plaintiffs seek to recover against a United States corporation and ultimately attach that corporation's assets located in the United States.  Even if Marriott were to consent to jurisdiction in Russia, Plaintiffs would have the added expense of having to seek ultimate enforcement of a Russian court award here.  Moreover, Marriott's website says that it is governed by United States law.[85]  There is no rationale for this case to be heard in a Russian court.

In order to prove there is an adequate alternative forum, Marriott must prove that Russian courts would have personal jurisdiction over the named defendant, not its possible co-conspirators, to hear the same claim that is being brought by Plaintiffs in this action.  In its Motion, Marriott has not even alleged, let alone supported with any evidence, that Russian courts would have jurisdiction over Marriott on this claim.

In its brief, and through the supporting Declaration of William E. Butler, Marriott sets out to prove that foreigners could sue the Moscow hotels in Moscow.  Marriott's expert on the issue, Mr. Butler, opines that:  "Foreign citizens have the right to bring suit in [Russian courts] against a Russian judicial person (which I assume for purposes of this Declaration, the relevant Marriott hotels in Moscow to be)."[86]  Mr. Butler then goes on to address the propriety of the use of "pre-arranged monetary units and the related requirements of disclosure imposed on businesses *in Russia.*"[87]  Interesting as this may be, it is of no consequence.  Plaintiffs do not question the hotels' right, under Russian law and custom, to charge whatever it will.  Plaintiffs do attack, however, Marriott's deception of its customers and Plaintiffs make that attack at the source, as

---

[84] *Id.*
[85] *See* Colson Dec. Ex. 1J.
[86] Butler Dec. ¶ 9.
[87] Butler Dec. ¶ 11.

identified by Marriott itself, of that deception.  For this reason, the witnesses and evidence will be found here, and the convenience of the parties will be better served by keeping the case in this forum.  All of the evidence in this case is in English.  The Marriott reservation website, terms and conditions, reservation confirmations, and final bills issued by the hotel are in English.

For the same reasons, the public interest factors weigh against dismissal.  It will not be unduly burdensome for the court in this District to hear a case brought by a District resident against a company which proclaims itself to be located in the District.  Finally, this case is brought under the CPPA, not under Russian law, and any argument that the court will be forced to consider Russian law simply misconstrues Plaintiffs' claims.

### E.  Plaintiffs' Unjust Enrichment Claim Should Not Be Dismissed Under the Voluntary Payments Doctrine

Marriott's contention that the voluntary payment doctrine should be applied to Plaintiffs' claims is completely misguided and without merit.  As noted in the single D.C. case that discusses the doctrine, "[t]he voluntary payment doctrine raised by defendants is an old common law doctrine rarely cited by courts in modern, complex transactions."[88]  More importantly, "the voluntary payment doctrine derives from contract or quasi-contract and is a defense when one is being sued by another on a contract between two partners."[89]  Here, Plaintiffs are not suing based on a contractual or quasi-contractual duty, but for violations of a statute.

Even if the voluntary payment doctrine were applicable, "[w]hen intentional misconduct is alleged on the part of a party seeking to obtain the benefits of the voluntary payment doctrine,

---

[88] *Avianca v. Corriea*, 1992 U.S. Dist. LEXIS 4709, * 20 (D.D.C. 1992), attached as Exhibit 4.
[89] *Id.* at * 26 (Rejecting application of voluntary payment doctrine where lawsuit was not based on breach of contract but on tort).

the equities sway against its application."[90]   Plaintiffs have alleged that Marriott's conduct was intentional.

Finally, the doctrine does not apply if the payment "is not truly voluntary."[91] This includes situations in which a payment is made under coercion or duress.[92] "Duress . . . need not reach the level of disaster to preclude application of the voluntary payment doctrine."[93] Certainly, anyone would be hard-pressed to suggest that Plaintiffs' payment of their hotel bills was truly voluntary. Any reasonable person trying to check out of a hotel in a foreign country would find it difficult if not impossible, under the circumstances, to refuse to pay their bill with no knowledge of what consequences such an action would engender. In addition, unless an individual checking out of one of the Russian hotels had access to a currency converter, he or she would not be able to discern on-the-spot how much the overcharge was at the 32 ruble per dollar rate, as opposed to what the charge would be at the official exchange rate. As alleged in the First Amended Complaint, Plaintiffs generally did not know the amount of the upcharge until they received their credit card bills.

Finally, even if the voluntary payment doctrine is available to Marriott, raising that defense is laden with numerous factual issues that cannot be resolved in the context of the pending motion.

## III.    CONCLUSION

Plaintiffs have alleged a good cause of action that focuses entirely upon Marriott's false and misleading statements and omissions made here while booking reservations for its Moscow hotel properties. Those false and misleading statements and omissions are actionable without

---

[90]  *Id.* at * 24.
[91]  *Id.* at * 24.
[92]  *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 668 (7th Cir. 2001).
[93]  *Id.* at 669.

reference to Russian law. Since Plaintiffs' cause of action arises out of Marriott's domestic

activity and under domestic law, the proposition that this case should be adjudicated in Russia is

absurd, particularly in light of the fact that Marriott's reservations website contains a United

States choice of law provision. Marriott now admits that its longstanding, widespread, and

unambiguous practice of claiming that it is headquartered in Washington, D.C. is false. Because

of these false representations, designed to enhance Marriott's brand image, the District of

Columbia has a compelling interest in applying the CPPA to Marriott's conduct. Nothing in the

language of the CPPA withholds its application from non-residents. Such application is

compelled by long-standing treaty obligations of the United States and is consistent with

numerous court decisions here and elsewhere. Marriott's Motion to Dismiss should be denied.


Dated:  August 3, 2005                                    Respectfully submitted,



                                                          _____/s/ Paul D. Cullen, Sr._____
Of Counsel:                                               Paul D. Cullen, Sr., D.C. Bar No. 100230
                                                          Daniel E. Cohen, D.C. Bar No. 414985
                                                          Susan Van Bell, D.C. Bar No. 439972
Mark W. Borghesani, Esq                                   THE CULLEN LAW FIRM, PLLC
D.C. Bar No. 426734                                       1101 30th Street, N.W., Suite 300
19 Sivtsez Vrazhek Per., kv. 10                           Washington, D.C.  20007
Moscow 119003 Russia                                      (202) 944-8600 (Telephone)
+7-916-640-0290 (Telephone)                               (202) 944-8611 (Telecopier)
                                                          *Attorneys for Plaintiffs*