**EXHIBIT 4**

1992 U.S. Dist. LEXIS 4709, *

AVIANCA, INC., et al., Plaintiffs, v. MARK F. CORRIEA, et al., Defendants.

Civil Action No. 85-3277 (RCL)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

1992 U.S. Dist. LEXIS 4709

April 13, 1992, Decided
April 13, 1992, Filed

**SUBSEQUENT HISTORY:** [*1] As Amended March 16, 1993. Counsel Amended February 14, 1996.

**DISPOSITION:** GRANTED IN PART and DENIED IN PART

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff corporation and defendant law firm filed cross-motions for summary judgment in the corporation's claim for alleged fraudulent actions taken by the law firm and one of its attorneys. A partner of the law firm also filed a motion to be dismissed from all counts of the complaint.

**OVERVIEW:** The court had previously held that the law firm breached its fiduciary duty to the corporation because, without full and adequate disclosure, one of the law firm's attorney participated in transactions in a variety of capacities that compromised his position as the corporation's attorney and may have earned him and his law firm financial benefits at the corporation's expense. The parties filed cross-motions for summary judgment on the remaining claims and a partner of the law firm sought a dismissal from all counts of the complaint. The court granted in part and denied in part the parties motions. The court found that the issue of damages for the breach of fiduciary duty was for the jury to decide. The court found that a reasonable jury could differ on the issue of whether the attorney's conduct was fraudulent. The court granted the law firm's motion with regard to a transaction with which the corporation had no involvement because there was no showing that the corporation would have profited from the transaction but for the attorney's abuse. The court denied the partner's motion because of his knowledge and acquiescence to all of the attorney's actions.

**OUTCOME:** The court granted in part and denied in part the cross motions for summary judgment filed by the law firm and the corporation in an action by the corporation against the law firm for alleged fraudulent acts committed by an attorney at the law firm. The court denied the motion file by a partner at the law firm because of his knowledge and acquiescence of the actions.

**CORE TERMS:** summary judgment, lease, voluntary payment, breach of fiduciary duty, counterclaim, aircraft, indemnity, law firm, withdrawal, partner, fiduciary duty, disgorgement, breached, lawsuit, mail, reasonable jury, cross-motion, misconduct, ratification, inflated, ongoing, compromised, subsidiary, planes, owed, fraudulent, defrauding, intend, respect to count, legal fees

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard
HN1 To succeed under Fed. R. Civ. P. Rule 56, a party must demonstrate that there remain no genuine issues of material fact and must then prevail under the law, even though all inferences are drawn in favor of the party opposing the motion. Courts must be particularly wary of granting summary judgment when, intent is at issue. In addition, a court should generally refrain from deciding a case when a reasonable jury could draw divergent inferences that would affect the outcome of the case. Where the testimony of the one witness is the heart of the case, the jury should be permitted wide latitude to assess his credibility and to draw reasonable inferences. The court also notes that claims of fraud must

be proved by clear and convincing evidence, a difficult standard to meet at summary judgment. More Like This Headnote | Shepardize: Restrict By Headnote

Legal Ethics > Client Relations > Conflicts of Interest
**HN2** A client can not recover for an attorney's conflict of interest if the client is not harmed. More Like This Headnote

Torts > Damages > Damages Generally
**HN3** When a defrauding party earns more than the defrauded party loses, damages are the amount of the defendant's profit. More Like This Headnote

Torts > Damages > Damages Generally
**HN4** A fiduciary who uses his or her position to obtain secret profits is generally required to cede any such profits to the party whose loyalty is compromised. More Like This Headnote

Torts > Business & Employment Torts > Deceit & Fraud
**HN5** In order to succeed on a claim of fraud, a party must prove some damages that resulted from reliance on defendants' fraud. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses
**HN6** A person who volunteers payment under a claim of right with full knowledge of all relevant facts cannot then demand the payment back; mistake of law does not permit recovery, while mistake of fact does. More Like This Headnote

Contracts Law > Consideration > Enforcement of Promises
Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses
**HN7** One cannot take a "gift" back once given. The voluntary payment doctrine is thus a rule against welshing. More Like This Headnote

Contracts Law > Contract Modifications
Contracts Law > Contract Conditions & Provisions > Waivers
Contracts Law > Performance > Accord & Satisfaction
**HN8** The voluntary payment doctrine is most commonly applied in situations where the terms of an initial contract have not been fulfilled by a seller/payee (for whatever reason) and a subsequent agreement, one that decreases the burden or increases the compensation to the seller/payee without consideration, replaces it; such agreements are common among parties who prefer compromise to litigation if possible. Once the subsequent agreement has been performed, a payor cannot then sue on the initial contract to get his payments back; the payor is deemed to have waived its rights. More Like This Headnote

Contracts Law > Contract Conditions & Provisions > Express Warranties
**HN9** The voluntary payment doctrine does not generally apply, however, when a party has expressly reserved a right to take some legal action or when the party has paid under protest. More Like This Headnote

Contracts Law > Contract Modifications
**HN10** When intentional misconduct is alleged on the part of a party seeking to obtain the benefits of the voluntary payment doctrine, the equities sway against its application. In some situations, a party may have little choice but to continue fulfilling its obligations under a contract due to business necessity; in such cases, the payment is truly not voluntary. More Like This Headnote

Contracts Law > Remedies > Rescission & Redhibition
**HN11** A party has a choice of remedies when a contract is at issue. The party may either affirm the contract and sue for damages or seek rescission and recover special damages only. Even after a fraud has been discovered, plaintiffs may still affirm the transaction and seek damages for misrepresentation. More Like This Headnote

Contracts Law > Remedies > Ratification
Ratification requires that a party intend to affirm the contract with full knowledge of all

HN12± material facts and circumstances. More Like This Headnote

Contracts Law > Remedies > Ratification
HN13± The doctrine of ratification does not apply unless the intent to ratify is crystal clear. Defendants bear a heavy burden to show that the intent to ratify was unequivocal. More Like This Headnote

Contracts Law > Contract Conditions & Provisions > Indemnity
HN14± Indemnification agreements are to be read narrowly in order to insure that no party is assuming burdens which they did not intend. More Like This Headnote

Contracts Law > Defenses > Public Policy Violations
Torts > Negligence > Defenses > Exculpatory Clauses
HN15± New York courts also may interpose the barrier of public policy when an exculpatory clause could be interpreted to permit fraudulent or malicious conduct. More Like This Headnote

Securities Law > Bases for Liability > Racketeer Influenced & Corrupt Organizations
Evidence > Procedural Considerations > Inferences & Presumptions
HN16± To establish a claim under the Racketeer Influenced and Corrupt Organization Act § 1962 (c) (RICO), plaintiffs must show (1) the existence of an enterprise which affects interstate or foreign commerce; (2) that defendant was "employed by" or "associated with" the enterprise; (3) that defendant participated in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity. In addition, plaintiffs must demonstrate that the violation of RICO caused an injury to plaintiffs' business or property. Defendants' objections center on the requirement of injury and on the fourth element, that plaintiffs establish a pattern of racketeering activity. More Like This Headnote

Criminal Law & Procedure > Criminal Offenses > Fraud > Mail Fraud
Securities Law > Bases for Liability > Racketeer Influenced & Corrupt Organizations
Evidence > Procedural Considerations > Inferences & Presumptions
HN17± To show a pattern of racketeering injury, plaintiffs must prove that defendants committed multiple predicate acts of mail and wire fraud. To establish mail or wire fraud, plaintiffs must show a scheme to defraud and the use of the mails or interstate wires to execute the scheme. Indeed, the use of the mails need not be an essential element of the scheme under Racketeer Influenced and Corrupt Organization Act § 1341; a defrauding party need only use the mails or interstate wires as an incident to or a step in the execution of the scheme. The mailing or wire transmission may contain no false information, yet still be the basis for a mail or wire fraud count. In addition to the predicate acts, plaintiffs must meet the vague requirement of "continuity plus relationship" among the predicates that would constitute a pattern of racketeering activity. More Like This Headnote

Legal Ethics > Client Relations > Attorney Fees
Torts > Malpractice Liability > Misconduct Generally
HN18± The general rule is that an attorney need only return fees for the representation which was compromised by a breach of fiduciary duty or by fraud. More Like This Headnote |
Shepardize: Restrict By Headnote

**COUNSEL:**
FOR FULBRIGHT/JAWORSKI, intervenor: Frederick Robinson, Esquire, Richard William Beckler, FULBRIGHT & JAWORSKI, L.L.P, Washington, DC.

FOR MARK F. CORRIEA, defendant: Robert Francis Reklaitis, HOPKINS & SUTTER, Washington, DC. John Alan Galbraith, Michael Shobe Sundermeyer, John Kazar Villa, WILLIAMS & CONNOLLY, Washington, DC. John H. Sellman, John H. Spellman, Maureen Duignan, HOPKINS & SUTTER, Washington, DC. FOR CORRIEA & TIERNEY, MARTIN J. TIERNEY, JR., BARBARA HARRISON, as Personal Representative for the Estate of Mark F. Corriea, defendants: Robert Francis Reklaitis, HOPKINS & SUTTER, Washington, DC. Michael Shobe Sundermeyer, John Kazar Villa, WILLIAMS & CONNOLLY, Washington, DC. John H. Sellman, John H. Spellman, Maureen Duignan, HOPKINS & SUTTER, Washington, DC. FOR JULIO MARIO SANTODOMINGO, ANDRES JOHANNES CORNELISSEN, defendants:

Michael Shobe Sundermeyer, John Kazar Villa, WILLIAMS & CONNOLLY, Washington, DC. John H. Sellman, John H. Spellman, Maureen Duignan, HOPKINS & SUTTER, Washington, DC.

FOR MARK F. CORRIEA, MARTIN J. TIERNEY, JR., counter-claimants: John H. Sellman, John H. Spellman, Maureen Duignan, HOPKINS & SUTTER, Washington, DC. FOR CORRIEA & TIERNEY, ALFREDO VELEZ DE LA ROSA, counter-claimant: John H. Sellman, John H. Spellman, Maureen Duignan, HOPKINS & SUTTER, Washington, DC. FOR JULIO MARIO SANTODOMINGO, counter-claimant: Michael Shobe Sundermeyer, John Kazar Villa, WILLIAMS & CONNOLLY, Washington, DC. John H. Sellman, John H. Spellman, Maureen Duignan, HOPKINS & SUTTER, Washington, DC. FOR BARBARA HARRISON, as Personal Representative for the Estate of Mark F. Corriea, counter-claimant: Robert Francis Reklaitis, HOPKINS & SUTTER, Washington, DC. John Alan Galbraith, Michael Shobe Sundermeyer, John Kazar Villa, WILLIAMS & CONNOLLY, Washington, DC. John H. Sellman, John H. Spellman, Maureen Duignan, HOPKINS & SUTTER, Washington, DC.

FOR AVIANCA, INC., AEROVIAS NACIONALES DE COLOMBIA, S.A., SOCIEDAD AERONAUTICA DE MEDELLIN, HELICOPTEROS NACIONALES DE COLOMBIA, S.A., counter-defendants: Mac Simmion Dunaway, George D Billock, Gary Evans Cross.

**JUDGES:** Lamberth

**OPINIONBY:** ROYCE C. LAMBERTH

**OPINION:** MEMORANDUM OPINION

This case returns to the court once again on the parties' cross-motions for summary judgment on various counts of the complaint and the counterclaim. On February 6, 1989, the court granted summary judgment for the plaintiffs on both count I of the complaint, holding that the defendants had breached their fiduciary duty to plaintiffs, and count I of the counterclaim, holding that defendants' allegation of defamation was unfounded because the statements at issue were true. See Avianca, Inc. v. Corriea, 705 F. Supp. 666 (D.D.C. 1989); Memorandum Opinion of June 3, 1991 (C.A. No. 85-3277) (rejecting defendants' motion for reconsideration). Now the parties have filed cross-motions for summary judgment on counts II and III (fraudulent misrepresentation and RICO violations) of the complaint and counts VII and VIII (attorneys' fees and the applicability of certain indemnity clauses) of the counterclaim. In an "additional" motion for summary judgment, defendant Martin Tierney also seeks dismissal as a defendant from all counts of the complaint.

I. Facts

After six years of voluminous discovery [*2] and contentious litigation, the facts of this case have become relatively clear. Plaintiff Aerovias Nacionales de Colombia, S.A. (hereinafter "Avianca") is a Colombian corporation that operates domestic and international airlines in Colombia. Avianca owns either all or a majority of the shares of the other plaintiffs, which include Avianca, Inc., the Colombian parent company's agent in the United States; Helicol, a Colombian corporation operating helicopters and fixed-wing aircraft in South America; SAM, a domestic Colombian air carrier; and Norasco, a wholly-owned subsidiary incorporated in the United States that permits Avianca to take advantage of certain tax benefits. The defendants are Avianca's former attorneys, the law firm of Correia & Tierney and the two partners of that firm. Defendant Mark Correia personally performed virtually all of the work that the firm did for Avianca. Andres Cornelissen, former president of Avianca, was also a defendant, but the court has entered a default judgment against him; the damages that he will be liable for, if any, remain to be determined.

From 1980 to 1985, at least in part because of the influence of Cornelissen, defendant Correia, and [*3] later his law firm of Correia & Tierney, performed legal services for Avianca in aircraft lease transactions, corporate financing, and government relations matters. Over the five-year period, Correia participated in 25 to 30 lease transactions; plaintiffs do not cite any specific problems with Correia's work in most of these transactions. Beginning in 1985, however, after a transition in Avianca's leadership, Avianca officials began an investigation which revealed some suspicious and potentially illegal activity stemming from the relationship between Cornelissen and Correia and focusing on Correia's representation of Avianca. This investigation identified three specific transactions during which Correia, as the court has held, breached his fiduciary duty to the plaintiffs. See Avianca, Inc., 705 F. Supp. at 678 - 82. These three transactions are the foundation of this lawsuit.

A. Unauthorized use of Norasco funds

Correia filed the incorporation papers for Norasco on behalf of Avianca in 1980 and agreed to serve as Norasco's president and attorney. Avianca instructed Correia to register title to the company in Correia's name, but required him to endorse the [*4] shares over to Avianca's American subsidiary. From 1980 to 1982, Correia admits that he withdrew over $ 240,000 of Norasco's funds in checks payable either to himself, his law firm, or Fund Sources International ("FSI"), a company wholly owned by him. Correia often used the money for his own personal expenses, such as repairs on a Rolls Royce which he and Cornelissen jointly owned. Correia has now repaid most of the money which he took, but the parties still disagree as to how much interest he owes.

B. The Faucett Transaction

In 1981, Cornelissen, then executive vice-president of Avianca, asked Correia to form a closely held corporation for the sole benefit of Cornelissen. Correia incorporated American Aerospace, Limited ("AAL") in Bermuda and listed himself as president, chairman, and attorney. By request of Cornelissen, Correia kept secret that the corporation was actually owned by Cornelissen. In 1982, AAL and Correia's company FSI arranged a lease agreement for two Boeing 707 aircraft with Faucett Airlines, a Peruvian company. AAL and FSI leased the planes from two other companies, Atasca and Madelaine, and subsequently re-leased the planes to Faucett. Subsequently, at Correia's [*5] urging, Avianca entered the transaction to provide maintenance to the aircraft; Correia never informed Avianca that he owned FSI and that an Avianca official -- Cornelissen -- owned AAL. After Faucett defaulted on the leases, Correia, at the request of Atasca and Madelaine, demanded $ 148,000 (payable to FSI and AAL) in engine reserves that had been advanced to Avianca; Avianca disputed that it owed this money. When Avianca personnel informed Correia that he had a conflict of interest in the case because he had taken a position adverse to his client (Avianca), he withdrew.

C. The Twin Otter Transaction

In 1981, Cornelissen sent Correia to Helicol, which is partly owned by Avianca, to aid the company in arranging for the lease of two Twin Otter aircraft. Correia submitted a proposal himself, through his company FSI, which was accepted by Helicol. Correia had difficulty obtaining lease financing, and Helicol informed him that it intended to purchase the aircraft directly from the manufacturer. Correia threatened to hold Helicol liable for violating its agreement with FSI. On the same day, Cornelissen loaned Correia $ 247,000, [*6] much of which Correia used to secure financing for the transaction. Helicol and FSI then consummated the transaction. Neither Avianca nor Helicol knew that Cornelissen was involved in the transaction in any way.

II. Procedural History and the Pending Motions

In 1985, an audit of Norasco discovered Correia's extensive withdrawals. Subsequently, Avianca officials began to investigate some of Correia's other dealings with the company. At about the same time, Andres Cornelissen resigned as president of Avianca in the midst of a shareholders' dispute. A few days later, Avianca, having received an independent opinion that Correia's actions in the Twin Otter transaction were unethical, fired Correia & Tierney. Avianca filed suit against the defendants on October 16, 1985. The parties have engaged in massive discovery and have filed innumerable motions before this court. On February 6, 1989 the court held that Correia had breached his fiduciary duty to Avianca in all three of the transactions; the court also ruled that Cornelissen could be added as a defendant. The court's holding at that time was narrow; the court found "an ongoing, continuous attorney-client relationship" which the [*7] defendants had breached in three discrete instances. Avianca, Inc., 705 F. Supp. at 681. The court left the issue of damages for later resolution. In preparation for trial, the parties now seek to narrow the issues further by resolving most of the claims on summary judgment. Although the motions for summary judgment on the complaint are generally organized along the counts of the complaint, the court will analyze the motions transaction by transaction as each transaction raises slightly different issues. The court will then discuss several issues separately which do not fall readily into any one of the transactions.

In order to fully understand the parties' motions on counts II and III of the complaint and on count VIII of the counterclaim, it is necessary to clarify the damages that plaintiffs seek. Plaintiffs' claims for damages are different for each transaction. Because of Correia's withdrawal of Norasco funds, plaintiffs seek not only the return of the remaining funds at an appropriate market rate of interest, but also the value of the lost use of Norasco funds, the expense incurred in discovering and accounting for the unauthorized withdrawals, and the annual [*8] management fees paid to Correia & Tierney. Though plaintiffs do not claim any losses from the Faucett transaction, they demand any and all money earned

by Correia and FSI in connection with that transaction on the ground that fraudulent conduct should not be rewarded. Plaintiffs argue that they paid inflated lease payments in the Twin Otter transaction and that Correia profited by needlessly inserting FSI into the transaction. Thus plaintiffs claim that they are entitled to this profit or, in the alternative, to the money that they lost from making inflated lease payments. In addition, plaintiffs seek to disgorge all legal fees earned by Correia and his law firm over the years which they represented Avianca; under plaintiffs' theory, all of this representation was tainted by Correia's clear loyalty to Cornelissen (and himself), rather than to his client. Because Correia used the mail and interstate wires in connection with these alleged acts of fraud, plaintiffs argue that their damages must be trebled under RICO and that they are entitled to attorneys' fees. Lastly, plaintiffs seek punitive damages in excess of 1 million dollars.

III. Analysis of Motions for Summary Judgment [*9]

HN1 To succeed under Rule 56, a party must demonstrate that there remain no genuine issues of material fact and must then prevail under the law, even though all inferences are drawn in favor of the party opposing the motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Courts must be particularly wary of granting summary judgment when, as in plaintiffs' fraud and RICO claims, intent is at issue. See Attorney General of the United States v. Irish People, Inc., 254 U.S. App. D.C. 229, 796 F.2d 520, 524 (D.C.Cir. 1986); National Union Fire Insurance Co. v. Turtur, 892 F.2d 199, 205 (2d Cir. 1989). In addition, a court should generally refrain from deciding a case when a reasonable jury could draw divergent inferences that would affect the outcome of the case. See Alyeska Pipeline Serv. Co. v. Environmental Protection Agency, 272 U.S. App. D.C. 355, 856 F.2d 309, 314 (D.C.Cir. 1988). In this case, where the testimony of the one witness -- the principal defendant Mark Correia -- is the heart of the case, n1 the jury should be permitted wide latitude to [*10] assess his credibility and to draw reasonable inferences. n2 See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The court also notes that plaintiffs' claims of fraud must be proved by clear and convincing evidence, a difficult standard to meet at summary judgment. See Hercules & Co. v. Shama Restaurant Corp., 566 A.2d 31, 39 n.16 (D.C. 1989); see also Anderson, 477 U.S. at 252 - 56. Thus, the court will permit most, though not all, of the issues to go to trial. Below the court analyzes the issues, transaction by transaction.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The plaintiffs anticipate that Mr. Correia will be on the witness stand for almost 20 hours.

n2 The court notes that Mr. Correia's testimony has differed throughout his affidavits and his deposition testimony. The jury should be permitted to assess his credibility and his testimony in light of these anomalies. See Tippens v. Celotex Corp., 805 F.2d 949, 953 - 54 (11th Cir. 1986).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

Throughout the analysis, [*11] it is critical to remember that the defendants are being sued because they were the attorneys of the plaintiff and are alleged to have taken advantage of that position in an unlawful manner. The court has held that the defendants breached their fiduciary duty to the plaintiffs because, without full and adequate disclosure, Correia participated in the three transactions in a variety of capacities that compromised his position as Avianca's attorney and may have earned him and his law firm financial benefits at the plaintiffs' expense. To put it colloquially, Correia wore too many hats; such behavior was inimical to his role as Avianca's attorney. Defendants continually attempt to cloud the issues by stressing that Correia's behavior as president of FSI (and AAL and Norasco) was reasonable and lawful. These protestations are immaterial to this lawsuit. The foundation of plaintiffs' lawsuit is not that Correia was the president of some other companies that took advantage of Avianca and its subsidiaries, but rather, that he, in those capacities, violated his obligations as one of Avianca's attorneys -- to such an extent that, plaintiffs argue, his conduct constituted actionable fraud.
[*12]
A. The Norasco Withdrawals

The defendants do not deny that the withdrawals were made nor do they recant Correia's testimony that he believed he could do anything he wanted with Norasco's money (so long as he paid off all of Norasco's obligations). Defendants also admit that Norasco is owed whatever principal is outstanding,

increased by an appropriate rate of interest. Defendants argue, however, that the plaintiffs have failed to establish any of the elements of fraud and thus cannot obtain any further damages, including punitive damages or RICO treble damages. Defendants also maintain that Avianca was on notice that Correia was using Norasco funds to offset bills owed by Avianca to Correia & Tierney. Plaintiffs respond that no reasonable jury could decide that Correia's actions did not constitute fraud.

Plaintiffs have not demonstrated to the court the amount of money that defendants owe Norasco, although both sides agree that some payment is outstanding. Thus, the damages issue remains for the jury on the court's prior summary judgment ruling on count I for breach of fiduciary duty. There also remain disputed issues of fact concerning Correia's intent to deceive. Defendants [*13] allege that Correia gave notice to plaintiffs by informing Avianca's treasurer that he was using Norasco funds and that he could not have intended to deceive Avianca because he kept meticulous records of the money which he withdrew from Norasco's account. While the court has held that he did not provide sufficient disclosure to avert a breach of fiduciary duty charge, a jury could infer that he did not intend to deceive Avianca. See United States v. McNeive, 536 F.2d 1245, 1252 (8th Cir. 1976) (stating that the absence of an intent to conceal tends to rebut evidence that the defendant had the requisite intent to defraud). A reasonable jury could, however, decide that Correia's conduct was fraudulent and that his so-called "notice" to Avianca's treasurer was itself a deception. Thus, there remain disputed issues of fact in plaintiffs' case of fraud. Therefore, both cross-motions for summary judgment on count II with regard to the Norasco withdrawals shall be DENIED.

B. The Faucett Transaction

Defendants argue that plaintiffs have shown no damages from the Faucett transaction and that, further, the plaintiffs have not made a prima facie case of fraud. Plaintiffs [*14] have never claimed any damage; indeed, their attorney stated in open court that they were not financially injured in the transaction. See Transcript of Aug. 22, 1986 Hearing at 30 (C.A. No. 85-3277). Rather plaintiffs seek to recover the profits earned by Correia and FSI in the transaction on the theory that a wrongdoer should not profit from his misdeed, even if the "victim" is not injured; further, plaintiffs argue that Correia's alleged fraud was part of his ongoing deception and his dedication to Cornelissen's interests, which compromised all of his representation of Avianca.

Defendants correctly note that the Faucett transaction centered around a leasing arrangement that did not involve Avianca. Correia, through AAL and FSI, engineered a deal between Atasca/Madelaine and Faucett for the lease of two aircraft; in his own words, he "structured a mutually beneficial transaction." Correia Dep. at 13 - 14. Avianca only entered the transaction subsequently to provide maintenance to the aircraft. Any money earned by FSI, AAL, or Correia ostensibly derived from the initial deal. There has been no showing at all that FSI, AAL, or Correia obtained any money from Avianca directly or [*15] from the maintenance agreement. n3 Unquestionably, Correia placed himself in an unethical situation: he was representing a company owned by one of Avianca's high officials that could potentially compete with Avianca for business and he even aligned himself adverse to Avianca, one of his principal clients, when he demanded the engine reserves from Avianca for Atasca and Madelaine. See Avianca, Inc., 705 F. Supp. at 680 - 81. This clear breach of fiduciary duty does not, however, mean that Avianca relied on his representations in to its detriment. Avianca entered the deal and assumably made some profit until Faucett defaulted. When Correia, as president of FSI asserted the interests of Atasca and Madelaine, Avianca officials informed him that he had a conflict of interest, a fact which he admittedly should have recognized at a much earlier time. Avianca did not, however, rely on his breach in any way nor were they damaged by any loss in the transaction. See De La Maria v. Powell, Goldstein, Frazer & Murphy, 612 F. Supp. 1507, 1518 - 19 (N.D.Ga. 1985) (holding that HN2 a client could not recover for an attorney's conflict of interest if the client was [*16] not harmed).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 It might be argued that the initial deal could not have been consummated without the Avianca maintenance agreement. Plaintiffs, however, have shown no evidence that the initial deal depended in any way on the subsequent maintenance arrangements.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Plaintiffs, however, argue that they should receive any profits that Correia, FSI, and AAL made on the

transaction. All of the profits derived from the initial transactions and had no direct causal connection with the breach of fiduciary duty or the alleged fraud, both of which occurred later. While there is ample precedent for a victim of fraud recovering more than his or her losses because of the profit earned by the wrongdoer, see, e.g., Wilson v. Great American Indus., Inc., 855 F.2d 987, 996 (2d Cir. 1988) (holding that, HN3 when a defrauding party earns more than the defrauded party loses, "damages are the amount of the defendant's profit."), n4 the court knows of no such case where the defrauded party was not injured at all and where the [*17] causal link between the fraud and the wrongdoer's profit was so attenuated. Undoubtedly HN4 a fiduciary who uses his or her position to obtain secret profits is generally required to cede any such profits to the party whose loyalty was compromised. See Women's Fed. Sav. & Loan Ass'n v. Nevada Nat'l Park, 811 F.2d 1255, 1260 (9th Cir. 1982). Here, however, Correia's profit derived from a transaction with which Avianca had no involvement; although Avianca might have objected to its attorney's involvement in such a transaction, there has been no showing that Avianca would have profited from the lease transaction but for Correia's abuse of his position. Simply because Correia breached his fiduciary duty and perhaps attempted to defraud Avianca by demanding engine reserves, which he was not at all sure Avianca owed, does not entitle plaintiffs to receive profits he made from what was, in essence, a separate transaction. HN5 In order to succeed on a claim of fraud, a party must prove some damages that resulted from reliance on the defendants' fraud. n5 Plaintiffs in this case have not shown any damages resulting from reliance on the fraud and thus cannot recover all of Correia's [*18] profits from the Faucett transaction. Thus, the defendants' motion for summary judgment shall be GRANTED as to count II of the complaint with respect to the Faucett transaction and the plaintiffs' motion shall be DENIED.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Cases where the plaintiff is awarded more than his or her damages generally involve situations where the defendant, subsequent to the fraud, received an unexpected windfall, which the plaintiff could have been in a position to receive, had the fraud not been committed or where the defendant used fraudulently obtained property to generate further profits. See Wilson, 885 F.2d at 996; Thomas v. Duralite Co., 524 F.2d 577, 589 (3d Cir. 1975).

n5 The court reserved the issue of damages in its previous ruling granting summary judgment against defendants on plaintiffs' breach of fiduciary duty claim.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

C. The Twin Otter Transaction

The defendants present three complete legal defenses to liability for the Twin Otter transaction and also argue that plaintiffs [*19] have not established the elements necessary for commonlaw fraud or RICO violations. The court rejects all of defendants' contentions, but also holds that there are genuine issues of material fact that remain to be decided by a jury and therefore both cross-motions for summary judgment shall be denied.

i. Helicol's Payment of Lease Responsibilities

Defendants argue that plaintiffs are barred from recovering damages related to inflated lease payments on the Twin Otter transaction because plaintiff Helicol, Avianca's subsidiary, continued to make payments until the natural termination of the leases, some four years after the institution of this lawsuit. By continuing these payments, defendants claim, the plaintiffs demonstrated their approval of the transaction and also failed to appropriately mitigate their damages. Defendants set forth two theories -- the so-called "voluntary payment" doctrine and the doctrine of ratification -- to support their contention. Under either theory, defendants argue that Helicol had to make an irrevocable choice once it discovered the allegedly fraudulent conduct of defendant Correia. Helicol could continue to fulfill its contractual obligations to [*20] FSI and thereby sacrifice any remedy for inflated lease payments, or Helicol could seek rescission by affirmatively breaching and instituting a lawsuit. Instead, Helicol continued to fulfill its obligations under the contract and sought relief for fraud against Correia, the

lawyer whom Avianca had sent to help Helicol design this transaction. For the reasons stated below the court finds neither theory persuasive.

a. The Voluntary Payment Doctrine

The voluntary payment doctrine raised by defendants is an old common law doctrine rarely cited by courts in modern, complex transactions. HN6 A person who volunteers payment under a claim of right with full knowledge of all relevant facts cannot then demand the payment back; mistake of law does not permit recovery, while mistake of fact does. n6 The doctrine might best be thought of as a corollary to the general rule about contracts without consideration: while such a contract is not enforceable, once completed, it is generally irrevocable; HN7 one cannot take a "gift" back once given. The voluntary payment doctrine is thus a rule against welshing. See Armco, Inc. v. Southern Rock, Inc., 696 F.2d 410, 413 (5th Cir. 1983) (citing [*21] the need to "honor voluntary arrangements" as the "heart" of the voluntary payment doctrine). HN8 The doctrine is most commonly applied in situations where the terms of an initial contract have not been fulfilled by a seller/payee (for whatever reason) and a subsequent agreement, one that decreases the burden or increases the compensation to the seller/payee without consideration, replaces it; such agreements are common among parties who prefer compromise to litigation if possible. See, e.g., Prenalta Corp. v. Colorado Interstate Gas Co., 944 F.2d 677, 685 (10th Cir. 1991); Georgia Power Co. v. Foster Wheeler Corp., 161 Ga. App. 641, 288 S.E.2d 720 (Ga.App. 1982). Once the subsequent agreement has been performed, a payor cannot then sue on the initial contract to get his payments back; the payor is deemed to have waived its rights.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 The defendants cite Brisbane v. Dacres, 5 Taunt. 143 (1813), an English case that was the genesis of the doctrine. Limited application of the rule in Brisbane may be plausible. The court notes in passing, however, that, according to one commentator from the University of Michigan School of Law, the full implications of Brisbane, its predecessors and the line of cases following it, which the defendants ask this court to recognize, have been "condemned almost universally by writers and very commonly by judges." G. Palmer, The Law of Restitution § 14.27 & nn. 5 - 8 (1978) (quoting authorities who term the rule adopted in Brisbane "a monstrous mistake").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*22] HN9

The voluntary payment doctrine does not generally apply, however, when a party has expressly reserved a right to take some legal action or when the party has paid under protest. n7 Defendants cite American Metal Co. v. M/V Belleville, 284 F. Supp. 1002, 1007 (S.D.N.Y. 1968), for the proposition that the doctrine applies even if the plaintiff has protested that it does not owe the payments. The court finds that this assertion is against the weight of authority. In a case argued by defendant's own counsel, Prenalta Corp. v. Colorado Interstate Gas Co., 944 F.2d 677, 685 (10th Cir. 1991), the court held that the plaintiff must exhibit "unequivocally manifest its intent to relinquish a claim for repayment." See id. In that case, the appellate court remanded this factual issue for a jury trial. See id. at 686. Here Helicol clearly demonstrated that it relinquished none of its claims when it joined Avianca's lawsuit as a plaintiff to seek liability in tort for the inflated lease payments in October of 1985, only a few months after Avianca's investigation had turned up evidence of Mr. Correia's breach of fiduciary duty. Thus, [*23] Helicol acted appropriately when it became aware of the relevant facts and sought to preserve its rights. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 The voluntary tax payment doctrine generally denies a taxpayer relief for an unlawful tax even if the taxpayer protested the tax. The public policy reasons for this rule are stronger in the tax context because the rule prevents "the taxing entity from using funds paid by taxpayers in a given budget year and subsequently being required to refund these amounts." City of Laredo v. South Texas Nat'l Bank, 775 S.W.2d 729, 731 (Tex. Ct. App. 1989).

n8 Plaintiffs argue that they still do not know all of the relevant facts because of the dearth of testimony from Mr. Cornelissen and the conflicting testimony of W. Correia in his deposition and his affidavits. Because of the court's rejection of the voluntary payment doctrine, the court need not decide this issue. If, however, the court had accepted the voluntary payment doctrine as defendants have advanced it, this issue would have been inappropriate as a ground for summary judgment because, as in Prenalta, factual issues remain concerning whether plaintiffs have at any time known all of the relevant facts.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*24]

The court further questions the viability of the voluntary payment doctrine in a complex transaction involving fraudulent conduct. HN10 When intentional misconduct is alleged on the part of a party seeking to obtain the benefits of the voluntary payment doctrine, the equities sway against its application. n9 In some situations, a party may have little choice but to continue fulfilling its obligations under a contract due to business necessity; in such cases, the payment is truly not voluntary. See National Ass'n of Broadcasters v. F.C.C., 180 U.S. App. D.C. 259, 554 F.2d 1118, 1128 (D.C.Cir. 1976) (rejecting the doctrine where plaintiffs had to make the payments in order to maintain their broadcasting licenses); Big John, B.V. v. Indian Head Grain Co., 718 F.2d 143, 151 (5th Cir. 1983) (rejecting the doctrine because plaintiffs could not obtain their sunflower seed without paying the disputed expenses). n10 Requiring a breach and suit for rescission may not be commercially reasonable. Further, application of the voluntary payment doctrine in this instance appears to contradict the traditional rule that HN11 a party has a choice of remedies when a contract is at issue. The party [*25] may either affirm the contract and sue for damages or seek rescission and recover special damages only. See Dresser v. Sunderland Apartments Tenants Ass'n, 465 A.2d 835, 840 (D.C.App. 1983); Kent Homes Inc. v. Frankel, 128 A.2d 444, 445 - 6 (D.C.App. 1957). Even after a fraud has been discovered, plaintiffs may still affirm the transaction and seek damages for misrepresentation. See F.H. Smith Co. v. Low, 57 App. D.C. 167, 18 F.2d 817, 820 (D.C.App. 1927); 12 Williston on Contracts 636 (1981). Helicol chose the first option -- to affirm the contract and to seek damages for inflated lease payments.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 In Georgia Power Co. v. Foster Wheeler Corp., 161 Ga. App. 641, 288 S.E.2d 720 (Ga. App. 1982), the court rejected the plaintiff's attempt to circumvent the voluntary payment doctrine by suing in tort rather than on the contract. Unlike that case, plaintiffs here are not suing the party with whom they made the contract, FSI, or attempting to turn a contract breach by FSI into a tort. Plaintiffs are suing Correia and the other defendants as their attorneys, not as parties to the contract. [*26]

n10 Were the court to accept the voluntary payment doctrine, plaintiffs would have the opportunity to demonstrate that the payments were not voluntary because of their need for the leased planes at issue. In that event, the scarcity of such aircraft because they were no longer manufactured and the fact that Helicol acquired the right to buy the planes at the end of the lease would be relevant. Indeed, defendants' assertion that Helicol got a good deal in the Twin Otter transaction, in part because prices for such aircraft increased subsequently, would fuel an argument that, by affirming the contract, Helicol was actually mitigating its damages because breaching and seeking to lease planes elsewhere would have only increased Helicol's damages. See Thor Power Tool Co. v. Weintraub, 791 F.2d 579, 585 (7th Cir. 1986).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The voluntary payment doctrine is inappropriate in this case for even more fundamental reasons. The voluntary payment doctrine derives from contract or quasi-contract and is a defense when one is being sued by another on a contract between the two partners; plaintiffs [*27] here seek a remedy in tort against their attorney. Defendants stated at oral argument that plaintiffs are attempting to pierce the corporate veil and to reach Correia through profits earned by FSI. Indeed, by suing Correia and not FSI, plaintiffs are explicitly not attempting to pierce the corporate veil. Once again, the multitude of roles which Correia played confuses the issues. The court has found that there was "an ongoing, continuous attorney-client relationship." Avianca, Inc., 705 F. Supp. at 681. Plaintiffs are suing Correia

as their attorney and not in his capacity as president of FSI; it is irrelevant to this inquiry that the grounds for his alleged misconduct as their attorney are founded, in part, in his status as president of FSI. The suit may best be likened to one of fraudulent inducement against a third party; generally such a suit gives the plaintiff no right to disaffirm the contract, but it does permit a remedy for damages against the party that fraudulently induced the plaintiff to enter into the transaction. Helicol followed an appropriate course by continuing to fulfill its contractual obligations with FSI while seeking to obtain [*28] damages from the third party that it deemed committed the actual fraud and breach of fiduciary duty -- Correia. For all of the abovementioned reasons, the court rejects the application of the voluntary payment doctrine.

b. Ratification

Akin to their argument regarding the voluntary payment doctrine, defendants also raise the doctrine of ratification as a complete defense to any liability on the Twin Otter transaction. HN12 Ratification requires that a party intend to affirm the contract with full knowledge of all material facts and circumstances. See Thermo Contracting Corp. v. Bank of New Jersey, 69 N.J. 352, 354 A.2d 291, 296 (N.J. 1976). Plaintiffs continue to argue that they still do not have full knowledge of Correia and Cornelissen's activities. While this may be true, the court finds that it is irrelevant because HN13 the doctrine of ratification does not apply unless the intent to ratify is crystal clear. Defendants bear a heavy burden to show that the intent to ratify was unequivocal. See Thomson McKinnon Securities, Inc. v. Moore's Farm Supply, Inc., 557 F. Supp. 1004, 1012 (W.D.Tenn. 1983). In this case, plaintiffs' actions indicate the opposite -- Helicol [*29] joined this lawsuit upon becoming aware of the defendants' misconduct. While they chose to affirm the contract and seek damages, Helicol did not ratify the contract and sacrifice any remedy. Further, as explained above, plaintiffs are seeking damages from their attorney in tort, not from FSI on the contract. Thus ratification is also inappropriate.

ii. Indemnity Clauses

Defendants argue that indemnity clauses found in the Norasco Service Agreement and the Twin Otter leases effectively shield Correia from any liability. According to defendants, the indemnity clauses require Avianca to pay any liability that Correia incurs from this case in reference to the Twin Otter transaction. Thus, even were plaintiffs to win a jury award, they would only win the right to pay themselves; indeed, they might even be liable for defendants' attorneys' fees. Plaintiffs argue vigorously that Mr. Correia's actions do not fall within the bounds of the indemnity clauses and further that his alleged intentional misconduct is excepted from both indemnity clauses, as properly interpreted.

Under the Norasco Service Agreement, Avianca undertook to indemnify Norasco and its officers for any "liabilities, [*30] obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements" related to its services for Avianca; the Agreement explicitly stated that Avianca would not, however, be liable for any "willful misconduct" by Norasco. Norasco Service Agreement at 15. The Twin Otter leases contain a provision that requires the reimbursement of FSI and Norasco officers for any "claims, damages, losses, liabilities, demands, suits, judgments, causes of action, legal proceedings, whether civil or criminal, penalties, fines, [or] other sanctions" which resulted from the lease and related transactions. Twin Otter Leases at 30. Defendants note that such indemnity provisions are standard in the industry and are designed to insure that companies in the middle of a transaction are protected from liability if some aspect of the transaction goes awry.

Neither indemnity clause protects Correia as a matter of law. As the court has repeatedly stated, the error of Correia's course of conduct is that he (and Cornelissen) wore too many hats; this is the basis for the court's prior finding that defendants had breached their fiduciary duty as a matter of law. Correia engaged in self-dealing [*31] throughout all of the transactions at issue. Because he was involved in the Twin Otter transaction in so many different ways, the indemnity clauses do not cover the full scope of his activities and his wrongdoing. The Norasco agreement does not cover his actions because some of his alleged misconduct occurred outside of his activities as Norasco's president. Similarly, the Twin Otter leases fail to provide protection for the same reasons. It is crucial to remember that the reason why Mr. Correia is being sued is not that he was the president of a corporation with whom Avianca did business, but rather that he was Avianca's lawyer and he failed to fulfill his duties to the plaintiffs (and indeed allegedly defrauded the plaintiffs). The indemnity, clauses simply do not apply.

Even if the court held that the indemnity clauses covered the sorts of activity in which Correia engaged,

they would still not indemnify him for acts of fraud. The Norasco Service agreement does not contemplate protection for the sort of misconduct alleged in the complaint. The Norasco indemnity clause would not excuse intentional misconduct, as alleged in count II, and further, it would not cover any action taken [*32] by a Norasco officer which was done in the service of himself, rather than in the service of Avianca. That is the essence of the plaintiffs' claim; Mr. Correia did not act as Avianca's servant, as his position as Avianca's attorney and Norasco's president required. Thus, the Norasco Service Agreement provides no protection.

The Twin Otter indemnity clause does not explicitly except willful conduct, yet any other reading would appear to violate common sense and what the court finds to be the intent of the parties. The court agrees with plaintiffs' recitation of New York law. HN14 Indemnification agreements are to be read narrowly in order to insure that no party is assuming burdens which they did not intend. See Mobil Oil Corp. v. Wellpoint Dewatering, 110 A.D.2d 1085, 488 N.Y.S.2d 938, 939 (N.Y.App.Div. 1985); Tokyo Tanker Co. v. Etra Shipping Corp., 142 A.D.2d 377, 536 N.Y.S.2d 75 (N.Y.App.Div. 1989); see also Gross v. Sweet, 49 N.Y.2d 102, 107, 424 N.Y.S.2d 365, 400 N.E.2d 306 (1979) (stating that exculpatory clauses must be strictly construed against a party seeking to avoid liability). HN15 New York courts also may interpose the barrier of public policy when an exculpatory clause could be interpreted [*33] to permit fraudulent or malicious conduct. See Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983). The court does not believe that indemnity of the sort of intentional wrongdoing which Correia is alleged to have committed was in the contemplation of the parties when the contracts were executed. Thus, the court rejects defendants' arguments and defendants' motion for summary judgment on count VIII of the counterclaim shall be DENIED. Plaintiffs' motion for summary judgment on count VIII of the counterclaim shall be GRANTED.

iii. Genuine Issues of Material Fact

Plaintiffs argue that no reasonable jury could believe that Correia's actions in the Twin Otter transaction, particularly his refusal to inform Helicol of the loan from Cornelissen, were not intentionally fraudulent. Defendants argue that plaintiffs were not damaged, that there was no intent to deceive, and further that the loan from Cornelissen was not material to Helicol's decision to enter into the transaction. Unquestionably the amount (or lack) of damages is a disputed issue between plaintiffs and defendants. Many of the parties' legal arguments are, at bottom, disputes over whether Helicol [*34] got a good deal when the leases were executed. In addition, the court finds that there are genuine disputes concerning Correia's intent and the causal relationship between the defendants' failure to disclose and Avianca's damages. Therefore, both cross-motions for summary judgment on count II of the complaint with respect to the Twin Otter transaction will be DENIED.

D. The RICO Claims

The plaintiffs' RICO claims require a small amount of further discussion. HN16 To establish a claim under § 1962(c) of the RICO statute, plaintiffs must show "(1) the existence of an enterprise which affects interstate or foreign commerce; (2) that the defendant was 'employed by' or 'associated with' the enterprise; (3) that the defendant participated in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity." Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 286 U.S. App. D.C. 182, 913 F.2d 948, 950 (D.C.Cir. 1990), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L. Ed. 2d 1007 (1991) (quoting Alcorn County v. United States Interstate Supplies, Inc., 731 F.2d 1160, 1168 (5th Cir. 1984)). In addition, plaintiffs [*35] must demonstrate that the violation of RICO caused an injury to plaintiffs' business or property. See id. Defendants' objections center on the requirement of injury and on the fourth element, that the plaintiffs establish a pattern of racketeering activity.

The requirement of injury has been discussed above in connection with the plaintiffs' common-law fraud claims. Defendants' arguments are nearly identical to those set forth in their memoranda concerning fraud claims and they meet with the same results. Because the plaintiffs have not demonstrated any injury on account of the Faucett transaction, defendants' motion for summary judgment on count III with regard to the Faucett transaction shall be GRANTED. The court, however, finds that the plaintiffs have shown that they may have been injured in the other transactions and thus will not grant summary judgment on the other two transactions on the basis of a lack of injury.

HN17 To show a pattern of racketeering injury, the plaintiffs must prove that defendants committed multiple predicate acts of mail and wire fraud. To establish mail or wire fraud, plaintiffs must show a scheme to defraud and the use of the mails or interstate wires [*36] to execute the scheme. See

United States v. Maxwell, 287 U.S. App. D.C. 234, 920 F.2d 1028, 1035 (D.C.Cir. 1990). Indeed, "the use of the mails need not be an essential element of the scheme" under § 1341; a defrauding party need only use the mails or interstate wires as an incident to or a step in the execution of the scheme. Schmuck v. United States, 489 U.S. 705, 710 - 11, 103 L. Ed. 2d 734, 109 S. Ct. 1443 (1989). The mailing or wire transmission may contain no false information, yet still be the basis for a mail or wire fraud count. See id. at 715. In addition to the predicate acts, the plaintiffs must meet the vague requirement of "continuity plus relationship" among the predicates that would constitute a pattern of racketeering activity. See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985).

Defendants' arguments that plaintiffs have failed to demonstrate a scheme to defraud simply recast the same arguments which defendants made regarding plaintiffs' common-law fraud claims. Defendants claim that there was no specific intent to defraud, as required by the [*37] mail fraud statute. See United States v. Rhone, 275 U.S. App. D.C. 10, 864 F.2d 832, 837 (D.C.Cir. 1989). Although a breach of fiduciary duty does not by itself create a scheme to defraud, see United States v. Ballard, 663 F.2d 534, 540 (5th Cir. 1981), the court has found, in its discussion of common-law fraud, that, regardless of Correia's assertions of good faith, there is sufficient evidence of an intent to defraud that the issue should be heard by a jury. Defendants also argue that the mail fraud statute requires an intent to injure, not simply an intent to defraud, and that such intent is absent from Correia's conduct. The plaintiffs allege that Correia intended to profit from his position as Avianca's attorney in a manner that would bring him money at the company's expense; but for Correia's actions, Avianca would have gotten a better deal on the Twin Otter aircraft and would have had the use of the Norasco funds in full. These allegations and the factual support which plaintiffs have thus far presented are probative of both the intent to defraud and the intent to injure since whatever money defendants were to obtain from these transactions could have belonged [*38] to the plaintiffs. The court regards defendants' citation of United States v. Starr, 816 F.2d 94 (2d Cir. 1987) as inapposite. In Starr, the convictions were overturned because the defendants were accused of defrauding the wrong people -- the defendants there were being prosecuted for defrauding their customers when the only person or entity injured by the action was the United States Postal Service. In this case, the disputed lease payments and Norasco funds are alleged to belong properly to the plaintiffs.

The court, while rejecting defendants' arguments for summary judgment, also rejects plaintiffs' argument that no reasonable jury could find that Correia did not intend to defraud and injure Avianca. Further, causation issues remain for the jury concerning the Twin Otter transaction. Thus, plaintiffs' motion for summary judgment on all three transactions shall be DENIED and defendants' motion for summary judgment on the Norasco loans and the Twin Otter transaction shall be DENIED.

E. Recovery of all Attorneys' Fees

Plaintiffs seek the extraordinary recovery of all attorneys' fees paid to Correia and his law firm from 1980 to 1985, a total of over $ [*39] 800,000. Plaintiffs argue that Correia's conduct was so egregious that forfeiture of all attorneys' fees is an appropriate sanction. Plaintiffs can cite only a single legal authority for this proposition -- an opinion out of this district in Financial General Bankshares, Inc. v. Metzger, 523 F. Supp. 744, 773 (D.D.C. 1981), which was vacated for lack of jurisdiction. See Financial General Bankshares, Inc. v. Metzger, 220 U.S. App. D.C. 219, 680 F.2d 768 (D.C.Cir. 1982). HN18 The general rule is that an attorney need only return fees for the representation which was compromised by a breach of fiduciary duty or by fraud. Plaintiffs argue that this is an appropriate case for disgorgement because Correia's conduct was outrageous and deserving of a severe sanction. Although the court hardly condones Correia's conduct, disgorgement is an extraordinary remedy, and if it is ever appropriate, it should be used only in situations where the deterrence rationale is so important that only disgorgement will serve a socially useful purpose. See In Re Eastern Sugar Antitrust Litigation, 697 F.2d 524, 533 (3rd Cir. 1982) (reserving such extreme sanctions for misconduct [*40] "so egregious that the need for attorney discipline and deterrence of future improprieties of that type" is great). The court does not believe that this is such a case.

Plaintiffs' argument, however, rests on more than simple revulsion at Correia's deeds. Plaintiffs claim that Correia was at the beck and call of Cornelissen for five years, ready and willing to sell out Avianca for Cornelissen's (and his own) interests at any time. As such, all of Correia's representation of Avianca and its subsidiaries over the five-year period was tainted. Under this theory, even the ordinary rule of damages would require the disgorgement of all fees. Avianca was denied the benefit of a zealous advocate who always pursued its interests; this is what they paid for and they did not get the benefit of such a bargain. Because his loyalty was always in doubt, there is no telling how else his work for

Avianca was affected.

This argument returns the court to the initial conceptual issue of whether this case is to be seen as three separate incidents of misconduct or a continuing scheme directed against plaintiff companies for five years. While Avianca speculates about other possible harm that may have come [*41] to them while Correia was being a less than zealous advocate, the fact is that they can point to no specific actions taken by Correia or damages incurred by plaintiffs, other than the three transactions discussed above. It has not been disputed that Mark Correia generally did good work in the 25 or so other lease transaction for which he was retained; indeed Avianca continued to hire him because he did competent work at a reasonable price. While Avianca's interests may have been in jeopardy for five years because of Correia's lack of ethics or his greed or his greater loyalty to Cornelissen, the threat of injury does not provide a sufficient ground on which to award damages. The plaintiffs have presented no evidence that would lead the court or a reasonable jury to believe that Correia was involved in other instances of misconduct. While the ongoing attorney-client relationship gives rise to plaintiffs' specific claims because the defendants violated the duties which this relationship created, plaintiffs cannot then recover all fees over the entire period because of specific instances of improper conduct. Because there is no evidence linking Correia's actions in other transactions [*42] or throughout his representation of Avianca in other contexts to any damages to plaintiffs, the court holds that there was no ongoing breach of fiduciary duty or fraud such that the all of Correia's representation was compromised and such as would require the disgorgement of all legal fees. n11 Thus, defendants' motion for summary judgment on the issue of disgorgement of legal fees shall be GRANTED and plaintiffs' motion shall be DENIED.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n11 Plaintiffs state repeatedly in their memoranda that the court has rejected the defendants' theory of segmented representation and attempt to argue that the court must then hold that all of Correia's representation of Avianca was tainted. In rejecting the notion of "segmented representation," the court simply refuses to permit the defendants to avoid liability by stating that Correia took some actions as Avianca's attorney and others as the president of FSI. This view does not, however, require the court to hold, as plaintiffs would have, that Correia's representation of Avianca cannot be broken down into tainted and untainted transactions.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*43]
F. Count VII of the Counterclaim -- Transitional Attorneys' Fees

Plaintiffs are incensed at the idea that they should pay fees to Correia incurred in the transition from Correia to another attorney; this court has already held that Correia breached his fiduciary duty and he should not be rewarded. Nonetheless, in light of the court's holding that Correia and his law firm need not disgorge the fees from representation that was not directly affected by any instances of fraud or breach of fiduciary duty, plaintiffs must provide some other justification for not paying Correia for work that they contracted for. Unfortunately, plaintiffs have no defense but their anger.

Defendants submit uncontroverted evidence that the plaintiffs agreed to pay Correia $ 3000 for him to turn over all Avianca files and to get the new attorneys up to speed. At this time (August 1985), Avianca had some idea of the breaches that Correia had committed; this knowledge was the reason he was fired. Avianca's decision to pay him the $ 3000 may not have been a choice the company relished, but it was one that they made; perhaps the company thought that the sooner they got rid of Correia the better, even if it [*44] cost a little money. Regardless of the reasoning, defendants are entitled to at least the $ 3000 which Avianca promised them in a letter dated August 15, 1985. Defendants also argue that Avianca promised to pay for all of the transition expenses, including those over and above $ 3000. This issue remains unclear and the court reads plaintiffs' memoranda to be a denial of this claim. Thus, absent a further motion or more documentation from the parties, a jury shall be permitted to hear testimony on the issue of Avianca's promise to pay the defendants for transitional expenses over and above the $ 3000. Therefore, defendants' motion for summary judgment on count VII of the counterclaim shall be GRANTED in part and DENIED in part and plaintiffs' motion shall be DENIED.

IV. The "Additional" Motion for Summary Judgment

Defendant Martin Tierney, Mark Correia's partner, seeks dismissal from all of the counts of the complaint on the ground that he had no personal involvement with any of the allegedly fraudulent acts committed by Correia; further, he had only limited knowledge of the transactions. Correia himself performed virtually all of the legal services which the firm furnished to [*45] Avianca. In addition, Tierney argues that respondeat superior liability is inappropriate under RICO because the statute implements substantial civil penalties for what is, in essence, criminal conduct.

Tierney attempts to hide behind the same shield that Correia does -- he claims that, because Correia's actions were those of an entrepreneur and not a lawyer, he (Tierney) should not liable. For many of the reasons explained above, the court rejects this theory. Neither Correia, nor his law firm, nor his partner can avoid liability by segmenting their actions into those taken as Avianca's attorney and those taken independent of that role. Defendants are being sued in their capacity as plaintiffs' lawyer; Correia & Tierney (and not simply Mark Correia) were Avianca's attorneys. Under D.C. partnership law, Tierney may still be liable.

While the court sympathizes with the Tierney's argument that respondeat superior liability should not be imposed under RICO, the court notes that partnership liability is somewhat different from an employer's liability for an employee's intentional actions; whereas it may be unjust to hold a corporation trebly liable for a single employee's criminal acts, [*46] the situation changes dramatically in the partnership context, where all involved are high-level managers of the firm. Partners are routinely held jointly and severally liable for the actions of their partners. The analogy to traditional respondeat superior liability becomes even weaker in the context of a two-person partnership.

Further, plaintiffs make a strong case for direct liability. Tierney knew about the Norasco withdrawals and apparently acquiesced. There is no doubt that these withdrawals were made in furtherance of the partnership's interests as Correia claimed he took the money to pay off debts which Avianca owed the law firm. Although Tierney pleads that he had no knowledge of the Twin Otter transaction, he stated in his deposition that he and Correia had a two-hour conversation concerning the legal ethics of Correia's intended action; contrary to the court's prior holding, Tierney states that he believed Correia's actions were not a breach of fiduciary duty. He took no action to prevent any of this unethical behavior by his partner, despite being legally obliged to do so. See Beckman v. Farmer, 579 A.2d 618, 655 (D.C.App. 1990). Thus, because of his [*47] status as a partner in Correia & Tierney and because of his knowledge and acquiescence to all of Correia's actions concerning the Norasco withdrawals and the Twin Otter transaction, defendants' additional motion for summary judgment shall be DENIED.

V. Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment shall be GRANTED IN PART and DENIED IN PART, defendants' cross-motion for summary judgment shall be GRANTED IN PART and DENIED IN PART, and defendants' additional motion for summary judgment shall be DENIED in a separate order filed on this date.

Royce C. Lamberth

United States District Judge

Date: APR 13 1992

ORDER - April 13, 1992, Filed

Upon consideration of the memoranda of counsel for plaintiffs and defendants and for the reasons stated in the accompanying memorandum opinion, it is hereby ORDERED that:

1. Plaintiffs' motion for summary judgment on counts II and III of the second amended complaint is DENIED;

2. Defendants' motion for summary judgment on counts II and III is GRANTED IN PART and DENIED IN PART as follows:

a. Defendants' motion is GRANTED on counts II and III with respect to claims arising out of the Faucett transaction as described [*48] in the accompanying memorandum opinion;

b. Defendants' motion is DENIED on counts II and III with respect to the Norasco loans and the Twin Otter transaction as described in the accompanying memorandum opinion;

3. Plaintiffs' motion for summary judgment is DENIED with respect to count VII of the counterclaim and GRANTED with respect to count VIII of the couterclaim;

4. Defendants' motion for summary judgment is GRANTED with respect to count VII of the counterclaim and DENIED with respect to count VIII of the counterclaim;

5. Defendants' motion for summary judgment concerning the remedy of the disgorgement of legal fees is GRANTED;

6. Defendants' additional 1991 motion for partial summary judgment to dismiss defendant Martin Tierney from all claims is DENIED.

SO ORDERED.

Royce C. Lamberth

United States District Judge

DATE: APR 13 1992

Service: **Get by LEXSEE®**
Citation: **1992 u.s. dist. lexis 4709**
View: Full
Date/Time: Wednesday, August 3, 2005 - 10:41 AM EDT

\* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.