**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRITT A. SHAW, et al.,
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

   v.

MARRIOTT INTERNATIONAL, INC.

        Defendant.

Civil Action No. 05-1138 (GK)
**(Status Conference – April 28, 2008)**

# MARRIOTT INTERNATIONAL, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

BALT2\4353333.1

**TABLE OF CONTENTS**

STATEMENT OF FACTS ......................................................................................................... 3

I.      Marriott International, Inc. ............................................................................................ 3

II.     The Marriott Russia Hotels ........................................................................................... 4

III.    Russian Currency Law .................................................................................................. 5

IV.     Reservations for the Marriott Russia Hotels ................................................................. 7

V.      Currency Calculator ...................................................................................................... 9

VI.     The Plaintiffs ............................................................................................................... 10

        A.      Britt Shaw ....................................................................................................... 10

        B.      Neal Charness ................................................................................................. 12

        C.      Irina Paliashvili .............................................................................................. 13

        D.      Sarah Mendelson ............................................................................................ 13

        E.      CSIS ................................................................................................................ 15


LEGAL STANDARD ............................................................................................................. 15

ARGUMENT ........................................................................................................................... 16

I.      The Court Should Not Certify The Class Because The Putative Class
        Representatives Each Lack Standing ........................................................................... 16

II.     The Court Should Decline To Certify The Proposed Class Because It Is Not
        "Adequately Defined And Clearly Ascertainable." ..................................................... 20

III.    Plaintiffs' Proposed Class Fails To Meet The Rule 23(a) Requirements Of
        Commonality, Typicality And Adequacy .................................................................... 22

        A.      Class Certification Should Be Denied Because Plaintiffs Cannot Meet The
                Commonality Requirement .............................................................................. 22

        B.      Plaintiffs Cannot Meet The Typicality Or Adequacy Requirements Of
                Rule 23(a) ........................................................................................................ 26

                1.      Plaintiffs Cannot Meet Rule 23(a)'s Typicality Requirement ............... 27

      2.     Plaintiffs Cannot Meet Rule 23(a)'s Adequacy Requirement ...................30

IV.   Class Certification Should Be Denied Because Plaintiffs Cannot Show A
      Predominance Of Common Legal And Factual Issues And Superiority Of The
      Class Action Method, As Required For Certification Under Rule 23(b)(3). ....................33

     A.    Plaintiffs Have Not Demonstrated A Predominance Of Either Legal Or
           Factual Issues.................................................................................................34

         1.     Plaintiffs Cannot Establish A Predominance Of Legal Issues .................34

              a.     An actual conflict exists between the DC CPPA and the
                     consumer protection statutes of other states. ................................36

              b.     District of Columbia law does not apply classwide under
                     the rigorous choice of law inquiry required by precedent. ............39

              c.     District of Columbia law cannot constitutionally apply
                     classwide....................................................................................42

         2.     Plaintiffs Cannot Establish a Predominance of Common Factual
              Issues Because Plaintiffs' Proposed Worldwide Class Would
              Require Adjudicating A Great Number of Individualized Factual
              Issues. ....................................................................................................45

     B.    A Class Action Is Not The Superior Method By Which To Try The Claims
           Asserted By Plaintiffs. .....................................................................................46

CONCLUSION ...........................................................................................................48

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adas v. Ames Color-File,*
407 N.W.2d 640 (Mich. Ct. App. 1987)................................................................................38

*Allstate Ins. Co. v. Hague,*
449 U.S. 302 (1981) ............................................................................................................43

*Am. Pipe & Const. Co. v. Utah,*
414 U.S. 538 (1974) ............................................................................................................27

*Am. Rockwool, Inc. v. Owens-Corning Fiberglass Corp.,*
640 F. Supp. 1411 (E.D. N.C. 1986) ..................................................................................38

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ............................................................................................16, 20, 35

*Antonson v. Robertson,*
141 F.R.D. 501 (D. Kan. 1991) ..........................................................................................42

*Athridge v. Aetna Cas. & Sur. Co.,*
351 F.3d 1166 (D.C. Cir. 2003)....................................................................................18, 38

*Barreras Ruiz v. American Tobacco Co.,*
180 F.R.D 194 (D. P.R. 1998) ............................................................................................47

*Berger v. Compaq Computer Corp.,*
257 F.3d 475 (5th Cir. 2001)...............................................................................................33

*BMW of N.A. v. Gore,*
517 U.S. 559 (1996) ............................................................................................................45

*Bonaparte v. Tax Court,*
104 U.S. 592 (1881) ............................................................................................................45

*Broussard v. Meineke Discount Muffler Shops,*
155 F.3d 331 (4th Cir. 1998)...............................................................................................48

*Bykov v. Radisson Hotels Int'l,*
2006 WL 752942 (D. Minn. 2006)
*aff'd Bykov. v. Radisson Hotels Int'l, Inc.* 221 Fed. Appx. 490, 491-92 (8th Cir.
2007)..................................................................................1, 6, 18, 20, 28

*Castano v. American Tobacco Co,*
84 F.3d 734 (5th Cir. 1996)...............................................................................................46

*Chin v. Chrysler Corp.*,
   182 F.R.D. 448 (D.N.J. 1998) ................................................................44

*Clifton Terrace Assocs., Ltd. v. United Techs.Corp.*,
   728 F. Supp. 24 (D.D.C. 1990),
   *vacated in part on other grounds*, 929 F.2d 714 (D.C. Cir. 1991)......................19, 37

*Cruz v. American Airlines, Inc.*,
   356 F.3d 320 (D.C. Cir. 2004)................................................................17, 20

*DeBremaecker v. Short*,
   433 F.2d 733 (5th Cir. 1970)................................................................16, 20

*Demitropoulos v. Bank One Milwaukee, N.A.*,
   915 F. Supp. 1399 (N.D. 111. 1996) ........................................................37

*Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*,
   239 F.R.D. 9 (D.D.C. 2006) ................................................................20

*District of Columbia v. Coleman*,
   667 A.2d 811 (D.C. 1995)................................................................40

*Dix v. Am. Bankers Life Assurance Co.of Fla.*,
   415 N.W.2d 206 (Mich. 1987) ................................................................38

*Dunn v. Midwest Buslines, Inc.*,
   94 F.R.D. 170 (E.D. Ark. 1982) ................................................................22

*Duphily v. Del. Elec. Coop., Inc.*,
   662 A.2d 821 (Del. 1995)................................................................38

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) ................................................................45

*EEOC v. Printing Indus. of Metro. Wash., D.C., Inc.*,
   92 F.R.D. 51 (D.D.C. 1981) ................................................................27

*Eisen v. Carlisle & Jacqueline*,
   417 U.S. 156 (1974) ................................................................46

*Eli Lilly & Co. v. Home Ins. Co.*,
   764 F.2d 876 (D.C. Cir. 1985)................................................................39

*Eshaghi v. Hanley Dawson Cadillac Co Inc.*,
   574 N.E.2d 760 (III. App. Ct. 1991) ........................................................38

*Forbes* v. *Par Ten Group, Inc.*,
394 S.E.2d 643 (N.C. Ct. App. 1990)
*review denied* 402 S.E.2d 824 (N.C. 1991) ...............................................................38

*Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
174 F.R.D., 347 (D.N.J. 1997) ...............................................................44, 47

*Foster v. St. Jude Med., Inc.*,
229 F.R.D. 599 (D. Minn. 2005) ...............................................................21, 35, 36

*Freeman v. Hewit*,
329 U.S. 249 (1946) ...............................................................45

*Friends of Tilden Park, Inc. v. District of Columbia*
806 A.2d 1201 (D.C.2002) ...............................................................18

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006) ...............................................................16

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982) ...............................................................17, 27

*Gonzalez v. Brady*,
136 F.R.D. 329 (D.D.C. 1991) ...............................................................23

*Greenwald v. Integrated Energy, Inc.*,
102 F.R.D. 65 (S.D. Tex. 1984) ...............................................................42

*Guity v. Commerce Ins. Co.*
631 N.E.2d 75 (Mass. App. Ct. 1994) ...............................................................37

*Healy v. The Beer Institute*,
491 U.S. 324 (1989) ...............................................................45

*Henry Schein, Inc. v. Stromboe*,
102 S.W.3d 675 (Tex. 2002) ...............................................................37

*Hoexter v. Simmons;*
140 F.R.D 416 (D. Ariz. 1991) ...............................................................42

*Hoyte v. Yum Brands, Inc.*,
489 F. Supp. 2d 24, 28-29 (D.D.C. 2007) ...............................................................17, 18

*In re A.H. Robins Co.*,
880 F.2d 709 (4th Cir. 1989),
*(abrogated on other grounds by Amchem Prods)*, 521 U.S. 591 ...............................................................20

*In re Bridgestone/Firestone, Inc.,*
    288 F.3d 1012 (7th Cir. 2002) ............................................................35, 36, 42, 44, 47

*In Re Ford Motor Co. Ignition Switch Prod. Liab. Litig., v. Ford Motor Co.,*
    174 F.R.D. at 341 ............................................................................................36, 37, 47

*In re Laser Arms Corp. Sec. Litig.,*
    19A F. Supp. 475 (S.D.N.Y. 1989)........................................................................42

*In re Newbridge Networks Sec.,*
    926 F. Supp. 1163 (D.D.C. 1996)..........................................................................30

*In re One Bancorp Sec. Litig.,*
    136 F.R.D. 526 (D. Me. 1991) ..............................................................................42

*In re Paxil Litig.,*
    212 F.R.D. 539 (C.D. Cal. 2003)...........................................................................47

*In re Prempro Prods. Liab. Litig.,*
    230 F.R.D. 555 (E.D. Ark. 2005) ..........................................................................36

*In re Rhone-Poulenc Rorer, Inc.,*
    51 F.3d 1293 (7th Cir. 1995).................................................................................45

*In re St. Jude Med., Inc.,*
    425 F.3d 1116, 1120 (8th Cir. 2005) .....................................................................41

*Kassover v. Computer Depot, Inc.,*
    691 F. Supp. 1205 (D. Minn. 1987) .............................................................42, 45, 46

*Kirkman v. North Carolina R.R. Co.,*
    220 F.R.D. 49 (D. N.C. 2004) ..............................................................................47

*Kirkpatrick v. J.C. Bradford & Co.,*
    827 F.2d 718 (11th Cir. 1987)........................................................................30, 42

*Koenig v. Benson,*
    117 F.R.D. 330 (E.D.N.Y. 1987)..........................................................................30

*Kremens v. Bartley,*
    431 U.S. 119 (1977) .............................................................................................17

*Krueger v. Wyeth,*
    2008 WL 481956 (S.D.Cal. 2008)........................................................................33

*Lightfoot v. District of Columbia,*
    246 F.R.D. 326 (D.D.C. 2007) .............................................................................23

*Littlewolf v. Hodel,*
  681 F. Supp. 929 (D.D.C. 1988)............................................................................27

*Love v. Johanns,*
  439 F.3d 723, 727 (D.C. Cir. 2006).................................................................16, 35

*McCarthy v. Kleindienst,*
  741 F.2d 1406 (D.C. Cir. 1984)............................................................................16

*Nelson v. Greenspan,*
  163 F. Supp. 2d 12 (D.D.C. 2001).........................................................................17

*New York Life Ins. Co. v. Head,*
  234 U.S. 149 (1914) .............................................................................................45

*Occidental Land, Inc. v. Superior Court of Orange County,*
  18 Cal.3d 355 (1976)............................................................................................38

*Osbourne v. Capital City Mortgage Corp.,*
  727 A.2d 322 (D.C. 1999)....................................................................................37

*Parks v. Macro-Dynamics, Inc.,*
  591 P.2d 1005 (Ariz. Ct. App. 1979) ...................................................................38

*Pendleton v. Schlesinger,*
  73 F.R.D. 506 (D.D.C. 1977) .........................................................................27, 28

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985) .......................................................................35, 42, 43, 44, 45

*Phillips v. Klassen,*
  502 F.2d 362 (D.C. Cir. 1974).............................................................................27

*Poe v. Sears, Roebuck & Co.,*
  1998 WL 113561 (N.D. Ga.).................................................................................39

*Prado-Steiman v. Bush,*
  221 F.3d 1266, 1279 (11th Cir. 2000) .............................................................17, 20

*Richard/Allen/Winter, Ltd. v. Waldorf*
  509 N.E.2d 1078 (Ill. App. Ct. 1987) ..................................................................37

*Richards v. Delta Airlines, Inc.,*
  453 F.3d 525, 529 (D.C. Cir. 2006)................................................................16, 35

*Rooney v. Med. Ctr. Hosp. of Vt., Inc.,*
  649 A.2d 756 (Vt. 1994)......................................................................................38

*Rued Ins., Inc. v. Blackburn, Nickels & Smith, Inc.,*
   543 N.W.2d 770 (N.D. 1996) ...................................................................................38

*Schiff v. American Ass'n of Retired Persons,*
   697 A.2d 1193, 1194 (D.C. App. 1997) ...................................................................20

*Shaw v. Hyatt Int'l Corp.,*
   2005 WL 3088438 (N.D. Ill.),
   *aff'd Shaw v. Hyatt Int'l Corp.,* 461 F.3d 899 (7th Cir. 2006) ................................1

*Shaw v. Marriott Int'l, Inc.,*
   474 F. Supp. 2d 141 (D.D.C. 2007) ..........................................................................40

*Southern Pacific Co. v. Arizona,*
   325 U.S. 761 (1945) ..................................................................................................45

*Spence v. Glock, Ges.m.b.h.,*
   227 F.3d 308 (5th Cir. 2000) ...............................................35, 41, 42, 43, 44, 45

*State Farm Mutual Automobile Insurance Co. v. Campbell,*
   538 U.S. 408 (2003) ..................................................................................................45

*Stephenson v. Capano Dev., Inc.,*
   462 A.2d 1069 (Del. 1983) .......................................................................................39

*Stiver v. Allsup, Inc.,*
   587 N.W.2d 77 (Neb. 1998) ......................................................................................38

*Szczubelek v. Cendant Mortgage Corp.,*
   215 F.R.D. 107 (D. N.J. 2002) ..................................................................................45

*Tylka* v. *Gerber Prods., Inc.,*
   178 F.R.D. 493 (N.D. Ill. 1998) ...............................................................................36

*United Group of Nat'l Paper Distribs. v. Vinson,*
   666 So.2d 1338 (La. Ct. App.),
   *writ denied.* 679 So.2d 1358 (La. 1996) ..................................................................38

*Valentino v. Carter-Wallace, Inc.,*
   97 F.3d 1227 (9th Cir. 1996) ....................................................................................47

*Vickers v. General Motors Corp.,*
   204 F.R.D. 476 (D.Kan. 2001) .................................................................................22

*W. States Wholesale, Inc. v. Synthetic Indus., Inc.,*
   206 F.R.D. 271 (C.D. Cal. 2002) ..............................................................................33

*Walsh v. Ford Motor Co.*,
  807 F.2d 1000 (D.C. Cir. 1986)..................................................................34, 35, 39

*Washkoviak v. Student Loan Mktg. Ass'n*,
  900 A.2d 168 (D.C. 2006) ........................................35, 39, 40, 41, 42, 43, 44

*Wells v. Allstate Ins. Co.*,
  210 F.R.D. 1 (D.D.C. 2002) ....................................................................33, 37

*Williams v. First Gov't Mortgage & Investors Corp.*,
  225 F.3d 738 (D.C. Cir. 2000)............................................................18, 37, 38

*Zandman v. Joseph*,
  102 F.R.D. 924 (N.D. Ind. 1984)....................................................................42

**Statutes**

Ala. Code §8-19-10(f) ....................................................................................37

Alaska Stat. § 45.50.531(i) ...........................................................................39

Ark. Code Ann. § 4-88-113(f) .......................................................................37

Ark. Code Ann. §4-88-204 ............................................................................37

Colo. Rev. Stat. Ann. § 6-1-113 ....................................................................39

Conn. Gen. Stat. §42-110 .......................................................................37, 39

D.C. Code § 28-3901(a)(2) .....................................................................19, 37

D.C. Code § 28-3905(k)(1) .....................................................................37, 39

Fla. Stat. Ann. 501.207(1) .............................................................................39

Idaho Code Ann. §48-603) .............................................................................38

Iowa Code Ann. §714.16(7 ............................................................................37

Kan. Stat. Ann. §50-626(b)(l) ........................................................................38

Kan. Stat. Ann. §50-634(b) ...........................................................................39

Ky. Rev. Stat. Ann. §367.220(1) ...................................................................39

La. Rev. Stat. Ann. §51:1409(A) ...................................................................37

Me. Rev. Stat. Ann. tit. 5, §213 .....................................................................39

Miss. Code Ann. §75-24-15(4) ..................................................................................37

Mont. Code Ann. §30-14-133(1) ...............................................................................37

Nev. Rev. Stat. Ann. §§42.001, 42.005 ...............................................................38, 39

Nev. Rev. Stat. Ann. §598.0915 ...............................................................................38

Okla. Stat. Ann. tit. 15, §§753(5) ..............................................................................38

Or. Rev. Stat. Ann. § 646.638(1) .........................................................................38, 39

S.C. Code Ann. §39-5-140(a) ....................................................................................37

Tenn. Code Ann. § 47-18-109 ...................................................................................39

Tex. Bus. & Com. Code Ann. § 17.45 (Vernon 2002) .............................................37

Utah Code Ann. § 13-11-19(4)(a) .............................................................................38

Utah Code Ann. § 13-11-21(2) ..................................................................................38

## Other Authorities

Center for Strategic & International Studies, CSIS 00045-000065 ....................7, 8, 24, 25, 29, 30

Center for Strategic & International Studies, CSIS 00024 .........................................30

Center for Strategic & International Studies, CSIS 00032-00033................................31

Federal Law, Article 6a No. 173-FZ, "On  Currency Control and Currency Regulation,
    " Dec. 10, 2003. ......................................................................................................5

*Moore's Fed. Prac.* § 23.21[1] (2001) ...............................................................16, 17

*Moore's Fed. Practice* § 23.21[3] ......................................................................20, 22

*Moore's Fed. Practice*, § 23.46[2] ..........................................................................49

Restatement (Second) of Conflict of Laws § 145: (a) ..........................................39, 40

## Rules

Fed.R.Civ.P. 23............................................................................................... Passim

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BRITT A. SHAW, et al.,<br>on behalf of themselves and all others<br>similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>MARRIOTT INTERNATIONAL, INC.<br><br>        Defendant. | Civil Action No. 05-1138 (GK) |

**MARRIOTT INTERNATIONAL, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Plaintiffs seek to certify a class of worldwide scope and indefinite duration based on a claim that, by allegedly not disclosing in advance to its guests that currency exchange in Russia for hotel rooms priced in U.S. dollars would be performed according to standard Russian practices, Marriott International, Inc. ("Marriott") violated the District of Columbia Consumer Protection Procedures Act ("DC CPPA"). This lawsuit is virtually identical to two other putative class actions – both of which have been dismissed – filed by the same counsel against other hotel operators.[1] Plaintiffs' claims in this companion case are also without merit, and the class Plaintiffs seek to certify falls well short of satisfying the requirements for certification.

After discovery revealed that few people fit within Plaintiffs' initial class definition of Marriott.com users who relied on the currency converter, Plaintiffs radically expanded their proposed class definition and they now propose the following class:

> All persons who booked a room reservation at a Marriott hotel property in
> Russia through the Marriott Reservation System, who received a room rate

---

[1] *See Shaw v. Hyatt Int'l Corp.,* 2005 WL 3088438 (N.D. Ill.), *aff'd Shaw v. Hyatt Int'l Corp.,* 461 F.3d 899 (7th Cir. 2006) (attached as Ex. 1); *Bykov v. Radisson Hotels Int'l,* 2006 WL 752942 (D. Minn. 2006) *aff'd Bykov. v. Radisson Hotels Int'l, Inc.* 221 Fed. Appx. 490, 491-92 (8th Cir. 2007) (attached as Ex. 2).

confirmation stated in U.S. Dollars, and whose final bill at checkout was
stated in Russian Rubles.

This Court should not certify this putative class for the following reasons:

1.  Discovery has revealed that the proposed class representatives lack standing to pursue claims against Marriott and thus lack standing to represent the putative class.

2.  Plaintiffs cannot meet their burden of establishing an "adequately defined and clearly ascertainable" class.  Plaintiffs' proposed class is ill-defined because it encompasses members, for example, who cannot allege they have suffered injury, who received full disclosure of the currency exchange system, from around the world who have had no contacts with the District of Columbia, and who have had no contact whatsoever with Marriott.

3.  Plaintiffs cannot meet the criteria of Fed. R. Civ. P. 23(a)(2)-(4), which require that there are questions of law or fact common to the class, that the claims or defenses of the representative parties are typical of the class, and that the class representatives will adequately represent the class.  Plaintiffs' proposed class now encompasses guests who made hotel reservations through a wide range of distribution channels – including not only marriott.com and the Marriott toll-free system, but also third-party websites, independent travel agents, and direct contact with hotels neither owned nor operated by Marriott.  Only some of these channels are Marriott controlled, yet all provide prospective guests with different information concerning room rates and terms and many supplemented information provided by Marriott with their own rates and terms. The countless materially different factual circumstances encompassed within Plaintiffs' proposed class preclude a showing of commonality or typicality.  Indeed, the diversity of the named Plaintiffs' claims demonstrates that there are no "typical" claims at issue here.

Moreover, the proposed class representatives have jettisoned the interests of some dissimilar members of the putative class, thereby demonstrating their inadequacy as class representatives.

4.  Plaintiffs also cannot meet the requirements of Rule 23(b)(3), which mandate that common questions of law or fact predominate and that a class action is the superior method of resolution.  The rigorous choice of law analysis required upon motion for class certification shows that District of Columbia law does not apply to the entire class, because the District does not have the most significant relationship to each class member's claim.  Instead, this Court would have to apply the consumer protection laws of nearly all 50 states and 143 foreign countries to resolve the disputes of the proposed class.  These laws have many significant differences, and so common questions of law do not predominate.  Nor do common questions of fact predominate, based on the many materially different factual situations at issue, as noted above.  In addition, these differences make a class action unmanageable and thus not the superior method of resolving this dispute.  Finally, the hotels in Russia affiliated with Marriott all now quote prices in rubles and settle hotel bills in rubles.  For all these reasons, this Court should not certify this class.

## STATEMENT OF FACTS

**I.     Marriott International, Inc.**

Marriott is a hospitality company with more than 2,900 lodging properties in the United States and 67 other countries and territories.  Affidavit of Brendan Ross, attached as Ex. 3, ¶3. The company is incorporated in Delaware.  Affidavit of Juan Carlos Garcia, attached as Ex. 4, ¶3.  Its headquarters and principal place of business are in Bethesda, Maryland.  *Id.*  Marriott's SEC filings state that its headquarters and principal place of business are in Maryland.  Ross Aff., Ex. 3 ¶5.  Marriott annually files a personal property tax return with the Maryland State

Department of Assessments and Taxation ("SDAT"). *Id* ¶6  Marriott also pays an annual fee to SDAT so that it can maintain its physical existence in the State of Maryland. *Id* ¶7.  Marriott's federal identification number begins with the state code "52" for Maryland, further confirming that its corporate headquarters and principal place of business are in Maryland. *Id* ¶4.  The servers for Marriott's website – www.marriott.com – are operated out of Frederick, Maryland. Affidavit of Debbie McGrath, attached as Ex. 5, ¶4.

## II.    The Marriott Russia Hotels

Plaintiffs' claims involve seven hotel properties affiliated with Marriott.  These seven hotels are located in Russia (collectively, the "Marriott Russia Hotels").  Four of these hotels – the Renaissance Moscow, the Renaissance Samara, the Renaissance St. Petersburg Baltic, and the Courtyard Moscow – are managed by Marriott and have been since they opened for business ("Marriott Managed Hotels").  Garcia Aff., Ex. 4 ¶6.[2]  The remaining three hotels – the Moscow Marriott Grand, the Moscow Marriott Royal Aurora, and the Moscow Marriott Tverskaya – are franchised hotels that are neither owned nor operated by Marriott ("Marriott Franchised Hotels"). *Id* ¶7.  Rather, the Marriott Franchised Hotels are, and have been since opening, owned and operated by wholly-owned subsidiaries of Interstate Hotels and Resorts, Inc. ("Interstate"). *Id* ¶8.[3]  Interstate is not owned by Marriott.

The Marriott Franchised Hotels utilize Russian websites operated by Marriott Hotels of Moscow to assist guests in making reservations for the Marriott Franchised Hotels.  Upon information and belief, Interstate owns and operates Marriott Hotels of Moscow.  Ross Aff.,

---

[2] Renaissance Moscow opened on January 1, 1990; Renaissance Samara on September 12, 2003; Renaissance St. Petersburg Baltic on May 11, 2004; and Courtyard Moscow on December 10, 2005. Garcia Aff., Ex. 4 ¶6.

[3] The dates on which these hotels became Marriott franchises are as follows:  Moscow Marriott Grande on August 23, 1997; Moscow Marriott Royal Aurora on January 12, 1999; and Moscow Marriott Tverskaya on January 12, 1999. Ross Aff., Ex. 3 ¶7.

Ex. 3 ¶12. Marriott has no affiliation with Interstate's Marriott Hotels of Moscow and plays no role in its operation or the Russian websites it maintains. *Id.* Marriott has no control over the information, disclosures, or room confirmations that Interstate's Marriott Hotels of Moscow provides to prospective guests that access these Russian websites to make reservations. *Id.*

As is true with all Marriott hotels, the local management of the Marriott Russia Hotels set their own room rates and decides whether to quote room rates in U.S. dollars or other currency. Affidavit of Mary LoGiudice, attached as Ex 6, ¶4. Likewise, during the entire time that Marriott Russia Hotels quoted prices in U.S. dollars, the internal exchange rate applied by the hotels was determined by the hotels themselves, not Marriott. *Id.* ¶10. The Marriott Russia Hotels no longer quote room prices in U.S. dollars; rather, all seven of the hotels now quote room prices in rubles. Garcia Aff., Ex. 4 ¶13.[4]

## III.    Russian Currency Law

Pursuant to Russian law, services purchased in Russia, such as hotel lodging, may only be paid for in rubles—and no other currency. Affidavit of William Elliott Butler, attached as Ex. 7, ¶¶6-8; Article 6a of the Federal Law "On Currency Control and Currency Regulation," No. 173-FZ of Dec. 10, 2003.[5] To comply with this legal requirement, the Marriott Russia Hotels would convert the quoted U.S. dollar amount into rubles using a hotel exchange rate and a pre-arranged monetary unit called a "currency unit" or simply "unit" when a guest checked out

---

[4] The period of time each hotel used dollars as the room rate currency was unique to that hotel and was a decision by the hotel's local management. The Renaissance Moscow quoted prices in U.S. dollars from March 31, 1997 to January 1, 2008. The Renaissance Samara quoted prices in U.S. dollars from September 12, 2003 to December 14, 2006. The Renaissance St. Petersburg Baltic quoted prices in U.S. dollars from May 11, 2004 to December 12, 2006. The Courtyard Moscow quoted prices in U.S. dollars from December 10, 2005 to December 19, 2006. The Moscow Marriott Grand quoted prices in U.S. dollars from August 23, 1997 to December 20, 2006. The Moscow Marriott Royal Aurora quoted prices in U.S. dollars from January 12, 1999 to December 20, 2006. The Moscow Marriott Tverskaya quoted prices in U.S. dollars from January 12, 1999 to December 13, 2006. Garcia Aff., Ex. 4 ¶10.

and paid for his or her room. *Id* ¶¶11-12. The currency unit always equaled the amount quoted in U.S. dollars. Garcia Aff., Ex. 4 ¶11. For example, if a guest booked a room at $250.00 U.S. dollars per night, this amount would be equal to 250 currency units. At a hotel exchange rate of 30 currency units to 1 ruble, the guest would pay 7,500 rubles (250 x 30 = 7,500) at check-out. In Russia, this practice was followed not just by Marriott Russia Hotels, but by most other hotels and businesses that quoted prices for goods or services in U.S. dollars to protect against the ruble's fluctuations in value. Butler Aff., Ex. 7 ¶5. *See infra* FN6.

Businesses uniformly have quoted prices in a more stable currency, such as the U.S. dollar, to avoid the costs of constantly reprinting price lists, invoices, restaurant menus, etc., priced in the less stable ruble. *Id* ¶5. Internal or "house" exchange rates were used by businesses in Russia for similar reasons. By setting an internal exchange rate above the Central Bank Rate, businesses could better protect themselves from fluctuations in the value of the ruble that would occur before those businesses had a chance to transmit the ruble payments they received from customers to their respective banks and exchange those amounts for the equivalent amount of a more stable currency. *See Bykov*, 2006 WL 752942 at *2 n.4, Ex. 2.[6]

---

Russian law recognizes a narrow exception when a purchase is made by a pre-arranged bank transfer. *Id.*

[6] Former named Plaintiff Irina Paliashvili testified that she has considerable expertise in Russian business practices and that, following the dissolution of the Soviet Union in 1991, "there was very high inflation rate and the currency exchange there was unpredictable." Paliashvili Dep., Ex. 8 at 23-25. To "cope with the fact that there was wide fluctuation in exchange rates and also a black market for exchange rates," businesses used the dollar "as an informal denominator." *Id.* at 25-27. Even though businesses were required by law to pay in rubles, they would reach an informal salary agreement in dollars with their employees, and then convert dollars to rubles for each payment period. *Id.* Paliashvili testified that, during the time she ran her law firm in Russia, she had this type of agreement with her employees "because [the] dollar was a stable currency then and ruble was not." *Id.* at 61-63.

## IV.    Reservations for the Marriott Russia Hotels

When a Marriott hotel property selects its room rates and the currency in which those room rates will be quoted, it enters this information into Marriott's Automated Reservation System for Hotel Accommodations ("MARSHA"). LoGiudice Aff., Ex. 6 ¶4. As a general rule (subject to exceptions not relevant here), only the hotels may enter or modify this information. *Id.*

Once the hotel information is entered into MARSHA, numerous different reservation channels access this information to assist prospective guests in making reservations. McGrath Aff., Ex. 5, ¶5. A prospective guest may make a reservation at a Marriott Russia Hotel through any of the following reservation channels: (a) contact the hotel directly; (b) access one of several Russian websites that are managed and operated by Interstate's Marriott Hotels of Moscow; [7] (c) call a Marriott toll-free number; (d) contact a third-party travel agent; (e) use an Internet site such as Expedia.com; or (f) book a reservation on marriott.com. *Id* ¶6; Ross Aff., Ex. 3 ¶12. Due to the customized nature of the interfaces between MARSHA and each reservation channel, the data fields and hotel information displayed by one reservation channel (e.g., marriott.com) differ from the data fields and hotel information displayed by another (e.g., Expedia). McGrath Aff., Ex. 5 ¶7.

Some guests at the Marriott Russia Hotels book their rooms by contacting the hotels directly. A prospective guest choosing this method, speaks with hotel personnel in Russia. The hotels sometimes send these guests in their confirmations that the rate quoted is in units equal to U.S. dollars but that payment must be made at the hotel's current exchange rate in rubles only. *See, e.g.,* CSIS 00045-000065, Ex. 9. In 2005, hotel personnel taking reservations at Marriott

---

[7] Interstate's Marriott Hotels of Moscow website does not constitute an official reservation channel of Marriott. Marriott became aware of Interstate's unauthorized use of Marriott's name during this case. Ross Aff., Ex. 3 ¶12.

Managed Hotels began orally advising prospective guests that the quoted price was in currency units subject to the hotel's exchange rate at check-out. Garcia Aff., Ex. 4 ¶16.

Other guests book their rooms at the Marriott Russia Hotels by visiting one of several Russian websites that are owned, managed, and operated by Interstate's Marriott Hotels of Moscow or by contacting Marriott Franchised Hotels directly. Some of these guests, including named class representatives, received written confirmations stating that the room rate was quoted in currency units equal to U.S. dollars subject to the hotel's internal exchange rate at check-out. Dep. of Sarah Mendelson, attached as Ex. 10 at 87-91; Mendelson Dep. Ex. 20A, attached as Ex. 11; CSIS 00045-00065, Ex. 9; McGrath Aff., Ex. 5 ¶6.

Still other guests at the Marriott Russia Hotels book their rooms by calling a Marriott toll-free number and those calls are routed to a reservation agent via Marriott Global Reservation Sales operated by Marriott. Depending on which toll-free number the guest calls and the call volume, the guest may speak with a reservation agent in one of several locations worldwide, none of which is Washington, D.C. Dep. of Tina Wolz, attached as Ex. 12 at 58; LoGiudice Aff., Ex. 6 ¶14. As of August 5, 2005, Marriott expressly directed its toll-free reservation agents to disclose to inform guests that the rate being quoted was in currency units equal to U.S. dollars but that payment must be made at the hotel's current exchange rate in rubles only. *Id* ¶15.

Alternatively, some guests use third-party travel agent located throughout the world to book their stays. The interface that travel agents use to access MARSHA information related to room availability and rates varies by travel agency. McGrath Aff., Ex. 5 ¶8. In 2005, Marriott inserted language in MARSHA stating that prices quoted in U.S. dollars must be paid in rubles at the hotel's exchange rate at the time of check-out, but this information may or may not have been viewed by the travel agents and passed along to the prospective guest. *Id* ¶8-10. Marriott does

not control the disclosures made by third-party travel agents and some travel agencies utilize their own independent rate-related disclosures. *Id.* ¶¶9-10.

A prospective guest may also make a reservation by contacting on-line travel agents such as Expedia.com. Although MARSHA provides rate and pricing information to some of these sites, Marriott has no control over the rate or currency exchange disclosures made by on-line agents. *Id* ¶10.

Finally, a prospective guest may book a reservation for a hotel by visiting marriott.com. The primary servers for marriott.com are in Maryland. *Id.* ¶4. In 2005, language was added to marriott.com explaining that, although prices were quoted in U.S. dollars, charges were payable in local currency subject to the hotel's exchange rate at check-out. *Id.* ¶19. If the guest provided an e-mail address, the guest would receive an e-mail confirmation with that same information. *Id.* ¶19.

## V.    Currency Calculator

In June 2003, Marriott placed a currency calculator on marriott.com. Using the currency calculator, a prospective guest could convert an amount in one currency into any of approximately 158 different currencies. The currency calculator was never intended to provide an exact exchange rate for possible future guest stays. To do so would have been impossible as currency fluctuations are unpredictable. *Id.* ¶¶15-18.

Plaintiffs premised their original complaint on prospective guests' reliance on the currency calculator's converted amount. Plaintiffs' Original Complaint at ¶¶ 44-54. However, with the exception of Plaintiff Shaw, none of the named Plaintiffs used the currency calculator. Dep. of Neal Charness, attached as Ex. 13 at 75-76; Dep. of Irina Paliashvili, attached as Ex. 8 at

38; Mendelson Dep., Ex. 10 at 76; Mendelson's Answer to Interrogatory No. 11 of Marriott's

First Set of Interrogatories ("Mendelson's First Interrog."), attached as Ex. 14.

## VI.    The Plaintiffs

### A.    Britt Shaw

Plaintiff Britt Shaw is a U.K. resident domiciled in Florida. Shaw graduated from

Columbia Law School in 1989 and started his own firm in Russia practicing corporate law.

Shaw Dep., Ex. 15 at 37, 40. He lived and worked in Moscow from 1992 through 2000. *Id.* at 4,

34, 167.

Shaw knew as early as 2000 that Russian hotels would make room reservations in dollars

and apply their own exchange rates to convert the hotel bill into rubles at check-out. *Id.* at 77-

79. Even though Shaw expected some transaction cost to be associated with the dollars to rubles

exchange, *id.* at 80-81, 136, he admitted that sometimes he would "get a slightly better exchange

rate than he thought he was entitled to," *id.* at 79, and that as of spring 2005, he was "always

getting what [he] felt was a reasonable exchange rate [from Marriott] which was close to the

official exchange rate." *Id.* at 55, 75-76, 91.

Shaw stayed at Marriott Russia Hotels at least 10 times per year, starting in 2000. *Id.* at

55, 91. He never "noticed I was being overcharged" until a spring 2005 dinner conversation with

Mark Borghesani, Shaw's attorney friend of 15 years and Plaintiffs' co-counsel here. *Id.* at 21,

71-72, 82-83. During that dinner, Borghesani and Shaw also discussed filing a lawsuit against

Hyatt for Shaw's February, 2005 stay at the Hyatt. Shaw's 2005 lawsuit against Hyatt

(dismissed on a preliminary motion) made the same misrepresentation claims concerning Hyatt's

website and currency calculator that Shaw is making against Marriott in this case. *Id* at 108-109;

Shaw Deposition Ex. 18 at 5-6, attached as Ex. 16; *Shaw,* 2005 WL 3088438 at *2, Ex. 1.

Soon after his dinner with Borghesani, Shaw made his next reservation for a stay at a Marriott Russia Hotel. Although Shaw normally made travel arrangements through American Express Travel Services in London, he personally made this reservation on marriott.com. Shaw reviewed the exchange rate on Marriott's currency calculator when making the reservation, Shaw Dep., Ex. 15 at 120, but does not recall looking at the currency calculator for any of his other stays. *Id.* at 122. On the same day he made the reservation, five days prior to arriving at the hotel, he e-mailed the reservation confirmation to Plaintiffs' co-counsel Borghesani. *Id.* at 115-116; Shaw Deposition Ex. 19, header at p.1, attached as Ex. 17. Shaw had by then booked dozens of rooms at Marriott Russia Hotels from 2000-2005. Shaw knew very well that the quoted price in U.S. dollars would be subject to the hotel's exchange rate. Shaw also knew that the hotel had previously used an exchange rate of 32 rubles/dollar, which was the rate he received on previous stays at the Renaissance Moscow, Shaw Dep., Ex. 15 at 96-98, and at the Moscow Hyatt. *Id.* at 103-106; *Shaw,* 461 F.3d at 900., Ex. 1.

When Shaw checked into the Renaissance Moscow Hotel on April 19, 2005, he signed a registration card stating that the daily rate of $425 was in currency units, Shaw Dep. Ex. 15 at 125, and he "expected to be charged in rubles" at check out. *Id.* at 128. When he received his bill at check-out, the 425 units charged matched his expectation as to dollar rate for the room. *Id.* at 127. Shaw acknowledged that the exchange rate of 32 rubles to one unit was clearly stated on the bill. *Id.* at 128. Shaw's employer paid for his stays at the Marriott Russia Hotels. *Id.* at 102-107. He stayed at Marriott Russia Hotels at least eight times after April, 2005. *Id.* at 86-87, 90-91; Shaw Dep. Ex. 12, attached as Ex. 18.

### B.    Neal Charness

Plaintiff Neal Charness, a Michigan resident, holds college and law degrees, including an undergraduate minor in economics. Charness Dep., Ex. 13 at 4, 23-24, 26. He has traveled to Canada, Australia, New Zealand, England, Wales, Russia, Scotland and France. *Id.* at 36.

In booking stays at issue in this litigation, Charness first accessed marriott.com but completed the reservations by contacting the Marriott toll-free number. *Id.* at 75. He did not use the currency calculator or rely on any Marriott advertising. *Id.* at 75-76, 128. Charness assumed that the U.S. dollar amount on the website "would be paid at close to the official conversion rate" at check-out. *Id.* at 76. During his first stay at the Marriott Tverskaya on November 19, 2004, Charness saw a sign at check-in stating that he would be charged in currency units at check-out. *Id.* at 91, 164. When Charness checked out of the hotel, his check-out folio charged in units an amount equal to the price previously quoted in U.S. dollars. *Id.* at 93-94, 148.

Approximately three weeks later, Charness returned to a Marriott Russia Hotel. He admits being aware of the business practice of quoting prices in U.S. dollars but requiring payment in rubles, *id.* at 149-50, and expecting to be charged in currency units subject to the hotel's exchange rate. *Id.* at 150-151. When he checked into the Marriott Grand on December 8, 2004, Charness again signed the registration form indicating that the room price was in units. *Id.* at 83-84, 93; Dep. Exs. 2, 6, attached as Ex. 19. He recalled that there was a sign indicating the use of currency units at the hotel. Charness Dep., Ex. 13 at 103. When Charness checked out of the hotel, the units charged equaled to the U.S. dollar price previously quoted by a Marriott toll-free reservation agent . *Id.* at 93-94; 148.

### C.    Irina Paliashvili

Irina Paliashvili[8] is a citizen of the Ukraine with a U.S. green card. Paliashvili Dep., Ex. 8 at 4-5. She graduated from Kiev University School of International Law and has a Ph.D in international law. *Id.* at 15-16. She travels to Russia two times annually, but did so previously five to six times annually. *Id.* at 37. She knew hotels in addition to Marriott used internal exchange rates to settle accounts in rubles, and that invoices must be paid in rubles. *Id.* at 50-51, 75-76.

Paliashvili's travel agent made the reservation that is the subject of this action. *Id.* at 38, 64-65. Prior to staying at the Marriott Russia Hotels, Paliashvili never visited the marriott.com website or spoke with any Marriott toll-free sales representatives. *Id.* at 68. Nor did she see or rely on any advertising to make the reservation. *Id.* at 69. Paliashvili did not pay for her room. All of her trips were business-related and paid for by her clients or law firm. *Id.* at 48, 55, 85-86.

### D.    Sarah Mendelson

Sarah Mendelson is a U.S. citizen and resident of the District of Columbia. Mendelson Dep., Ex. 10 at 3-5. Her education includes college, graduate school, and fellowships. *Id.* at 115-16. She is an experienced traveler, familiar with Russia. She did research in the Soviet Union in 1990-1991, worked in Moscow from 1994-1995, and is fluent in Russian. *Id.* at 16-17. Mendelson is well-accustomed to exchange rate practices in Russia. *Id.* at 23-24.

Since 1999, Mendelson has stayed at Marriott Russia Hotels over twenty times. *Id.* at 77-79; Dep. Ex. 18, attached as Ex. 20. Neither Mendelson nor her assistant ever made a reservation to stay at a Marriott Russia Hotel through marriott.com. Mendelson Dep., Ex. 10 at 62, 76. Generally, Mendelson's assistant made Mendelson's reservations via e-mails and

---

[8] Paliashvili withdrew as a named Plaintiff in this case but remains a member of the Plaintiffs' proposed class. Pls. Mot. to Amend First Am. Class Action Compl. at 2.

telephone calls to the hotels or through Interstate's Marriott Hotels of Moscow.  Mendelson First Interrog. at No. 11, Ex. 14  Mendelson does not recall ever using the Marriott website currency calculator.  *Id.*; Mendelson Dep., Ex. 10 at 76.

The reservation confirmations Mendelson received in 2002 and 2003 stated that "[t]he above rate is quoted in units equal to US Dollars . . . Payment must be made at the hotel's current exchange rate in rubles only."  *Id.* at 90-91; Dep. Ex. 20, attached as Ex. 21.  In making a reservation for a stay at the Marriott Moscow Grand in January, 2004, Mendelson was advised by Interstate's Marriott Hotels of Moscow that the hotel's exchange rate was higher than that of the Central Bank Rate.  Mendelson Dep., Ex. 10 at 102-106; Dep. Ex. 26, attached as Ex. 22. Finally, for many of her Marriott stays, Mendelson was charged the U.S. Embassy rate, which applied the Central Bank exchange rate to convert her hotel bill to rubles at checkout.  *Id.* [9]

Mendelson never complained about rates at the Marriott Russia Hotels, including during meetings between Interstate and her employer, Plaintiff Center for Strategic and International Studies ("CSIS"), in which she participated to discuss the company's [which company's] special corporate rates.  Mendelson First Interrog., Ex. 14 at No. 13; Mendelson Dep., Ex. 10 at 121. [10] Mendelson's employer paid for her rooms at the Marriott Russia Hotels.  Mendelson First Interrog., Ex. 14 at No. 11 Mendelson Dep., Ex. 10 at 37-38 ("I personally don't pay anything."). Mendelson is not trying to recover damages in this case.  *Id.* at 39-40.

---

[9] Upon being presented with evidence that she was charged the Central Bank rate, Mendelson testified that she does not know for which of her Marriott Russia Hotel stays she is seeking recovery. *Id.* at 117, 119, 126, 129-131.

[10] Per CSIS policy, Mendelson had an obligation to advise the Chief Financial Officer or someone else at CSIS if she believed that she was being overcharged by any hotel used by CSIS for business.  Deposition of Greg Broaddus attached as Ex. 24 at 68.  Likewise, Mendelson had an obligation to advise the Chief Financial Officer or someone else at CSIS if she believed she was being subject to an improper exchange rate by any hotel used by CSIS for business.  *Id.* at 68-69.  Mendelson never advised anyone at CSIS of a perceived overcharge.  *See* Mendelson First Interrog., Ex. 14 at No. 13.

### E.    CSIS

Plaintiff CSIS is a Delaware corporation, headquartered in Washington, D.C.[11]  Pls.' Second Am. Class Action Compl. & Demand for Jury Trial, ¶15.  CSIS employees, including Plaintiff Mendelson, frequently travel to Russia to further CSIS's business objectives of research and policy analysis.  *See id.*  CSIS's projects are funded primarily through grants, and its employees' travel expenses are budgeted into those appropriations.  CSIS's Answer to Interrog. No. 25 of Marriott's First Set of Interrog, attached as Ex. 23.  Documents produced by CSIS suggest that numerous of its hotel charges are not for guest rooms, but for meals, conference rooms, and other miscellaneous charges.  *See, e.g.* CSIS 00103; 00126, Ex. 9. [12]

### **LEGAL STANDARD**

At the class certification stage, Plaintiffs bear the burden of demonstrating that they have met the requirements for certification under Rule 23.  *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613-14 (1997); *Richards v. Delta Airlines, Inc.*, 453 F.3d 525, 529 (D.C. Cir. 2006); *Love v. Johanns,* 439 F.3d 723, 727 (D.C. Cir. 2006).

First, Plaintiffs must demonstrate that they have proposed a class that is "adequately defined and clearly ascertainable."  *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970); *Moore's Fed. Prac.* § 23.21[1] (2001) ("The identity of class members must be ascertainable by reference to objective criteria.").

Additionally, Plaintiffs must satisfy all four requirements of Rule 23(a):

      (a)     that the class is so numerous that joinder of all members is impracticable;

---

[11] As discussed in Marriott's Motion for Partial Dismissal of Plaintiffs' Second Amended Complaint, currently pending before this Court, CSIS, as a corporation, is not a proper plaintiff to a DC CPPA claim.

[12] The class that Plaintiffs now seek to certify (unlike that in Plaintiffs' Second Am. Compl.) limits damages to charges for rooms, and does not include other hotel expenditures. Broaddus Dep., Ex. 24. at 102. However, CSIS's corporate representative admitted that CSIS's credit card bills do not identify whether charges were for rooms or other hotel expenditures. *Id.* at 103-05. Such determinations would require analysis of each employee's hotel stays.

(b)     that there are questions of law or fact common to the class;

(c)     that the claims or defenses of the representative parties are typical of the claims or defenses of the class; <u>and</u>

(d)     that the representative parties will fairly and adequately protect class interests.

*Amchem,* 521 U.S. at 613-14; *Richards,* 453 F.3d at 529; *Love,* 439 F.3d at 727.

Plaintiffs also must prove that they satisfy the requirements of one of the three subdivisions of Rule 23(b).  *Richards,* 453 F.3d at 529; *Garcia v. Johanns*, 444 F.3d 625, 631 n.6 (D.C. Cir. 2006); *McCarthy v. Kleindienst,* 741 F.2d 1406, 1414 n.9 (D.C. Cir. 1984).  Plaintiffs have moved for class certification under Rule 23(b)(3), which requires that they establish "that the questions of law or fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

This Court may certify the class only if it is satisfied, upon rigorous analysis, that Plaintiffs have met their burdens.  *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161 (1982); *Kremens v. Bartley*, 431 U.S. 119, 135 (1977).

## <u>ARGUMENT</u>

## I.    <u>THE COURT SHOULD NOT CERTIFY THE CLASS BECAUSE THE PUTATIVE CLASS REPRESENTATIVES EACH LACK STANDING.</u>

As a threshold matter, in order to represent the putative class, the named Plaintiffs must have standing to raise the DC CPPA claims at issue here.  *See, e.g., Cruz v. American Airlines, Inc.*, 356 F.3d 320, 327-331 (D.C. Cir. 2004) (affirming denial of class certification where named plaintiffs lack standing to maintain claims at issue); *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) ("[I]t is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district

court must determine that at least one named class representative has Article III standing to raise each class subclaim."); *Nelson v. Greenspan*, 163 F. Supp. 2d 12, 19 (D.D.C. 2001) ("A class representative must have standing to bring that claim."); *Moore's Fed. Practice* § 23.21[1] ("In order to have standing to serve as a class representative, each named plaintiff must possess an interest or suffer an injury that is shared by all members of the class that he or she seeks to represent"). Here, discovery has confirmed that the named Plaintiffs lack the required standing, class certification must be denied, and the Court need not expend resources on "any formal typicality or commonality review." *Prado-Steiman, 221 F. 3d at 1279.*

All five putative class representatives lack standing to maintain DC CPPA claims because they have not been injured in fact by Marriott. *See, e.g., Hoyte v. Yum Brands, Inc.*, 489 F. Supp. 2d 24, 28-29 (D.D.C. 2007); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 177-78 (D.D.C. 2003). As this Court has made clear, a plaintiff suing under the DC CPPA must make a showing of actual injury:

> While [certain statutory language] might suggest that a plaintiff could pursue a claim under DCCPPA without an actual or threatened injury, the cases hold otherwise. *Williams v. Purdue Pharma Co.,* 297 F.Supp.2d 171, 178 (D.D.C. 2003) ("the CPPA [does] not change the requirements for standing under D.C. law, despite its broad language") *citing Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1206 (D.C.2002) (the D.C. courts, though not established under Article III of the Constitution, nevertheless recognize constitutional and prudential standing requirements)....[P]laintiff must present an actual or threatened injury-in-fact to have standing to raise his DCCPPA claims

*Hoyte*, 489 F. Supp. 2d at 28-29.[13]

Shaw, Mendelson and Paliashvili have no injury-in-fact and thus no standing because

---

[13] *See also Athridge v. Aetna,* 351 F.3d 1166, 1176 (D.C. Cir. 2003); *Williams,* 297 F. Supp. 2d at 177-178 (dismissing the plaintiffs' DC CPPA claim because "while it asserts that defendants engaged in false and misleading advertising, it does not plead that these [plaintiffs] *were in any way deceived—or even saw—any of that advertising*" and because the plaintiffs had "fail[ed] to allege any particularized and *specific injury-in-fact suffered*") (emphasis added). This Court in *Williams* distinguished an administrative proceeding, where no injury is required, from a claim by a private plaintiff, who must have injury to have standing. *Id.* at 178.

they did not pay their hotel bills, which were paid instead by their employers or clients. *E.g.*, Shaw Dep., Ex. 15 at 102-03; Mendelson Dep., Ex. 10 at 32; Paliashvili Dep., Ex. 8 at 48, 55, 85-86; *see, e.g.*, *Bykov*, 221 Fed. Appx. at 492, Ex. 2 (affirming the district court's conclusion that Bykov "lacked standing because Bykov's company, and not Bykov, paid the hotel bill and suffered the alleged injury").

Shaw, Mendelson, and Paliashvili also lack standing because they were not misled and thus suffered no cognizable harm by Marriott. Rather, all three were familiar with currency units as well as the requirement that they pay the hotel bill in rubles at the hotel's internal exchange rate. Shaw Dep., Ex. 15 at 138-39; Mendelson First Interrog., Ex. 14 at No. 10; Paliashvili Dep., Ex. 8 at 50-51, 75-76. Moreover, Mendelson and Paliashvili never received representations by Marriott as to its room rates either because they dealt only with Interstate's Marriott Hotels of Moscow and the Marriott Franchised Hotels or because they did not make their own reservations for their stays at the Marriott Russia Hotels. *Id.*, Ex. 8 at 38, 64-65; Mendelson First Interrog., Ex. 14 at No. 11. In fact, Mendelson was expressly informed of the internal exchange rate conversion. Mendelson Dep., Ex 10 at 90-91; Dep. Ex. 20, attached as Ex. 21.[14]

In addition, Shaw (a U.K. resident) and Charness (a Michigan resident) lack standing to bring DC CPPA claims because discovery has revealed that neither their residency nor the method used to reserve their hotel rooms has any connection to the District of Columbia. When Shaw accessed marriott.com (with its servers located in Maryland) or called his U.K. travel agent, his reservation was processed outside of the District of Columbia. Similarly, when Charness called the Marriott toll-free number to complete his reservation, Charness Dep., Ex. 13

---

[14] Mendelson's confirmation stated: "the above rate is quoted in units equal to US Dollars. All major credit cards are accepted. Payment must be made at the hotel's current exchange rate in rubles only." Dep. Ex. 20, attached as Ex. 21.

at 75-76, his call was directed to an operator at an international call center – none of which are in the District of Columbia. LoGiudice Aff., Ex. 6 ¶14. As shown in Section IV.A., *infra,* District of Columbia law does not apply to these Plaintiffs' claims because the District is not the jurisdiction with the most significant relationship to those claims.

Finally, CSIS is a corporation. As such, it lacks standing to pursue claims under the DC CPPA. *See* D.C. Code § 28-3901(a)(2); *Clifton Terrace Assocs., Ltd. v. United Tech. Corp.,* 728 F. Supp. 24, 34 (D.D.C. 1990), *vacated in part on other grounds,* 929 F.2d 714 (D.C. Cir. 1991); Marriott's Motion for Partial Dismissal of Plaintiffs Second Amended Complaint at 4-5.

Failure to satisfy the standing threshold bars the individual claims of the named class representatives. It also undermines the viability of the proposed class as a whole, requiring the denial of Plaintiffs' class certification motion and negating the need for Rule 23 analysis. *See Cruz,* 356 F.3d at 327-331; *Prado-Steiman,* 221 F.3d at 1279; *Nelson,* 163 F. Supp. 2d at 19.[15]

---

[15] Plaintiffs' class representatives are without standing to pursue the claim as well. Indeed, they did not include that claim in their class definition or briefing and therefore have waived certification of it. Not one of the class representatives considered the location of Marriott's headquarters in making the reservations. Nor was any class representative under the impression that Marriott was headquartered in Washington, D.C. at the time they made reservations to stay at the Marriott Russia Hotels. In fact, these Plaintiffs either were not aware of the location of Marriott's headquarters or actually *knew* that Marriott was headquartered in Maryland. *See, e.g.,* Morrison Dep. (CSIS employee), Ex. 26 at 63 (Q: "Do you know where Marriott International is headquartered?" A: "It's Maryland." Q: "Did the headquarters of Marriott International have any impact on your selection of a hotel in Russia?" A: "No."); Mendelson First Interrogatories, Ex. 14 at Nos. 21-23, ("I am unfamiliar with Marriott's representations regarding 'geographic origin' in connection with its hotel services."); Einhorn Dep. (CSIS employee), attached as Ex. 25 at 53 (stating that he did not know where Marriott is headquartered).

Likewise, Plaintiffs did not brief their unjust enrichment claim in their Motion for Class Certification and apparently have abandoned it. In any event, this claim could not be certified because Plaintiffs' claims involve express contracts between them (or their employers) and Marriott. *Schiff v. American Ass'n of Retired Persons,* 697 A.2d 1193, 1194 (D.C. 1997); *Shaw,* 461 F.3d at 902 ("Similarly, Shaw fails to present a claim for unjust enrichment, because that is unavailable where the claim rests on the breach of an express contract."); *Bykov,* 2006 WL 752942, Ex. 2 at 5-6 (dismissing claims against Radisson where "[p]laintiff cannot prove unjust enrichment because his claim is governed by an express contract between the parties"). Certification of this claim also would be inappropriate because of the individualized determinations required to determine the applicability of the voluntary payment doctrine. As this Court has explained, issues of voluntary payment *vel non* are questions "of fact, to be judged in light of all the applicable circumstances surrounding a given transaction." *Shaw,* 474 F. Supp. 2d at 151, Ex. 1.

## II.    THE COURT SHOULD DECLINE TO CERTIFY THE PROPOSED CLASS BECAUSE IT IS NOT "ADEQUATELY DEFINED AND CLEARLY ASCERTAINABLE."

As a preliminary requirement to class certification under Rule 23, the proposed class must be "adequately defined and clearly ascertainable." *DeBremaecker*, 433 F.2d at 734; *In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir. 1989), *abrogated on other grounds by Amchem Prods.*, 521 U.S. 591; *Moore's Fed. Practice* § 23.21[3]; *see also Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 239 F.R.D. 9, 25 (D.D.C. 2006) (noting that plaintiffs must establish that the general outlines of the membership of the class are determinable at the outset of the litigation). Here, Plaintiffs do not propose a meaningful class definition and fail to meet this threshold requirement. The Court should decline to certify the proposed class.[16]

First, the proposed class is inadequately defined and not clearly ascertainable because it is not restricted to members who can allege that they were harmed by Marriott. For example, the proposed class encompasses individuals who did not pay for their room and/or never received any representation from Marriott. *See supra* Section I. [17]    As a result, before the court could

---

[16] The Court cannot properly evaluate Rule 23 requirements because Plaintiffs' criteria for class membership are so unclear. For example, it is impossible to determine whether the named Plaintiffs' claims and defenses are typical where the class definition is so expansive that it does not identify a typical class member. *See infra* Section III.B.1.

[17] Plaintiffs have re-defined the class as discovery revealed that few, if any, people were affected by the facts alleged in the initial Complaint, i.e., that guests were misled by the currency calculator on marriott.com. Original Compl. ¶¶ 44-54. Plaintiffs have massively expanded their class definition to include vast numbers of individuals who were not even arguably harmed by Marriott. *See infra* Section I. They now include:

> [a]ll persons who booked a room reservation at a Marriott hotel property in Russia through the Marriott Reservation System, who received a room rate confirmation stated in U.S. dollars, and whose final bill at check-out was stated in Russian Rubles.

Plaintiffs' Motion p. 1. Plaintiffs' Second Amended Complaint – filed after their motion for class certification – sought to certify yet a different class of persons: those "who have been improperly charged excess amounts for rooms and other hotel charges owned, operated, managed, or franchised by Marriott during the time period between May 2002 and the present." PRAYER FOR RELIEF at ¶ 1. Plaintiffs' failure to adhere to a consistent class definition is itself a sound basis for the Court to decline to certify the class. "Ultimately, the constantly changing legal theories, relief, and class composition, contribute to the inescapable conclusion that the class certification motion must be denied." *Foster v. St. Jude Med., Inc.*, 229 F.R.D. 599, 603 (D. Minn. 2005).

engage in a Rule 23 analysis, it would be required to make individual determinations to "weed out" those putative members who plainly fit within Plaintiffs' expansive definition but just as plainly have no claim against Marriott because they have not been harmed by Marriott. For each proposed class member, the Court would need to inquire, for example:

- Whether the individual used a reservation channel controlled by Marriott or a third party;

- Whether the individual—or someone else—made the reservation at issue;

- Whether the individual received a room rate quote from Marriott in U.S. dollars;

- Whether the individual received a disclosure or confirmation stating that the quoted room rate was in currency units payable in rubles at the hotel's exchange rate at the time of check-out;

- Whether the individual was aware of the Russian business practice of quoting prices in currency units and requiring payment in rubles determined by an internal exchange rate;

- Whether, at the time of check-out, the hotel applied the Central Bank exchange rate or its internal exchange rate to convert U.S. dollars into rubles;

- Whether the individual paid the hotel bill and did not pass the expense to a third party, such as an employer or client;

- Whether the individual complained about the price and was given some refund, rebate or other settlement from Marriott in response; and

- Whether the individual voluntarily paid his or her hotel bill without complaint or made subsequent stays at the Marriott Russia Hotels after being aware of the practice of quoting in currency units and requiring payment in rubles at the hotel's internal exchange rate as a result of a prior stay at a Marriott Russia Hotel.

A class definition that requires the court to make such individual determinations is inadequate. *See e.g.*, Moore's Fed. Practice § 23.21[3][c].

Plaintiffs' class definition is also inadequate and unascertainable because it is unrestricted by time. It completely ignores applicable statutes of limitations on class members' claims and includes members whose claims are time-barred by law. *Vickers v. General Motors Corp.*, 204

F.R.D. 476, 478 (D.Kan. 2001) ("in the absence of proposed time periods limiting the scope of the class," plaintiffs did not adequately define the class); *Dunn v. Midwest Buslines, Inc.*, 94 F.R.D. 170, 172 (E.D. Ark. 1982) (refusing to certify class in part because it lacked temporal limits).

Finally, Plaintiffs' class definition is unrestricted by geography and includes members, such as Shaw and Charness, who made reservations for stays without having any contact or involvement with the District of Columbia, and therefore cannot avail themselves of its consumer protection laws. *See* Moore's Fed. Practice § 23.21[3] (suggesting that a proposed class without fixed, geographic boundaries may be overbroad).

Indeed, Plaintiffs' counsel in recent depositions has been unable to articulate the definitions of the proposed class. When class representative Mendelson was reminded that all of her hotel stays were paid by her employer, and asked whether she or her employer was asserting the claim, Plaintiffs' counsel instructed her not to answer, stating "until the Court decides who the real party in interest is, we don't have an answer to that." Mendelson Dep., Ex. 10 at 176-178. Ambiguity also plagued the depositions of other CSIS employees. *See, e.g.,* Deposition of J. Stephen Morrison, attached as Ex. 26 at 101 ("Whether or not he is a member of the class is going to be determined by the definition the court adopts in this case."). When Marriott counsel asked Plaintiffs' expert, Timothy Brickell, whether Mr. Brickell's analysis of hotel stays had "the purpose to identify the number of guests who met the class criteria," Plaintiffs' counsel instructed Mr. Brickell not to answer because "the class criteria hasn't been established yet, because the court hasn't ruled on the motion for class certification." Deposition of Timothy Brickell, attached as Ex. 27 at 143-144. [18] That Plaintiffs' counsel will not articulate the scope of

---

[18] The only reference to ascertainability in Plaintiffs' Motion is to the analysis by Mr. Brickell. However, Mr. Brickell did <u>no</u> analysis of the class definition or whether he could ascertain the number of persons who fell within

the proposed class underscores that the class is unascertainable and cannot be certified.

## III.  PLAINTIFFS' PROPOSED CLASS FAILS TO MEET THE RULE 23(a) REQUIREMENTS OF COMMONALITY, TYPICALITY AND ADEQUACY.

### A.  CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS CANNOT MEET THE COMMONALITY REQUIREMENT.

For the putative class to be certified, Rule 23(a) requires Plaintiffs to establish "issues of fact and law common to the class," *Gonzalez v. Brady*, 136 F.R.D. 329, 331 (D.D.C. 1991), and "at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightfoot v. District of Columbia*, 246 F.R.D. 326, 337 (D.D.C. 2007). Plaintiffs have established no common issues of fact or law, and no one issue which, if resolved, would affect a significant number of putative class members. Rather, Plaintiffs commonality argument hinges on erroneous allegations that Marriott possesses "exclusive control over the dissemination of information contained in [this] reservation system" and that "false information was uniformly disseminated" because "for all its Russian hotel guests, Marriott issued a written confirmation which stated the room rate in U.S. Dollars." Motion at 12, 14-15.

Contrary to Plaintiffs' allegations, facts adduced during discovery establish that (1) Marriott does not exclusively control dissemination of information to customers concerning Marriott room rates and terms, (2) there is no uniform method of distribution of this information, and (3) Marriott does not issue uniform, written confirmations stating rates in U.S. dollars to all Russian hotel guests.[19] Rather, Marriott guests obtain information about Marriott lodging rates

---

the definition. Plaintiffs' counsel instructed Mr. Brickell not to answer whether "in drafting his declaration, [his] purpose was to identify the number of guests who met the class criteria." Brickell Dep. at 139-141, 143-144.

Instead, Mr. Brickell's analysis merely tallies the number of all guest stays at the Marriott Russian Hotels for the dates dictated by Plaintiffs' counsel, regardless of whether, for example, these guests received any representations by Marriott, suffered any injury, or were aware of the exchange rates at issue. In short, Mr. Brickell's analysis provides no aid to class certification because he does not account for which, if any, guest stays would represent even an arguable claim against Marriott. *See id.* at 154-159; *see also id.* at 135-137, 139-141, 146.

[19] Not all guests received written confirmations, and putative class representatives Mendelson and CSIS even

and terms through a wide variety of reservation channels, such as Marriott website and call center networks, internet travel websites (*e.g.*, Expedia), traditional travel agencies, and independently operated hotel networks (such as Marriott Hotels of Moscow). Significantly, Marriott does not control the information ultimately provided to the customer through many of these channels, and many of them supplement any information received from Marriott (via the MARSHA system or otherwise) with their own wide variety of rates and terms.[20] As a result, information customers receive varies significantly depending upon the channel they use. Therefore, resolution of any single factual issue relative to a particular guest's receipt of information about room rates at the Marriott Russian Hotels would not affect all or even a significant number of putative class members.

Plaintiffs ignore that their proposed class encompasses countless permutations of the following factors relevant both to standing and liability: 1) the information channel a guest uses to book a room; 2) guest knowledge about currency exchange before the stay; and 3) information content the guest received. The following illustrations demonstrate the lack of common factual issues surrounding guests' receipt of information concerning room rates at the Marriott Russian Hotels:

- Guests who made reservations at the Marriott Franchised Hotels by contacting those properties directly did not receive any representations from Marriott.

- Guests who made reservations at the Marriott Franchised Hotels by accessing Russian

---

received written confirmations expressly stating that the room rate was in "units" which would be converted to rubles at checkout using "the hotel's current exchange rate." CSIS 00045-00065, attached as Ex. 9.

[20] There is no "common" compilation of information in MARSHA accessible by all reservation channels. Marriott does not have "exclusive control" over the information in MARSHA. The Marriott Russia Hotels, not Marriott, dictate their room rates, the currency in which to quote those rates, and their internal exchange rates. LoGiudice Aff., Ex. 6 ¶7. Moreover, the various reservation channels access different customized interfaces with MARSHA. McGrath Aff., Ex. 5 ¶7. Due to these customizations, information regarding room rates displayed by one reservation channel (e.g., Marriott.com), differs from the information displayed by another channels (e.g., a travel agent). *Id.*

websites controlled and operated by Interstate's Marriott Hotels of Moscow did not receive any representations from Marriott.

- Guests who made reservations through travel agents or third-party websites and received representations about room rates from those entities but not from Marriott.

- Guests who contacted the Marriott Franchised Hotels directly to make their room reservation often received reservation confirmations containing the following language: "Payment Procedures: The above rate is quoted in units equal to US Dollars. All major credit cards are accepted. Payment must be made at the hotel's current exchange rate in rubles only." *E.g.*, Mendelson Dep., Ex. 10 at 87-91, Dep. Ex. 20A, attached as Ex. 11; CSIS 00045-00065, attached as Ex. 9.

- Guests who made reservations through one of the websites owned by Interstate's Marriott Hotels of Moscow frequently received a facsimile or e-mail confirmation stating that the rate for the particular Marriott Franchised Hotel was quoted in units equal to U.S. dollars but that payment must be made at the hotel's current exchange rate in rubles only. *Id.*

- Guests who made reservations on marriott.com after the summer of 2005 received information during the reservation process, on the currency converter, and in reservation confirmations and pre-arrival e-mails explaining that, although rates were quoted in U.S. dollars, the hotel charges would be payable in local currency subject to the hotel's exchange rate. McGrath Aff., Ex. 5 ¶19 [21]

- Guests who made reservations through Marriott's toll-free number after August 5, 2005 were told by agents that a quoted price in U.S. dollars was equal to currency units that would be converted to rubles at the hotel's exchange rate. LoGiudice Aff., Ex. 6 ¶15.

Similarly, the question of whether a particular guest was misled by Marriott – relevant to both standing and liability – cannot be commonly resolved. For example, those guests with prior knowledge of the use of internal exchange rates do not present common factual issues to those guests without such knowledge. Thus, for each guest, this Court would need to determine:

---

[21] After May 3, 2005, prospective guests using marriott.com received reservation confirmations and pre-arrival e-mails containing this statement: "Rate(s) quoted in US Dollars. All charges are payable in local currency subject to the Hotel's exchange rate at check-out." McGrath Aff., Ex. 5 ¶19. Prospective guests who visited the website on or after June 5, 2005 and used the currency calculator received this "Hotel Exchange Rate" language: "Converted amount is based on the exchange rate from the close of business of the preceding day and is for comparison purposes only." *Id.* Finally, guests who made their reservations on marriott.com after August 2005 received the following information at Step 4 ("Review Details") and at Step 6 ("Confirmation") of the reservation process: "All prices Quoted in US Dollars! Charges are payable in local currency at applicable hotel exchange rate at checkout." *Id.*

- Whether the guest was a repeat visitor like Shaw, Paliashvili and Mendelson who knew that the hotel's exchange rate would apply to the bill at check-out; or,

- Whether the guest was a first-time visitor at a Marriott Russian Hotel who was aware of the business practices common in Moscow.

In sum, Plaintiffs cannot establish commonality with respect to their proposed class because of the myriad differences in reservation channels and information received in the reservation process, as well as the wide variations in guests' knowledge concerning the use of internal exchange rates. In addition, Plaintiffs have failed to show that there are any common issues of law supporting class certification. *See infra* Section IV. These individualized issues also would make it impossible to define a more narrow class for certification. Because Plaintiffs cannot satisfy Rule 23(a)'s requirement for commonality, the Court should not certify the class.

**B.    PLAINTIFFS CANNOT MEET THE TYPICALITY OR ADEQUACY REQUIREMENTS OF RULE 23(a)**

Rule 23(a) permits certification only if the class representative claims are typical of the class claims as a whole and if the representative parties will fairly and adequately protect the interests of the class. *Gen. Tel. Co.*, 457 U.S. at 158 n.13; *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 550-51 (1974); *EEOC v. Printing Indus. of Metro. Wash., D.C., Inc.*, 92 F.R.D. 51, 54 (D.D.C. 1981). For the class representatives' claims to be "typical," their claims and the applicable defenses must "exhibit the essential characteristics of" the class's claims. *Pendleton v. Schlesinger*, 73 F.R.D. 506, 509 (D.D.C. 1977); *see also Littlewolf v. Hodel*, 681 F. Supp. 929, 935 (D.D.C. 1988). To satisfy the adequacy requirement, Plaintiffs' interests must coincide with the interests of other class members. *Gen. Tel. Co.*, 457 U.S. at 158 n.13; *Phillips v. Klassen*, 502 F.2d 362, 366 (D.C. Cir. 1974). Plaintiffs do not satisfy either requirement.

### 1.    Plaintiffs Cannot Meet Rule 23(a)'s Typicality Requirement

Because the proposed class is inadequately defined, unascertainable and lacks common questions of fact or law, there is no "typical" Plaintiff in this putative class. At the very least, a properly constructed class would have to be limited to those members who actually received a common and precisely-defined misrepresentation from Marriott, who suffered some injury thereby, and to whom the DC CPPA properly applies.

Even if Plaintiffs had defined such a class, none of the named Plaintiffs could meet the class definition or satisfy the typicality requirement. Typicality requires that "the claims of the representatives and absent class members are sufficiently similar so that the representatives' acts are also acts on behalf of the class." *Littlewolf*, 681 F. Supp. at 935. Here, the proposed class representatives are uniquely and variably situated. They are sophisticated and frequent travelers to Russia. In many instances, they did not even make the reservations that are the subject of this lawsuit and/or did not incur any costs for their hotel bills. *See Bykov*, 2006 WL 752942 at *5. Because the named Plaintiffs do not "exhibit the essential characteristics of" the class's claims, they do not satisfy Rule 23(a)'s typicality requirement. *Pendleton*, 73 F.R.D. at 509.

Shaw's claims are not typical of any properly limited class. First, he was not misled by any of Marriott's representations about room rates because he had prior knowledge of the normal practice for Russian hotels to bill in rubles and employ a hotel exchange rate to protect against currency fluctuations. Shaw Dep., Ex. 15 at 55, 68-71, 77-79, 91. Indeed, he acknowledged in his deposition that he was <u>not</u> misled into thinking that he would pay his final hotel bill in the U.S. dollars price he had been quoted on marriott.com. *Id.* at 72. Second, Shaw suffered no monetary damage because his employer ultimately paid his hotel bills as part of his business travel. *Id.*. at 102-03, 137. Finally, Shaw has no connection to or association with the District of

Columbia. He is a resident of the U.K. and is domiciled in Florida for tax purposes. *Id.* at 166-67. Thus, the choice of law analysis that the Court must perform with respect to him will reveal that there is no basis for him to invoke D.C. law. *See infra* III.A.

Charness's claims also are not typical of any properly limited class. Charness, like Shaw, is an experienced traveler and attorney. Charness Dep., Ex. 13 at 23-24, 26. He has acknowledged that he was not misled by Marriott: when he checked into the Marriott Tverskaya, he saw the sign indicating the use of currency units for guest charges and inquired as to the conversion rates used for currency units. *Id.* at 91, 164. Prior to checking into the Marriott Grand in Moscow for the second stay at issue in this litigation, he signed a registration card indicating that the room rate was in currency units. *Id.* at 83, 84, 93; Dep. Exs. 2, 6, Ex. 19. Finally, D.C. law does not apply to Charness's claim because neither he nor the reservation method he used has any connection to the District of Columbia or the DC CPPA. *See supra*, Section VI.B.

Paliashvili's claims are not typical because, among other things, she was not misled by any of Marriott's representations as to room rates, and she suffered no damages because her clients or firm paid for her hotel stays.[22] Paliashvili Dep., Ex. 8 at 48, 55, 85-86. Nor did she make the reservation that is the subject of this action.[23] Thus, she never received—much less was misled by—any representations by Marriott as to payment procedures at the Marriott Tverskaya. *Id.*

---

[22] Paliashvili, a citizen of the Ukraine, is a frequent traveler to Russia and a sophisticated attorney. *See supra* Section VI.C. Before her stay at the Marriott Tverskaya, Paliashvili was aware that hotels must settle accounts in rubles, usually by applying a hotel exchange rate. Paliashvili Dep., Ex. 8 at 50-51; 75-76; *see also supra* n.4.

[23] Paliashvili's travel agent made her reservations for her. Paliashvili Dep., Ex. 8. at 38, 64-65. In fact, prior to staying at the Marriott Tverskaya, Paliashvili had never visited the Marriott website or spoken to any toll-free operators. *Id.* at 68.

Mendelson's claims are not typical of a properly limited class because she did not make her own reservations, she was not misled by Marriott, and she suffered no damages. Having lived in and traveled frequently to Russia for business purposes, Mendelson was cognizant of Russian exchange rates as a business matter, and she could not have been misled by any representation about room rates. Mendelson Dep., Ex. 10 at 16-17, 23-24. She did not make her own reservations for stays at the Marriott Russia Hotels.[24] Further, she received hotel confirmation expressly stating that the quoted price was in currency units and that the bill would be settled in rubles at the hotel's exchange rate. Ex. 9, CSIS 00045-00065. In making a reservation at the Marriott Moscow Grand in 2004, Mendelson was advised by Interstate's Marriott Hotels of Moscow that the hotel's exchange rate was higher than that of the Central Bank rate. CSIS 00024, attached as Ex. 9. Thus, Mendelson never received—much less was misled by—any representations from Marriott as to its room rates. Moreover, she suffered no damages because her employer paid for her trips.[25]

CSIS's claims are not typical of any properly narrowed class. First, for the reasons stated in Marriott's Motion to Dismiss currently pending before this Court, CSIS has no standing to bring a claim under the DC CPPA because it is a corporation and thus not a "consumer" under the Act. Second, for numerous hotel stays by its employees, CSIS suffered no damages because it often received a special rate at the Central Bank exchange rate. Mendelson First Interrog., Ex. 14 at No. 5; Ex. 9, CSIS 00024. Finally, where the hotel exchange rate did apply, CSIS received

---

[24] Mendelson's assistant made her room reservations, *id.* at 62, 76, but not by contacting Marriott. Rather, she contacted Marriott Hotels of Moscow, an entity not affiliated with Marriott, to make the reservations. Mendelson First Interrog., Ex. 14 at No. 11. She did not make reservations online and never used the currency calculator. Mendelson Dep., Ex. 10 at 76.

[25] "I personally don't pay anything." Mendelson Dep., Ex. 10 at 32. Even if she had, she would have suffered no damages for her hotel stays that were billed and exchanged to rubles at the Central Bank rate. *Id.* at 104-106.

confirmations for its employees' stays that disclosed the use of currency units and of the hotel's exchange rate for settlement in rubles. Ex. 9, CSIS 00045-00065.

### 2.    Plaintiffs Cannot Meet Rule 23(a)'s Adequacy Requirement

Class representatives owe a fiduciary duty to unnamed class members. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) (adequate representatives must have personal characteristics necessary to fulfill fiduciary role); *Koenig v. Benson*, 117 F.R.D. 330, 333-34 (E.D.N.Y. 1987) (class representative has fiduciary obligation to class members). This duty requires, among other things, that class representatives be familiar with the lawsuit such that they do not abdicate completely the conduct of the case to class counsel. *In re Newbridge Networks Sec.*, 926 F. Supp. 1163, 1177 (D.D.C. 1996) (requiring class representatives to have familiarity with the case and interest in prosecuting the class's claims to meet the adequacy requirement). Plaintiffs do not fairly and adequately protect the interests of the class because they are passive participants in this lawsuit. Their abdication of responsibilities as class representatives is demonstrated by, among other things, their inconsistent and varied understandings of their claims and their willingness to jettison the claims of unnamed class members when diligent pursuit those claims might prove inconvenient. For these reasons, Plaintiffs have failed to establish the adequacy of representation required by Rule 23(a)(4).

Facts developed in discovery indicate that this litigation was initiated not by genuinely aggrieved individuals, but by Plaintiffs' counsel, in part by encouraging plaintiffs to sue Marriott as well as other hotel companies (Hyatt and Radisson). Shaw, the first and originally the only Plaintiff in this action, was introduced to this litigation by his longtime friend Mark Borghesani, co-counsel for Plaintiffs in this case. Shaw Dep., Ex. 15 at 21.[26]    Shaw engaged Borghesani

---

[26] Similarly, Paliashvili joined this lawsuit after speaking with Borghesani, whom she had known since the mid-1990's. Paliashvili Dep., Ex. 8 at 90-91.

immediately before the April 18, 2005 Marriott hotel stay which served as the basis for his claim against Marriott. *Id.* at 122-23. Likewise, until approached by The Cullen Law Firm to participate in this litigation, *see* Mendelson's First Interrog., Ex. 14 at No. 1, Mendelson and CSIS had a good relationship with the Marriott Russia Hotels, meeting with Interstate on an annual basis to discuss the special corporate rates that CSIS receives for its employees' travel to Russia. *E.g.*, Ex. 9, CSIS 00032-000033.

Perhaps because of these circumstances, the named Plaintiffs have shown a striking lack of the commitment to the litigation and the class that is required by Rule 23(a)(4).[27] In deposition, for example, the class representatives revealed a fundamental lack of knowledge about their claims,[28] admitted that they had not reviewed critical documents (such as the Complaint),[29] and admitted that they are content to leave "the case and investigation and everything to the lawyers." Charness Dep., Ex. 13 at 159-160.[30]

---

[27] Indeed, Plaintiffs' counsel actually discouraged commitment to the litigation and the class. During Mendelson's deposition, counsel asserted that, as class representative, it was not necessary for her to know anything about the claims of the putative class. Mendelson Dep. Ex. 10. at 188-190.

[28] Shaw testified that the basis for his claim against Marriott is not that he was misled by representations as to Marriott's room prices, but that the hotel exchange rate applied to Shaw's hotel bill was too high. Shaw Dep. , Ex. 15 at 72. This claim is fundamentally different from that of the class. Mendelson admitted that she does not know what claims she was making on behalf of certain putative class members or, for which employee hotel stays CSIS was making a claim, despite being designated as the corporate representative. Mendelson Dep., Ex. 10 at 150, 154, 156, 191. During Mendelson's deposition, Plaintiffs' counsel asserted that, as class representative, it was not necessary for her to know anything about the claims of the putative class. *Id.* at 188-190.

[29] Shaw, Mendelson, and Charness did not recall ever seeing Plaintiffs' Amended Complaint or speaking with any other class representative. Shaw Dep., Ex. 15 at 18-19, 22, 29-30 (upon reviewing the Amended Complaint during deposition, Shaw stated that part of it was not accurate); Mendelson's First Interrog., Ex. 14 at No. 2, Mendelson Dep., Ex. 10 at 134; Charness Dep., Ex. 13 at 16, 160-61, 163. None of them was aware of or made any inquiry into the reasons that Paliashvili withdrew as a named Plaintiff. Answers to Marriott's Third Set of Interrogs. at Nos. 1-2 by Shaw, Charness and Answers to Marriott's Second Set of Interrogs by Mendelson, attached as Ex. 28.

[30] Paliashvili abandoned her role as class representative entirely, for reasons yet unknown because she did so *after* her deposition. She purports to retain her rights as a class member to seek damages.

Most significantly, Plaintiffs have been willing to abandon claims for relief for unnamed class members upon finding such claims inconvenient to pursue.    Notwithstanding her admissions that she had never spoken to another class representative and did not know what the class's claims were, Mendelson unilaterally waived, on behalf of the class, any damages in excess of the statutory amount of $1500, even though some class members may have an interest in seeking greater damages. Mendelson Dep., Ex. 10 at 35.[31]  Likewise, CSIS was not aware of the nature of the class's claims,[32] and upon instruction of counsel, unilaterally waived, on behalf of CSIS and the putative class, any damages in excess of the statutory amount of $1500. Broaddus Dep., Ex. 24 at 36-38; Mendelson Dep., Ex. 10 at 35.  Named Plaintiffs' overall lack of understanding of the putative class's claims, and their willingness to waive and thereby abandon potential claims of the class, demonstrate that the class representatives' and the class's interests are in conflict.  As such, they cannot fairly and adequately represent the class.  *See W. States Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002) ("[A] class representative is not an adequate class representative when the class representative abandons particular remedies to the detriment of the class."); *see also Krueger v. Wyeth*, 2008 WL 481956 (S.D.Cal. 2008).[33]

---

[31]Before Mendelson's waiver, Plaintiffs sought "an award of damages to Class members in an amount equal to treble damages or $1,500 per violation, whichever is greater." Second Am. Compl., Prayer for Relief, ¶ 5.

[32] CSIS's corporate representative admitted that he did not know whether CSIS, as a class representative, is making a claim in this case for specific employee stays at the Marriott Russia Hotels. Broaddus Dep., Ex. 24 at 73, 75-77, 82, 84-87, 89-90, 92, 94, 99, 101, 105-106.  Mendelson, who is one of CSIS's corporate representatives, was unaware of her status as such during her corporate designee deposition until informed by counsel. Mendelson Dep., Ex. 10 at 36-37.

[33] With respect to adequacy, this case is unlike *Wells v. Allstate*, 210 F.R.D. 1 (D.D.C. 2001). In *Wells*, the class representatives were not—as here—seeking to keep people in the class while at the same time waiving damages for those purported class members.

Further, CSIS will exclude putative class members based on its own convenience. Plaintiffs' counsel refused to produce CSIS's President, John Hamre, for deposition even though Mr. Hamre has traveled to Moscow in connection with CSIS business, has stayed at the Marriott Russia Hotels, and would presumably be captured within Plaintiffs' proposed class definition. *See* Broaddus Dep., Ex. 24 at 42-50; Ex. 29, December 28, 2007 letter from Marriott's counsel to Plaintiffs' counsel. According to CSIS, it unilaterally decided to exclude Mr. Hamre from the putative class and is not seeking to recover damages on his behalf due to "a decision of counsel." Mendelson Dep., Ex. 10 at 47; Broaddus Dep., Ex. 24 at 47, 50. CSIS's willingness to jettison claims and putative class members shows it will not fairly and adequately represent the class's interests as required by Rule 23(a)(4).[34]

## IV. CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS CANNOT SHOW A PREDOMINANCE OF COMMON LEGAL AND FACTUAL ISSUES AND SUPERIORITY OF THE CLASS ACTION METHOD, AS REQUIRED FOR CERTIFICATION UNDER RULE 23(b)(3).

In addition to satisfying all four requirements of Rule 23(a), Plaintiffs must prove that they satisfy one of the bases for certification under Rule 23(b). Plaintiffs have moved for certification under Rule 23(b)(3), which requires that Plaintiffs establish "that the questions of law or fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1003 (D.C. Cir. 1986).

---

[34] In addition, the named Plaintiffs will not fairly and adequately represent the interests of the class because some of the named Plaintiffs' interests may become antagonistic. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482, n.13 (5th Cir. 2001). For example, Plaintiffs Shaw and Mendelson did not pay for their numerous hotel stays over a several-year period, and Plaintiff Charness did not stay more than three nights in Marriott's Russian hotels. Accordingly, these Plaintiffs may value their cases for much less than would putative class members with more frequent hotel stays or who paid for their own stays.

Plaintiffs cannot establish a predominance of common legal issues because: (a) conflicts exist between the DC CPPA and other states' and countries' consumer protection laws; (b) under a choice-of-law analysis, the law of the District of Columbia cannot apply on a classwide basis because the District does not have the "most significant relationship to this dispute;" and (c) applying D.C. law to this case would violate constitutional principles and would interfere with the enforcement of consumer protection laws enacted by other states and countries to protect their own citizens (who are members of the putative class).

Plaintiffs also cannot establish a predominance of common factual issues because there are no factual issues common to the entire putative class. Rather, as explained above, *see supra* Sections II, III.A, the putative class members' claims implicate numerous, materially different reservation methods and hinge on individualized questions concerning injury and the specific representations, if any, received from Marriott.

Nor have Plaintiffs established the superiority of the class action method. The extremely broad class proposed by Plaintiffs would be unmanageable, is not susceptible of subclassing, and would not promote judicial economy and efficiency, as required by Rule 23(b)(3).

## A.    PLAINTIFFS HAVE NOT DEMONSTRATED A PREDOMINANCE OF EITHER COMMON LEGAL OR COMMON FACTUAL ISSUES.

### 1.    Plaintiffs Cannot Establish A Predominance Of Common Legal Issues.

At the class certification stage, this Court must perform a rigorous analysis of the law of each class member's state (or country) to determine whether there are differences in the potentially applicable laws, and if so, which jurisdictions have the most significant relationship to the dispute. *Amchem Prods.*, 521 U.S. at 613-14; *Richards*, 453 F.3d at 529; *Love*, 439 F.3d at 727. As *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 176 n.11 (D.C. 2006), provides:

> . . . [it was] necessary, in determining whether class action certification was available and, if so, what jurisdiction's law to apply, for the trial court to conduct "an individualized choice-of-law analysis" with respect to the claims of each member of the class. *See In re St. Jude Med., Inc.,* 425 F.3d 1116, 1120 (8th Cir. 2005) (citing *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 822-23, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)).

This analysis is necessary because Plaintiffs cannot establish a predominance of common legal issues if, as here, many different jurisdictions' materially different laws apply to the claims of the putative class members. *See, e.g., Walsh,* 807 F.2d at 1003; *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1015-18 (7th Cir. 2002); *Spence v. Glock,* 227 F.3d 308, 312 (5th Cir. 2000).

Moreover, in *Walsh,* this Circuit made clear that the burden lies on class action plaintiffs to provide an "extensive analysis" of state law variables to reveal whether these pose "insuperable obstacles" to class certification. *Walsh,* 807 F.2d at 1017. Plaintiffs have not even attempted to meet this burden, and this failure is fatal to their class action claims. *Id.* at 1016-17 ("Appellees see the 'which law' matters as academic. They say no variations in state warranty laws relevant to this case exist. A court cannot accept such an assertion 'on faith.' Appellees, *as class action proponents, must show that it is accurate.*") (emphasis added); *see Foster,* 229 F.R.D. at 605 ("[P]laintiffs have the burden of providing an extensive analysis of state law variations to determine whether there are insuperable obstacles to class certification....This analysis is required, in part, because the district court must determine whether variations in state law defeat predominance.") (internal citations and quotation marks omitted).

In any case, as explained below, Plaintiffs cannot show that legal issues predominate. There are fundamental differences, and thus immutable conflicts, between the 50 states' consumer protection laws and the DC CPPA. These differences preclude uniform application of D.C. law, which does not have the most significant relationship to all class members' disputes, and which cannot be applied classwide without violating fundamental constitutional principles.

a.    An actual conflict exists between the DC CPPA and the consumer protection statutes of other states.

As an increasing number of federal courts have recognized, state consumer protection statutes vary in many significant respects. *In re Bridgestone/Firestone*, 288 F.3d at 1015-18 ("State consumer-protection laws vary considerably, and courts must respect those differences rather than apply one state's law to sales in other states with different rules."); *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 563 (E.D. Ark. 2005) (denying certification of nationwide class given variations in state consumer protection laws and indicating that "a review of the . . . consumer fraud/unfair competition claims reveals that these laws cannot reasonably be grouped in a comprehensive manner that does not seriously impinge on the integrity of the law of each state"); *Tylka* v. *Gerber Prods., Inc.*, 178 F.R.D. 493, 498 (N.D. Ill. 1998) ("[A] brief review of the applicable statutes reveals not only nuances, but differing standards of proof, procedure, substance, and remedies . . . . Therefore, individual issues of law predominate which preclude certification of a nationwide class seeking redress under the various states' consumer fraud statutes . . . ."); *see also In re Ford Motor Co. Ignition Switch Prods. Liab. Litig v. Ford Motor Co.*, 174 F.R.D. 332, 351 (D.N.J. 1997); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675 (Tex. 2002) (decertifying 50 state consumer fraud and breach of warranty class action where plaintiff sought to apply law of Texas to entire nationwide class).

The DC CPPA differs substantially from the consumer protection statutes of other states.[35] For example:

- The DC CPPA permits a private cause of action, *see* D.C. Code § 28-3905(k)(1), while other states do not.[36]

---

[35] The examples given in the subsequent text and footnotes are by way of example only. A complete description of the differences among the consumer protection statutes of the 50 states is provided in the attached State Law Variation Appendix, attached as Ex. 30.

[36] The Iowa consumer protection statute, *see* Iowa Code Ann. §714.16(7), does not allow for a private cause of

- The DC CPPA permits a consumer class action, *see Wells v. Allstate Ins. Co.*, 210 F.R.D. 1 (D.D.C. 2002), while other states do not.[37]

- A corporation is not a consumer under the DC CPPA. *See* D.C. Code § 28-3901(a)(2); *Clifton Terrace Assocs., Ltd. v. United Techs.Corp.*, 728 F. Supp. 24, 34 (D.D.C. 1990), *vacated in part on other grounds*, 929 F.2d 714 (D.C. Cir. 1991). In contrast, at least one state permits a business to sue under their consumer protection statutes.[38]

- The DC CPPA permits a trial by jury. *See Williams v. First Gov't Mortgage & Investors Corp.*, 225 F.3d 738, 745 (D.C. Cir. 2000). Other states' consumer protection statutes do not.[39]

- Under the DC CPPA, the scienter level for a defendant is an intent to misrepresent by clear and convincing evidence. *See Osbourne v. Capital City Mortgage Corp.*, 727 A.2d 322, 325 (D.C. 1999). Other states require varying levels of scienter, ranging from willfulness to a complete absence of intent.[40]

- The DC CPPA, as a matter of threshold standing, requires a plaintiff to establish injury from the alleged misrepresentation. *Williams*, 297 F. Supp. 2d at 178. States vary widely as to whether a plaintiff must establish reliance on or deceit by the alleged misrepresentation.[41]

---

action, and the Arkansas statute only allows for private causes of action by elderly or disabled persons. Ark. Code Ann. §4-88-204. Ark. Code Ann. § 4-88-113(f) provides that "[a]ny person who suffers actual damage or injury as a result of an offense or violation as defined in this chapter has a cause of action to recover actual damages, if appropriate, and reasonable attorney's fees."

[37] Examples of states that do not permit class actions are Wisconsin, Louisiana, Mississippi, Montana, and Alabama. *See, e.g., Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F. Supp. 1399, 1416 n.17 (N.D.Ill. 1996) (noting that Wisconsin does not permit a class action); La. Rev. Stat. Ann. §51:1409(A); Miss. Code Ann. §75-24-15(4)); Mont. Code Ann. §30-14-133(1); S.C. Code Ann. §39-5-140(a); Ala. Code §8-19-10(f) (providing class actions only for the attorney general or district attorney).

[38] *E.g.*, Tex. Bus. & Com. Code Ann. § 17.45 (Vernon 2002) (extending recovery to partnerships and corporations).

[39] The consumer protection statutes in Illinois, *see Richard/Allen/Winter, Ltd. v. Waldorf*, 509 N.E.2d 1078 (Ill. App. Ct. 1987), and Massachusetts, *see Guity v. Commerce Ins. Co.*, 631 N.E.2d 75, 76 (Mass. App. Ct. 1994), do *not* allow for trial by jury. Connecticut does not allow the jury to decide whether a plaintiff is entitled to punitive damages. Conn. Gen. Stat. §42-110.

[40] Many states have some sort of scienter requirement. For example, Oregon requires willful conduct. Or. Rev. Stat. §646.638(1). Louisiana, *see United Group of Nat'l Paper Distribs. v. Vinson*, 666 So.2d 1338 (La. Ct. App.), *writ denied* 679 So.2d 1358 (La. 1996), and Illinois, *see Eshaghi v. Hanley Dawson Cadillac Co Inc.*, 574 N.E.2d 760, 764 (Ill. App. Ct. 1991), require intent. Idaho, *see* Idaho Code Ann. §48-603), Kansas, *see* Kan. Stat. Ann. §50-626(b)(l), Oklahoma, *see* Okla. Stat. Ann. tit. 15, §§753(5) & (7), and Nevada, *see* Nev. Rev. Stat. Ann. §598.0915, require knowledge. Utah requires intent or knowledge. Utah Code Ann. §13-11-4(2).

[41] California, *see Occidental Land, Inc. v. Superior Court of Orange County*, 18 Cal.3d 355 (1976), and North Carolina, *see Forbes* v. *Par Ten Group, Inc.*, 394 S.E.2d 643 (N.C. Ct. App. 1990) *review denied* 402 S.E.2d 824 (N.C. 1991), require reliance. The Michigan Consumer Fraud Act requires that a plaintiff must establish that a *reasonable person* would have relied on the defendant's representations; individual reliance is not required. *Dix v. Am. Bankers Life Assurance Co.of Fla.*, 415 N.W.2d 206, 209 (Mich. 1987). Reliance is required in Arizona, but it need not be reasonable. *Parks v. Macro-Dynamics, Inc.*, 591 P.2d 1005, 1008 (Ariz. Ct. App. 1979).

- To establish "causation" between the alleged misrepresentation and a plaintiff's claimed damages, the DC CPPA requires a showing of actual damages. *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1176 (D.C. Cir. 2003). State consumer protection statutes use a variety of materially different formulations to embody this causation requirement.[42]

- The DC CPPA permits awards of treble damages, punitive damages, attorneys' fees, and injunctive relief. D.C. Code § 28-3905(k)(1). The availability of such relief is not uniform, but varies significantly among states.[43]

Further, because Plaintiffs' proposed class included individuals who reside in foreign countries worldwide, this Court will also need to consider whether the DC CPPA and the consumer protection statutes of other countries conflict. Plaintiffs have simply ignored this issue, and this failure is fatal to their claim of predominance. *See Walsh*, 807 F.2d at 1016-17.

---

[42] Although the majority of consumer protection statutes require some form of proximate causation, "[t]here are countless variations on the definition of proximate causation...." *Adas v. Ames Color-File*, 407 N.W.2d 640, 642 (Mich. Ct. App. 1987). For example "Delaware recognizes the traditional [common law] 'but for' definition of proximate causation [which is] 'that direct cause without which [an] accident would not have occurred' [or one] 'which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred.'" *Duphily v. Del. Elec. Coop., Inc.*, 662 A.2d 821, 828-29 (Del. 1995) (internal citations and emphasis omitted). Other states that have adopted the traditional "but for" approach include Nebraska, *see Stiver v. Allsup, Inc.*, 587 N.W.2d 77, 82 (Neb. 1998), and North Dakota, *see Rued Ins., Inc. v. Blackburn, Nickels & Smith, Inc.*, 543 N.W.2d 770, 773 (N.D. 1996).

North Carolina employs a completely different "substantial factor" proximate cause standard. Under the North Carolina consumer protection statute, a "plaintiff must prove that the defendant's conduct was a *substantial cause* of [plaintiff's injury] [the injury to plaintiff's business], and ... that [his injury] [the injury to his business] was a type of injury which defendant's conduct was naturally likely to cause." *Am. Rockwool, Inc. v. Owens-Corning Fiberglass Corp.*, 640 F. Supp. 1411, 1444 (E.D.N.C. 1986) (internal citations omitted) (emphasis added). Vermont courts also have approved this approach. *See Rooney v. Med. Ctr. Hosp. of Vt., Inc.*, 649 A.2d 756, 762 (Vt. 1994).

In Michigan, however, proximate cause "'indicates a requirement of unbroken causation between an act and injury produced by that act'" which goes beyond mere "but for" causation, but is not defined specifically as a "substantial factor" standard. *Adas*, 407 N.W.2d at 642 (internal citations omitted).

[43] For example, the Tennessee consumer protection statute allows for the recovery of actual damages or treble damages (if the violation is knowing or willful) and reasonable costs and fees. Tenn. Code Ann. § 47-18-109. Although at least half of consumer protection statutes do not provide for treble damages, a number allow for punitive damages. *See, e.g.*, Alaska Stat. § 45.50.531(i); Colo. Rev. Stat. Ann. § 6-1-113; Conn. Gen. Stat. Ann. §42-110g(a); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076-77 (Del. 1983); Fla. Stat. Ann. 501.207(1); Kan. Stat. Ann. §50-634(b)); Ky. Rev. Stat. Ann. §367.220(1); Me. Rev. Stat. Ann. tit. 5, §213; Nev. Rev. Stat. Ann. §§42.001, 42.005; Or. Rev. Stat. Ann. § 646.638(1). There is no uniform standard for awarding punitive damages. The standard of conduct justifying punishment, the burden of proof, procedural trial requirements, the availability of caps and limits, and requirements that some portion of punitive awards be paid to the state all differ from state to state. *See, e.g.*, *Poe v. Sears, Roebuck & Co.*, 1998 WL 113561 at *3 (N.D. Ga.) (Ex. 6) ("[T]he different states have varying laws with respect to punitive damages.").

b.    District of Columbia law does not apply classwide under the rigorous choice of law inquiry required by precedent.

Facing the significant and recognized differences among state consumer protection laws just described, in order to show a predominance of common legal questions, it is Plaintiffs' burden to establish that the DC CPPA is the appropriate choice of law to apply classwide. If, under a choice of law analysis, the DC CPPA does not apply classwide, then Plaintiffs' claim of predominance fails.

Because there are significant conflicts in state consumer protection laws, the Court may apply the DC CPPA to the entire class only if it determines that the District of Columbia has the "most significant relationship to the dispute." *Washkoviak*, 900 A.2d at 180; *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985). As part of this analysis, the Court must consider "the four factors enumerated in Restatement (Second) of Conflict of Laws §145: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship is centered." *Washkoviak*, 900 A.2d at 180; *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995).

At the motion to dismiss stage, the Court, in its choice-of-law analysis, specifically "le[ft] open the possibility that discovery may uncover evidence indicating that another jurisdiction has a greater interest than the District of Columbia in the resolution of this controversy." *Shaw v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 141, 150 (D.D.C. 2007). Discovery has in fact revealed such evidence, which demonstrates that the law of many states (or countries) other than the District of Columbia properly applies to many class members' claims. Applying this Court's prior analytic framework to the facts revealed in discovery demonstrates that Maryland,

Delaware, and perhaps many other jurisdictions "have a greater interest than the District of

Columbia in the resolution of this controversy:

- *Place of Injury*: At the motion to dismiss stage, this Court held "[I]n this case, the injuries occurred where Plaintiffs 'received the alleged misrepresentations.' *Washkoviak*, 900 A.2d at 181. Even though this factor is accorded less weight in misrepresentation claims, it equally affects the District of Columbia, New York and Michigan." *Shaw*, 474 F. Supp. 2d at 149. Now, at the class certification stage, the evidence shows guests would have received representations, if any, from Marriott in a number of different states and countries, depending on where the class member resides or was located when contacting the call center, server, travel agent or hotel.

- *Place of Cause of Injury*: At the motion to dismiss stage, this Court equated the place where Marriott's pricing practices and policies are developed to the place of incorporation. This Court assumed this location to be the District of Columbia for the Motion to Dismiss, based on Plaintiffs' allegations in the Amended Complaint. *Id.* Now, at the class certification stage, the affidavit of Marriott's corporate designee demonstrates that Marriott is incorporated in Delaware. Garcia Aff., Ex. 4 at ¶3. Moreover, the evidence shows that many of the representations encompassed within Plaintiffs' proposed class did not come from Marriott, but emanated from the unaffiliated Marriott Hotels of Moscow, from third party travel agents and websites, and from the hotels themselves. For these non-Marriott representations, the place of cause of injury is unrelated to Marriott's place of incorporation and varies on a worldwide basis.

- *Residence/Incorporation*: At the motion to dismiss stage, this Court assumed that Marriott's residence, place of incorporation, and principal place of business was Washington, D.C. *Shaw*, 474 F. Supp. 2d at 149. Now, at class certification stage, Marriott has demonstrated that its corporate headquarters and principal place of business is Maryland and that its place of incorporation is Delaware. *Id* at ¶3; *see supra* Section I. Additionally, the evidence now demonstrates that nearly all plaintiffs reside outside of the District of Columbia in at least 44 states and 143 countries. McGrath Aff., Ex. 5 at ¶13-14.

- *Where Relationship Centered*: At the motion to dismiss stage, this Court observed that "Plaintiffs allege they purchased their tickets over the Internet, which does not point to one jurisdiction having more interest than another." *Shaw*, 474 F. Supp. 2d at 149 (citation omitted). Now, at the class certification stage, Plaintiffs no longer base their complaint solely on consumers who booked rooms on marriott.com. Instead, they seek to certify a class of persons worldwide who made reservations by any means, including directly reserving with hotels in Russia, or reserving through third-party travel organizations, reservation agents or Internet websites all over the world. Many putative Plaintiffs cannot establish any "relationship" with Marriott because they did not receive any representations from Marriott regarding room rates. *See infra* at Section IV.B. At the least, this factor favors the application of D.C. law even less than at the motion to dismiss stage, given the great number of jurisdictions now involved.

As the analysis of each of these factors indicates, the rationale offered by Plaintiffs at the motion to dismiss stage for a classwide application of the DC CPPA is severely undermined both by the evidence developed in discovery, and by Plaintiffs' expanded class definition. Plaintiffs most recently proposed class is worldwide in scope and not focused on the District of Columbia or its residents; the lawsuit is no longer limited to alleged representations that Marriott made on its website regarding room rates; and the evidence now establishes that, although Marriott has historic connections to Washington, D.C., its headquarters, principal place of business, and its website servers are located in Maryland.

Accordingly, under the District of Columbia choice of law rules, the District of Columbia does not have the most significant relationship to this dispute on a classwide basis. Rather, each class member's claim is subject to the laws of the class member's home state, or some other state or country where the call center, server, travel agent or hotel is located. *St. Jude,* 425 F.3d at 1120; *Spence,* 227 F.3d at 312 (cited approvingly in *Washkoviak,* 900 A.2d at 176 n.11). To determine the state law applicable to each class member would require conducting an individualized choice-of-law analysis regarding each class member's claim and circumstances. Even assuming the applicable state laws could be determined, common questions would not predominate because the Court would need to adjudicate class members' claims under the disparate standards of all of these jurisdictions' laws. The necessity of such a detailed analysis establishes that common issues of law do not predominate. *Spence,* 227 F.3d at 312; *In re Bridgestone/Firestone,* 288 F.3d at 1015-18; *see also Antonson v. Robertson,* 141 F.R.D. 501, 508 (D. Kan. 1991); *Kassover v. Computer Depot, Inc.,* 691 F. Supp. 1205, 1213 (D. Minn. 1987); *accord Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 725 (11th Cir. 1987); *In re One Bancorp Sec. Litig.,* 136 F.R.D. 526, 533 (D. Me. 1991); *Hoexter v. Simmons,* 140 F.R.D 416,

424 (D. Ariz. 1991); *In re Laser Arms Corp. Sec. Litig.,* 794 F. Supp. 475, 495 (S.D.N.Y. 1989); *Zandman v. Joseph,* 102 F.R.D. 924, 929 (N.D. Ind. 1984); *Greenwald v. Integrated Energy, Inc.,* 102 F.R.D. 65, 71 (S.D. Tex. 1984)

      c.    <u>District of Columbia law cannot constitutionally apply classwide.</u>

      Although choice of law principles resolve the matter, it also would be unconstitutional to apply the DC CPPA to the entire worldwide putative class. To ensure that application of the forum state's law to non-resident class members is constitutional, a court must determine: (1) whether a conflict exists among the various applicable laws; and (2) if a conflict exists, whether the forum state has significant contacts with each class member such that it would not violate due process to apply the forum's state laws to each class member. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 822 (1985). Many substantial conflicts exist between the DC CPPA and the other jurisdictions' applicable laws, *see supra* Section IV.A.1.a., and the constitutional inquiry thus hinges on the second prong of this test: whether the District of Columbia has significant contacts with each class member. Plaintiffs' proposed class is unconstitutional because the District of Columbia does not have a "significant aggregation of contacts" to "ensure that the choice of [that state's] law is not arbitrary or unfair." *Shutts,* 472 U.S. at 821 (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312-13 (1981)); *Washkoviak,* 900 A.2d at 183 n.19.[44]

      In *Hague,* the Supreme Court held that "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." 449 U.S. at 312-13. The corollary is also true, i.e., "if a State has only an insignificant contact with the parties and the occurrence or transaction, application of its law is

---

[44] This Court has previously observed, that the DC CPPA does have potential extraterritorial application, such as

unconstitutional." *Id.* Applying *Hague* here demonstrates that the law of the District of Columbia may not constitutionally be applied to the claims of all class members. For the great majority of the proposed class, there is no connection between individuals' claims and the District of Columbia, as the entire reservation process took place outside of the District of Columbia, including abroad, and involved only residents of other states and countries Significantly, there is no allegation or offer of proof that any alleged misrepresentation was made to a single named Plaintiff in the District of Columbia.

Plaintiffs brought this claim in the District of Columbia based on the mistaken allegation that Marriott is headquartered there. Even if such an assumption had been true—which it is not—federal courts reject the contention that the law of a particular state can be applied to a nationwide class action simply because the corporate defendant happens to be headquartered in that state. The D.C. Court of Appeals in *Washkoviak* cited with approval *Spence v. Glock*, 277 F.3d 308 (5th Cir. 2000); in *Spence*, the Fifth Circuit reversed the district court's application of Georgia law to consumers in all 50 states and the District of Columbia because the defendant's headquarters and principal place of business was in Georgia, and held that each state has an interest in defining its own consumer protection law. *Id.* at 314. *See also Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. at 347-48 (D.N.J. 1997) (rejecting plaintiffs' request to certify a nationwide class under the law of Michigan because the defendant's headquarters was located there, and holding that the laws of each putative class member's home state must be applied, as the laws of each putative class member's home state had interests that outweighed the interests of Michigan).

Here, it would be unfair and arbitrary to apply the District of Columbia's consumer

---

where an individual plaintiff or transaction has significant contact with the District of Columbia.

protection law to a worldwide class simply because plaintiffs mistakenly allege a District of Columbia headquarters, particularly when an overwhelming majority of the class has had no contacts whatsoever with the District of Columbia. *Shutts*, 472 U.S. at 821. Under these circumstances, applying the DC CPPA to the entire putative class would interfere with the enforcement of other states' and nations' consumer protection laws *In re Bridgestone/Firestone*, 288 F.3d at 1018; *Spence*, 227 F.3d at 314; *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 458 (D.N.J. 1998) (observing that the interests of other states would be impaired if their laws are not applied to their citizens).

> Each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws. These interests arise by virtue of each state being the place in which plaintiffs reside, or the place in which plaintiffs bought and used their allegedly defective vehicles or the place where plaintiffs' alleged damages occurred.

*Ignition Switch*, 174 F.R.D. at 347-48.

There is no reason to think non-residents would expect or even want the District of Columbia's law to apply to their claims. *See Shutts*, 472 U.S. at 822 ("[w]hen considering *fairness* [of which jurisdiction's law to apply], an important element is the expectation of the parties") (emphasis added). Accordingly, the Constitution compels that these claims be tried in accordance with the substantive law of the state of each class member. As a result, common legal issues do not predominate and this Court should decline to certify the class action.[45]

---

[45] Applying District of Columbia law classwide also would violate other constitutional principles. First, applying the DC CPPA to individuals outside the District of Columbia would violate the Dormant Commerce Clause. "No state can legislate except with reference to its own jurisdiction[.]" *Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881). The Commerce Clause acts as a "limitation upon the power of the States," *Freeman v. Hewit*, 329 U.S. 249, 252 (1946), and "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. The Beer Institute*, 491 U.S. 324, 336 (1989) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982)); *see also Southern Pacific Co. v. Arizona*, 325 U.S. 761, 775 (1945) (finding that state law violates the Commerce Clause where the "practical effect of such regulation is to control [conduct] beyond the boundaries of the state").

    2.    **Plaintiffs Cannot Establish a Predominance of Common Factual Issues Because Plaintiffs' Proposed Worldwide Class Would Require Adjudicating A Great Number Of Individualized Factual Issues.**

Plaintiffs are also unable to establish a predominance of common factual issues because resolution of class members' claims raise numerous individualized issues of fact. *Kassover*, 691 F. Supp. at 1213; *see also supra* Sections II, III.A. Where, as in this case, the class members' factual circumstances vary significantly, courts decline to certify the class. *See, e.g., Szczubelek v. Cendant Mortgage Corp.*, 215 F.R.D. 107 (D.N.J. 2002) (finding that plaintiffs' claim under the state's consumer fraud act lacked predominance because of variation in disclosures received).

Here, adjudicating each class member's claim would require the Court to make individualized findings concerning: which reservation method the guest used; whether the guest had in fact received any representation from Marriott; whether the guest had been harmed by any such representation; whether the guest had received information that the bill would be in rubles at the hotel's internal exchange rate; whether the guest's bill was paid for by someone else; and whether the stay was for business or personal purposes. *See supra* Section III.A. These individualized inquiries would be relevant to standing, class membership, and underlying liability—all of which would need to be resolved for each potential class member. Because these

---

Second, application of the DC CPPA would violate principles of comity and federalism. No state may impose its own policy choices on neighboring states. *BMW of N.A. v. Gore*, 517 U.S. 559, 571 (1996) (noting that "one state's power to impose burdens on the interstate market . . . is also constrained by the need to respect the interests of other States" and that a state "may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States" because it would impermissibly and unconstitutionally interfere with the policy choices of those States by supplanting their own laws and regulations); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1301 (7th Cir. 1995) ("The voices of quasi-sovereigns that are the states of the United States sing negligence with a different pitch."). In *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 421 (2003), the Supreme Court reiterated its support of these basic principles of federalism and comity: "[i]t would be impossible to permit the statutes of [any given State] to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends. This is so obviously the necessary result of the Constitution that it has rarely been called into question and hence authorities directly dealing with it do not abound." *Id.* (quoting *New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914)).

central issues cannot be resolved without individualized factual determinations, Plaintiffs have failed to establish the predominance of common factual questions.

### B. A CLASS ACTION IS NOT THE SUPERIOR METHOD BY WHICH TO TRY THE CLAIMS ASSERTED BY PLAINTIFFS.

Under Rule 23(b)(3), Plaintiffs must demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." In analyzing superiority, the Court must evaluate the difficulties likely to be encountered if the case were to proceed to trial as a class action. *Castano*, 84 F.3d 734, 740 (5th Cir. 1996). This examination "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 160 (1974). 417 U.S. 156, 160 (1974).

A fundamental component of the superiority analysis is whether the case would be manageable as a class action. *Castano*, 84 F.3d at 744-45. Plaintiffs have failed to establish the manageability of the class action they propose—a key prerequisite to a finding of superiority under Rule 23(b)(3). Indeed, it is Plaintiffs' burden to come forward with a trial plan that demonstrates how the class claims can be tried in a way that both achieves the efficiencies of scale that class treatment is intended to promote, and in a way that does not violate defendant's due process and Seventh Amendment rights. *See In re Paxil Litig.*, 212 F.R.D. 539, 548 (C.D. Cal. 2003) ("[T]he presentation of a preliminary, unworkable trial plan, does not suffice for class certification."). Plaintiffs' failure to propose a workable trial plan is itself grounds for denying class certification.[46]

---

[46] *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (It is plaintiff's burden at the class certification stage to present a viable trial plan "showing . . . how the class trial could be conducted"); *Barreras Ruiz v. American Tobacco Co.*, 180 F.R.D 194, 197 (D. P.R. 1998) ("[T]he failure of plaintiff's counsel to provide a specific plan to manage these cases suggests a nearly cavalier attitude towards the complexity of the class they propose."); *Ignition Switch*, 174 F.R.D. at 341-42 (lack of trial plan for proposed nationwide class involving automobiles resulted in denial of class certification).

As elaborated above, Plaintiffs' proposed class is unmanageable because it is not administratively feasible for the court to determine whether a particular individual is a member of the class. *Kirkman v. North Carolina R.R. Co.*, 220 F.R.D. 49 (M.D.N.C. 2004). The class definition proposed by Plaintiffs is so broad that it would cover huge numbers of individuals who suffered no harm or never even received a representation from Marriott. Thus, as explained *supra* Sections II and III.A, the burden would fall upon the Court to conduct individualized inquiries to determine whether class members had prior knowledge of Marriott's pricing practices; whether they received information explaining currency units and hotel exchange rates; whether they booked their own rooms; what exchange rate was used to convert their bills into rubles at checkout; whether they, and not some employer or client, ultimately paid for the hotel room; and whether they received a credit or billing adjustment as compensation. Because all of these inquires would be necessary to determine class membership (as well as standing and liability), a class action is not a superior mechanism for adjudication.[47]

Plaintiffs cannot prove their class claims through representative proofs (and they have made no showing to that effect), because no one set of proofs is representative of the sprawling proposed class. Rather, Plaintiffs' broad proposed class definition attempts to mask individualized issues by seeking damages for individuals regardless whether they suffered any injury or received any representations at all from Marriott. Such an approach jeopardizes Marriott's rights to due process and a fair trial. *See Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 344-45 (4th Cir. 1998). Where, as here, the class claims turn on

---

[47] In addition, "[b]ecause these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable." *In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1018.

individualized issues, those issues cannot simply be buried in an overbroad class definition in order to make the class claims appear more manageable.

## CONCLUSION

For the foregoing reasons, Marriott International, Inc. respectfully requests that this Court deny Plaintiffs' Motion for Class Certification.

Dated:  March 3, 2008                         /s/ Joel Dewey
                                              Joel Dewey (Bar No. 358175)
                                              Holly Drumheller Butler  (Bar No. 459681)
                                              Sonia Cho (Bar No. MD26995)
                                              Jennifer Skaggs (Bar No. 500014)
                                              DLA Piper US LLP
                                              6225 Smith Avenue
                                              Baltimore, Maryland 21209
                                              410-580-3000
                                              410-580-3001 (facsimile)
                                              *Attorneys for Defendant*
                                              *Marriott International, Inc.*