## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRITT A. SHAW, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-1138 (GK) |
| v. | ) | Discovery Status Conference – 3/20/08 |
| | ) | |
| MARRIOTT INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### JOINT STATUS REPORT REGARDING DISCOVERY

Pursuant to this Court's Minute Order of March 13, 2008, the parties submit this Joint Status Report Regarding Discovery in preparation for the Discovery Status Conference on March 20, 2008.  On March 17 and 18, 2008 the parties met and conferred by telephone on outstanding discovery issues in an attempt to reach resolutions where possible.  The parties were unable to reach agreement on some of the issues and now respectfully request this Court's assistance in resolving them.  Each outstanding discovery issue ripe for resolution by this Court is set forth in Exhibit A, along with the parties' respective positions as to that issue.

Respectfully submitted,

Counsel for Plaintiffs:

_____/s/_____
Paul D. Cullen Sr
Randall S. Herrick-Stare
Joyce E. Mayers
Amy M. Lloyd
The Cullen Law Firm
1101 30th St., NW, Suite 300
Washington, D.C. 20007
Phone: 202-944-8600
Facsimile: 202-944-8611

Counsel for Marriott International, Inc.:

_____/s/_____
Joel Dewey
Holly Drumheller Butler
Jennifer Skaggs
DLA Piper US LLP
6225 Smith Avenue
Baltimore, MD  21209-3600
Phone: 410-580-3000
Facsimile: 410-580-3001

## Exhibit A

I.    **Defendant's Motion re: Plaintiffs' Privilege Log**

    A.    **Defendant's Position:**

Plaintiffs have failed to produce a complete privilege or redaction log to identify the documents withheld or information redacted and to enumerate the grounds therefor. To date, plaintiffs have only produced a privilege log for a portion of the documents withheld or produced in a redacted form at the deposition of Timothy Brickell, plaintiffs' expert. However, there were other relevant and responsive documents referred to by Mr. Brickell—such as an analysis he performed of Marriott's data—that were not produced on the grounds that they were work product. Plaintiffs have not produced any log identifying the documents and the specific reasons why each of those documents are privileged. As such, Marriott has not had a reasonable basis to evaluate whether plaintiffs' assertion of privilege is valid. Marriott seeks an order compelling production of such a log.

    B.    **Plaintiffs' Position:**

It is understood that Marriott seeks only a privilege log regarding the files of Tim Brickell. Mr. Brickell authored a declaration in support of the Plaintiffs motion for class certification (See Doc. 55, Plaintiffs' Notice of Filing of Sealed Exhibits, Item 21). In his declaration he reported upon his tally of the number of records from those produced to date by Marriott meeting certain search criteria, e.g. date and source of reservation. The complete data set which Mr. Brickell searched was produced to Marriott at his deposition. At that time Marriott explored without objection the procedures undertaken and all of the search criteria used by Mr. Brickell to make the tally reported in his declaration. Marriott, in an effort to obtain files unrelated to his declaration, has elected to characterize Mr. Brickell's tally as an expert opinion, and demanded production of all of Mr. Brickell's files associated with the Marriott case, and has

demanded a privilege log.  Mr. Brickell has, under the supervision of the undersigned, undertaken analyses of Marriott unrelated to his declaration.  It is believed that these of his files are protected by the work product privilege, and, if he is an expert (a proposition disputed by the Plaintiffs in so far as it refers to his tally of record in a database), he has not been endorsed as such, and any consultations with him not associated with his declaration are protected by the consulting expert privilege.

## II.    Defendant's Motion re: Plaintiffs' Expert

### A.    Defendant's Position:

In support of the Motion for Class Certification, plaintiffs relied on their expert Timothy Brickell's Declaration (Ex. 21) to assert that "[b]ased upon an analysis of data produced to date by Marriott . . . , there are no less than 110,522 guest stays which fit within the class definition."  The Brickell Declaration was the only basis cited for this claim in plaintiffs' motion.  During Mr. Brickell's deposition, plaintiffs' counsel instructed Mr. Brickell not to answer inquiries into this determination.  For example, Mr. Brickell was asked: "in the course of your conversations and meetings with counsel, were you ever asked to identify the guests who met the class criteria in this case?"  Brickell Dep. at page 143.  He was instructed not to answer.  Subsequently, he was asked: "in drafting your declaration, was the purpose to identify the number of guests who met the class criteria?"  Id. at 143-144.  Again, he was instructed not to answer.  Plaintiffs' counsel now contends that Mr. Brickell's Declaration (signed under penalty of perjury) "is a bit of an over-statement."

Unless the Declaration is withdrawn, Marriott seeks an order granting full discovery (including documents and his resumed deposition) into his determination of class scope because it is the only basis for plaintiffs' claim regarding the number of guest stays.

**B.**    <u>Plaintiffs' Position:</u>

Consistent with their claim of privileges, the Plaintiffs assert, and asserted at his deposition, that the scope of Tim Brickell's deposition examination was limited by the scope of his declaration. Marriott fully examined Mr. Brickell on the data underlying his declaration and the procedures he used. There is thus nothing further for him to be examined about. Additional discovery is justified only if this Court overrules the Plaintiffs' claims of privilege, and allows inquiry into matters not addressed in his declaration. On this record there is not basis for doing so.

Marriott demands withdrawal of Tim Brickell's declaration in support of the Plaintiffs motion for class certification. His declaration was filed to establish the "numerosity" criteria for class certification. Marriott has not challenged the "numerosity" of the proposed class. That is not surprising; there are over 8,000 residents of Washington, D.C. alone listed in the guest stay data Marriott has produced. The demand for withdrawal is premised upon the statement in Mr. Brickell's declaration that "there are no less than 110,522 guest stays that fit within the class definition." At the time of Mr. Brickell's declaration, and now, no class definition has been adopted by the Court. Thus, his declaration was a bit of an overstatement, then and now. Further, the class definition proposed in the Plaintiffs motion for class certification is as follows: "All persons who booked a room reservation at a Marriott hotel property in Russia through the Marriott reservation system, who received a room rate confirmation stated in U.S. dollars, and whose final bill at check-out was stated in rubles." In his deposition, Mr. Brickell testified that the tally reported in his declaration was the tally of those GNRs in the data produced to date by Marriott that a) reflected as the source of the reservation either Marriott's internet site or Marriott's 800 number, and b) occurred either after May 13, 2002 (three years before the suit was filed) or after the hotel began operating, whichever was later. He did not look at reservation confirmations or hotel bills. The Plaintiffs rely upon other evidence relating the Marriott data to reservation confirmations and check-outs. Though Marriott filed its brief in opposition to the motion for class certification after

4

Mr. Brickell's deposition, and thus after being fully informed of its bases, Marriott did not challenge his declaration as being inadequate to support an inference that the "numerosity" criteria was satisfied.   There is no reason to withdraw his declaration.

### III.    **Defendant's Motion re: Document Production by Plaintiff CSIS**

#### A.    **Defendant's Position:**

On November 5, 2007, Marriott served requests for documents relating to CSIS's employees' stays at the Marriott Russia Hotels.   CSIS made a partial production of these documents on December 28, 2007.   Subsequently, on March 10, 2008, CSIS made a supplemental production of employee travel records.   Marriott has reviewed CSIS's document productions and determined that there is still at least one employee, John Hamre, who has traveled to Russia and for whom CSIS did not (and has since refused) to produce any travel records.   There are other persons who worked as consultants for CSIS, who traveled to Russia on CSIS business, and for whom CSIS claims it is seeking recovery; CSIS has not produced those records or, in the alternative, identified those documents that they are not producing on grounds of privilege.   Marriott seeks an order compelling their production to the extent they are not privileged and compelling the production of a privilege log for those documents that are being withheld on privilege grounds.

CSIS's electronic documents have not been subject to a litigation hold.   CSIS's responsive electronic documents must be preserved and produced, and Marriott seeks an order to this effect.

#### B    **Plaintiffs' Position:**

The undersigned believes that all documents in the possession of CSIS and associated with stays by CSIS employees in Marriott Russian hotels since May 2002 have been produced, and none intentionally withheld.   These documents are either monthly American Express statements (redacted to delete transactions with non-Marriott entities) or requests for reimbursement and associated backup documentation.   CSIS is preserving its paper files until told it is free to destroy them.   In the

course of litigation it became apparent that CSIS had records of stays by CSIS employees that were not reflected in the data produced by Marriott. If Marriott will produce a **complete** list of visits by the identified CSIS employees, the undersigned will ask CSIS to double-check its own investigation.

CSIS President and CEO, Dr. Hamre stayed at the Marriott Renaissance St. Petersburg in February and July 2005. CSIS has explicitly stated on the record that it will not rely upon Dr. Hamre's testimony, will not call him as a witness, and will not seek to introduce records of his stays at Marriott Russian hotels as exhibits.

## IV.    Plaintiffs' Motion re: Guest Stay Data

### A.    Plaintiffs' Position:

There are seven hotels in Russia that are the subject of the Plaintiffs' claims. Four are operated by Marriott (Renaissance Moscow, Renaissance Samara, Renaissance St. Petersburg, and City Center); three are licensed by Marriott (Tverskaya, Grand and Royal Aurora).

Marriott operates an international reservation system, utilized by all seven of the hotels. Per their licenses, the licensed hotels are both obligated to utilize the reservation system and to contribute on a pro rata basis to the cost of its operation. The records in the reservation system are called Guest Name Records ("GNRs"). The system containing the GNRs before and for a short period of time after a stay is called MARSHA ("Marriott's Automated Reservation System for Hotel Accommodations"). Thereafter GNRs were transferred to OSCAR ("Optical Storage Collection and Retrieval"). Now they are transferred to the Marriott Reservations Data Warehouse ("MRDW"). In addition to the reservation system, hotels operate Property Management Systems ("PMS").

Plaintiffs have repeatedly sought complete guest stay data for all seven hotels yet Marriott has failed to provide such data.

A.    Marriott has provided incomplete MRDW data; no MRDW data has been produced for the Renaissance Samara for 2003 (the hotel opened sometime in mid-2003), and no MRDW data has been produced for the Renaissance Moscow for all of 2003, and for 2002 (the hotel opened sometime in 2002).

Marriott's counsel asserts, citing to specific Bates numbers, that this data has been produced. The undersigned has investigated that assertion and concluded that Plaintiffs still do not have this data. PMS data for these hotels has been produced.

B.    While Marriott has produced PMS data for the four operated hotels, it has failed to produce PMS data for the three licensed hotels. Based upon other data produced, e.g. occupancy rates, lengths of stays, and numbers of rooms, it is estimated that Marriott has produced data for only about 30% of the total stays at the licensed hotels.

The three licensed hotels are obligated by their license agreements (§7.1A of license agreements) to utilize, and feed guest stay information into Marriott's Reservation System. And those license agreements with the three hotels provide that Marriott's wholly owned subsidiary ("MHA") is entitled to receive from the licensed hotels"...such... information and data as MHA may reasonably request, in the form and at the times and places specified by MHA..." (§12.2 of license agreements). Additionally, Marriott is entitled to audit financial reports made by the licensed hotels to Marriott. A copy of a license agreement will be brought to the March 20, 2008 status conference.

**B.    Defendant's Position:**

Plaintiffs' claims involve seven hotel properties affiliated with Marriott and located in Russia. Four of these hotels—the Renaissance Moscow, the Renaissance Samara, the Renaissance St. Petersburg Baltic, and the Courtyard Moscow—are managed by Marriott and have been since they each opened for business. The remaining three hotels—the Moscow Marriott Grand, the

Moscow Marriott Royal Aurora, and the Moscow Marriott Tverskaya—are franchised hotels that are neither owned nor operated by Marriott.

In the course of responding to Plaintiffs' 140 interrogatories and document requests, Marriott has produced approximately 12,500 pages of hard copy documents, and approximately 40,000 pages of documents in electronic form. As part of that production, Marriott has produced responsive guest data in its possession for each of the seven hotel properties for each of the relevant years: 2002 to 2007. In particular, Marriott has produced guest data for the managed hotels from their property management systems ("PMSs") and for the franchised hotels from Marriott's MRDW database.

Marriott has not, and cannot, produce data from the franchised hotels' PMSs because the data is the hotels' property, and they do not consent to provide that information for this lawsuit. Contrary to plaintiffs' assertions, the license agreements do not give Marriott authority to extract this data from the franchised hotels, whose owners own the guest data. Plaintiffs tacitly acknowledge that Marriott does not have possession, custody, or control of this data because they issued subpoenas for it to the franchised hotels' operators (third parties having no affiliation with Marriott). However, after serving those subpoenas, plaintiffs subsequently withdrew their request.

## V.    Plaintiff's Motion re: Franchised Hotels' Exchange Rates

### A.    Plaintiffs' Position:

Until recently, the hotel bills of Marriott Russian hotel guests were tallied in "units," and then translated into rubles on the final invoice at check-out. The bills referred to the rate at which units of debt were translated into rubles of debt as the "hotel exchange rate."

The Plaintiffs seek the "hotel exchange rates" utilized over time at the three licensed hotels to calculate the bills presented to guests at check-out. Marriott has provided this information for the four hotels it operates, but not for any of the three licensed hotels. Under its license

agreements, Marriott is entitled to this information; see above.   Independent of the licensed hotels' billing systems, it appears Marriott has the data necessary to calculate the hotel exchange rates. Marriott asserts that PMS data is redundant of MRDW data.  In the PMS data produced to date, the revenue to the hotel from a guest's stay is reported in both U.S. dollars and rubles.  The ratio between the two is the so-called "hotel exchange rate."  By providing the revenue figures in both units, the requested information can be obtained.  However, when Marriott produced MRDW data it included revenue amounts expressed only in U.S. dollars.  All that is necessary to provide the "hotel exchange rate" data the Plaintiffs have sought is the production of the revenue for each stay expressed in rubles.  Marriott also has data from other sources that would allow the calculation, e.g. prices quoted in dollars at the time of reservations from its reservation system, and the rates stated in rubles on hotel bills, from its accounting systems.  Thus, Marriott can calculate the "hotel exchange rate" but declines to do so.  Plaintiffs seek either the hotel exchange rates or the data necessary to calculate them.

### B.    **Defendant's Position:**

Plaintiffs complain that Marriott has not produced hotel exchange rates for the franchised hotels.  Marriott was only able to produce this information for the managed hotels by asking Marriott employees at those managed hotels to compile the information.  Marriott does not have possession, custody, or control of hotel exchange rate information for the franchised hotels. Marriott does not project revenue and earnings for the franchised hotels. The accounting documents that Marriott receives from the franchised hotels only contains general earned revenue data, which is then used to calculate franchisee fee payments.  Marriott does not receive any information from the franchised hotels concerning their exchange rates. Marriott also does not have access to check-out folios (i.e., the hotel bills) from the franchised hotels.

Additionally, the hotels' exchange rates are <u>irrelevant</u> to plaintiffs' damages claims. In recent depositions and correspondence, plaintiffs state that their damages are calculated by multiplying the "number of representations Marriott made" by $1500. They claim the details of the actual stay, including the exchange rate, is not relevant. Since plaintiffs' position argues that this information is not relevant according to plaintiffs' theory of the case, there is no basis to compel this information.

## VI.    Plaintiffs' Motion re: OSCAR Screens

### A.    Plaintiffs' Position:

The Plaintiffs sought complete OSCAR data yet only a few copies of OSCAR records have been produced. Marriott has failed to provide a comprehensive production of OSCAR data. Plaintiffs sought the OSCAR data because unlike MRDW data, OSCAR records included a field recording the type of currency, e.g. U.S. dollars, in which room rates were quoted at the time of reservation. (A sample OSCAR record will be brought to the March 20 status conference.) The currency in which room rates were quoted is central to Plaintiffs' claims that quotations in U.S. dollars masked and therefore added to the misrepresentation of the difference between the reservation room price and the check-out room price, stated in rubles. In the meet and confer conference on March 17, 2008, counsel for Marriott stated a belief that the MRDW data it has produced to date included this field. He re-affirmed his belief in a call on March 18. Upon a reinspection of the MRDW data produced to date, either it does not include this piece of information, or it is coded in such a way that it is masked to our inspection. If data has been produced but in a form difficult to comprehend, the Plaintiffs seek a glossary or other instruction so that they may understand what they have. Otherwise, the Plaintiffs seek production of the OSCAR data, or if a field was omitted from the past productions of MRDW data, that **complete** MRDW data now be produced.

### B.    Defendant's Position:

Plaintiffs have requested archived OSCAR screens, which are one-page summaries of each guest's reservation details. Plaintiffs claim the OSCAR data is relevant to obtain the room rate and room rate currency for each guest stay.

First, all of the relevant information sought by this request already has been provided to plaintiffs. All of the Marriott Russian hotel guests identified in OSCAR would also have been identified in the MRDW and PMS data which Marriott has already produced to plaintiffs. (The main difference between the databases is that OSCAR is a snapshot of the reservation screen data with only a few searchable data fields, whereas MRDW and PMS each are in a format like that requested by plaintiffs with searchable data fields.) With regard to the rate information produced, the PMS data identifies both the room rate and currency for guests at managed hotels; the MRDW data identifies the information necessary to calculate the room rate. Further, Marriott has produced separately a detailed description of which currencies were quoted for all Russian Marriott Hotels for all relevant points in time. Thus, plaintiffs' will not get any relevant new information from OSCAR data, as they already have all the room rate and currency data contained in OSCAR through Marriott's prior document productions.

Second, the hotels' room rates and currency of room rates are <u>irrelevant</u> to plaintiffs' damages claims. In recent depositions and correspondence, plaintiffs state that their damages are calculated by multiplying the "number of representations Marriott made" by $1500. They claim the details of the actual stay, including the room rate and currency of room rate, is not relevant according to plaintiffs' theory of the case. Since plaintiffs' position argues that this information is not relevant, there is no basis to compel this information.

Finally, the burden on Marriott to produce the OSCAR data greatly outweighs the negligible relevance of the redundant data. Pursuant to an August 1, 2000 MARSHA reference guide, these

were available dating to 1991 on "optical storage devices." However, the optical disk was discarded a number of years ago due to mechanical problems. Today, the immense cost of maintaining Marriott's world-wide OSCAR database requires that data roll off of OSCAR to tape every 16 months. The burden upon Marriott to produce this duplicative information is substantial; Marriott estimates the cost to produce OSCAR data for May 2002 through 2006 at approximately $245,000. The lack of any additional probative value is greatly outweighed by the burden to Marriott, and this discovery should not be compelled.

## VII.    Plaintiffs' Motion re: Additional 30(b)(6) Depositions of Marriott

### A.    Plaintiffs' Position:

On February 27, 2008, plaintiffs served Marriott with a Notice of Rule 30(b)(6) Deposition ("Notice"), to commence on March 20, 2008, on the following subject areas of examination.

> 1.    Marriott's data associated with Marriott's Reservation System; including the persons and departments responsible for processing, storage, preserving, and transmittal of both electronic and 'hard copy' data associated with guest reservations at Marriott Russia hotels, including the MARSHA and OSCAR systems (including storage on magnetic media and optical disk, *see* 7M-001183) and the Marriott Data Warehouse. Marriott's policies and procedures regarding data retention both before and after May 2002.

> 2.    Information regarding the guest reservation data provided to Plaintiffs in discovery in this matter, including the identification of the data fields utilized by Marriott; the information contained in each data field; the source of information for each guest reservation; Marriott's processes of gathering and producing the electronic data; and the databases accessed to respond to Plaintiffs' discovery requests.

On March 13, 2008, plaintiffs served Marriott with a Notice of Rule 30(b)(6) Deposition ("Notice"), to commence on March 27, 2008, with the following area of examination:

> Pankaj Birla or someone most knowledgeable about information associated with the email correspondence (11M-01131 – 001132) stating in part, "confirm we are maintaining a 5% mark-up on internal exchange rate, because based on above exchange rate we if we are

still at 30 then our mark-up is 8.5%." Including the exchange rate comparison referenced in that email and any other information related to a practice, policy, or procedure of maintaining a mark-up rate.

**B.**    **Defendant's Position:**

On April 16, 2007, plaintiffs' served their 30(b)(6) Notice on Marriott, which contained seven subjects for examination. In response to that Notice, Marriott produced seven separate Marriott employee witnesses in May-September, 2007.

On February 27 and March 13, 2008, plaintiffs served two additional 30(b)(6) Notices. As a preliminary matter, these Notices are improper because they fail to comply with F.R.Civ.P. 30(a)(2)(B). *See Ameristar Jet Charter, Inc. v. Signal Composites, Inc.,* 244 F.3d 189, 192-193 (1st Cir. 2001); *Innomed Labs, LLC v. Alza Corp.,* 211 F.R.D. 237, 239-240 (S.D.N.Y. 2002). Moreover, plaintiffs' request for two additional 30(b)(6) depositions are improper because the topics for examination either: (1) have already been explored with prior 30(b)(6) witnesses, *see Ameristar,* 244 F.3d at 193; (2) could have been explored with prior 30(b)(6) witnesses because the relevant documents had been produced prior to that witness's deposition, *see id.*; (3) have been disclosed in letters to plaintiffs' counsel that supplement Marriott's document productions; or (4) are protected from disclosure by the attorney-client privilege or the attorney work product doctrine.

### a.  February 27, 2008 30(b)(6) Notice

Concerning the February 27, 2008, subject #1 is duplicative of areas examined in earlier depositions of Marriott 30(b)(6) depositions and, therefore, is not proper at this time. Plaintiffs had ample opportunity to explore each of the topics listed in Subject #1 during the prior corporate deposition of Marriott, which occurred over several days in May and August of 2007 and involved testimony by four corporate designees. Indeed, the document referenced in Subject #1 was

produced by Marriott in advance of those corporate designee depositions. In fact, plaintiffs explored the topics of the storage of MARSHA data and OSCAR's reservation retrieval capacities during the deposition of Debbie McGrath. That plaintiffs did not explore those topics in the level of detail that they now wish they had does not make plaintiffs' current request to depose Marriott again on these topics proper. Further, plaintiffs' request for the production of a witness on Marriott's policies and procedures regarding data retention before May, 2002 is wholly irrelevant to this litigation—the scope of production for which only goes back to May, 2002. Thus, Marriott objects to the production of a witness for the topics designated in Subject #1.

Marriott also objects to the production of a witness for any topics contained in Subject #2 because the information sought on each topic either (1) has been provided by Marriott in prior document productions (or correspondence relating to those productions) or (2) is protected from disclosure by the attorney-client privilege or the attorney work product doctrine.

Marriott has already explained "the identification of the data fields utilized by Marriott." The transmittal letters to plaintiffs' counsel accompanying Marriott's guest data productions (dated May 7, 2007; June 21, 2007; August 1, 2007; August 2, 2007; December 19, 2007; and February 27, 2008) fully explain this information through the use of data tables. Thus, there is no need for Marriott to designate a witness to testify on this topic.

With regard to "the information contained in each data field," at plaintiffs' request, Marriott already produced glossaries of codes for the data fields that were not obvious to plaintiffs on August 1, 2007. Further, Debbie McGrath testified in her deposition as to the reservation source codes. Thus, there is no need for Marriott to designate a witness to testify on this topic.

Likewise, with regard to the "the source of information for each guest reservation," such information has already been produced. To the extent it is known, the "source information" is contained in guest data productions themselves and explained in the data tables referenced above. Thus, there is no need for Marriott to designate a witness to testify on this topic.

With regard to "Marriott's processes of gathering and producing the electronic data," any additional information beyond that which Marriott has already produced is protected by the attorney-client privilege and the attorney work product doctrine.  Marriott thus objects to designating a witness to testify on this topic.

With regard to the "databases accessed to respond to plaintiffs' discovery requests," Marriott has fully explained this information in correspondence to plaintiffs' counsel dated August 1, 2007 and February 8, 2008.  Indeed, recent correspondence dated January 28, 2008 from plaintiffs' counsel suggests that plaintiffs already understand that the databases accessed to respond to plaintiffs' discovery request for guest data are: the Marriott Reservations Data Warehouse for the franchised hotels and the Property Management Systems of the managed hotels, noting that "because the [franchised] hotels' PMS did not communicate with the Marriott Reservation System, that [guest] data is now lodged only in the hotels' PMS, not in the Marriott Reservation System. That answers the question why the reservations do not appear in data from the Marriott Reservation System . . . ."

Because Marriott has already produced documents or other information responding to all topics in Subject #2 of the Notice (except those protected from disclosure by the attorney-client privilege or the attorney work product doctrine), Marriott objects to the production of a witness to testify on those topics.  To do so would not only be needlessly cumulative but it would also be unduly burdensome to Marriott.

### b.  March 13, 2008 30(b)(6) Notice

The March 13, 2008 Notice relates to the subject area of exchange rates at Russian Marriott hotels and Marriott's policies and procedures regarding "mark up" rates at those hotels.

This subject area was included within plaintiffs' initial 30(b)(6) Notice served April 16, 2007, in which subject 3 was "Marriott's policies and procedures regarding the use of a hotel

exchange rate and the conversion methodology to be applied to that rate." By letter dated April 20, 2007, Marriott designated Linda Bartlett to testify on that subject.

Ms. Bartlett was deposed on May 9, 2007. During her testimony, she was questioned about Subject 3 (including hotel exchange rates, setting of rates and Marriott's policy concerning exchange rates at Russian Marriott hotels); the chart of exchange rates produced by Marriott; and Marriott's August 2005 "policy regarding hotel currency exchange rate disclosure." Further, she was questioned specifically about the use of "mark up" rates appearing. In short, she was questioned at length about prior and current policies on this issue.

Plaintiffs thus have extensively interrogated Marriott's corporate witness on the issue of exchange rates, as well as a "mark up" rate, and their request for a second deposition in this area should be rejected.