# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRITT A. SHAW, et al.** | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) **Civil Action No. 05-1138(GK)** |
| **v.** | ) **(Status conference: April 28, 2008)** |
| | ) |
| **MARRIOTT INTERNATIONAL, INC.** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN REPLY TO MARRIOTT'S OPPOSITION TO PLAINTIFFS'
## <u>MOTION FOR CLASS CERTIFICATION</u>

Of Counsel:

Mark Borghesani, Esq.
c/o The Cullen Law Firm, PLLC
1101 30th Street, N.W., Suite 300
Washington, D.C., 20007
Tel: (202) 944-8600
Fax: (202) 944-8611

Paul D. Cullen, Sr. (100230)
Joyce E. Mayers (268227)
Randall S. Herrick-Stare (482452)
Amy M. Lloyd (975887)
The Cullen Law Firm, PLLC
1101 30th Street, N.W., Suite 300
Washington, D.C. 20007
Tel: (202) 944-8600
Fax: (202) 944-8611
*Counsel for Plaintiffs*

March 31, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RESTATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.    Plaintiffs' Factual Contentions Remain Unchallenged. . . . . . . . . . . . . . . . . . . . . 1

    2.    Factual Allegations Interposed by Marriott in its Opposition Brief
         are Irrelevant and Pose no Obstacles to Class-Wide Adjudication.. . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    THE PROPOSED CLASS IS ADEQUATELY DEFINED AND CLEARLY
    ASCERTAINABLE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.    PLAINTIFFS SATISFY RULE 23(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Plaintiffs Have Met the Requirements of Rule 23(a).. . . . . . . . . . . . . . . . . . 10

        (1)    Rule 23(a)(2) – Commonality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        (2)    Rule 23(a)(3) – Typicality.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        (3)    Rule 23(a)(4) – Adequacy of Representation. . . . . . . . . . . . . . . . . . . 13

III.    PLAINTIFFS SATISFY RULE 23(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    Predominance of Legal Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.    Application of D.C. Law on a Class-wide Basis Does Not
           Violate Constitutional Standards.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

           (a)    General principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

           (b)    Marriott's contacts with the District of Columbia. . . . . . . . . . . . 17

           (c)    The aggregation of contacts with the District of Columbia create
                 State interests.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

(d)     Imposition of D.C. law will not disrupt the reasonable expectations of any party.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

(e)     Marriott confuses the due process requirement that the forum jurisdiction have significant contacts with class members' claims with the requirement for minimum contacts necessary for personal jurisdiction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

2.     The District of Columbia's Choice of Law Rule Supports the Application of Its Laws to Marriott's Conduct.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

(a)     This Court's Earlier Analysis is Correct.. . . . . . . . . . . . . . . . . . . 24

(b)     Marriott Bears the Burden to Show That Some Other Jurisdiction Has a *Greater Interest* than the District of Columbia.. . . . . . . . . 26

B.     Predominance of Common Factual Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV.     PLAINTIFFS HAVE STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Adam Wechsler & Son, Inc. v. Klanck*, 561 A.2d 1003 (D.C. 1989). . . . . . . . . . . . . . . . . . . . . . . 13

*Alicke v. MCI Communications Corporation*, 111 F.3d 909
 (D.C.Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*Allstate Insurance Co. v. Hague*, 449 U.S. 302 (1981). . . . . . . . . . . . . . . 14, 15, 17, 21, 22, 23, 24

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Bledsoe v. Crowley*, 849 F.2d 639 (D.D.C. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Bykov v. Radisson Hotels, Int'l*, 2006 WL 752942 (D.Minn. 2006). . . . . . . . . . . . . . . . . . . . . . . 33

*Bykov v. Radisson Hotels, Int'l*, 221 Fed.App. 490 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . 33

*Bynum v. District of Columbia*, 214 F.R.D. 27 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Calvetti v. Antcliff*, 346 F.Supp.2d. 92. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fainbrun v. Southwest Credit Systems, L.P.*, 246 F.R.D. 128
 (E.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fears v. Wilhelmina Model Agency*, 2003 WL 21659373
 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ford v. Chartone, Inc.*, 908 A.2d.72 (D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201
 (D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Gaither v. Myers*, 404 F.2d. 216 (D.C.Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Havens Realty Corp. v. Coleman*, 455 U.S. 363. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Hnot v. Willis Group Holdings, Ltd.*, 228 F.R.D. 476
 (S.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Firestone Tire and Rubber Co.*, 1972 WL 127476 (F.T.C. 1976). . . . . . . . . . . . . . . . . . . . 11

*In re Firestone Tire and Rubber Co.*, 481 F.2d 246 (6th Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Firestone Tire and Rubber Co.*, 414 U.S. 1112 (1973).. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Lorazapam & Clorazepate Antitrust Litigation*, 202 F.R.D. 12
  (D.D.C. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Market Development Corp.*, 1980 WL 338982 (F.T.C. 1980). . . . . . . . . . . . . . . . . . . . . 11

*In re ORFA Securities Litigation*, 654 F.Supp. 1449 (D.N.J. 1987). . . . . . . . . . . . . . . . . . . . 23

*In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Vitamins Antitrust Litigation*, 209 F.R.D. 251 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . 13

*In the matter of Bridgestone/Firestone, Inc.*, 288 F.3d. 1012
  (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Kaiser Georgetown Community Health Plan, Inc. v. Stutsman*,
  491 A.2d. 502 (D.C. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 29

*Lerch v. Citizens First Bancorp*, 144 F.R.D. 247 (D.N.J. 1992). . . . . . . . . . . . . . . . . . . . . . . 23

*Love v. Johanns*, 439 F.3d. 723 (D.C.Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Martin v. Heinhold Commodities, Inc.*, 510 N.E. 2d 840 (Ill. 1987). . . . . . . . . . . . . . . . . . . . 23

*Murray v. GMAC Mortgage Corp.*, 434 F.3d. 948 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . 14, 34

*Novartis v. Federal Trade Commission*, 223 F.3d. 783 (D.C. Cir. 2000). . . . . . . . . . . . . . . . 11

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). . . . . . . 9, 12, 14, 15, 17, 21, 22, 24, 27, 28

*Pigford v. Glickman*, 182 F.R.D. 341 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Prado-Steiman v. Bush*, 221 F.3d 1266 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Ramirez v. Midwest Airlines*, __F.Supp.2d__, 2008 WL 682438
  (D.Kan. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

iv

*Renaissance Cruises v. Glassman*, 738 So.2d 436 (Fla. App. 1999). . . . . . . . . . . . . . . . . . . . . . . . 23

*Richards v. Delta Airlines*, 453 F.3d 523 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Shaw v. Hyatt Int'l Corp.*, 2005 WL 3088438 (N.D.Ill. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Shaw v. Hyatt Int'l Corp.*, 461 F.3d. 899 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Shaw, et al. v. Marriott International, Inc.* 474 F.Supp.2d 141
  (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24, 25, 29, 30, 33

*Shroeder v. Capital Indemnity Corp.*, 2006 WL 2009053
  (E.D.Wis. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Spence v. Glock*, 227 F.3d 308 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Walsh v. Ford Motor Co.*, 807 F.2d. 1000 (D.C.Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Washington Mutual Bank, FA v. Superior Court*, 15 P.3d. 1071
  (Cal. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168 (D.C. 2006). . . . . . . . . 20, 24, 26, 29

*Wells v. Allstate Insurance Co.*, 210 F.R.D. 1 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . 8, 11, 12

*Williams v. Central Money Co.*, 974 F.Supp.22 (D.D.C. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Williams v. The Perdue Pharma Co.*, 297 F.Supp.2d. 171 (D.D.C. 2003). . . . . . . . . . . . . . . 32, 34

## Federal Rules

Fed.R.Civ.P.23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 35

Fed.R.Civ.P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Statutes

District of Columbia Consumer Protection Procedures Act. . . . . . . . . . . . . . . . . . . . . . . . *passim*

**INTRODUCTION**

Marriott's Opposition to Class Certification ("Marriott Opp. Br.") follows the well-worn path taken by defendants in such matters – redefine the Plaintiffs' causes of action and the statutory prerequisites for relief and then attack the vulnerabilities built-in to the redefined causes of action under Rule 23, Fed.R.Civ.P.  Plaintiffs respond by refocusing the Court's attention on the precise causes of action for which class-wide adjudication is sought as well as the statutory prerequisites for relief by individual consumers under the D.C. CPPA.  It is readily apparent that the elements of Plaintiffs' claims are easily established on a class-wide basis.  Factual allegations injected by Marriott are simply irrelevant and pose no obstacle to their class-wide adjudication. Plaintiffs also address the propriety of applying the law of the District of Columbia to Marriott's conduct in this matter.   Application of D.C. law is completely consistent with constitutional standards.  Furthermore, the choice of law rules adopted by the courts of the District of Columbia involve a modified governmental interest test that this Court properly implemented in its prior Fed.R.Civ.P. 12(b)(6) ruling.  Finally, we show that the Named Plaintiffs have experienced injury in fact and have standing to adjudicate their claims on a class-wide basis.

**RESTATEMENT OF FACTS**

**1.      Plaintiffs' Factual Contentions Remain Unchallenged**

The proposed class is comprised of all guests of Marriott's Russian Hotels who received reservation confirmations from Marriott stating room rates in U.S. Dollars.  Marriott's dollar denominated price representations were objectively false and had a tendency to mislead.  No guests were ever allowed to pay for room charges in dollars nor could any guest purchase a sufficient number of rubles to pay his hotel bill for the amount in dollars identified in his written

1

confirmation from Marriott.  Except for the ultimate conclusion that Marriott's dollar

denominated price quotations were objectively false and had a tendency to mislead, Marriott does

not contest the basic facts set forth in Plaintiffs' initial memorandum.  Marriott's Russian hotels

now quote room prices in rubles: Plaintiffs make no claim under the CPPA for charges imposed

where reservation rates are quoted in rubles.

      Marriott admits that prior to August, 2005, it made no disclosures through its worldwide

reservation system or in its written confirmations that final hotel bills would be rendered in

Russian rubles subject to the hotel's "exchange rate."  Price, and how it is calculated and paid,

are obviously material to a guest's decision to book a room at Marriott.  Marriott informs us now

that, in August 2005, it began to include the following language in its written reservation

confirmations: "All prices quoted in U.S. Dollars.  Charges are payable in local currency at

applicable hotel exchange rate at checkout."  Exhibit 25, 4M-000556-559.  This disclosure

contributes to, rather than eliminates, the tendency to mislead created by Marriott's dollar

denominated price quotation.  The purported disclosure misleads the consumer by suggesting that

the payment of hotel charges will involve a currency exchange transaction (dollars for rubles).  In

fact, only rubles are involved.  The "disclosure" does not disclose what the hotel's so-called

"exchange rate" is, that it is based on an *undisclosed* "dollars to units to rubles" conversion, and

that it will be significantly less favorable than the official dollars to rubles exchange rate used by

Russia's Central Bank.

      Marriott's misrepresentations through its dollar denominated price quote and its failure to

disclose material facts related to hotel "exchange rates" were uniform for the entire class and may

be adjudicated on a class-wide basis.[1]  Records of guests who booked rooms through Marriott's

worldwide reservation system and received written confirmation from Marriott are contained in a

central database called MARSHA.[2]  That database stores room rates for all hotels operating

within Marriott's worldwide reservation system including both Marriott owned and franchised

hotels.  All reservations made through Marriott's worldwide reservation system are stored in

MARSHA.   Written confirmations are issued to guests by MARSHA.  Exhibits 9, 11 and 13 to

Doc. No. 62.  The class is defined as including all those who received such dollar denominated

reservation confirmations from Marriott and who paid for their hotel stay in Russian rubles at

check-out.

　　　　MARSHA allows prospective guests to reserve a room at a Marriott hotel using one of

several distribution channels including Marriott's toll-free reservation phone number, online at

www.marriott.com, travel agencies or directly through a participating hotel.[3]  All information

---

[1] Exhibit 7 to Motion for Class Certification ("Doc. No. 62"), Marriott's Answer to
Interrogatories 2 and 3 in Plaintiffs' First Set of Discovery Requests; Exhibit 27, Marriott's
Answer to Interrogatories 1 and 2 in Plaintiffs' Fourth Set of Discovery Requests; Marriott's
Third Party Complaint (Doc. No. 30).

[2] Exhibit 6 to Doc. No. 62, MARSHA stands for "Marriott Automated Reservation
System for Hotel Accommodations." The MRDW (Marriott Reservation Data Warehouse) is the
reporting system dedicated to providing reporting and analytic capabilities for reservations data
from MARSHA. The data in MRDW is taken from MARSHA nightly and stored with the
greatest amount of detail available as current systems allow.  MRDW Reports General
Information at Bates No. 10M-00030, Exhibit 28.

[3] Exhibit 3 to Doc. No. 62, LoGiudice Deposition, p. 97, lines 14 - 19.  According to a
"Glossary of Terms" produced by Marriott (Bates No.: 10M-00012), Exhibit 6 to Doc. No. 62),
MARSHA is "the central reservation system that is used by Marriott for transient, group and
contract bookings and also serves as an inventory management system for property guest
rooms."; Exhibit 29, "Marriott currently distributes rates to numerous online sites and has
established direct connect with Travelocity (currently in place) and Expedia (August 2004) for
seamless rate distribution."11M-01210; Exhibit 30, "Marriott and Travel Agency Systems,"

relating to the guest reservation process is collected and recorded in the MARSHA database.

Reservations made by a guest directly with a hotel property are frequently incorporated in the

MARSHA database.  This includes room rates, room reservations, reservation confirmations, and

the currency governing the transaction.[4]  By contract, Marriott's franchised hotels are required to

participate in Marriott's worldwide reservation system and are not permitted to charge a "rate

higher than the rate specified to the guest by the Reservations System office at the time the

guest's reservation was made."  Marriott's Third Party Complaint, Doc. 30 at ¶¶ 21, 25, 36.

Regardless of the method used to make a reservation, the information provided to the prospective

guest in the form of a written confirmation is generated by the MARSHA database[5] which is

controlled by Marriott.[6]  This enables Marriott to provide uniform information to prospective

guests of all its hotels.[7]  Marriott touts the MARSHA system as "simplif[ying] rate quotes by

ensuring consistent rate quotes across all distribution channels."  Exhibit 29 at Bates No. 11M-

091212.  A chart produced by Marriott in discovery demonstrates graphically that MARSHA is

---

Bates No. 10M-00876.

[4]  Exhibit 4 to Doc. No. 62, McGrath Deposition, p. 97, lines 15-19; Exhibit 7 to Doc. No. 62, Marriott's Answer to Interrogatory No. 3.

[5]  Exhibit 5 to Doc. No. 62, Humberto Chacon Deposition, p. 41, line 9 to 13; Exhibit 4 to Doc. No. 62, McGrath Deposition, p. 75, lines 13-18; Exhibit 29, 11M-01211;  Exhibit 31, MARSHA Reference Guide (Portions), Bates No. 7M-00030 to 7M-00050 and Exhibit 32, 7M-00340 to 7M-00350.

[6]  Exhibit 4 to Doc. No. 62, McGrath Deposition, p. 118, line 4 to p. 119, line 3; p. 162, line 12 to 163 line 8; p. 157, line 14 to p. 158, line 14. Exhibit 1 to Doc. No. 62, Bartlett Deposition, p. 143, line 21 to p. 144, line 2.

[7]  Exhibit 33, 11M-01597-598; Exhibit 34, 9M-01692-693 email among Marriott employees demonstrating that Marriott Int'l has control over the information set forth for all 7 Russian hotels.

the centerpiece of the Marriott Global Reservation Sales Network.  *Id.*, "Power of Global

Reservation Sales Network," at Bates No. 11M-01211.  All seven of the Russian Marriott hotel

properties at issue in this litigation participate in Marriott's MARSHA reservation system.[8]

Marriott admits the facts central to Plaintiffs' claims.  Marriott's Answer to Interrogatory No. 2

of Plaintiffs' First Set of Interrogatories is illuminating:

> **INTERROGATORY NO. 2:**  Identify all Marriott hotel Properties at which room
> rate quotations are initially provided by you to guests in U.S. dollars but then are
> billed, at the time of checkout, at a foreign currency conversion rate which is
> different than the Official Exchange Rate for the foreign currency involved.

> **RESPONSE TO INTERROGATORY NO. 2:**  Marriott objects to this
> Interrogatory as overly broad and unduly burdensome. . . .Without waiving the
> foregoing specific or general objections, Marriott states that all of the Marriott
> Russia Hotels identified in plaintiffs' General definitions and Instructions No. 2 are
> hotel properties for which room rates are quoted in U.S. dollars and "Units" and in
> which exchange rates other than the official exchange rates set by the Central Bank
> of Russia are used to calculate the total amount of the bills to be paid by the guests
> at check-out.

Marriott also admits that the practice of quoting and confirming a price in U.S. Dollars

but charging an unrelated amount in rubles was not transparent.  Exhibit 26 at 10M-00468.  In an

internal memorandum discussing the practice of using currency units, Marriott executive Michael

Simon states: "In order to overcome this in-transparent practice the Marriott properties have

decided to change their pricing structure into Russian Roubles as of 01 January 2007.  The

migration to Russian Roubles will result in a transparent pricing and accounting structure as of

2007."[9] Plaintiffs applaud Marriott for making this change.  This case, however, deals with the

---

[8] ¶ 33, pg. 8, Third Party Complaint; Exhibit 1 to Doc. No. 62, Bartlett Deposition, p.
143, line 21 to p. 144, line 2.

[9] *Id.*; Exhibit 35, Marriott employee email expressing concern that guests are not being
informed of the correct rate at 10M-00987.

consequences of Marriott's previous policy of misleading and deceiving consumers by quoting prices in dollars.

**2.    Factual Allegations Interposed by Marriott in its Opposition Brief are Irrelevant and Pose no Obstacles to Class-Wide Adjudication.**

The following facts injected by Marriott have no bearing on the adjudication of the claims raised by the Plaintiffs.

A.    <u>Reservations are made by guests through several different channels</u>.  Marriott makes a big point of the fact that reservations are made through several distinct channels including 1) through Marriott's website; 2) over the telephone via Marriott's "800" number; 3) through travel agents; 4) by contacting the hotel directly.  Marriott asserts that it has no direct control over the disclosures made through some of these channels, particularly numbers 3 and 4.  All guests who book reservations through Marriott's worldwide reservations system are given the same rate information for hotel rooms through MARSHA, irrespective of the channel through which they booked their reservation.    That written confirmation is the basis for Marriott's liability – not random conversations with travel agents or "800" number operators.

B.    <u>Marriott does not establish room rates for its franchised hotels</u>.  It is irrelevant who establishes the dollar denominated room rate.  What is relevant is whether Marriott quotes a dollar denominated room rate to guests under circumstances that violate the CPPA.  Even where a franchised hotel establishes its own rate, its contract with Marriott prevents it from charging more than the rate disclosed to prospective guests through MARSHA.  Doc. 30 at ¶ 36.

C.    <u>Some guests had no contact with Marriott</u>.  Guests who had no contact with Marriott would not be in the class.  For example, some guests may have made their arrangements

6

directly with one of the franchised Russian hotels.  Unless their name appears on the MARSHA database indicating that they had received a written confirmation from Marriott, they would not be in the class.  Note, however, that the MARSHA database records disclose that there are well over 200,000 guest stays booked through participating hotels that were entered into MARSHA. Exhibit 36, Second Declaration of Tim P. Brickell ("Second Brickell Decl.") at 21.

D.     Some guests filed complaints with Marriott and have received rebates.  Such guests, if otherwise in the class, may be entitled to statutory damages unless Marriott secured a formal release.  If such releases exist, they may be presented by Marriott for consideration during the remedy phase of this proceeding.  Discovery produced by Marriott discloses only 454 guest complaints none of which included a legal release of Marriott by the guest.  Exhibit 37, Declaration of Kelly E. Taylor ("Taylor Decl.") at 7.  There are approximately 402,801 records of guest stays at Russian hotels in the MARSHA database. Second Brickell Decl. at 18.  Assuming that these complaint files are relevant to anything but remedy, dealing with 454 records poses no serious obstacle to class certification.  This simply is not a problem large enough to prevent the certification of a class with over 288,000 members.

E.     Some guests are experienced and sophisticated travelers who could not have been deceived by Marriott's conduct.  This includes guests with multiple stays at Marriott hotels.  D.C. Code § 28-3904 provides that the violations alleged by Plaintiffs may be found "whether or not any consumer is in fact mislead, deceived or damaged, thereby . . . ."  Marriott completely ignores this language and insists that this Court must examine the state of mind of each class member.  Of course, the standard to be used in judging Marriott's conduct is whether a "reasonable consumer" would be deceived by  misrepresentations and failure to disclose material

7

facts. *Wells v. Allstate Insurance Company,* 210 F.R.D. 1, 9 (D.D.C. 2002); *Alicke v. MCI Communications Corporation*, 111 F.3d 909, 912 (D.C. Cir. 1997). The state of mind of individual consumers is simply irrelevant.

**ARGUMENT**

**I.    THE PROPOSED CLASS IS ADEQUATELY DEFINED AND CLEARLY ASCERTAINABLE**

In determining whether a class is sufficiently definite to warrant class certification, "[t]he key question is whether plaintiffs can demonstrate that members of their proposed class are identifiable when utilizing objective standards." *Fainbrun v. Southwest Credit Systems, L.P.*, 246 F.R.D. 128, 133 (E.D.N.Y. 2007) (citing *Hnot v. Willis Group Holdings Ltd.*, 228 F.R.D. 476, 481 n. 2 (S.D.N.Y.2005)). In the present matter, the proposed class is easily ascertainable using objective standards – Marriott's own records of guest stays. Courts generally require that the class be "sufficiently definite that it is administratively feasible for the court to determine whether a particular individual is a member." *Bynum v. District of Columbia*, 214 F.R.D. 27 (D.D.C. 2003). "[B]y looking at the class definition, counsel and putative class members can easily ascertain whether they are members of the class." *Id.* citing *Pigford v. Glickman,* 182 F.R.D. 341, 346 (D.D.C.1998)*.* The proposed class is comprised of "All persons who booked a room reservation at a Marriott hotel property in Russia through the Marriott Reservation System, who received a room rate confirmation stated in U.S. Dollars, and whose final bill at checkout was stated in Russian Rubles." They are all listed in the MARSHA database. Furthermore, "an individual would be able to determine, simply by reading the definition, whether he or she was a member of the proposed class." *Bynum*, 214 F.R.D. at 32. "There is no ambiguity regarding

who these individuals may be, nor any need for a factual inquiry beyond a search of Defendant's records."*Fainbrun*, 246 F.R.D. at 133.  Finally, class members "need not be ascertained before the class certification," though they "must be ascertainable at some point in the case." *Id. citing Fears v. Wilhelmina Model Agency*, 2003 WL 21659373 at *2 (S.D.N.Y. Jul.15, 2003).

Marriott also raises a number of meritless issues with respect to the adequacy of the definition of the proposed class.  Marriott Opp. Br. at 20-23.  First, Marriott complains that the definition is not limited by time.  Plaintiffs' Second Amended Class Action Complaint challenges alleged violations arising after May 2002, consistent with CPPA Section 12-301(8)'s three-year limitation on actions.  Plaintiffs assume that this limitation period is implicit in the proposed class definition but have no objection to it being included in the definition approved by this Court.

Marriott asserts that the Court must make individual inquiries as to contacts between putative class members and the District of Columbia.  Not so.  Absent class members who are linked to a controversy being adjudicated in a specific state need not possess the same minimum contacts with the forum as required for an out of state defendant in order to satisfy due process of law. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-812 (1985) ("*Shutts*").

Marriott also asserts that the Court must inquire as to which distribution channel individual reservations were made.  Under Plaintiffs' theory of the case, the key factor is whether the guest received a written price confirmation from Marriott, not what distribution channel the guest went through to secure such confirmation.  Likewise, whether the guest or someone else (like a secretary or an assistant) made the reservation is immaterial so long as the guest received a written reservation confirmation that violated D.C. Code § 28-3904.

9

Marriott asserts that this Court must determine whether the hotel involved in a particular transaction applied the Central Bank exchange rate or its own internal exchange rate. Marriott has admitted, however, that all of its Russian hotels used an internal exchange rate rather than the Central Bank's rate to calculate final bills. Exhibit 7 to Doc. No. 62, Marriott's Answer to Interrogatory No. 2. Marriott's admission makes further inquiry unnecessary. The evidence produced by Marriott also shows that each hotel's internal "exchange rate" was less favorable to guests than the Central Bank rate.[10]

## II.     PLAINTIFFS SATISFY RULE 23(a)

### A.     Plaintiffs Have Met the Requirements of Rule 23(a)

#### (1)     Rule 23(a)(2) – Commonality

Marriott argues that the numerous information channels and means for initiating the reservation process renders common proof of the claims impossible. Marriott ignores the fact that, regardless of the means by which the reservation was made or the information regarding the room rate was communicated to the hotel guest, every class member received a written confirmation from Marriott's centralized reservation system, MARSHA, which stated the confirmed room rate in U.S. Dollars. Regardless of how a guest contacted Marriott, the end result is the same for every class member – entry of the reservation in MARSHA and a written confirmation of the room rate in U.S. Dollars.

----

[10] See Exhibit 16 to Doc. No. 62, tables prepared by Marriott comparing, for the four hotels it managed, the "hotel exchange rates," the Central Bank rates and the markup of the former over the latter. See also Exhibit 38, a collection of correspondence regarding complaints by nine consumers complaining about the use, by the three Russian hotels licensed by Marriott, of a hotel exchange rate that is higher than the Central Bank exchange rate, in preparing hotel bills. (Emphasis added.)"

Marriott asserts that some of its Russian hotel guests knew they would be charged a higher rate in U.S. Dollars than they were told in their written confirmation received by Marriott. Marriott argues that if a hotel guest knew somehow he would be cheated by its express misrepresentation of the room rate in U.S. Dollars, that guest's claim is somehow different from the guest who is ignorant of the fraud. That is simply not the standard for proof of a violation of the CPPA.

The plain language of the CPPA refutes Marriott's contention. Section 28-3904 states that the enumerated conduct violates the CPPA "whether or not any consumer is in fact misled, deceived or damaged thereby...." *Id.* To prove a claim under D.C. Code 28-3904 (e) and (f), the plaintiff must establish: (1) the failure to disclose a material fact or the misrepresentation of a material fact (2) which would tend to mislead. *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 99 (D.D.C. 2004). Courts applying the CPPA have consistently held that the standard of proof under the CPPA is a "reasonable person standard." *Wells*, 210 F.R.D. 1; *Alicke*, 111 F.3d 909. On claims involving misrepresentation through a failure to disclose, the proof "necessary is that the facts withheld be material in the sense that a reasonable [person] might have considered them important in making this decision." *Novartis v. Federal Trade Commission,* 223 F.3d 783, 786 (D.C. Cir. 2000), (*citing In re Cliffdale Associates., Inc.,* 103 F.T.C. 110, 165 (1984)). Causation or proof that a consumer would have acted differently had they known the true facts is based upon a reasonable person standard, not individualized proof. *Wells,* 210 F.R.D. at 9. The fact that a consumer might have or did purchase the product, here a room at a Russian Marriott hotel, even though they knew the truth, is irrelevant. *In re Firestone Tire and Rubber Co.,* 1972 WL 127476 (FTC 1976), *aff'd,* 481 F.2d 246 (6th Cir.), *cert denied*, 414 U.S. 1112 (1973); *In re*

11

*Market Development Corp.,* 1980 WL 338982 (FTC 1980).

        **(2)**        **Rule 23(a)(3)  – Typicality**

        Marriott's argument as to the typicality of the Named Plaintiffs' claims is more notable for what Marriott ignores rather than what it asserts.  The typicality requirement of Rule 23(a)(3) is satisfied "if each class member's claim arises from the same course of events that led to the claims of the representative parties." *Wells,* 210 F.R.D. at 6.  As demonstrated in our opening brief, each Named Plaintiff received a written confirmation from Marriott misrepresenting the room rate in U.S. Dollars.  At the time of checkout from a Marriott Russian hotel, each Named Plaintiff was charged a quantity of Russian rubles at a rate in excess of what could be acquired by tendering the number of dollars identified in the written confirmation.  Proof of these facts will establish Marriott's violations of the CPPA.

        None of the circumstances described in connection with any of the Named Plaintiffs defeats the typicality of their claims.  As described elsewhere in this brief, the CPPA does not require actual deception - Marriott's liability will be determined under a reasonable person standard; absent class members need not establish minimum contacts with the forum (*Shutts*, 472 U.S. at 811-812); none of the Named Plaintiffs were reimbursed by Marriott so their claims are typical of the class as a whole; and the 454 guests who complained and may have received reimbursement present a minor claims administration task, not a typicality issue.

        Marriott further challenges CSIS's typicality on the grounds that it is not a "consumer" for purposes of the CPPA.  As discussed more fully in Plaintiffs' Opposition to Marriott's Motion for Partial Dismissal of Second Amended Complaint (Doc. No. 67), CSIS is a consumer under the circumstances alleged in this action.  The D.C. Court of Appeals held that the

determining factor in the application of the CPPA was where the transaction fell along the

distribution chain. Where the purchaser is not in the regular business of buying and reselling the

goods, he is a "consumer" within the meaning of the CPPA. *Ford v. Chartone, Inc.*, 908 A.2d 72,

83 (D.C. 2006); *Adam Wechsler & Son, Inc. v. Klank*, 561 A.2d 1003 (D.C. 1989).   CSIS is not a

participant in the hospitality business, but booked the Marriott rooms for use of employees and

contractors while they were in Russia.

### (3)     Rule 23(a)(4)  – Adequacy of Representation

Marriott contends that the Named Plaintiffs are not adequate class representatives

because: (1) they do not have detailed knowledge of the conduct of the litigation, and have

described their claims in somewhat different ways; and (2) the litigation seeks statutory rather

than compensatory damages.  Neither is a basis upon which to deny class certification.

First, each class representative has knowledge that they were charged more for their hotel

stay at a Marriott Russian hotel than the room rate stated in U.S. Dollars on their written

confirmations.[11]  Regardless of how they phrased that claim, it amounts to the same thing  –

Marriott misrepresented the room rates that would actually be charged.  Class representatives are

not required to have a detailed understanding of the nature and facts of the case.   *In re Vitamins*

*Antitrust Litigation*, 209 F.R.D. 251, 262 (D.D.C. 2002).  All that is required is that the class

representative is willing and able to prosecute the litigation through qualified counsel. *Id.; In re*

*Lorazapam & Clorazepate Antitrust Litigation,* 202 F.R.D. 12, 29 (D.D.C. 2001).  Each class

representative has testified in a deposition; Plaintiffs Shaw and Charness took time to travel to

---

[11] Exhibit 39, Shaw Deposition p. 80, line 4 - pg. 82, line 2; Charness Deposition p. 98,
line 5 to p. 100, line 20; Mendelson Deposition, p. 187 line 11 to p. 188, line 2.

the District of Columbia for their depositions.  Each class representative has produced documents
and responded to several sets of interrogatories.  Marriott cannot show that the class
representatives have not vigorously pursued their claims through class counsel.

Second, Marriott argues that the Named Plaintiffs are not adequate class representatives
because they seek statutory rather than compensatory damages.  Crediting that argument would
defeat the fundamental policy underlying Rule 23(b)(3), which "was designed for situations such
as this, in which the potential individual recovery is too slight to support separate  suits, but
injury is substantial in the aggregate." *Murray v. GMAC Mortg. Corp.,* 434 F.3d 948, 953 (7th
Cir. 2006).  "Refusing to certify a class because the plaintiff decides not to make the sort of
person-specific arguments that render class treatment infeasible would throw away the benefits of
consolidated treatment." *Id.*  If some class members wish to pursue actual damages, they may opt
out and litigate independently.

In this case, the overwhelming majority of guest stays generated overcharges of less than
the $1,500 per violation in statutory damages provided by the CPPA.  Plaintiffs estimate that
only 691 guest stays or 0.3 % of the total class, generated overcharges of more than $1,500.
Exhibit 40, Third Declaration of Tim P. Brickell.  These few class members may opt out of the
class, and pursue their claims separately if they choose to do so.

## III.  PLAINTIFFS SATISFY RULE 23(b)(3)

### A.  Predominance of Legal Issues

The U.S. Supreme Court has addressed a forum state's choice of law determination in
two seminal cases: *Allstate Insurance Company v. Hague*, 449 U.S. 302 (1981), and *Phillips
Petroleum Company v. Shutts*.  472 U.S. 797 (1985). The rule that emerges from these cases is

that, where there are conflicts between the laws of two or more jurisdictions each of which has some claim for imposing its own law on a dispute, the forum State may assert its law where it has significant contacts or aggregation of contacts "creating state interests," such that the choice of its law is neither arbitrary nor fundamentally unfair.

Plaintiffs first discuss this rule and examine the aggregation of contacts between Marriott and the District of Columbia to show that those contacts create "state interests" such that the application of D.C. law to this matter is neither arbitrary nor fundamentally unfair. Next, Plaintiffs examine D.C.'s choice of law rule (modified governmental interest) to demonstrate that this Court applied that rule properly in finding that Marriott's conduct at issue here is governed by the law of the District of Columbia.

> **1.     Application of D.C. Law on a Class-wide Basis Does Not Violate Constitutional Standards.**

> **(a)     General principles**

In *Allstate*, the U.S. Supreme Court examined whether Minnesota's application of its insurance law to claims arising out of a collision in Wisconsin between two residents of Wisconsin, one of whom had worked in Minnesota for 15 years prior to the fatal accident and who regularly commuted to Minnesota from Wisconsin. The suit was filed in Minnesota by the deceased victim's widow who had moved to Minnesota after the victim's death, but before initiating the litigation. Allstate was authorized to do business in Minnesota, but the insurance policies were delivered in Wisconsin, *Allstate*, 449 U.S. at 306, and executed by Allstate in Illinois. *Id.* at 317. The Minnesota trial court applied Minnesota law and the Supreme Court of Minnesota affirmed.

On *certiorari* to the U.S. Supreme Court, the plurality opinion by Justice Brennan

recognized what it termed a long-established principle that an issue or a set of facts in a lawsuit

"may justify, in constitutional terms, application of the law of more than one jurisdiction." *Id* at

638. Where the laws of more than one jurisdiction may reasonably be applied, the Court held

that ". . . for a State's substantive law to be selected in a constitutionally permissible manner, that

State must have a significant contact or significant aggregation of contacts, creating state

interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id*. at 312-

313. Three contacts with Minnesota were found to be controlling: (1) the deceased's status as an

employee in Minnesota, *Id.* at 313-314; (2) the deceased's daily commute from Wisconsin into

Minnesota, *Id.* at 314; and (3) the fact that the defendant Allstate was licensed to do business in

Minnesota and could hardly claim unfamiliarity with its laws or surprise that those laws could be

applied to it. *Id.* at 317-318.

Justice Stevens filed a concurring opinion wherein he noted that "the [Full Faith and

Credit] Clause does not rigidly require a forum state to apply foreign law whenever another State

has a valid interest in the litigation." *Id.* at 322-323. Justice Stevens went on to find that

"Petitioner has failed to establish that Minnesota's refusal to apply Wisconsin law poses any

direct or indirect threat to Wisconsin's sovereignty," *Id.* at 325 (citations omitted), and that a

forum state's application of its own law would not violate the Due Process clause unless it were

"totally arbitrary or fundamentally unfair to either litigant." *Id.* at 326.

The dissenting opinion offered no substantial disagreement with the plurality on the test

to be applied, but found the contracts relied upon in the plurality opinion to be trivial. *Id.* at 332.

In *Shutts*, the Supreme Court of Kansas had approved the application of Kansas law to a

16

claim that members of the plaintiff class were entitled to interest on royalty payments under gas leases, payment of which was delayed pending approval of certain price increases by the Federal Power Commission.  The gas leases were located in 11 separate states, but only one quarter of one percent of these gas leases were on Kansas land.  *Id.* at 801.  "[O]ver 99% of the gas leases and 97% of plaintiffs . . . had no apparent connection to the State of Kansas except for this lawsuit."  *Id.* at 819.  Phillips Petroleum did own property and conduct business in Kansas, *Id.* at 799, but was incorporated in Delaware and maintained its principal place of business in Oklahoma.  *Id.* at 814-815.  The record showed that there were potential conflicts between the law of Kansas and the laws of other states (particularly Texas and Oklahoma) with respect to whether interest was owed on delayed royalty payments and, if so, at what rate.  *Id.* at 816-818.

The majority opinion in *Shutts* agreed with the plurality opinion in *Allstate* that a forum state could impose its own law notwithstanding conflicts or potential conflicts with the laws of other jurisdictions.  Imposition of the forum state's law was, however, subject to "modest restrictions" requiring that the forum state "'must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'  *Id.*, at 312-313."  *Shutts*, 472 U.S. at 818 (quoting from *Allstate*).  Such contacts were found lacking.

### (b)    Marriott's contacts with the District of Columbia

The aggregation of contacts between Marriott and the District of Columbia create state interests such that the application of D.C. law in this proceeding is neither arbitrary nor fundamentally unfair.  Marriott's historic roots in the District of Columbia date back to 1927 when its founders began their business operations here.  Answer to First Amended Complaint

17

("Answer"), ¶ 17.  Marriott admits that it is authorized to conduct and regularly conducts business in the District of Columbia.  Answer, ¶ 17.

Marriott admits that its website contains numerous representations that its corporate headquarters is at One Marriott Drive in Washington, D.C. 20058.  Answer, ¶¶ 23-26.  Marriott's annual report to its shareholders for the years 2000 - 2006 all contain similar representations.  Answer, ¶ 27; Taylor Decl. at 2.  From 2002 to 2007, Marriott's annual meeting of shareholders was held at the J.W. Marriott Hotel, 1331 Pennsylvania Ave., N.W., Washington, D.C. 20008.  *Id*.  Marriott admits that  Exhibit 99 attached to its Form 8-K Report dated February 8, 2005, filed with the Securities and Exchange Commission, shows Corporate Headquarters address as Marriott Drive, Washington, D.C., 20058.  Answer, ¶ 28.  All of Marriott's formal press releases prior to August 8, 2007 (found on its website) recite that it is headquartered in Washington, D.C.  Taylor Decl. at 7.  Marriott admits that its General Counsel is identified in Martindale Hubbell as being located at One Marriott Way, Washington, D.C. 20058.  Answer, ¶ 29.

When asked to produce documents containing representations that its corporate headquarters is in the District of Columbia, Marriott objected on the grounds that such documents do not relate to any claim or defense and are too burdensome to produce.  Response to Plaintiffs' First Set of Interrogatories, ¶ 34.  Exhibit 7 to Doc. No. 62.  Plaintiffs accept the fact that such documents are undoubtedly voluminous and may be burdensome to produce, but reject the assertion that they are irrelevant.

Marriott has tacitly admitted that the thousands of representations to the general public through press releases, potential guests of its hotel properties and others through its website, the investing public through its annual reports and SEC filings, and the legal community through its

18

General Counsel's Martindale Hubbell listing, were false when it filed two sworn declarations stating that its headquarters and principal place of business are actually located at 10400 Fernwood Road, Bethesda, MD, 20817.[12]

There are significant contacts between the District of Columbia and the plaintiff class. Plaintiff CSIS maintains its principal place of business within the District of Columbia. Plaintiff Mendelson resides within the District of Columbia. Second Amended Complaint, ¶¶ 14, 15.

Marriott's corporate records disclose that during the period covered by this litigation, there were 8,199 persons with District of Columbia addresses who were guests at one or more of its Russian hotel properties. Those 8,199 guests accounted for 11,324 separate stays at these hotels. Second Brickell Decl. at ¶ 17.

Marriott's representations that it is headquartered and maintains its principal place of business within the District of Columbia were made for its own personal gain. In their opposition to Marriott's Motion to Dismiss the First Class Action Complaint, Plaintiffs submitted the Declaration of Dr. Checkitan S. Dev of the Cornell University School of Hotel Administration. Doc No. 11-13. The Dev Declaration concluded that Marriott's representations that it is headquartered in Washington, D.C. had the effect of enhancing its brand identity, brand image and brand positioning thus significantly enhancing the value of its brand. Dev Declaration at ¶ 9.

Marriott has never challenged or even commented upon the Dev Decl. Indeed, Marriott has admitted that it promotes the identification of its brand with the District of Columbia for its

---

[12] Affidavit of Brendan Ross, Esq. (Exhibit 2 to Marriott Opp. Br.); Doc. No. 7-4, Declaration of Jeff B. Stant, filed in support of Marriott's Motion to Dismiss First Class Action Complaint.

own commercial advantage.  Marriott's Answer to paragraph 22 of plaintiffs First Amended

Class Action Complaint is noteworthy:

> Marriott admits that it has stated on its website that "the perpetuation of a company's
> culture has proven a positive financial impact."  Marriott states that its historic roots
> to the District of Columbia date back to 1927 when the Company's founders began
> their business operations in the District of Columbia.

Marriott Answer ¶ 22.  Thus, Marriott concedes that its misrepresentations as to the location of

its corporate headquarters has in fact had a "positive financial impact" on it.

### (c)    The aggregation of contacts with the District of Columbia create State interests.

The District of Columbia has an interest in enforcing the CPPA, an important statute

designed to provide procedures and remedies for a broad spectrum of practices that injure

consumers.  It also has a strong interest in promoting, through effective enforcement, fair

business practices throughout the community.  *Shaw v. Marriott International, Inc.*, 474 F.

Supp.2d 141, 147 (D.D.C. 2007) (citations omitted).  "The District of Columbia has a 'strong

interest in ensuring that its corporate citizens refrain from fraudulent activities.'"  *Id.* at 148

(quoting *Washkoviak v. Student Loan Marketing Ass'n*, 900 A. 2d 168, 181-182 (D.C. 2006).

The District of Columbia has an interest in protecting consumers and promoting fair business

practices by corporate entities headquartered there.  *Id.*

Plaintiffs' Second Amended Class Action Complaint alleges an additional cause of action

under CPPA § 28: 3904(t) which specifically prohibits "deceptive representations or designations

of geographic origin in connection with goods or services."  This provision precisely covers

Marriott's conduct here.  Marriott misrepresents that the origin of its services in the international

hospitality industry is Washington, D.C.  The District of Columbia's state interest in enforcing

this provision is especially strong where the deceptive practice being challenged falsely claims D.C. as the origin of its services.

There are currently two residents of the District of Columbia who are named plaintiffs in this proceeding (Mendelson and CSIS). More importantly, records produced by Marriott show an additional 8,198 absent class members with addresses in the District of Columbia stayed at Marriott's Russian hotels 11,324 times.

Marriott has engaged in a longstanding, widespread and systematic practice of convincing its customers, investors, competitors, the S.E.C., the legal community and anyone visiting its website or reading its press releases that it is headquartered and maintains its principal place of business in the District of Columbia. Marriott admits that this deception was designed to promote its commercial advantage and that it has succeeded in so doing. Marriott regularly holds its annual meeting of shareholders in the District of Columbia, but now insists that it should not be subject to D.C. law because it is actually headquartered a few miles over the border in Bethesda, Maryland.

On the face of these facts there can be no doubt that the District of Columbia has "state interests" in this controversy such that the imposition of its law would be neither arbitrary nor fundamentally unfair when viewed through the prisms of either the majority, plurality, concurring or dissenting opinions in *Allstate* and *Shutts*.

> **(d)  Imposition of D.C. law will not disrupt the reasonable expectations of any party.**

In evaluating the due process requirements for the application of state law to a nationwide class, the Supreme Court focused on the parties' ***expectations*** in determining the fairness of the

choice of law. *Shutts,* 472 U.S. at 822, citing *Allstate,* 449 U.S. at 333 (opinion of Powell, J.).

Thus, where an insured moved to Florida with knowledge of the insurer, Florida's application of

its own law to permit recovery on the policy was not unfair; the "insurer must have known that it

might be sued there." *Allstate,* 449 U.S. at 333 (opinion of Powell, J.). "A contact or pattern of

contacts satisfies the Constitution when it protects the litigants from being unfairly surprised if

the forum state applies its own law." *Id.* at 336. Marriott makes no claim that it was surprised.

Here, Marriott focuses only on the fact of the physical location of its headquarters in

Maryland, ignoring its longstanding, widespread and persistent misrepresentations that it is

headquartered in the District of Columbia. In terms of "expectations," Marriott's hospitality

customers knew only what Marriott told them – Marriott is headquartered in the District of

Columbia and is physically located at its address, One Marriott Drive, Washington, D.C. 20058.

More significantly, Marriott's representations in this regard were part of a purposeful public

relations agenda intended to create a positive public image and economic benefit from its close

association with the District of Columbia.

Marriott has wrapped itself in the flag of the District of Columbia for years for its own

commercial advantage and has encouraged the whole world to believe that its headquarters and

principal place of business are here. As the D.C. Court of Appeals has held in applying D.C. law

in a case in which defendants were headquartered in the District of Columbia, but the Plaintiff

lived and the offending conduct occurred in neighboring Virginia:

> Neither [defendant] can claim unfamiliarity with the laws of this
> jurisdiction [DC] or surprise that the state courts might apply
> forum law to litigation in which they are involved. . . . There can
> be no unfair surprise to these defendants ***nor any frustration of***

> *legitimate expectations* in our application of the District's law of
> negligence, for the defendants were aware that the plaintiff was
> both a ***resident of the metropolitan area*** and a District employee.[13]

Other courts have applied the substantive law of one state to nationwide classes on facts

similar to those in this case.  The Supreme Court of Illinois found that Illinois law could be

applied to a nationwide class alleging deceptive business practices where each member of the

plaintiff class asserted the same breach of fiduciary duty with respect to the same failure to

disclose the same fact.  *Martin v. Heinhold Commodities, Inc.*, 510 N.E. 2d 840, 847 (Ill. 1987).

The Illinois Court explained that Illinois had legitimate state interests "in applying its law to

adjudicate a dispute involving a business principally situated in its jurisdiction and which, ***by its***

***own efforts, insistently has sought to avail itself of both the courts and the laws of the forum***

***State. Id.***  See also *Renaissance Cruises v. Glassman*, 738 So. 2d 436 (Fla. App. 1999); *Lerch v.*

*Citizens First Bancorp,* 144 F.R.D. 247, 257 (D. N.J. 1992)(Defendant's principle place of

business was New Jersey, and many of the false statements emanated from the corporate offices).

*Washington Mutual Bank v. Superior Court,* 15 P.3d 1071 (Cal. 2001).  *In re ORFA Securities*

*Litigation*, 654 F. Supp. 1449, 1463-64 (D.N.J. 1987)("defendants chose to use New Jersey as

their principle place of business and ***cannot claim surprise*** at being held to the state's legal

---

[13]  *Kaiser Georgetown Community Health Plan,* 491 A.2d 502 at 508-09 (D.C. 1985)
(quotation marks omitted), citing *Allstate,* 449 U.S. at 317-18 (Opinion of Brennan, J.) In this
regard, the D.C. Court of Appeals in *Kaiser* noted with approval remarks by the D.C. Circuit:
> To confine the benefits of the District's rule to the territory ceded
> by the states of Maryland and Virginia to form the Nation's Capital
> would be to shun the present reality of the economically and
> socially integrated greater metropolitan area.  It is commonplace
> that residents of Maryland and Virginia are part of the Washington
> metropolitan trading area.
491 A.2d at 508-09 n. 9, citing *Gaither v. Myers*, 404 F.2d 216, 223 (D.C. Cir. 1968).

standards").

> **(e)    Marriott confuses the due process requirement that the forum jurisdiction have significant contacts with class members' claims with the requirement for minimum contacts necessary for personal jurisdiction.**

Marriott is wrong in its contention that Plaintiffs must show that the forum state has significant contacts *with each class member.* Marriott's Opp. Brief at 42. The Supreme Court held that to apply its law, the forum state must have "significant contact or aggregation of contacts to *the claims asserted* by each member of the plaintiff class. *Shutts*, 472 U.S. at 821, citing *Allstate*, 449 U.S. at 312-13. The choice of law analysis focuses upon the governmental interests of the forum state in the resolution of the dispute at the center of the litigation, and the parties' expectations as to what law will govern the claims. The *Shutts* Court specifically found that "a forum state may exercise jurisdiction *over the claim* of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant." *Shutts,* 472 U.S. at 811. Finally, absent class members will be free to opt out of any class certified by this Court should they wish to litigate elsewhere. *Id.* at 810-812.

> **2.    The District of Columbia's Choice of Law Rule Supports the Application of Its Laws to Marriott's Conduct.**

> **(a)    This Court's Earlier Analysis is Correct.**

This Court correctly applied the choice of law standard applicable under D.C. law. This Court stated: "Under District of Columbia law, courts employ 'a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute.'" *Shaw*, 474 F. Supp. 2d at 148, citing, *Washkoviak*, 900 A.2d at 168, 180.

24

In balancing the interests of the District of Columbia against those of other potentially interested state jurisdictions, this Court found that the District of Columbia had a stronger interest in the resolution of the issues related to Marriott's conduct than do other jurisdictions. *Shaw,* 474 F. Supp. 2d at 148. Supporting that ruling, the Court noted that Marriott had consistently represented itself to the public as headquartered in the District of Columbia, but argued to the Court that it was, in fact, headquartered just outside the District, in Bethesda, Maryland. *Id.* at 148, n. 6. While stopping short of ruling on the actual location of its headquarters, the Court stated that "Marriott's inconsistent positions further support the application of District of Columbia law in this case." *Id.* The Court recognized that the injury alleged by the Named Plaintiffs occurred where they received the alleged misrepresentations, and that the domicile states of the Named Plaintiffs had an interest in protecting the rights of their resident consumers. *Id.* at 149. Since there was at least one Named Plaintiff resident in the District of Columbia (now two), the court determined that this factor in the conflicts analysis applied equally to the interests of the District of Columbia and other jurisdictions. *Id.* at 149. Since this Court's earlier ruling, records produced by Marriott have disclosed that there are approximately 8,199 guests at Marriott's Russian hotels with District of Columbia addresses. Second Brickell Decl. at 17.

This Court then weighed the competing interests of the jurisdictions interested in the resolution of the claims in this lawsuit, noting, as many courts have held, that the choice of law analysis is not "merely a matter of counting contacts." *Id.* Discussing the District's governmental interest in this dispute, the Court found that the purposes of the Consumer Protection Procedures Act are to "assure that a just mechanism exists to remedy all improper

25

trade practices and to promote, through effective enforcement, fair business practices throughout the community." *Id.* at 147, *citing* D.C. Code § 28-3901(b) and *Williams v. Central Money Co.,* 974 F. Supp. 22, 27 (D.D.C. 1997). The Court rejected Marriott's argument that the CPPA does not have extraterritorial reach involving non-District of Columbia consumers, noting that courts in the District of Columbia have already concluded that its policies expressed by the CPPA "are advanced by application of the CPPA to cases involving non-District of Columbia consumers, merchants, and transactions." 474 F. Supp. 2d at 150.[14] This Court held that the District of Columbia's interest "in ensuring that its corporate citizens refrain from fraudulent activities" outweighs the interests of other jurisdictions in protecting their residents. *Id.* at 149-50, *citing Washkoviak,* 900 A.2d at 181. The Court further explained the choice of law equation, stating that even if the District of Columbia had only an equivalent interest as compared with other state jurisdictions, D.C. law would still apply because, in that circumstance, the law of the forum will be applied "unless the foreign jurisdiction has a ***greater interest*** in the controversy." *Id.* at 149 (emphasis added, citations omitted). This Court concluded, that the "District of Columbia clearly has a greater interest in the application of its consumer protection laws to the dispute in this case as compared with other states." *Id.* at 149.

> **(b)      Marriott Bears the Burden to Show That Some Other Jurisdiction Has a *Greater Interest* than the District of Columbia.**

This Court ended its opinion on Marriott's first motion to dismiss by leaving open the possibility that discovery might reveal some circumstance indicating that "another jurisdiction

---

[14] *Shaw v. Hyatt Int'l Corp.*, 2005 WL 3088438 (N.D.Ill. 2005), aff'd 461 F.3d. 899 (7th Cir. 2006) turned on the question of whether the Illinois consumer protection statute had extraterritorial effect and has no precedential value here with respect to the D.C. CPPA.

26

has a greater interest than the District of Columbia in the resolution of this controversy." *Id.* at 150 n. 11. Marriott responds to this invitation by arguing that Plaintiffs' Motion for Class Certification is fatally deficient for its failure to analyze the consumer protection laws of the fifty states, and identify the variations among these laws. No case holds that a class action proponent must survey the substantive law of every state jurisdiction which might have an interest in the subject matter of the lawsuit to identify the variations in the law and reconcile any differences. Marriott cites three cases for this proposition: *Amchem Products v. Windsor*, 521 U.S. 591, 613-14 (1997); *Richards v. Delta Airlines*, 453 F.3d. 523, 529 (D.C. Cir. 2006); *Love v. Johanns*, 439 F.3d 723, 727 (D.C. Cir. 2006). Marriott Opp. Br. at 34. None of these three cases even addresses any conflict of laws issue, much less makes the erroneous holding urged by Marriott. The burden on plaintiffs is to demonstrate that, under the choice of law standard applicable in the forum state, the state's interest is sufficient to make the application of its law "neither arbitrary nor fundamentally unfair." *Shutts,* 472 U.S. at 818. Plaintiffs' burden was satisfied with this Court's findings on the first motion to dismiss. Marriott now bears the burden of its challenge to the application of District of Columbia law. As the Supreme Court held:

> It is clear that a litigant challenging the forum's application of its own law to a lawsuit properly brought in its courts bears the burden of establishing that this choice of law infringes upon interests protected by the Full Faith and Credit Clause. *Allstate Insurance v. Hague,* 449 U.S. 302, 325 n. 13 (1981) (citation omitted).

See also *Washington Mutual Bank*, 15 P.3d at 1080 (class action opponent has not demonstrated that the interests of other states outweigh California's interest in having its law applied).

Marriott fails to meet its burden to establish that another jurisdiction has a ***greater interest*** than the District of Columbia in the resolution of this controversy. In its opposition to

27

class certification, Marriott identifies some differences among provisions in consumer protection laws of the 50 states.  But nowhere does Marriott identify any policy of any particular state associated with any of the numerous variations described.  Nowhere does Marriott compare any policy expressed by the consumer protection laws of foreign states with some policy expressed by D.C. law.  Nowhere does Marriott argue that the interests represented by the stated variations in law of any foreign jurisdiction outweigh the governmental interests discussed by this Court in its choice of law analysis under D.C. law.

None of the cases relied upon by Marriott support its position.  *Walsh v. Ford Motor Company,* 807 F.2d 1000 (D.C. Cir. 1986), did not arise under the laws of the District of Columbia and neither the district court nor the D.C. Circuit had occasion to opine anything about D.C.'s modified governmental interest test.  As a matter of fact, the district court failed to conduct any choice of law analysis at all.  *Walsh* arose under the federal Magnuson-Moss Warranty Act.  The district court erred in assuming in its class certification determination that "the federal act alone, uncomplicated by 'state law variations,' covered the class members' 'claims for breach of written warranty.'"  *Id.* at 1011.  The D.C. Circuit corrected this assumption, holding that "the Act calls for the application of state written and implied warranty law."  *Id.* at 1012.  In discussing further the application of state law in actions under Magnuson-Moss and class action determination, the *Walsh* Court noted that the district court had "refus[ed] to consider the application of 'varying state laws for breach of implied warranty,'" and that "the trial judge deferred for consideration on another day 'the question of which law shall apply.'"  *Id.* at 1016.  Citing *Shutts,* the *Walsh* Court noted that "the judge did not say whether she had in mind applying the law of one particular state to all members of the nationwide class."  *Id.* n. 90.

28

The district court made no finding regarding the requirements for a 50 state analysis in a choice of law determination, and the D.C. Circuit remanded, instructing the district court to "reexamine *whether* variations in State law prohibit a finding of predomination for common questions of law." *Id.* at 1012 (emphasis added). In final comment, the Court stated, "we return the case to the District Court with no prejudgment as to the outcome of a renewed predominance inquiry." *Id.* at 1019.

*In the matter of Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002), the controlling factor in the choice of law analysis was that the forum state, Indiana, is a *lex loci delicti* state. The choice of law standard applicable in such states is " the law of the place where harm occurred." *Id.* at 1016. "The *lex loci delicti* principle points to the place of injury, not the defendants' activities, as the source of law." *Id.* "It follows that Indiana's choice-of-law rule selects the 50 states and multiple territories where the buyers live, and not the place of the sellers' headquarters, for these suits." *Id.* at 1018.

The District of Columbia is not a *lex loci delicti* state. *Bledsoe v. Crowley*, 849 F.2d 639, 642 (D.D.C. 1988). Indeed, the D.C. Court of Appeals has expressly rejected the "wooden *lex loci delicti* doctrine." *Kaiser Georgetown Community Health Plan v. Stutsman*, 491 A.2d 502, 507 (D.C. 1985). Under District of Columbia law, courts employ "a modified government interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." *Shaw,* 474 F. Supp. 2d at 147-48, citing, *Washkoviak,* 900 A.2d at 180. This Court conducted a choice of law analysis using the standard applied under D.C. law, and found that the interests of the District of Columbia in regulating the conduct of its corporate citizens outweighs the interests of other jurisdictions.

29

In *Spence v. Glock* (227 F.3d 308 (5th Cir. 2000), the appeals court found that the district court's choice of law analysis was deficient because it did nothing more than count defendant's contacts with Georgia and failed to compare Georgia's interest in the action to that of any other interested jurisdiction.  *Id.* at 312-13.  The *Spence* Court noted that the other 50 state jurisdictions have an interest in protecting their consumers, a factor the district court failed to consider altogether.  *Id.* at 312-13.  In this case, this Court specifically addressed the interests of other involved jurisdictions on the very issue specified by the *Spence* Court.  This Court noted that states of domicile of the Named Plaintiffs had an interest in protecting their resident consumers, but the District of Columbia's interest in regulating the conduct of its corporate citizens was at least in equipoise with those competing interests.  *Shaw*, 474 F. Supp.2d at 150.  Where the interests of the jurisdictions are equally weighty, the law of the forum will be applied.  *Id.* at 149-50.

In *In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005), the Court found the district court's application of Minnesota law to a nationwide class deficient because the district court failed to conduct a conflicts of law analysis, instead relying on a provision of state law allowing any person injured by a violation of Minnesota consumer protection statutes to bring suit in Minnesota.  *Id.* at 1120.  The *St. Jude* Court found the district court's attempt "to preempt the due Process and Full Faith and Credit Clauses with state standing statutes" to be erroneous.  *Id.* at 1121.  The *St. Jude* Court noted that, ultimately, application of Minnesota law to the claims of class members might be proper, but the record lacked any indication that out-of-state parties would have any idea that Minnesota law would apply to their claims.  *Id.* at 1120.  Here, this Court has completed the conflicts analysis the *St. Jude* Court found missing.  This Court has

30

weighed the interests of consumers' resident jurisdictions against those of the District of

Columbia. And, most significantly, Marriott has made it fully transparent to all who have

contact with it, that it is located in the District of Columbia and its interests are thoroughly

associated with the District of Columbia. No party to this litigation, least of all Marriott, could

be surprised that the claims in this action might be governed by the consumer protection laws of

the District of Columbia.

**B.      Predominance of Common Factual Issues**

Plaintiffs have established above that the facts material to the proof of the common legal

issues in this action may also be established on a common basis. Marriott's dollar denominated

reservation confirmations were objectively false and had a tendency to mislead. Regardless of

the method by which a consumer accessed Marriott's reservation system, for all its Russian hotel

guests, Marriott issued a written confirmation which stated the room rate in U.S. Dollars. For all

its Russian hotel guests, the reservation was entered in Marriott's central reservation system at

the confirmation rate stated in U.S. Dollars. Each guest at a Marriott Russian hotel was issued a

final bill stated in Russian rubles in an amount that could not be purchased for the amount in

U.S. Dollars that was stated in the guest's written confirmation. For all class members, Marriott

advertised the room rates at one price, confirmed the guest reservations at that same price, yet

guests were charged a higher price at checkout.

None of the purported individualized fact issues are relevant to the determination of

Marriott's liability based on these common material facts. A consumer's knowledge of the fraud

is not material. Whether a hotel guest personally paid the bill or was reimbursed is not relevant

since the CPPA does not require proof of actual damages to establish liability; Plaintiffs have

established the invasions of an interest protected by the CPPA, and seek statutory damages under §28-3905(k)(1).  Unless the hotel guest purchased the room for resale in the chain of distribution for hospitality services, a guest's purpose for the stay at the Marriott is not relevant to liability. Marriott misrepresented the price of its Russian hotel rooms in U.S. Dollars, and failed to disclose to its hotel guests in its advertising and in its reservation confirmation practices that the checkout rate for the hotel room would be stated in Russian rubles, in an amount that the guest could not acquire from any bank in Russia at the official exchange rate for the amount in U.S. Dollars stated in Marriott's confirmation.

## IV.    PLAINTIFFS HAVE STANDING

Marriott concedes that only one class representative with Article III standing is needed to maintain this as a class action.  Marriott Opp. Br. at 16, citing *Prado-Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir. 2000).  Constitutional standing requires an "actual or imminently threatened injury that is attributable to the defendant and capable of redress by the court."  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992); *Williams v. The Purdue Pharma Co.,* 297 F. Supp.2d 171, 177 (D.D.C. 2003); *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1206 (D.C. 2002). Plaintiffs must have "suffered an injury in fact  – an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.   Economic injury is not a pre-requisite for standing*. *Friends of Tilden Park, Inc.,* 806 A.2d at 1207. (Citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982)).

Marriott does not contest the fact that Plaintiffs Charness and CSIS suffered injury in fact as a result of its conduct.  It is undisputed that Charness and CSIS paid the amounts charged by

one of the Russian Marriott hotels, including any alleged amounts in excess of the stated confirmed room rate.[15]   Charness is said to lack standing because he had no contacts with the District of Columbia and CSIS is said to lack standing because it is a corporation not authorized to pursue claims under the D.C. CPPA. (Marriott Opp. Br. at 18-19) These points are fallacious and have been addressed earlier in this brief.

Marriott argues that Plaintiffs, Shaw, Mendelson and Paliashvili, do not have standing because their employer or client reimbursed the charge for the hotel room.  Marriott confuses Article III "case or controversy analysis" with "actual damages."  Here, the CPPA creates in Plaintiffs a legally protected interest to be free from improper trade practices, and provides remedies to consumers whose rights are violated.  DC Code §§ 28-3901 and 28-3905(k)(1); *Shaw,* 474 F.Supp. 2d at 147.  Marriott misrepresented the room rates in U.S. Dollars to each Named Plaintiff through a written confirmation issued from Marriott's central reservation system.  Each named Plaintiff has the same personal stake in the outcome of the dispute with Marriott, an interest in receiving accurate information regarding the actual price of a room. Plaintiffs rights to fair trade practices in their transactions with Marriott were violated, regardless of whether any individual was reimbursed for the hotel charges, or the money to pay the hotel bill ultimately came out of the pocket of a third party.

The CPPA does not require proof of actual damages to recover for a violation of its

---

[15] Marriott's reliance on *Bykov v. Radisson Hotels, Int'l,* 2006 WL 752942 (D.Minn 2006), aff'd 221 Fed App. 490 (8th Cir 2007) is unavailing.  Bykov was the only class representative in that case and his hotel bill was paid by a corporation that he owned.  While we contend that the results would have been different if that case was brought under D.C. law, the fact that there are two additional plaintiffs in this case who paid their own hotel bills directly establishes injury in fact here that the *Bykov* court found lacking under the facts of that case.

provisions.  "A person . . . seeking relief from the use by any person of a trade practice in

violation of a law of the District of Columbia may recover or obtain the following remedies: (A)

treble damages, *or* $1,500 per violation. . . ." DC Code §28-3905(k)(1) (emphasis added).  Like

the statute at issue in *Ramirez v. Midwest Airlines,* ___ F. Supp. 2d ___, 2008 WL 682438

(D.Kan. 2008), the CPPA has, since October 2000, provided for the recovery of treble damages

**OR** statutory damages.  It is clear that proof of actual damages is not required to recover statutory

damages." *Id.; see also Schroeder v. Capital Indemnity Corp.,* 2006 WL 2009053, *4-5 (E.D.

Wis. 2006).[16]  This rule is predicated on an important assumption that one who has been

subjected to an unfair trade practice has suffered injury and many elect statutory damages if proof

of actual damages is difficult.  Judge Easterbrook in the Seventh Circuit has explained that

statutory damages allow for recovery where "actual loss is small and hard to quantify [and that]

is why statutes such as the Fair Credit Reporting Act provide for modest damages *without proof*

*of injury.*" *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 953 (7th Cir. 2006); *Schroeder,*

2006 WL 2009053 at *5; *Ramirez,* 2008 WL 682438 at *7.

**CONCLUSION**

     Plaintiffs described a single cohesive class unified by Marriott's common

misrepresentation of the price of a room in its Russian hotels through written confirmations

issued to each class member from Marriott's centralized reservation system.  This Court may

properly apply the law of the District of Columbia to the claims of a nationwide class without

---

[16]  *Williams v. Purdue Pharma,* 297 F. Supp. 2d at 176 does not hold to the contrary.
That case applied the pre-2000 version of 28-3905(k)(1) which provided expressly for recovery
only to a "consumer who suffers any damages."  Further, the plaintiffs in that case alleged a
"benefit of the bargain" theory of injury, and expressly did not allege that they suffered any
adverse consequences from their use of the product. *Id.* at 176.

offending the federal constitution.  The choice-of-law analysis already conducted by this Court

properly implements D.C.'s modified governmental interest standard.  This Court properly found

that the District of Columbia's interest in regulating corporate conduct within its jurisdiction is at

least as important as the interest of any competing jurisdiction.  Marriott's pervasive association

of its activities and its brand with the District of Columbia amply establish that the expectations

of the parties will not be frustrated by the application of D.C. law to this controversy.  Each of

the Named Plaintiffs has suffered the invasion of a legally protected interest, experienced injury

in fact, and has standing to represent the interests of the proposed class.

     For the reasons stated in this memorandum and in Plaintiffs' opening memorandum on

class certification, Plaintiffs have satisfied the requirements of FRCP Rule 23(a) and 23(b)(3),

and the Motion to Certify a Class in this action should be granted.


                      Respectfully submitted.


|  |  |
|---|---|
|  | /s/ Paul D. Cullen, Sr. |
| Of Counsel: | Paul D. Cullen, Sr. |
| Mark W. Borghesani, Esq. | Joyce E. Mayers |
| c/o The Cullen Law Firm PLLC | Randall Herrick-Stare |
| 1101 30th Street NW, Suite 300 | Amy M. Lloyd |
| Washington, D.C. 20007 | The Cullen Law Firm, PLLC |
| (202) 944-8600 | 1101 30th Street NW, Suite 300 |
|  | Washington, D.C. 20007 |
|  | (202) 944-8600 |
|  | Counsel for Plaintiffs |