# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRITT A. SHAW, et al.,<br>on behalf of themselves and all others<br>similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>MARRIOTT INTERNATIONAL, INC.<br><br>                Defendant. | Civil Action No. 05-1138 (GK)<br>Status Conference – July 7, 2008 |

**MARRIOTT INTERNATIONAL, INC.'S SURREPLY IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Plaintiffs' Reply Memorandum in Support of Class Certification ("Reply Mem.") injects into this case a new proposed class definition, as well as several related new legal and factual arguments that are contrary to the record and the law. As explained below and in Marriott International, Inc.'s ("Marriott's") Opposition Memorandum ("Opp."), class certification should be denied.

**I.    NO NAMED PLAINTIFF HAS STANDING.**

Marriott's Opposition established that a large number of members of Plaintiffs' proposed class – including the named Plaintiffs – do not have standing to sue under the D.C. CPPA for lack of an actual injury. Plaintiffs failed to address standing in their brief in support of class certification, but now concede that class certification must be denied if no named Plaintiff has standing to sue under the D.C. CPPA. Reply Mem. at 32.[1] However, in their reply brief,

---

[1] Throughout their reply brief, Plaintiffs attempt to conflate Marriott's standing argument with an argument concerning the interpretation of the D.C. CPPA. *See, e.g.*, Reply Mem. at 7 (mischaracterizing Marriott's standing argument as "completely ignor[ing]" the statutory standard for liability under D.C. Code § 28-3904); *id.* at 11-12. Plaintiffs address Marriott's standing argument directly at pages 32-34 of their brief.

1

Plaintiffs make the new argument that economic harm is not needed for standing, because "the CPPA creates in Plaintiffs a legally protected interest to be <u>free from improper trade practices</u>." Reply Mem. at 33 (emphasis added). Plaintiffs' argument is contrary to *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 28-29 (D.D.C. 2007) and *Williams v. The Purdue Pharma Co.*, 297 F. Supp. 2d 171, 177-78 (D.D.C. 2003), both of which require a tangible injury for standing to bring a CPPA claim. *Williams* directly rejects Plaintiffs' new argument: "The invasion of a purely legal right without harm to the consumer – in this case, [] <u>freedom from alleged false and misleading advertising</u> – can be addressed through the administrative process of the Government of the District of Columbia." *Williams*, 297 F. Supp. 2d at 178 (emphasis added). If injury could be established simply by asserting a right "to be free from improper trade practices," then the plaintiffs in *Hoyte* and *Williams* would have had standing to sue. This Court held to the contrary.

Despite that *Williams* is controlling, Plaintiffs make the erroneous claim in a footnote that *Williams* does not apply here, because it "applied the pre-2000 version" of the D.C. CPPA. Reply Mem. at 34 n.16. That is incorrect. *Williams* involved claims under both the pre- and post-2000 versions of the D.C. CPPA, but the portion of *Williams* relevant here and just discussed specifically pertained to the post-2000 version of the statute. *See Williams*, 297 F. Supp. 2d at 177 (explaining that "[t]he amendment to the CPPA in 2000 did not change the requirements for standing under D.C. law").[2]

Plaintiffs also cite *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201 (D.C. 2002) for the proposition that "[e]conomic injury is not a pre-requisite for standing."

---

[2] The cases cited by Plaintiffs from other jurisdictions, *see* Reply Mem. at 34, do not support their argument that an asserted right "to be free from improper trade practices" alone provides standing to sue, *id.* at 33. Rather, those cases concern statutory damages for plaintiffs with <u>actual</u> losses, albeit ones that may be "'small and hard to quantify.'" *Id.* at 34 (quoting *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)).

2

Reply Mem. at 32 (emphasis removed). However, <u>some</u> injury-in-fact – economic or otherwise – is required. *Friends of Tilden Park* and related cases concern plaintiffs (such as environmental or other non-profit associations) who, unlike Plaintiffs, concede no economic injury. Rather, they have some other real injury at stake. Those cases provide the Court no guidance where, as here, the claimed injury to the class is economic. Named plaintiffs who have not themselves paid for room stays at Marriott Russia Hotels, or who received the Central Bank currency exchange rate, have no injury and no standing to sue. Plaintiffs acknowledge that Plaintiffs Shaw, Mendelson and Paliashvili all fall into this category, Reply Mem. at 33 & n.15, as does CSIS, *see, e.g.*, Opp. at 14, 29; Opp. Ex. 10 (Mendelson Dep. at 89-90, 102-06); Opp. Ex. 14 (Mendelson First Interrog. at No. 5); Opp. Ex. 22 (Mendelson Dep. Ex. 26).[3]

## II. PLAINTIFFS' NEWLY DEFINED PROPOSED CLASS OF INDIVIDUALS RECEIVING "WRITTEN CONFIRMATIONS FROM MARRIOTT" SHOULD NOT BE CERTIFIED.

Marriott's Opposition identified the extreme overbreadth of Plaintiffs' proposed class as described in their Opening Memorandum ("Opening Mem."). Among other things, Plaintiffs' proposed class appeared to include at least tens of thousands of individuals who never received a representation from Marriott in the reservation process or received only non-uniform oral representations. Plaintiffs now purport to recognize this problem, making the significant concession that "[g]uests who had no contact with Marriott would not be in the class," such as the large number of individuals who "made their arrangements directly with one of the franchised Russian hotels." Reply Mem. at 6-7.[4] According to Plaintiffs, their proposed class is

---

[3] As Marriott has previously explained, Plaintiff Charness has no standing to bring a D.C. CPPA claim because his dealings with Marriott have no connection to Washington, D.C., and Plaintiff CSIS has no standing because it is a corporation.

[4] By this concession, Plaintiff Mendelson must be dismissed because she – like other CSIS employees – made reservations directly with the franchised hotels. *See* Opp. at 13-14.

3

now limited to those individuals who "received a written confirmation from Marriott." *Id.* at 7. As Plaintiffs now claim, "the key factor is whether the guest received a written price confirmation from Marriott." *Id.* at 9; *see, e.g., id.* at 1, 3, 6 ("That written confirmation is the basis for Marriott's liability.").

However, Plaintiffs incorrectly argue that their newly defined class would include all individuals whose reservations are stored in Marriott's worldwide automated reservation system – MARSHA – based on the erroneous factual premise that all individuals with reservations in MARSHA received written confirmations from Marriott. *See, e.g.,* Reply Mem. at 10 ("regardless of the means by which the reservation was made, . . . every class member received a written confirmation from Marriott's centralized reservation system, MARSHA, which stated the confirmed room rate in U.S. Dollars"); *id.* at 31 ("[F]or all its Russian hotel guests, Marriott issued a written confirmation which stated the room rate in U.S. dollars."). Plaintiffs' argument directly contradicts the record in this case.[5] MARSHA is a central repository for data that is accessed by a variety of reservation channels, many not controlled by Marriott. Opp. at 6-9. Only a small subset of the individuals whose reservations are in MARSHA "received a written confirmation from Marriott," Reply Mem. at 7 – namely, individuals who reserved via marriott.com, the toll-free number, or directly with the Marriott-managed hotels <u>and</u> who provided an email address or fax number. *See, e.g.,* Opp. at 9; McGrath Dep. at 100-01 (attached as Exhibit 1). For individuals using travel agents, non-Marriott Internet sites, or reserving with

---

[5] Notably, the only support provided by Plaintiffs for their new claim that "[w]ritten confirmations are issued to guests by MARSHA" is a citation to the email reservation confirmations received from Plaintiffs Shaw and Charness and to the itinerary Plaintiff Paliashvili received from her travel agent. Reply Mem. at 3. But, as Plaintiffs acknowledged in their Opening Brief, individuals using a third-party travel agent (such as Plaintiff Paliashvili) do not receive a written confirmation from Marriott; they receive an itinerary <u>from the travel agent</u>. Opening Mem. at 7.

4

the franchised Russian hotels directly, any confirmation does not come from Marriott – regardless whether the reservations are contained within MARSHA. Opp. at 24-25.[6]

Plaintiffs' mistaken premise about written confirmations, in addition to enormously overstating the size of their newly defined class, obscures the individualized analysis that would be necessary to determine class membership and liability. Because a great number of MARSHA reservations did not result in "written confirmations from Marriott," individualized inquiry would be required to determine which individuals with MARSHA reservations actually received such written confirmations from Marriott by (1) reserving via marriott.com, the toll-free number, or directly with a Marriott-managed hotel <u>and</u> (2) providing an email address or fax number.

Moreover, even within the significantly smaller group of individuals who actually received "written confirmations from Marriott," an individualized analysis would be required to determine the content of the representations at issue. An analysis of this type is fatal to Plaintiffs' effort to certify even a more limited class. *See, e.g.*, Opp. at 45. With respect to individuals reserving via the toll-free number or by directly contacting the Marriott-managed hotels, the oral representations received were neither uniform nor the same as the representations received by marriott.com users. *See id.* at 7-9. Individualized inquiry also would be necessary for individuals who reserved via marriott.com, in order to determine whether additional representations were received from Marriott, such as through follow-up contact with the toll-free number or the hotels themselves. Plaintiffs' attempt to dismiss all representations by Marriott other than the written confirmations as "random conversations," Reply Mem. at 6, is contrary to the required legal analysis, which commands a complete assessment of the representations made

---

[6] As explained below, Plaintiffs' reliance on reservations in MARSHA also vastly overstates the number of individuals who actually stay at the Marriott Russia Hotels because of the significant cancellation rate. *See infra* Section III.

5

in order to determine whether they are false or misleading and whether a material omission in fact occurred. D.C. Code §§ 28-3904(e), (f).

In sum, to the extent that Plaintiffs' revised class definition purports to encompass anyone whose reservation can be found in MARSHA, class certification cannot be granted because those individuals did not receive uniform representations or confirmations, let alone from Marriott. To the extent that Plaintiffs' revised class definition is confined, as it now claims to be, to individuals who received written representations from Marriott, individualized analysis would be required to determine both which individuals received written confirmations from Marriott, and the content of all representations received by those individuals from Marriott. These individualized inquiries are in addition to those already discussed in Marriott's Opposition, including those pertaining to standing. *E.g.*, Opp. at 19-21, 23-26 (discussing the need to determine, among other things, whether any injury in fact occurred – for example, whether individual customers paid for their own rooms or whether they paid at the Central Bank exchange rate). Thus, for the reasons discussed in Marriott's Opposition, even the more limited class that Plaintiffs now propose cannot be certified. And in no event should a class of individuals with MARSHA reservation records be certified based on the clearly erroneous factual premise that all reservations in MARSHA resulted in a reservation confirmation from Marriott.[7]

---

[7] In an effort to establish commonality, Plaintiffs also erroneously maintain that the Marriott Russia Hotels uniformly used an internal exchange rate rather than the Central Bank's rate to calculate final bills. Reply Mem. at 10. As discovery has made clear, that is not the case. Indeed, many of Plaintiff Mendelson's hotel stays were billed using the Central Bank rate, because her employer, CSIS, had negotiated that arrangement. Opp. at 14, 29; Opp. Ex. 10 (Mendelson Dep. at 89-90, 102-06); Opp. Ex. 14 (Mendelson First Interrog. at No. 5); Opp. Ex. 22 (Mendelson Dep. Ex. 26). It is thus untrue that "[a]t the time of checkout from a Marriott Russian hotel, each Named Plaintiff was charged a quantity of Russian rubles at a rate in excess of what could be acquired by tendering the number of dollars identified in the written

6

## III. PLAINTIFFS' NEW SECOND DECLARATION OF TIMOTHY P. BRICKELL IS FUNDAMENTALLY FLAWED, BUT UNDERSCORES THAT D.C. LAW CANNOT CONSTITUTIONALLY APPLY ACROSS THE PROPOSED WORLDWIDE CLASS.

### A. Mr. Brickell's New Declaration Vastly Overstates The Scope Of Any Conceivable Class.

In support of their opening brief, Plaintiffs submitted the Declaration of Timothy P. Brickell ("Brickell Decl."), an economic and litigation support consultant to counsel for Plaintiffs, whose analysis of guest reservation data produced by Marriott led him to conclude that "there are no less than 110,522 guests stays which fit within the class definition." Opening Mem. at 11 (citing Exhibit 21, Brickell Decl.).[8] Although that figure purportedly was limited to those reservations "made through Marriott's online guest reservation system, or through their toll-free 800 number," Brickell Dep. 117:13-15 (attached as Exhibit 2); *see* Brickell Decl. ¶ 4, Marriott has explained that this analysis is still unreliable and overly inclusive with respect to determining how many individuals would have arguable claims against Marriott. *See* Opp. at 22 & n.18. This is particularly so because Mr. Brickell's figure includes within the putative class all Internet reservations – regardless of whether they were made through marriott.com (and thus involved contact with Marriott) or through the use of online or other third-party travel agents (and thus did not). *See id.* As noted above, Plaintiffs now concede that individuals who had no

---

confirmation." Reply Mem. at 12. Plaintiff Mendelson's experience is representative of the established fact that certain government and corporate travelers received the Central Bank exchange rate. *See, e.g.*, Opp. Ex. 4 (Garcia Aff. ¶ 14). Despite this clear proof that not all customers – or even named Plaintiffs – received an internal exchange rate, Plaintiffs ask this Court to certify the class based on the erroneous premise that all transactions at the Marriott Russia Hotels used an internal exchange rate. Reply Mem. at 12.

[8] Plaintiffs dispute that Mr. Brickell is properly considered an expert in this case. Marriott has filed separately a motion to strike Mr. Brickell's testimony or, in the alternative, to compel production of expert disclosures and permit a full deposition.

7

direct contact with Marriott cannot be part of any class against Marriott. *See* Reply Mem. at 6 ("Guests who had no contact with Marriott would not be in the class.").

Accompanying their reply brief, Plaintiffs have submitted (as Exhibit 36) a Second Declaration of Timothy P. Brickell ("Second Brickell Decl.") with significantly new methodology and claims. Mr. Brickell now asserts that "402,801 individual guest stays," representing "288,413 individual guests" supposedly fall within the proposed class. *See* Second Brickell Decl. ¶ 18. Mr. Brickell further claims that additional analysis of Marriott's guest reservation data indicates that 11,324 of these guest stays, representing 8,199 unique individuals, are traceable to a Washington, D.C. address. *See id.* ¶¶ 13-17.[9] Unlike his first declaration, Mr. Brickell now bases his figures on <u>all</u> guest reservations made at Marriott hotels – including hundreds of thousands of reservations made directly with the hotel properties in Russia. *See id.* ¶ 22. Moreover, although Plaintiffs now propose to limit the class to individuals who received written confirmations from Marriott, Mr. Brickell's new figures – upon which Plaintiffs rely – includes no such limitation.

Mr. Brickell's second declaration vastly overstates the size of the putative class, for the following reasons. First, Mr. Brickell purports to rely on "statements made by opposing counsel" concerning the Marriott data he analyzes, Brickell Second Decl. ¶ 3, but neglects to mention the significant fact that undersigned counsel expressly advised Mr. Brickell that the data at issue accounts for <u>reservations</u>, not actual <u>guest stays</u>, and that the high rate of cancellations and no-shows is both surprising and meaningful. Thus, the reservation data upon which Mr.

---

[9] Mr. Brickell's methodology for determining whether a MARSHA record contains a D.C. address appears to have been overly inclusive; for example, he counted any record with "Washington" in the city field, regardless of whether "D.C." was in the state field. *See* Second Brickell Decl. ¶¶ 8-10. His analysis is also not a reliable proxy for the number of D.C. residents who stayed at Marriott Russia hotels; the number of D.C. residents is likely far smaller, as many of the D.C. addresses in MARSHA are likely business or government addresses.

8

Brickell relies overstates actual guest stays. Second, Mr. Brickell overstates any putative class by presenting figures purporting to represent individual guest stays as well as unique individuals, thereby incorrectly suggesting that one plaintiff could recover for multiple guest stays. Third, Mr. Brickell's figures include <u>all</u> Marriott Russia Hotel reservation records in MARSHA – regardless of whether the individual at issue received a written confirmation from Marriott or had any contact with Marriott whatsoever (as opposed to a third-party travel agent or website, or a franchised Russian hotel). Fourth, Mr. Brickell's figures fail to account for the established fact that not all individuals who stayed at the Marriott Russia Hotels actually received an internal exchange rate, as opposed to the Central Bank rate. *See supra* note 7. Fifth, Mr. Brickell's figures do not account for the many individuals who, for other reasons, lack standing to bring a claim against Marriott under the D.C. CPPA – because, for example, they did not make their own reservations and never saw any representations from Marriott; they were on business travel and did not pay their own bills; they were aware of the use of internal exchange rates and voluntarily availed themselves of the application of such a rate; or they have no residence in or connection to Washington, D.C. *See, e.g.*, Opp. at 19-21, 23-26.[10]

### B. Mr. Brickell's New Declaration Demonstrates The Unconstitutionality Of Applying D.C. Law To A Worldwide Class.

Although completely unreliable with respect to the size of the putative class, Mr. Brickell's figures demonstrate that a worldwide class action under D.C. law would be unconstitutional. In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the Supreme Court held that Kansas law could not constitutionally apply to a nationwide class action where "some

---

[10] Plaintiffs' Reply Brief also relies upon a new Third Declaration of Timothy P. Brickell ("Third Brickell Decl."). That Declaration is based on several flawed premises, including the erroneous assumption that all guest stays at the Marriott Russia Hotels were billed pursuant to an internal exchange rate. Third Brickell Decl. ¶¶ 10-14. As discussed above, that is untrue; many guests, including some named Plaintiffs, received the Central Bank rate. *See supra* note 7.

9

97% of the plaintiffs in the case had no apparent connection to the State of Kansas except for this lawsuit." *Id.* at 815. According to Mr. Brickell's own calculations, 97.2% of the proposed class would be comprised of individuals with non-D.C. addresses. *See* Reply Mem. at 7, 21; Second Brickell Decl. ¶¶ 13-18.[11] In reality, the percentage of non-D.C. putative class members is even higher than 97.2%, because a substantial and disproportionate number of the 8,199 D.C.-based individuals identified by Mr. Brickell are likely government employees or business travelers who either did not receive the internal exchange rate about which Plaintiffs complain, or did not pay for their stay themselves. *See supra* note 7; *see also supra* note 9.

Thus, as in *Shutts*, D.C. law cannot apply to the proposed worldwide class "because of the large number of transactions . . . which have little connection with the forum," *Shutts*, 472 U.S. at 821. This is so regardless of whether Marriott "owns property and conducts substantial business in the State." *Id.* at 819. As the Supreme Court explained, a state "must have a 'significant contact or significant aggregations of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [state] law is not arbitrary or unfair." *Id.* at 821-22 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (plurality op.)) (emphasis added).

Plaintiffs' *Shutts* argument not only ignores the miniscule number of D.C. putative class members, but simply misstates the requirements of *Shutts*. According to Plaintiffs, *Shutts* does not require "individual inquiries as to contacts between putative class members and the District of Columbia." Reply Mem. at 9, *see id.* at 24. That is incorrect. For choice of law purposes, *Shutts* demands that there be sufficient contacts "to the claims asserted by each member of the plaintiff class." *Shutts*, 472 U.S. at 821 (emphasis added); *see, e.g., In re St. Jude Med., Inc.*, 425

---

[11] That percentage is obtained by dividing Mr. Brickell's figures for total D.C. guest stays and total D.C. guests by, respectively, total individual guests stays and total individual guests.

10

F.3d 1116, 1120 (8th Cir. 2005) ("The Supreme Court has held an individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action." (citing *Shutts*)). Confusing the personal jurisdiction and choice of law holdings in *Shutts*, Plaintiffs erroneously claim that there is no requirement that absent class members have a nexus to the District of Columbia for D.C. law to apply, particularly where such class members can opt out. *See* Reply Mem. at 9, 24. That argument was expressly rejected in *Shutts*: "[W]hile a State may, for the reasons we have previously stated, assume jurisdiction over the claims of plaintiffs whose principal contacts are with other States, <u>it may not use this assumption of jurisdiction as an added weight in the scale when considering the permissible constitutional limits on choice of substantive law</u>." *Shutts*, 472 U.S. at 821 (emphasis added). Thus, for choice of law purposes, the Supreme Court "g[a]ve little credence to the idea that Kansas law should apply to all claims because the plaintiffs, by failing to opt out, evinced their desire to be bound by Kansas law." *Id.* at 820. As the Court stated, "plaintiff's desire for forum law is rarely, if ever controlling." *Id.*

The other new constitutional authorities cited by Plaintiffs, *see* Reply Mem. at 23, further confirm the unconstitutionality of the worldwide class under D.C. law proposed by Plaintiffs. For example, *Martin v. Heinold Commodities, Inc.*, 510 N.E.2d 840 (Ill. 1987), does not, as Plaintiffs contend, present "facts similar to those in this case." Reply Mem. at 23. To the contrary, *Martin* concluded that a nationwide class action under Illinois law was constitutionally permissible only because of <u>each class member's</u> extensive contacts with Illinois: "(1) the contracts containing the deceptive statements were all executed in Illinois; (2) the defendant's principal place of business was in Illinois; (3) the contract contained express choice-of-law and forum-selection clauses specifying that any litigation would be conducted in Illinois under Illinois law; (4) complaints regarding the defendant's performance were to be directed to its

11

Chicago office; and (5) payments for the defendant's services were to be sent to its Chicago office." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 855 (Ill. 2005) (distinguishing *Martin*).[12] In stark contrast, in this case, over 97% of claimed class members have no connection whatsoever to Washington, D.C.: they do not live there; their reservations were not made there; they never contacted Marriott there regarding complaints, payments, or any other matters; Marriott's principal place of business is not there; and their dealings with Marriott did not involve contracts specifying that any litigation would take place in Washington, D.C. under D.C. law. Moreover, as noted above, Mr. Brickell overestimates the percentage of putative D.C. class members, among other reasons, because his figures do not account for the facts that not all MARSHA records with D.C. addresses reflect D.C. residents and that a disproportionate number of putative class members with D.C. addresses in MARSHA likely received the Central Bank rate because a negotiated government or business rate applied. The other new authorities cited by Plaintiffs, *see* Reply Mem. at 23, are similarly inapposite and rely on Plaintiffs' mistaken allegation that Marriott's principal place of business is Washington, D.C. The District is not Marriott's principal place of business, and in any event, that alone – without more, particularly given the 97% of non-D.C. plaintiffs – does not make the worldwide application of D.C. law constitutional. *See* Opp. at 42-43.[13]

---

[12] Notably, *Avery*, followed in *Shaw v. Hyatt Int'l Corp.*, 2005 WL 3088438 (N.D. Ill.), *aff'd*, *Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899 (7th Cir. 2006), also ruled that the Illinois Consumer Fraud Act "does not have extraterritorial effect" and thus could not support a nationwide class action as a matter of statutory construction, *Avery*, 835 N.E.2d at 853, 855. *Avery* thus overruled the Illinois caselaw that Plaintiffs relied on in their 2005 Opposition to Marriott's Motion to Dismiss, which Plaintiffs cited in support of a broad reading of the D.C. CPPA. *See* Opp. at 22 (filed Aug. 3, 2005). Plaintiffs' prior reliance on now-overruled Illinois caselaw belies their present suggestion that Illinois law has no relevance here. *See* Reply Mem. at 26 n.14.

[13] Despite acknowledging that the Court has not ruled on the location of Marriott's headquarters, Opening Mem. at 2, Plaintiffs' opening brief did not attempt to prove for class certification purposes that Marriott is headquartered in D.C., other than stating that "Marriott has represented

## IV. PLAINTIFFS MISREPRESENT THE PROPER CHOICE OF LAW INQUIRY UNDER FEDERAL RULE 23 AT THE CLASS CERTIFICATION STAGE.

As explained, Plaintiffs' proposed class does not comport with the constitutional limits on choice of law. But the Constitution sets only a floor. Plaintiffs also attempt to evade their even weightier choice of law burden on class certification – which they failed to address at all in their opening brief – by conflating the constitutional test with the preceding choice of law analysis required by Federal Rule 23. *See, e.g.*, Reply Mem. at 27 (claiming that the "burden on plaintiffs" seeking class certification is merely to satisfy the *Shutts* standard). Plaintiffs incorrectly claim that at the class certification stage, the choice of law burden is on Marriott "to establish that another jurisdiction has a ***greater interest*** than the District of Columbia." *Id.* According to Plaintiffs, "[n]o case holds that a class action proponent must survey the substantive law of every state jurisdiction which might have an interest in the subject matter of the lawsuit to identify the variations in the law and reconcile any differences." *Id.*

Plaintiffs' new arguments are wrong. Under Federal Rule 23 and D.C. choice of law rules, it is Plaintiffs' burden to prove that the District has the "most significant relationship" to

---

itself to the world as headquartered in the District of Columbia," *id.* at 3. Marriott's Opposition provided specific and conclusive evidence that Marriott is in fact headquartered in Maryland, which is also its principal place of business. Opp. at 3-4. In reply, Plaintiffs now cite numerous instances where Marriott accurately reported its Washington, D.C. mailing address. Reply Mem. at 18. Plaintiffs are simply wrong that Marriott has "tacitly admitted" that the longstanding use of its correct mailing address amounts to "thousands" of false representations. *Id.* at 18-19.

    Plaintiffs also insist on twisting Marriott's Answer to the First Amended Complaint, which does not "concede[]" a "positive financial impact" from misrepresenting its corporate headquarters, or "admit[]" a deception "designed to promote its commercial advantage." *Cf. id.* at 20, 21. What Marriott said in its Answer and believes is that perpetuating a company's culture has a "positive financial impact." *See* Marriott Answer ¶ 22 (filed March 5, 2007). Finally, Plaintiffs' insinuation that Marriott has refused to produce documents related to its headquarters, Reply Mem. at 18, is inaccurate and misleading. Marriott objected to the production of those documents in 2005 and never again heard from Plaintiffs on this issue until March 27, 2008 – days before their reply brief was due – when Plaintiffs' counsel sent an email requesting these documents. Marriott is currently looking for responsive documents and will produce them.

13

each putative class member's claim. *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006); *see id.* at 176 n.11. As the D.C. Circuit held in *Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986):

> [T]o establish commonality of the applicable law, nationwide class action movants must creditably demonstrate, through an "extensive analysis" of state law variances, "that class certification does not present insuperable obstacles." As appellees themselves at one point accurately observed: "The issue can only be resolved by <u>first specifically identifying the applicable state law variations</u> and then <u>determining whether such variations can be effectively managed</u> through creation of a small number of subclasses grouping the states that have similar legal doctrines."

*Id.* at 1017 (quoting *In re Asbestos School Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986)) (emphasis added); *see, e.g.*, *Ward v. Dixie Nat'l Life Ins. Co.*, Nos. 06-2022, 06-2054, 2007 U.S. App. LEXIS 27699, at *22-23 (4th Cir. Nov. 29, 2007) ("Ward has the burden of showing 'that common questions of law predominate, and [she] cannot meet this burden when the various laws have not been identified and compared.'"); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("The burden of showing uniformity or the existence of only a small number of applicable standards (that is, 'groupability') among the laws of the fifty states rests squarely with the plaintiffs."); *Spence v. Glock, Inc.*, 227 F.3d 308, 313 (5th Cir. 2000) ("The burden of proof lies with the plaintiffs; in not presenting a sufficient choice of law analysis they have failed to meet their burden of showing that common questions of law predominate."); *see also, e.g.*, *In re St. Jude*, 425 F.3d at 1120; *Washkoviak*, 900 A.2d at 176 n.11.[14]

---

[14] Plaintiffs misleadingly cite the constitutional cases of *Shutts* and *Allstate* in claiming that the choice of law burden is Marriott's. Reply Br. at 27. As demonstrated by the Opposition and herein, it is Plaintiffs' burden under Federal Rule 23 to analyze potentially applicable state laws and establish that choice of law presents no bar to class certification. The language from *Allstate* quoted by Plaintiffs merely demonstrates that with respect to a *constitutional* challenge, the burden is on the party alleging unconstitutionality. Marriott's extensive choice of law analysis under both Rule 23 and the Constitution does not excuse Plaintiffs from satisfying their burden.

Plaintiffs did not address choice of law in their opening brief, other than to describe the Court's Motion to Dismiss ruling in their Statement of the Case. In reply, Plaintiffs do not attempt to satisfy their burden under Federal Rule 23(b)(3), *Walsh* and the other cases discussed above, but instead rest entirely on the Court's Motion to Dismiss ruling. *See* Reply Mem. at 24-26. At that stage, the Court was required to accept Plaintiffs' allegations as true. Moreover, at that stage, the Court was not faced with the disparate claims of putative class members hailing from all 50 states and over 100 foreign countries. As Marriott's Opposition demonstrated, the facts developed in discovery now indicate that D.C. law cannot apply either classwide or to the great majority of putative class members. Opp. at 38-41. In any event, class certification must be denied because Plaintiffs have flagrantly refused to meet their burden under Federal Rule 23 and the authorities cited herein.[15]

## CONCLUSION

For the foregoing reasons and those in Marriott's Opposition, Marriott respectfully requests that this Court deny Plaintiffs' Motion for Class Certification.

Dated: April 11, 2008

/s/ Joel Dewey

Joel Dewey (Bar No. 358175)
Holly Drumheller Butler (Bar No. 459681)
Sonia Cho (Bar No. MD26995)
Jennifer Skaggs (Bar No. 500014)
DLA Piper US LLP
6225 Smith Avenue
Baltimore, Maryland 21209
410-580-3000
410-580-3001 (facsimile)

*Attorneys for Defendant*
*Marriott International, Inc.*

---

[15] Plaintiffs attempt to distinguish the controlling authorities cited by Marriott, *see* Reply Mem. at 28-31, but fail to acknowledge that each of those cases requires the choice of law analysis that Plaintiffs refuse to conduct and that is fatal to their request for class certification.

15