**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRITT A. SHAW, et al.,
on behalf of themselves and all others
similarly situated,

            Plaintiffs,

     v.

MARRIOTT INTERNATIONAL, INC.

            Defendant.

Civil Action No. 05-1138 (GK)

Status Conference – July 7, 2008

**MARRIOTT INTERNATIONAL, INC.'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................. iv

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................4

    A.    Defendant Marriott International, Inc. .......................................................................4

    B.    The Marriott Russian Hotels And Related Practices ...............................................5

        1.    The Marriott Russia Hotels And Exchange Rate Practices .........................5

        2.    Reservations For The Marriott Russia Hotels.............................................7

        3.    Specific Reservation Channels ...................................................................8

    C.    The Plaintiffs..........................................................................................................10

        1.    Britt Shaw .................................................................................................10

        2.    Sarah Mendelson.......................................................................................11

        3.    CSIS ..........................................................................................................12

        4.    Neal Charness ...........................................................................................12

    D.    Procedural History ..................................................................................................13

ARGUMENT.........................................................................................................................14

    I.    WHERE THERE IS NO GENUINE FACTUAL DISPUTE AND MOVANT
        IS ENTITLED TO JUDGMENT AS A MATTER OF LAW, THE COURT
        SHOULD GRANT SUMMARY JUDGMENT, MOOTING CLASS
        CERTIFICATION ................................................................................................14

    II.    MARRIOTT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE NO
        PLAINTIFF HAS STANDING .............................................................................15

        A.    Plaintiff Shaw Lacks Standing..................................................................16

            1.    Shaw Lacks Standing Because He Did Not Pay For His Hotel
                Stays And Thus Has Suffered No Injury-In-Fact ..........................16

2.    Shaw Lacks Standing Under The D.C. CPPA Because His Hotel Stays Were For Business Purposes ......................................18

3.    Shaw Lacks Standing To Bring Claims Under The D.C. CPPA Because His Claims Are Unconnected To The District................19

   a.    The D.C. CPPA Does Not Apply To Shaw's Claims ........19

   b.    The District Does Not Have The "Most Significant Relationship" To Shaw's Claims .....................................21

   c.    Application Of The D.C. CPPA To Shaw's Claims Would Violate The Constitution .......................................24

B.    Plaintiff Mendelson Lacks Standing ...........................................26

1.    Mendelson Lacks Standing Because She Did Not Pay For Her Hotel Stays And Thus Has Suffered No Injury-In-Fact................26

2.    Mendelson Lacks Standing Under The D.C. CPPA Because Her Hotel Stays Were For Business Purposes ..............................26

3.    Mendelson Lacks Standing Because She Stayed Only At Marriott Franchised Hotels Not Owned Or Controlled By Marriott, And Marriott Thus Did Not Cause The Harm She Alleges ...........................................................................................27

C.    Plaintiff CSIS Lacks Standing ..................................................28

1.    CSIS Lacks Standing Under The D.C. CPPA Because It Is Not A "Consumer" Under The Act.....................................................28

2.    CSIS Lacks Standing Under The D.C. CPPA Because Its Employees' Hotel Stays Were For Business Purposes .................30

D.    Plaintiff Charness Lacks Standing To Bring Claims Under The D.C. CPPA Because His Claims Are Unconnected To The District.................30

E.    All Plaintiffs Lack Standing To Pursue Claims Under D.C. Code Sections 28-3904(a) And (t) Related To Marriott's Headquarters ...........31

III.    MARRIOTT IS ENTITLED TO SUMMARY JUDGMENT UNDER THE SEVENTH CIRCUIT'S REASONING IN *SHAW V. HYATT* ..............................32

A.    The *Shaw v. Hyatt* Litigation ...................................................32

B.     As In *Shaw v. Hyatt*, Plaintiffs' Claims Fail Because A Contract Governs ....................................................................................34

IV.    MARRIOTT IS ENTITLED TO SUMMARY JUDGMENT UNDER THE EIGHTH CIRCUIT'S REASONING IN *BYKOV V. RADISSON* ........................35

A.    *The Bykov* Litigation ...............................................................35

B.    As In *Bykov*, Most Plaintiffs' D.C. CPPA Claims Fail For Lack Of Injury And Causation.....................................................................37

C.    As In *Bykov*, Plaintiffs' Unjust Enrichment Claims Fail Because Express Contracts Govern And For Lack Of Standing.............................38

V.    PLAINTIFFS' CLAIMS UNDER THE D.C. CPPA FAIL AS A MATTER OF LAW ....................................................................................39

A.    Summary Judgment Should Be Entered For Marriott On Plaintiffs' Hotel Exchange Rate Claims Postdating Marriott's 2005 Provision To Prospective Guests Of The Information Plaintiffs Claim Was Improperly Omitted ...............................................................39

B.    No Plaintiff May Recover Statutory Damages For More Than One Stay ..............................................................................41

C.    Summary Judgment Should Be Entered For Marriott On Plaintiffs' D.C. CPPA Claims Concerning Marriott's Headquarters ........................41

VI.    IN THE ALTERNATIVE, SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST ALL MEMBERS OF PLAINTIFFS' PROPOSED CLASS WHOSE CLAIMS SHARE THE SAME DEFICIENCIES AS PLAINTIFFS' CLAIMS ...............................................................44

CONCLUSION...................................................................................45

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Albrecht v. Comm. on Employee Benefits*, 357 F.3d 62 (D.C. Cir. 2004) .....................................34

*Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909 (D.C. Cir. 1997) ..................................................39

*Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981)....................................................................25, 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................14

*Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801 (Ill. 2005) ....................................33, 34

*Avianca, Inc. v. Corriea*, No. 85-3277, 1992 U.S. Dist. LEXIS 4709 (D.D.C. Apr. 13, 1992) ........................................................................................................................38

*Bykov v. Radisson Hotels Int'l, Inc.*, No. 05-1280, 2006 U.S. Dist. LEXIS 12279 (D. Minn. Mar. 22, 2006)................................................2, 15, 34, 36, 37, 38

*Bykov v. Radisson Hotels Int'l, Inc.*, No. 06-2102, 2007 U.S. App. LEXIS 3276 (8th Cir. Feb. 12, 2007)................................................2, 17, 32, 35, 36, 38

*Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018 (D.C. 2007)...........................................19

*Clifton Terrace Assoc., Ltd. v. United Techs. Corp.*, 728 F. Supp. 24 (D.D.C. 1990), *vacated in part on other grounds*, 929 F.2d 714 (D.C. Cir. 1991) .............................28, 29

*Curtin v. United Airlines, Inc.*, 275 F.3d 88 (D.C. Cir. 2001) ......................................................15

*Cruz v. Am. Airlines*, 150 F. Supp. 2d 103 (D.D.C. 2001) ...........................................................15

*Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876 (D.C. Cir. 1985) ................................................21

*Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) ......................22

*Ford v. ChartOne, Inc.*, 908 A.2d 72 (D.C. 2006)......................................................................18

*Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201 (D.C. 2002)......................16

*Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1 (D.D.C. 2005) .......................................22

*Howard v. Riggs National Bank*, 432 A.2d 701 (D.C. 1981) .......................................................29

*Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24 (D.D.C. 2007)............................................16, 17

*Independent Communications Network, Inc. v. MCI Telecommunications Corp.*, 657 F. Supp. 785 (D.D.C. 1987) ....................................................................................29

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196 (1st Cir. 1996)...................................................................43, 44

*Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223 (D.C. Cir. 2004) ....................................22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................16, 18, 27, 28

*Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F. Supp. 588 (D.D.C. 1988) .....................18

*Miami Bldg. & Constr. Trades Council v. Sec'y of Def.*, 493 F.3d 201 (D.C. Cir. 2007).......16, 27

*Netherland v. Eli Lilly & Co.*, No. 04-cv-654, 2006 U.S. Dist. LEXIS 13027 (D.D.C. Nov. 13, 2006) .......................................................................................22

*OCONUS DOD Employee Rotation Action Group v. Cohen*, 140 F. Supp. 2d 37 (D.D.C. 2001) ..................................................................16, 18, 27, 28, 31

*Oglala Sioux Tribe v. United States Army Corps of Eng'rs*, 537 F. Supp. 2d 161 (D.D.C. 2008) ..................................................................................15

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ................................................25

*Rainbow/PUSH Coal. v. FCC*, 396 F.3d 1235 (D.C. Cir. 2005) ..................................16

*Schiff v. AARP*, 697 A.2d 1193 (D.C. 1997)...............................................................34

*Scott v. Harris*, 127 S. Ct. 1769 (2007) .......................................................................14

*Shaw v. Hyatt Int'l Corp.*, No. 05-5022, 2005 U.S. Dist. LEXIS 28250 (N.D. Ill. Nov. 15, 2005) ....................................................................................................2, 32

*Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899 (7th Cir. 2006)...........................................2, 32, 33, 34

*Shaw v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 141 (D.D.C. 2007)...................20, 21, 22, 23, 24, 38

*In re St. Jude Med., Inc.*, 425 F.3d 1116 (8th Cir. 2005)...............................................25

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ...............................................................17

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)...................................27

*State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)....................................25, 26

v

*Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5 (1st Cir. 1996) ................................43

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).........................................................15

*In re Swine Flu Immunization Prods. Liab. Litig.*, 880 F.2d 1439 (D.C. Cir. 1989).....................15

*United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240 (D.C. Cir.
      1996) ...................................................................................................................................34

*Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168 (D.C. 2006)................20, 21, 22, 25

*Williams v. First Government Mortgage & Investors Corp.*, 176 F.3d 497 (D.C. Cir.
      1999) .............................................................................................................................20, 21

*Williams v. The Purdue Pharma Co.*, 297 F. Supp. 2d 171
      (D.D.C. 2003) ...............................................................16, 17, 20, 21, 27, 28, 31, 37

## STATUTES AND RULES

15 U.S.C. § 1125(a)(1)(A) ..............................................................................................................43

Fed. R. Civ. P. 56(c) ......................................................................................................................14

D.C. Code § 28-3901(a)(2) .............................................................................................18, 19, 29, 30

D.C. Code § 28-3901(a)(6) .................................................................................................18, 19, 30

D.C. Code § 28-3901(b)(2) ............................................................................................................20

D.C. Code § 28-3904 ........................................................................................................16, 18, 19, 37

D.C. Code § 28-3904(a) ......................................................................................................3, 31, 42

D.C. Code § 28-3904(e) .........................................................................................................3, 39

D.C. Code § 28-3904(f) ..........................................................................................................3, 39

D.C. Code § 28-3904(h).........................................................................................................3, 39

D.C. Code § 28-3904(r) .............................................................................................................35

D.C. Code § 28-3904(t) .........................................................................................................3, 31, 42

D.C. Code § 28-3905(k).............................................................................................................16

D.C. Code § 28-3905(k)(1)....................................................................................................18, 19, 41

815 ILCS 505/1(e) ..................................................................................................35

Minn. Stat. § 325F.69, subd. 1 ..............................................................................37

## OTHER SOURCES

Federal Judicial Center, Manual for Complex Litigation (Fourth)................................15

Marriott International, Inc. ("Marriott"), by its attorneys, hereby submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment.

## INTRODUCTION

This case centers on Plaintiffs' challenge under the District of Columbia Consumer Protection Procedures Act ("D.C. CPPA") to Marriott's use of a widespread and longstanding practice of hotels and other businesses operating in Russia – quoting prices in U.S. dollars and then, for purposes of payment, converting those quoted prices into Russian rubles through the application of a hotel exchange rate.[1]  Since mid-2005, Marriott has provided additional information regarding the use of hotel exchange rates to its guests through its website, reservation call discussions and written confirmations, and more recently ceased quoting prices in U.S. dollars.  All Marriott-affiliated Russian hotels now quote room prices in rubles.

Plaintiffs have proposed that this Court certify an unprecedented worldwide class on these D.C. law claims, despite that the overwhelming majority of class members live outside the United States and that, by Plaintiffs' own estimation, only 2% of the proposed class (at most) would be D.C. residents.  Marriott already has provided extensive briefing as to why neither Plaintiffs' proposed class nor any class should be certified in this case.

However, the Court need not rule on Plaintiffs' novel class certification arguments because, as described herein, Marriott is entitled to summary judgment on all counts of Plaintiffs' Second Amended Class Action Complaint and Demand for Jury Trial ("Second Amended Complaint").  As the D.C. Circuit has recognized, where summary judgment is warranted, the issue of class certification becomes moot.

---

[1] Plaintiffs also have pleaded a claim for unjust enrichment.  They have not moved for class certification on that claim.  As discussed below, that claim fails as a matter of law.

First, summary judgment should be granted because none of the four Plaintiffs has standing to bring the claims at issue in this case.

No Injury-in-Fact.  Shaw and Mendelson lack standing because they have no injury-in-fact:  they did not personally pay for the hotel rooms and suffered no economic harm.

Business Use.  Shaw, Mendelson and the Center for Strategic and International Studies ("CSIS") lack standing under the D.C. CPPA because their stays were for business purposes. CSIS also has no standing because it is a corporation.

No Connection to D.C.  Shaw and Charness lack standing under the D.C. CPPA because their claims have no connection to the District of Columbia other than this lawsuit.

No Causation.  Mendelson and CSIS lack standing because they did not receive any alleged misrepresentations from Marriott, and because their claims pertain to hotels that Marriott neither owns nor controls.  Moreover, Shaw, Mendelson and CSIS were aware of the use of hotel exchange rates and thus were not deceived or misled by any representations.

Second, summary judgment should be granted for the reasons that the Seventh and Eighth Circuits rejected materially identical lawsuits brought by the same law firm and one of the same plaintiffs against two other American hospitality companies, Radisson and Hyatt.  *See Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899 (7th Cir. 2006) (affirming dismissal in *Shaw v. Hyatt Int'l Corp.*, No. 05-5022, 2005 U.S. Dist. LEXIS 28250 (N.D. Ill. Nov. 15, 2005)); *Bykov v. Radisson Hotels Int'l, Inc.*, No. 06-2102, 2007 U.S. App. LEXIS 3276 (8th Cir. Feb. 12, 2007) (affirming grant of summary judgment in *Bykov v. Radisson Hotels Int'l, Inc.*, No. 05-1280, 2006 U.S. Dist. LEXIS 12279 (D. Minn. Mar. 22, 2006)).  As the Seventh Circuit ruled, because Plaintiffs' claims pertain to an alleged breach of a contractual promise, Plaintiffs do not present proper consumer protection act or unjust enrichment claims.  And, as the Eighth Circuit ruled, Plaintiffs' claims

also fail because Plaintiffs cannot show injury or causation.  Under the Seventh and Eighth

Circuit's persuasive reasoning concerning materially identical facts, summary judgment against

Plaintiffs is warranted here.

Third, assuming the validity of Plaintiffs' D.C. CPPA theories, those claims fail in large

part as a matter of law based on the undisputed facts.  Plaintiffs assert two basic claims under the

D.C. CPPA – that Marriott's price quotes are deceptive in light of the hotel's exchange rate (D.C.

Code §§ 28-3904(e), (f) and (h)), and that Marriott has misrepresented the location of its

headquarters (D.C. Code §§ 28-3904(a) and (t)).  Plaintiffs' price quote claim fails as a matter of

law for all reservations post-dating Marriott's provision during the reservation process of

precisely the information that Plaintiffs claim was required.  Specifically, since 2005, Marriott

has informed guests reserving through Marriott-controlled reservation channels that, at check-

out, the U.S. dollar quoted price for hotel rooms would be subject to payment in rubles at the

hotel's exchange rate.[2]  Marriott also is entitled to summary judgment on Plaintiffs' claim

concerning Marriott's headquarters, which is physically located in Bethesda, Maryland, but

which has a Washington, D.C. postal address.  Notably, no Plaintiff received any representations

concerning the location of Marriott's headquarters – information that would have been

immaterial to Plaintiffs as well as to reasonable consumers.  Moreover, the D.C. CPPA does not

encompass the sort of "headquarters misrepresentation" claim that Plaintiffs assert.  Thus,

Marriott is entitled to summary judgment on the D.C. CPPA claims related to its headquarters.

Finally, the Court need not reach issues related to Plaintiffs' proposed class because

summary judgment should be granted to Marriott, thereby mooting the issue of class

certification.  However, in the alternative, Marriott respectfully submits that it would be entitled

---

[2] Prior to 2005, an individualized inquiry is required for each Plaintiff and putative class member regarding what information was provided regarding exchange rates.

to summary judgment against all class claims asserted by Plaintiffs.  To begin with, Marriott would be entitled to summary judgment against the class under the persuasive reasoning of the Seventh and Eighth Circuits in the *Shaw* and *Bykov* decisions.  The class's headquarters misrepresentation claim also fails as a matter of law classwide.  Moreover, under choice-of-law principles and the Constitution, Marriott would be entitled to summary judgment against the vast majority of proposed class members who are not D.C. residents or whose claims have a more significant relationship to a jurisdiction other than the District.  Marriott also would be entitled to summary judgment against all proposed class members who lack standing or a substantive claim for the reasons that Plaintiffs do:  for example, that they did not pay for their own rooms, or that they received the Central Bank rate, or that they never received any representations from Marriott, or that their hotel stays were for a business purpose, or that they received the exchange rate information that Plaintiffs claim should have been provided.  Thus, although class certification is unwarranted, for reasons previously briefed, Marriott would in any event be entitled to summary judgment against the class.

## STATEMENT OF FACTS[3]

### A.    Defendant Marriott International, Inc.

Marriott is a hospitality company with more than 2,900 lodging properties in the United States and 67 other countries and territories.  Facts ¶ 1.  Marriott is incorporated in Delaware. Facts ¶ 2.  Its headquarters and principal place of business are in Bethesda, Maryland.  Facts ¶ 3 (citing Plaintiff Shaw and Charness's admissions that "Marriott "in fact . . . is headquartered in Bethesda, Maryland").  Marriott has a historical connection to Washington, D.C., because of a

---

[3] The Statement of Facts in this memorandum relies on the separate Statement of Undisputed Facts ("Facts") submitted by Marriott.  Most factual references in this memorandum are to paragraphs in the separate Statement of Undisputed Facts, which in turn reference the underlying documents and depositions supporting the factual assertions.

root beer stand opened there in 1927.  Facts ¶ 5.  Marriott also has a Washington, D.C. mailing address, but mail sent to that address is routed directly to Marriott's headquarters in Maryland. Facts ¶ 6.  Marriott does not maintain a corporate office in the District.  *Id.*

Marriott annually files a personal property tax return with the Maryland State Department of Assessments and Taxation ("SDAT") and pays an annual fee to SDAT to maintain its physical existence in Maryland.  Facts ¶ 4.  The servers for Marriott's website, www.marriott.com, are operated out of Frederick, Maryland.  Facts ¶ 7.  None of Marriott's servers are located in Washington, D.C.  *Id.*

**B.    The Marriott Russia Hotels And Related Practices.**

**1.    The Marriott Russia Hotels And Exchange Rate Practices.**

Seven hotel properties in Russia relevant to this litigation are affiliated with Marriott (collectively, the "Marriott Russia Hotels").  Facts ¶ 9.  Four of these hotels are managed by Marriott and have been since they opened for business ("Marriott Managed Hotels").  *Id.*  The remaining three hotels are franchised hotels that are neither owned nor operated by Marriott ("Marriott Franchised Hotels"), but are, and have been since opening, owned and operated by wholly owned subsidiaries of Interstate Hotels and Resorts, Inc. ("Interstate").  Facts ¶¶ 10-13. Interstate is not owned or controlled by Marriott.  Facts ¶ 11.  Marriott's license agreements with the Interstate entities that operate the Marriott Franchised Hotels provide that the Interstate entitles are solely responsible for establishing all room prices and other hotel charges, including internal exchange rates.  Facts ¶¶ 12-13.

Interstate owns and operates a Russian organization called "Marriott Hotels of Moscow," which assists guests in making reservations for the Marriott Franchised Hotels.  Facts ¶ 14. Marriott Hotels of Moscow has Russian websites that provide email and telephone contact

information for guests wishing to reserve at Marriott Franchised Hotels. *Id*. Marriott has no affiliation with Interstate's Marriott Hotels of Moscow or its websites, and Marriott has no control over the information or confirmations that Interstate and Marriott Hotels of Moscow provide to prospective guests. *Id*.

As with all Marriott-affiliated hotels, the local management of the Marriott Russia Hotels set their own room rates and decide whether to quote room rates in U.S. dollars or other currency. Facts ¶ 15. The Marriott Russia Hotels no longer quote room prices in U.S. dollars; rather, all seven of the hotels quote room prices in rubles. Facts ¶ 16.[4]

Pursuant to Russian law governing until June 2004, services purchased in Russia, including hotel lodging, could only be paid for in rubles. Facts ¶ 17. To comply with this requirement during the time that the Marriott Russia Hotels quoted prices in U.S. dollars, at check-out, the hotels would translate the quoted U.S. dollar price into a price in a monetary unit referred to as a "currency unit." Facts ¶ 18. The currency unit price always equaled the price quoted in U.S. dollars. *Id*. Then, the currency unit price would be converted into a price in rubles using a hotel exchange rate set by the local hotel management. Facts ¶¶ 15, 18. The hotel exchange rate was conspicuously displayed at the Marriott Russia Hotels. Facts ¶ 33. The guests' bills also specified the use of currency units and the hotel exchange rate. Facts ¶ 18.

During the time that Marriott Russia Hotels converted prices quoted in U.S. dollars into rubles using a hotel exchange rate, virtually all hotels and businesses in Russia that quoted prices for goods or services in U.S. dollars also followed this practice, which grew out of the volatility of the ruble after the disintegration of the Soviet Union. Facts ¶ 19.

---

[4] Six of the Marriott Russia Hotels ceased quoting prices in U.S. dollars in December 2006. Facts ¶ 16. The Renaissance Moscow ceased doing so as of January 1, 2008. *Id*.

2.      **Reservations For The Marriott Russia Hotels.**

Marriott's worldwide automated reservation system is named "MARSHA," which stands for Marriott's Automated Reservation System for Hotel Accommodations.  Facts ¶ 20.  Marriott-affiliated hotel properties select their own room rates and currency for quoting those room rates, and then input this information into MARSHA.  *Id*.  In August 2005, Marriott inserted language in MARSHA stating that prices for Marriott Russia Hotels quoted in U.S. dollars must be paid in rubles at the hotel's exchange rate at check-out.  Facts ¶ 35.

Numerous different reservation channels – most of which are not owned or controlled by Marriott – may access the information in MARSHA to assist prospective guests in making reservations.  Facts ¶ 21.  Many of those reservation channels provide prospective guests with information that is different from or supplemental to the information provided by MARSHA.  *Id*. Each reservation channel that accesses MARSHA has its own practice for issuing written confirmations to individuals reserving hotel rooms.  Facts ¶ 29.  Marriott does not provide a written confirmation if the reservation is booked through a third-party reservation channel.  Facts ¶ 30.  Marriott provides a written confirmation to guests booking through an official Marriott reservation channel only if an email address or facsimile number is provided.  Facts ¶ 31.  Thus, only a small percentage of guests who stayed at the Marriott Russia Hotels during the time period at issue in this lawsuit received written confirmations from Marriott.  *Id*.

The Marriott Reservation Data Warehouse ("MRDW") is a central repository for data concerning Marriott hotel reservations made through the various reservation channels that access MARSHA.  Facts ¶ 22.  The guest data in MRDW pertains to reservations, not guest stays.  *Id*. Thus, the existence of a guest record in MRDW does not indicate that the guest actually fulfilled

the reservation, stayed at the hotel, or paid for the room. *Id.* A significant percentage of reservations in MRDW result in cancellations or no-shows. *Id.*

### 3. Specific Reservation Channels.

Some guests at Marriott Russia Hotels contact the Interstate-owned and operated Marriott Hotels of Moscow or the Marriott Franchised Hotels directly to reserve rooms at Marriott Franchised Hotels. Facts ¶¶ 23, 25. Marriott does not provide written confirmations to guests who book through these channels, which are controlled by Interstate. Facts ¶¶ 12, 13, 25, 30. Some guests who reserved with Marriott Franchised Hotels, including through Marriott Hotels of Moscow, were informed in their written confirmations that the rate quoted was in currency units equal to U.S. dollars, subject to the hotel's internal exchange rate at check-out. Facts ¶ 32.

Other guests at Marriott Russia Hotels use third-party traditional or on-line travel agents worldwide to book their stays. Facts ¶¶ 23, 26. Although some of these agents are provided with rate and pricing information through MARSHA, Marriott does not control the information provided to guests by these independent third parties. Facts ¶ 26. Guests who reserve via these agencies do not receive written confirmations directly from Marriott. Facts ¶¶ 26, 30.

Other guests at Marriott Russia Hotels book their rooms by contacting the hotels directly, through phone, email or otherwise. Facts ¶¶ 23-24 . A prospective guest using this method interacts with hotel personnel in Russia. Facts ¶ 24. In August 2005, hotel personnel taking reservations at Marriott Managed Hotels began orally advising prospective guests that the quoted price was in currency units subject to the hotel's exchange rate at check-out. Facts ¶ 34. Guests who reserve directly with Marriott Managed Hotels do not receive written confirmations from Marriott unless they provide an email address or fax number. Facts ¶ 31.

Other guests at Marriott Russia Hotels book their rooms by calling a Marriott toll-free number.  Facts ¶¶ 23, 27.  Those calls are routed to a reservation agent via Marriott Global Reservation Sales operated by Marriott.  Facts ¶ 27.  Depending on the toll-free number called and the call volume, the guest may speak with a reservation agent in one of several locations worldwide, none of which is in Washington, D.C.  *Id.*  As of August 5, 2005, Marriott directed its toll-free reservation agents to inform guests that the quoted rate was in currency units equal to U.S. dollars, but that payment must be made in rubles at the hotel's current exchange rate.  Facts ¶ 38.  Guests who reserve via the Marriott toll-free number do not receive written confirmations from Marriott unless they provide an email address or fax number.  Facts ¶ 31.

Finally, guests at Marriott Russia Hotels may reserve rooms by contacting Marriott via www.marriott.com.  Facts ¶ 23.  The primary servers for that website are in Maryland.  Facts ¶ 7.  There are no servers in Washington, D.C.  *Id.*  As of May 2005, for guests reserving rooms via www.marriott.com and providing an email address (but not receiving a negotiated group rate), Marriott's written confirmations informed guests that the quoted price would be payable at check-out in local currency subject to the hotel's exchange rate.  Facts ¶ 36.  In August 2005, Marriott added this information to its website reservation screens.  Facts ¶ 39.  Guests who reserve via www.marriott.com do not receive written confirmations unless they provide an email address or fax number.  Facts ¶ 31.[5]

---

[5] In June 2003, Marriott placed a currency calculator on its website so that a prospective guest could convert an amount in one currency into any of approximately 158 different currencies. Facts ¶ 28.  With the exception of one reservation by Plaintiff Shaw (which was made after Shaw knew that Marriott used an internal hotel exchange rate at check-out), no Plaintiff used the currency calculator.  *Id.*, Facts ¶ 46.

**C.    The Plaintiffs.**

**1.    Britt Shaw.**

Plaintiff Shaw is an American citizen who has resided in the United Kingdom since 2000. Facts ¶ 44.  He is domiciled in Florida for tax purposes and his last U.S. residence was in New York.  *Id*.  He graduated from Columbia Law School in 1989 and started his own firm in Russia practicing corporate law.  Facts ¶ 45.  He lived and worked in Moscow from 1992 through 2000. *Id*.

Shaw knew as early as 2000 that Russian hotels reserved rooms in U.S. dollars and applied an exchange rate to convert to rubles at check-out.  Facts ¶ 46.  From 2000 through 2007, Shaw traveled to Moscow approximately once a month for his Russian corporate client.  Facts ¶ 47.  He knew that the normal practice for hotels is to settle bills in local currency at an exchange rate.  *Id*.  He was knowledgeable about exchange rates and knew that when he exchanged money he would not necessarily get the Central Bank rate.  *Id*.

Shaw normally made his travel arrangements through an American Express travel agency.  Facts ¶ 48.  Once in April 2005, he made his hotel reservation on www.marriott.com. *Id*.  It was that stay that formed the basis for the allegedly "representative example of the transactions at issue" in this case.  Second Amended Complaint ¶ 48.  Shaw made this April 2005 reservation after he had already met with a lawyer regarding filing suit against Hyatt International Corporation ("Hyatt") concerning Hyatt's exchange rate practices.  Facts ¶ 48.

Shaw knew at the time he made the April 2005 reservation that the quoted price in U.S. dollars would be subject to the hotel's exchange rate.  Facts ¶¶ 46-47, 51.  He also knew that the Renaissance Moscow had previously used an exchange rate of 32 rubles per dollar, as had the Moscow Hyatt.  Facts ¶ 51.  When he checked in to the Renaissance Moscow on April 19, 2005,

Shaw signed a registration card stating that the daily rate of $425 was in currency units and that he "expected to be charged in rubles" at check out.  Facts ¶ 49.  At check-out, the 425 units charged matched the dollar rate that Shaw expected, and the exchange rate of 32 rubles to the dollar was clearly stated on the bill.  Facts ¶ 50.

Shaw's employer paid for all of his stays at the Marriott Russia Hotels, which were for business purposes.  Facts ¶ 53.  He stayed at Marriott Russia Hotels at least eight times after April 2005.  Facts ¶ 52.

### 2.    Sarah Mendelson.

Plaintiff Mendelson is a resident of the District of Columbia.  Facts ¶ 54.  She researched in the Soviet Union in 1990-91, worked in Moscow from 1994-95, and is fluent in Russian.  Facts ¶ 55.

Since 1999, Mendelson has stayed at Marriott Russia Hotels over twenty times.  Facts ¶ 56.  During the putative class period, Mendelson stayed only at Marriott Franchised Hotels, which are owned and operated by Interstate, not Marriott.  Facts ¶¶ 10-13, 58.  Generally, Mendelson's assistant made Mendelson's reservations via emails and telephone calls to the franchised hotels directly or through Interstate's Marriott Hotels of Moscow.  *Id*.  Neither Mendelson nor her assistant ever used www.marriott.com to make reservations.  *Id*.

Mendelson received written confirmations from the Marriott Franchised Hotels in 2002 and 2003 stating that "[t]he above rate is quoted in units equal to US dollars . . . Payment must be made at the hotel's current exchange rate in rubles only."  Facts ¶ 59.  When Mendelson reserved for a stay at a Marriott Franchised Hotel in January 2004, Interstate informed her that the hotel's exchange rate was higher than the Central Bank rate.  Facts ¶ 60.  For many of her

stays at Marriott Russia Hotels, Mendelson was charged the U.S. Embassy rate, which applied the Central Bank rate.  Facts ¶ 61.

Mendelson's stays were for business purposes and were paid for by her employer, CSIS. Facts ¶ 62.  Mendelson participated in meetings between Interstate and CSIS to discuss the CSIS's special corporate rates, and she never complained about the rates or the hotel's exchange rate at those meetings.  Facts ¶¶ 63-64.  She also never advised anyone at CSIS of any alleged overcharge, despite CSIS's policy requiring her to do so.  Facts ¶ 64.  Mendelson stated in her deposition that she is not seeking damages in this lawsuit.  Facts ¶ 62.

### 3.    CSIS.

Plaintiff CSIS is a Delaware corporation, headquartered in Washington, D.C.  Facts ¶ 65. CSIS employees, including Mendelson, frequently travel to Russia to further CSIS's business objectives of research and policy analysis.  Facts ¶ 66.  CSIS's projects are funded primarily through grants, and its employees' travel expenses are budgeted into those appropriations.  *Id.* CSIS or its project sponsors largely if not exclusively had negotiated corporate rates for CSIS employees' hotel stays and regularly received the Central Bank exchange rate.  Facts ¶ 68.  Many CSIS employees' stays at Marriott Russia Hotels were at Marriott Franchised Hotels.  Facts ¶ 69.

### 4.    Neal Charness.

Plaintiff Charness is a Michigan resident.  Facts ¶ 71.  He holds a law degree and has extensive worldwide travel experience.  *Id.*

In booking the stays at Marriott Russia Hotels at issue in this case, Charness first accessed www.marriott.com, but completed the reservations via the Marriott toll-free number. Facts ¶ 72.  During his first stay at the Marriott Tverskaya on November 19, 2004, Charness saw a sign at check-in stating that charges would be in currency units at check-out.  Facts ¶ 73.

When Charness checked out of the hotel, he was charged in currency units equal to the quoted price in U.S. dollars. *Id*.

Charness returned to Russia and stayed at the Marriott Grand approximately three weeks later. Facts ¶ 74. He was aware at that time that prices would be quoted in U.S. dollars but paid in rubles, subject to the hotel's exchange rate. *Id*. When he checked into the Marriott Grand in December 2004, Charness again signed a registration form indicating that the room price was in units, and he again saw a sign indicating the use of currency units. Facts ¶ 75. At check-out, Charness was charged in units equal to the quoted price in U.S. dollars. Facts ¶ 76.

**D. Procedural History.**

Plaintiff Shaw filed the initial complaint in this matter on May 13, 2005 in D.C. Superior Court, and Marriott removed to this Court. Plaintiffs filed a First Amended Complaint on July 1, 2005, adding Plaintiff Charness and former Plaintiff Paliashvili. The Court denied Marriott's motion to dismiss the First Amended Complaint by Order dated February 22, 2007.

On June 3, 2005, Ilya Bykov, represented by counsel for Plaintiffs, filed a putative class action against Radisson under Minnesota consumer protection laws on claims materially identical to those in this case. The District of Minnesota granted summary judgment to Radisson on March 22, 2006, and the Eighth Circuit affirmed on February 12, 2007.

On July 20, 2005, Plaintiff Shaw, represented by counsel for Plaintiffs, filed a putative class action against Hyatt under Illinois consumer protection laws on claims materially identical to those in this case. The Northern District of Illinois dismissed Shaw's Illinois suit on November 15, 2005, and the Seventh Circuit affirmed on August 29, 2006.

On October 19, 2007, Plaintiffs filed the Second Amended Complaint in this lawsuit. The Second Amended Complaint added two new Plaintiffs – CSIS and Mendelson – and

13

removed Plaintiff Paliashvili.  Marriott moved to dismiss the Second Amended Complaint, and

briefing is complete on that motion.  Plaintiffs also moved for class certification, and briefing is

complete on that motion.  Plaintiffs initially sought to certify a class of all persons who reserved

rooms at a Marriott-affiliated hotel in Russia through the Marriott Reservation System, who

received a rate confirmation in U.S. Dollars, and whose final bill was in rubles.  Plaintiffs'

Memorandum in Support of Motion for Class Certification at 10.  Plaintiffs have since clarified

that  "[u]nder Plaintiffs' theory of the case, the key factor is whether the guest received a written

price confirmation from Marriott . . . ."  Plaintiffs' Reply Memorandum in Support of Motion for

Class Certification ("Class Reply") at 9.

## ARGUMENT

**I.     WHERE THERE IS NO GENUINE FACTUAL DISPUTE AND MOVANT IS
ENTITLED TO JUDGMENT AS A MATTER OF LAW, THE COURT SHOULD
GRANT SUMMARY JUDGMENT, MOOTING CLASS CERTIFICATION.**

Summary judgment should be granted for Marriott "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that [Marriott] is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most

favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 127 S. Ct.

1769, 1774-75 (2007) (citations omitted).  "At the summary judgment stage, facts must be

viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as

to those facts."  *Id.* at 1776.  However, "'[t]he mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact.'"  *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original)).

This Court should consider Marriott's summary judgment motion prior to ruling on class

certification in order to "spare[] both the parties and the court a needless, time-consuming

inquiry into certification." *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 92-93 (D.C. Cir. 2001).

As this Court has recognized, "[i]f the resolution of the summary judgment motion may

eliminate the need to consider the certification motion *ab initio*, the court's interest in preserving

judicial resources, as well as the resources of the litigants, counsels in favor of addressing the

summary judgment motion first." *Cruz v. Am. Airlines*, 150 F. Supp. 2d 103, 111 (D.D.C. 2001);

*see* Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.133 (explaining that

"[t]he court may rule on motions pursuant to Rule 12, Rule 56, or other threshold issues before

deciding on certification," so as to "dispose of all or part of the litigation"); *Bykov*, 2006 U.S.

Dist. LEXIS 12279, at *21 ("Because Defendants' Motion for Summary Judgment is granted,

Plaintiff's Motion for Class Certification is denied as moot.").

## II.    MARRIOTT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE NO PLAINTIFF HAS STANDING.

"It is the plaintiff's burden to establish that the court has subject matter jurisdiction to

hear the case." *Oglala Sioux Tribe v. United States Army Corps of Eng'rs*, 537 F. Supp. 2d 161,

167 (D.D.C. 2008) (citing *In re Swine Flu Immunization Prods. Liab. Litig.*, 880 F.2d 1439,

1442-43 (D.C. Cir. 1989)).  "Whether a plaintiff has standing to pursue his or her claim is a

threshold question of subject matter jurisdiction." *Oglala Sioux Tribe*, 537 F. Supp. 2d at 169

(citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)).

Summary judgment should be granted for Marriott because no Plaintiff has standing to

bring the claims in this lawsuit.  Based on the undisputed facts developed in discovery, all

Plaintiffs have failed to show the injury-in-fact or causation required for standing, or have not

established the prerequisites for standing to sue under the D.C. CPPA, or both.

15

A.    **Plaintiff Shaw Lacks Standing.**

1.    **Shaw Lacks Standing Because He Did Not Pay For His Hotel Stays And Thus Has Suffered No Injury-In-Fact.**

Plaintiff Shaw did not did not suffer the injury-in-fact required for standing because his hotel stays were made for business purposes and paid for by his employer.

"'The "irreducible constitutional minimum of standing contains three elements"':  (1) injury-in-fact, (2) causation, and (3) redressability.'"  *Miami Bldg. & Constr. Trades Council v. Sec'y of Def.*, 493 F.3d 201, 205 (D.C. Cir. 2007) (quoting *Rainbow/PUSH Coal. v. FCC*, 396 F.3d 1235, 1240 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992))); *see, e.g.*, *OCONUS DOD Employee Rotation Action Group v. Cohen*, 140 F. Supp. 2d 37, 45 (D.D.C. 2001) ("To have standing, Plaintiffs must allege: (1) an injury in fact that is concrete and particularized and 'actual or imminent, not conjectural or hypothetical,' (2) 'a causal connection between the injury and the conduct complained of' and (3) that it is 'likely' rather than merely speculative that the injury will be redressed by the relief requested." (quoting *Lujan*, 504 U.S. at 560-61)).  These limits exist in federal courts as a matter of Article III of the Constitution, but also are recognized as part of substantive D.C. law.  *See, e.g.*, *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1206 (D.C. 2002).

As this Court has observed, these standing principles apply to claims brought under the D.C. CPPA.  Although language in the D.C. CPPA[6] "might suggest that a plaintiff could pursue a claim under the DCCPPA without an actual or threatened injury, the cases hold otherwise." *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 28 (D.D.C. 2007); *see Williams v. The Purdue*

---

[6] *See* D.C. Code § 28-3904 ("[i]t shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby"); *id.* § 28-3905(k) (authorizing claims by any person, "whether acting for the interests of itself, its members, or the general public").

*Pharma Co.*, 297 F. Supp. 2d 171, 177-78 (D.D.C. 2003) ("The amendment to the CPPA in 2000 did not change the requirements for standing under D.C. law, despite its broad language.").

Accordingly, to mount a claim under the D.C. CPPA, a "plaintiff must present an actual or threatened injury-in-fact to have standing to raise his DCCPPA claims." *Hoyte*, 489 F. Supp. 2d at 29. Each Plaintiff must establish a "particularized and specific injury in fact suffered." *Williams*, 297 F. Supp. 2d at 177. Each Plaintiff must "be himself among the injured." *Id.* at 178 (quoting, inter alia, *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972)).

Plaintiff Shaw lacks standing because he has suffered no injury-in-fact. It is undisputed that Shaw's employer paid for all of his stays at Marriott Russia Hotels, and thus he has suffered no economic harm based on the allegations in this case. Facts ¶ 53. Economic harm to the Plaintiffs is the sole basis for Plaintiffs' claim of injury-in-fact. *See* Second Amended Complaint ¶¶ 87, 93. Accordingly, summary judgment should be entered against Shaw.

Perhaps in recognition of Shaw's lack of economic harm, Plaintiffs have argued that economic harm is not needed for standing, claiming that "the CPPA creates in Plaintiffs a legally protected interest to be free from improper trade practices." Class Reply at 33. This Court has directly rejected that argument: "The invasion of a purely legal right without harm to the consumer," such as "freedom from alleged false and misleading advertising," does not confer standing to bring suit and "can be addressed through the administrative process of the Government of the District of Columbia." *Williams*, 297 F. Supp. 2d at 178; *accord, e.g.*, *Bykov*, 2007 U.S. App. LEXIS 3276, at *5 (affirming summary judgment where Bykov "lacked standing because Bykov's company, and not Bykov, paid the hotel bill and suffered the alleged injury").[7]

---

[7] Shaw also has not established the "causation" or "traceability" required for standing because it is undisputed that he was not deceived or misled by any representations or omissions of Marriott. *See infra* Section II.B.3; *see, e.g.*, *Williams*, 297 F. Supp. 2d at 177 (rejecting a D.C. CPPA claim

**2.    Shaw Lacks Standing Under The D.C. CPPA Because His Hotel Stays Were For Business Purposes.**

Shaw also lacks standing to pursue claims under the D.C. CPPA because his stays at the Marriott Russia Hotels were undisputedly for business purposes.

The "trade practices" outlawed by the D.C. CPPA and enforceable by private litigants, *see* D.C. Code §§ 28-3904, 28-3905(k)(1), are only those that pertain to "consumer goods or services," *id.* § 28-3901(a)(6) (defining "trade practices"). In turn, "consumer" goods or services are defined under the D.C. CPPA as goods or services that are "primarily for personal, household, or family use." *Id.* § 28-3901(a)(2). Thus, as courts have recognized, the protections of the D.C. CPPA do not extend to purchases that are for business or commercial use. *See, e.g.*, *Ford v. ChartOne, Inc.*, 908 A.2d 72, 81, 82 n.10, 84 n.12 (D.C. 2006) (explaining that the D.C. CPPA "does not apply to commercial dealings outside the consumer sphere," and thus that "[a] purchase of supplies or equipment for a business operation," such as "an attorney's purchase of, say, office supplies on his own behalf" would fall outside of the D.C. CPPA's coverage"); *Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F. Supp. 588, 591 (D.D.C. 1988) (holding that a taxi operator's purchase of gasoline and supplies did not fall within the CPPA's coverage because it was "made in connection with his role as an independent businessman").

---

where a plaintiff was not "in any way deceived" by the alleged misrepresentations); *OCONUS DOD Employee Rotation Action Group*, 140 F. Supp. 2d at 45 (standing requires "a causal connection between the injury and the conduct complained of" (quoting *Lujan*, 504 U.S. at 560-61)). Shaw expected to pay in rubles subject to an exchange rate at the time he made his hotel reservations, including the reservation that forms the centerpiece of this lawsuit. Facts ¶¶ 46-47, 51. But it is the lack of such information, according to Plaintiffs, that caused them injury. Because Shaw found nothing deceptive or misleading about this practice, he continued to reserve rooms at Marriott Russia Hotels, including after the inception of this case. Facts ¶ 52. Moreover, Shaw ordinarily reserved with a third-party travel agent and received no representations from Marriott, which therefore could not have caused Shaw's alleged harm. Facts ¶ 48; *see infra* Section II.B.3.

It is undisputed that Shaw's stays at the Marriott Russia Hotels were paid for by his employer and thus were for business purposes rather than "primarily for personal, household, or family use," D.C. Code § 28-3901(a)(2). *See* Facts ¶ 53. Thus, Shaw's claims do not pertain to a "trade practice" outlawed by the D.C. CPPA or enforceable by a private litigant. *See* D.C. Code §§ 28-3901(a)(6), 28-3904, 28-3904(k)(1). Accordingly, Marriott is entitled to summary judgment against Shaw for his D.C. CPPA claims. *See also* Marriott's Memorandum and Reply Memorandum in Support of Marriott's Motion for Partial Dismissal of Plaintiffs' Second Amended Complaint ("Marriott's Partial Dismissal Briefing").

### 3.    Shaw Lacks Standing To Bring Claims Under The D.C. CPPA Because His Claims Are Unconnected To The District.

Shaw resides in the United Kingdom, where he has lived for the entire time at issue in this case. Facts ¶ 44. The only connection between his claims and the District of Columbia is this lawsuit. He thus lacks standing to pursue claims under the D.C. CPPA, for at least three additional reasons: (1) the D.C. CPPA does not apply to his claims; (2) other jurisdictions have a more significant relationship to Shaw's claims; and (3) Shaw's claims do not have the constitutionally required nexus to the District.

### a.    The D.C. CPPA Does Not Apply To Shaw's Claims.

Because Shaw's claims against Marriott have no connection to the District of Columbia, the D.C. CPPA does not apply to his claims. As the D.C. Court of Appeals has recognized in a case involving the D.C. CPPA and related regulations, where "District of Columbia law does not apply to the circumstances presented, there is no choice of law to be made" and judgment should be entered for the defendant. *Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018, 1024 (D.C. 2007). In other words, before proceeding to a choice-of-law analysis, the Court must determine, as a statutory matter, whether the D.C. CPPA can apply to Shaw's claims.

19

"The CPPA was adopted by the D.C. Council to protect local consumers from improper and fraudulent trade practices." *Williams*, 297 F. Supp. 2d at 174; *see, e.g.*, D.C. Code § 28-3901(b)(2) (citing the need for "fair business practices throughout the community"). Although the D.C. CPPA is directed at local practices, this Court's motion to dismiss ruling recognized that the D.C. CPPA has been held to apply extraterritorially in certain circumstances, where a direct and substantial nexus to the District exists. *Shaw v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 141, 149-50 (D.D.C. 2007).

The undisputed evidence indicates that Shaw's claims do not fit within those circumstances for at least two reasons. First, Shaw is a resident of the United Kingdom and he has no relationship to the District other than this lawsuit. Facts ¶ 44. This case is thus unlike *Williams v. First Government Mortgage & Investors Corp.*, 176 F.3d 497 (D.C. Cir. 1999), in which the D.C. Circuit held the D.C. CPPA applicable to an out-of-state business because of harm to a D.C. consumer. *See id.* at 499 ("[T]he District of Columbia likewise has an interest in protecting its citizens from predatory loan practices, and the transaction also had significant contacts with the District."); *Shaw*, 474 F. Supp. 2d at 150. Second, the undisputed evidence adduced during discovery demonstrates that Marriott is neither incorporated nor headquartered in the District of Columbia; nor is the District its principal place of business or the location of any corporate office. Facts ¶¶ 3-6, 8. Indeed, Shaw has admitted that Marriott is headquartered in Maryland, not Washington D.C. Facts ¶ 3. Accordingly, *Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168 (D.C. 2006), does not support application of the D.C. CPPA here, because in *Washkoviak*, even though the plaintiffs were not D.C. residents, the defendant was a D.C. corporation and the District has a "strong interest in ensuring that its corporate citizens refrain from fraudulent activities." *Id.* at 180-82; *see Shaw*, 474 F. Supp. 2d at 150

(noting that in *Washkoviak*, "the deceptive and unfair policies and practices at issue . . . were formulated and conceived by Sallie Mae in the District of Columbia, were directed by Sallie [Mae] from the District of Columbia, and emanated from Sallie Mae in the District of Columbia" (quoting *Washkoviak*, 900 A.2d at 175)).

Shaw has resided in the United Kingdom for the entire time period at issue. Facts ¶ 44. It is undisputed that Marriott is incorporated in Delaware and that its headquarters and principal place of business are located at 10400 Fernwood Road, Bethesda, Maryland. Facts ¶ 3. Marriott has no corporate offices in the District of Columbia. Facts ¶ 6. None of Marriott's servers or call centers are located in the District. Facts ¶¶ 7, 27. All of Shaw's hotel stays at issue were in Russia. Facts ¶¶ 9-10, 47-53. None of the activities underlying Shaw's claims have taken place in the District or have any connection at all with the District. Accordingly, the D.C. CPPA does not apply to Shaw's claims.

> **b.    The District Does Not Have The "Most Significant Relationship" To Shaw's Claims.**

Even assuming that the D.C. CPPA could apply to Shaw's claims, choice of law principles dictate that the District's law does not apply. As this Court has recognized, "[i]n a diversity case such as this, 'the law of the forum state supplies the applicable choice-of-law standard.'" *Shaw*, 474 F. Supp. 2d at 147 (quoting *Williams*, 176 F.3d at 499). "Under District of Columbia law, courts employ 'a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute.'" *Shaw*, 474 F. Supp. 2d at 147-48 (quoting *Washkoviak*, 900 A.2d at 180).[8] This inquiry entails "determin[ing]

---

[8] The "most significant relationship" test applies because there is a conflict in potentially applicable laws, *see, e.g.*, *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985), as Marriott established in its class certification briefing. *See* Marriott's Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Class Opp.") at 35-38 & Ex. 30.

which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review," guided by the four Restatement factors:  "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship is centered."  *Shaw*, 474 F. Supp. 2d at 148 (quoting *Washkoviak*, 900 A.2d at 180).

Courts must perform "an individualized choice-of-law analysis" for each Plaintiff. *Washkoviak*, 900 A.2d at 176 n.11 (citation omitted).[9]  With respect to Shaw's claims, the potentially applicable laws include those of the District (alleged by Shaw, despite no connection), Maryland (where Shaw has admitted Marriott is headquartered, Facts ¶ 3), Delaware (where Marriott is incorporated, Facts ¶ 2), New York (Shaw's last United States residence, Facts ¶ 44), Florida (where Shaw is domiciled, Facts ¶ 44), the United Kingdom (where Shaw resides and generally made reservations, *id*.), or other jurisdictions that may have a connection to the activities at issue.  As the relevant analysis below demonstrates, the District of Columbia does not have the most significant relationship to Shaw's claims.

Place of Injury.  Shaw's injury (if any) occurred where he "received the alleged misrepresentations."  *Shaw*, 474 F. Supp. 2d at 149 (quoting *Washkoviak*, 900 A.2d at 181).  The undisputed record evidence is that Shaw received no alleged misrepresentations in the District, but generally made reservations in the United Kingdom, where he has lived for the entire time at issue.  Facts ¶¶ 44, 47-48.  This factor does not support applying D.C. law to Shaw's claims.

---

[9] *See, e.g.*, *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 266 (D.D.C. 2006) (recognizing a separate choice of laws analysis for each plaintiff); *Netherland v. Eli Lilly & Co.*, No. 04-cv-654, 2006 U.S. Dist. LEXIS 13027, at *28 (D.D.C. Nov. 13, 2006) (same); *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 24 (D.D.C. 2005) (same); *cf., e.g.*, *Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004) ("under District of Columbia choice of law rules, 'different law may apply to different issues in a lawsuit'" (citation omitted)).

Place of Cause of Injury. The place of the conduct causing the alleged injury is where the alleged misrepresentations or any relevant "pricing practices and policies" came from. *Shaw*, 474 F. Supp. 2d at 149. The undisputed evidence is that Marriott is headquartered in Maryland, not the District of Columbia, and it is incorporated in Delaware. Facts ¶¶ 2-3. The undisputed evidence also shows that no representation or omission alleged by Plaintiffs emanated from the District of Columbia. Facts ¶¶ 2-3, 7, 27. Accordingly, this factor does not support the application of D.C. law to Shaw's claims.

Domicile, Residence, Nationality, Place of Incorporation and Place of Business. Shaw resides in the United Kingdom and has no connection to the District of Columbia other than filing this lawsuit. Facts ¶ 44. Marriott is headquartered in Maryland, where it is physically located and which is its principal place of business. Facts ¶ 3. Marriott is incorporated in Delaware. Facts ¶ 2. Marriott has a historic connection to Washington, D.C. and a Washington, D.C. mailing address, but no corporate offices in the District. Facts ¶¶ 5-6. Thus, this factor does not weigh in favor of applying the District's law to Shaw's claims. If anything, this factor supports applying the law of the United Kingdom, Maryland, or Delaware.

Where Relationship Centered. Shaw's Marriott reservations were made from London over the Internet or through travel agents. Facts ¶¶ 44, 48. As the Court previously observed, the use of the Internet "does not point to one jurisdiction having more interest than another." *Shaw*, 474 F. Supp. 2d at 149. Moreover, discovery has shown that Marriott's servers are primarily located in Maryland and that none are located in the District. Facts ¶ 7. Accordingly, this factor does not weigh in favor of applying D.C. law.

This analysis demonstrates that the D.C. CPPA does not apply to Shaw's claims against Marriott: Neither Shaw nor his claims have any connection to the District of Columbia, and,

unlike at the motion to dismiss stage, the evidence now conclusively establishes as a matter of fact that Marriott is headquartered in Maryland, which is also its physical location, its principal place of business, and the location of its principal computer servers for its reservation website. Marriott's historic connection to the District and D.C. mailing address are simply not enough to give the District the "most significant relationship" to Shaw's claims, particularly in light of the other jurisdictions with more significant connections.

Nor were those factors what led the Court at the motion to dismiss stage to determine that D.C. law could apply. Rather, the Court's ruling hinged on the presence of a D.C. plaintiff – which Shaw is not – and that the District has an interest in "promoting fair business practices by corporate entities headquartered within the city limits," *Shaw*, 474 F. Supp. 2d at 148 – which Marriott is not.[10] The Court noted, however, that "discovery may uncover evidence indicating that another jurisdiction has a greater interest than the District of Columbia in the resolution of this controversy." *Id.* at 150 n.11. As shown above, discovery has uncovered undisputed evidence that other jurisdictions have a greater interest than the District in Shaw's dispute with Marriott. Marriott respectfully submits that Maryland, Delaware, the United Kingdom, New York or Florida all have more significant interests than does the District of Columbia.

### c.   Application Of The D.C. CPPA To Shaw's Claims Would Violate The Constitution.

The inapplicability of the D.C. CPPA and the "most significant relationship" choice of law analysis are dispositive of Shaw's D.C. CPPA claim. However, as Marriott explained in its class certification briefing, it also would be unconstitutional to apply D.C. law to claims, like Shaw's, that lack a "'significant aggregation of contacts'" to "ensure that the choice of [D.C.]

---

[10] Plaintiffs have since removed their sole original D.C. plaintiff and named two replacement D.C. plaintiffs, neither of which have standing. *See infra* Sections II.B, II.C.

law is not arbitrary or unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985)

(quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)).  As with choice of law,

whether a plaintiff's claim may constitutionally proceed under D.C. law must be analyzed

individually.  *Washkoviak*, 900 A.2d at 176 n.11; *see, e.g.*, *Shutts*, 472 U.S at 821-22 (contacts

must be assessed for the claims of "each member of the plaintiff class"); *In re St. Jude Med.,

Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) ("The Supreme Court has held an individualized

choice-of-law analysis must be applied to each plaintiff's claim in a class action.").

    As the Supreme Court has provided, "if a State has only an insignificant contact with the

parties and the occurrence or transaction, application of its law is unconstitutional."  *Allstate*, 449

U.S. at 310-11; *see, e.g.*, *Shutts*, 472 U.S. at 821 (rejecting application of a state's law to "a

transaction with little or no relationship to the forum").  Among other reasons, a state generally

does not "have a legitimate concern" in punishing "unlawful acts committed outside of the

State's jurisdiction."  *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 421-22 (2003) (citing

*Shutts*, in the context of punitive damages).  Indeed, "[a] basic principle of federalism is that

each State may make its own reasoned judgment about what conduct is permitted or proscribed

within its borders, and each State alone can determine what measure of punishment, if any, to

impose on a defendant who acts within its jurisdiction."  *Id.* at 422; *see* Class Opp. at 41-44.

    Here, as explained above, there is no connection between the District of Columbia and

Shaw's dispute with Marriott, other than Plaintiffs' allegation that Marriott is headquartered in

Washington, D.C.  Undisputed facts that have emerged through discovery demonstrate that this

allegation is erroneous:  Marriott is headquartered in Maryland and has no corporate offices in

the District.  Facts ¶¶ 3, 6.  At most, Marriott has a historic connection to the District and a

District mailing address that routes mail directly to Maryland.  Facts ¶¶ 5-6.  In these

circumstances, it would violate due process to apply D.C. law to Shaw's claims against Marriott.

*See State Farm*, 538 U.S. at 421-22; *Allstate*, 449 U.S. at 309-11; Class Opp. at 41-44.[11]

### B.    Plaintiff Mendelson Lacks Standing.

#### 1.    Mendelson Lacks Standing Because She Did Not Pay For Her Hotel Stays And Thus Has Suffered No Injury-In-Fact.

Mendelson also did not suffer the injury-in-fact required for standing because her

employer paid for her hotel stays.  *See supra* Section II.A.1; Facts ¶ 62.  Indeed, Mendelson

admitted in her deposition that she is not seeking damages in this case.  Facts ¶ 62.

Mendelson lacks an injury-in-fact for the additional reason that for many of her stays at

Marriott Russia Hotels, she received the Central Bank rate that Plaintiffs claim should have

applied.  Facts ¶ 61.  Plaintiffs' entire claim is premised on the use of a hotel exchange rate that

allegedly results in a charge in Russian rubles that is "materially higher than the dollar equivalent

at the official exchange rate set by the Central Bank of Russia."  Second Amended Complaint

¶ 4.  When Mendelson received the Central Bank rate, she (or more precisely, her employer,

CSIS) suffered no arguable economic harm or injury-in-fact.

#### 2.    Mendelson Lacks Standing Under The D.C. CPPA Because Her Hotel Stays Were For Business Purposes.

Mendelson also lacks standing to pursue claims under the D.C. CPPA because her stays

at the Marriott Russia Hotels were undisputedly for business purposes.  *See supra* Section II.A.2;

Facts ¶ 62.

---

[11] For these same reasons and those in *infra* Section II.D, Marriott is entitled to summary judgment on Shaw's and Charness's claims for punitive damages.  As the Supreme Court held in *State Farm*, a state does not have a "legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction."  538 U.S. at 421. Thus, just as *Shutts* does not authorize the imposition of D.C. law to Shaw's and Charness's claims because of the lack of any significant contact to the District, *State Farm* bars any imposition of punitive damages under D.C. law based on Shaw's or Charness's claims.

**3.    Mendelson Lacks Standing Because She Stayed Only At Marriott Franchised Hotels Not Owned Or Controlled By Marriott, And Marriott Thus Did Not Cause The Harms She Alleges.**

Because Mendelson's stays at Marriott Russia Hotels were limited to Interstate's Marriott Franchised Hotels, which are not owned or controlled by Marriott, Facts ¶¶ 10-13, Marriott did not cause any of her alleged harm. Mendelson thus lacks standing to bring suit against Marriott.

As noted above, the "irreducible constitutional minimum of standing" requires a showing of "causation." *Miami Bldg. & Constr. Trades Council*, 493 F.3d at 205 (citations omitted); *see, e.g.*, *OCONUS DOD Employee Rotation Action Group*, 140 F. Supp. 2d at 45 (requiring "a causal connection between the injury and the conduct complained of" (quoting *Lujan*, 504 U.S. at 560-61)). To establish causation, a plaintiff must prove that the alleged injury is "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560-61 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)); *see, e.g.*, *Williams*, 297 F. Supp. 2d at 177 (in the D.C. CPPA context, standing requires a showing that a plaintiff was "in any way deceived – or even saw – any of" the alleged misrepresentations).

It is undisputed that Mendelson stayed only at Marriott Franchised Hotels in Russia during the relevant time period. Facts ¶ 58. Those hotels are owned, operated and controlled by Interstate or a subsidiary of Interstate, not Marriott. Facts ¶¶ 10-14, 58. Marriott does not own or control Interstate. Facts ¶ 11. All representations or omissions that Mendelson received in the reservation process came from Interstate or its subsidiaries – either from Interstate's "Marriott Hotels of Moscow," or from the Franchised Hotels themselves. Facts ¶¶ 14, 25, 30, 58-60. The written confirmations that Mendelson received came from Interstate or its subsidiaries, not Marriott. Facts ¶ 14, 25, 30, 58-60. Mendelson never reserved a room via www.marriott.com,

27

Marriott's toll-free number, or any other reservation channel that involved interacting with Marriott personnel or receiving representations directly from Marriott. Facts ¶ 58. Accordingly, Mendelson's alleged harm is not traceable to Marriott. Because Mendelson's claims pertain to the "independent action of some third party not before the court" – namely, Interstate or its subsidiaries – she has no standing to make a claim against Marriott. *Lujan*, 504 U.S. at 560-61.

In addition, Mendelson cannot establish causation because since the beginning of the time period at issue in this lawsuit, if not earlier, Mendelson had both actual and constructive notice that a hotel exchange rate would be applied to the price quoted in U.S. dollars – precisely the notice that Plaintiffs claim was required. Facts ¶ 59. Indeed, as early as 2002, Mendelson received written confirmations from Interstate or its subsidiaries expressly informing her that "[t]he above rate is quoted in units equal to US Dollars . . . Payment must be made at the hotel's current exchange rate in rubles only." *Id.* Moreover, Mendelson interacted with Interstate about the exchange rate to be applied at check-out. Facts ¶¶ 58-61. Because the undisputed evidence establishes that Mendelson, like Shaw, *see supra* n.7, was not deceived or misled by any representations related to Marriott Russia Hotels, there is no "causal connection between the injury and the conduct complained of," and Mendelson lacks standing to sue. *OCONUS DOD Employee Rotation Action Group*, 140 F. Supp. 2d at 45 (quoting *Lujan*, 504 U.S. at 560-61)); *Williams*, 297 F. Supp. 2d at 177 (rejecting a D.C. CPPA claim where a plaintiff was not "in any way deceived").

## C.    Plaintiff CSIS Lacks Standing.

### 1.    CSIS Lacks Standing Under The D.C. CPPA Because It Is Not A "Consumer" Under The Act.

It is undisputed that CSIS is a corporation. Facts ¶ 65. As this Court has held previously, it is therefore not a "consumer" subject to the protections of the D.C. CPPA. *See, e.g.*, *Clifton*

*Terrace Assoc., Ltd. v. United Techs. Corp.*, 728 F. Supp. 24, 34 (D.D.C. 1990), *vacated in part on other grounds*, 929 F.2d 714 (D.C. Cir. 1991).

The CPPA defines the noun "consumer" to mean "a person who does or would purchase, lease (from), or receive *consumer goods or services*" or "a person who does or would provide the economic demand for a trade practice." D.C. Code § 28-3901(a)(2) (emphasis added). As an adjective, "consumer" "describes anything, without exception, which is *primarily for personal, household, or family use*." *Id.* (emphasis added).

In light of these definitions, this Court has held repeatedly that corporations have no standing to bring D.C. CPPA claims:

> This Court has held that the legislative history of the CPPA, along with a consistent reading of its provisions, unequivocally indicates that ***the CPPA was intended to protect consumer-plaintiffs only, and not corporations***. *Independent Communications Network, Inc. v. MCI Telecommunications Corp.*, 657 F. Supp. 785, 787 (D.D.C. 1987) (Gasch, J.); *see also Howard v. Riggs National Bank*, 432 A.2d 701, 709 (D.C. 1981) (CPPA designed to police trade practices arising only out of consumer-merchant relationships).

*Clifton Terrace*, 728 F. Supp. at 34 (emphasis added). As the Court held in dismissing the claim in *Clifton Terrace*, "[s]ince plaintiff is not a consumer within the meaning of the CPPA, its claims thereunder are properly dismissed." *Id.*; *accord, e.g.*, *Indep. Commc'ns Network*, 657 F. Supp. at 788 (holding that because "ICN describes itself as a corporation engaged 'in the interstate sale of long distance telephone services,'" it "is not a 'consumer,'" and thus is "not entitled to a cause of action under the provisions of the Consumer Protection Procedures Act").

CSIS also does not satisfy the statutory definition of a "consumer" as a "person who does or would provide the economic demand for a trade practice." D.C. Code § 28-3901(a)(2). As explained with respect to Marriott's separate "business purposes" argument, *see supra* Section II.A.2., the "trade practices" outlawed by the D.C. CPPA are only those that pertain to

"consumer goods or services," *id.* § 28-3901(a)(6), which are goods and services "primarily for personal, household, or family use," *id.* § 28-3901(a)(2). CSIS does not provide the economic demand for a trade practice because it does not solicit or purchase goods or services for personal, household or family use: CSIS's economic demand arises out of its role as a corporation and its need to attend to corporate business in Russia, Facts ¶¶ 65-66. *See also* Marriott's Partial Dismissal Briefing.

       **2.    CSIS Lacks Standing Under The D.C. CPPA Because Its Employees' Hotel Stays Were For Business Purposes.**

CSIS also lacks standing to pursue claims under the D.C. CPPA because its employees' stays at the Marriott Russia Hotels were undisputedly for business purposes. *See supra* Section II.A.2; Facts ¶¶ 65-66; *see also* Marriott's Partial Dismissal Briefing.[12]

    **D.    Plaintiff Charness Lacks Standing To Bring Claims Under The D.C. CPPA Because His Claims Are Unconnected To The District.**

Like Shaw, Charness has no connection to the District of Columbia other than this lawsuit. He is a resident of Michigan. Facts ¶ 71. He made his reservations to stay at Marriott Russia Hotels from Michigan, via the Internet and the Marriott 1-800-number, Facts ¶¶ 71-72, neither of which are serviced in the District of Columbia, Facts ¶¶ 7, 27. As noted earlier, Marriott is incorporated in Delaware and is headquartered in Maryland, which is its principal

---

[12] In addition, CSIS lacks standing because it suffered no injury-in-fact arguably caused by Marriott. CSIS commonly received the Central Bank exchange rate that Plaintiffs claim should have applied for its employees' stays at Marriott Russia Hotels. Facts ¶ 68. CSIS lacks any injury-in-fact, and thus any standing to bring suit, with respect to those stays. *See supra* Section II.B.1. Further, many of CSIS employees' stays were at Marriott Franchised Hotels. Facts ¶ 69. As explained above, Marriott is not responsible for representations or omissions related to those hotels, which are owned, operated and controlled by Interstate. Facts ¶¶ 11-14, 25, 30. CSIS cannot establish causation, and thus standing, for these stays. *See supra* Section II.B.3. CSIS and its employees also were not deceived or misled by the use of a hotel exchange rate, which was described to CSIS employees both in written confirmations and in discussions with Interstate representatives. Facts ¶¶ 59-60, 69. Accordingly, CSIS lacks standing because it has failed to establish causation. *See supra* Section II.B.3.

place of business.  Facts ¶¶ 2-3.  Charness has admitted that Marriott is headquartered in

Maryland, not the District.  Facts ¶ 3.  Accordingly, for the reasons discussed above with respect

to Shaw, Charness lacks standing because:  (1)  the D.C. CPPA does not apply to his claims; (2)

the District does not have the "most significant relationship" to his claims; and (3) application of

the D.C. CPPA to Charness' claims would violate the Constitution.  *See supra* Section II.A.3.

> **E.    All Plaintiffs Lack Standing To Pursue Claims Under D.C. Code Sections 28-3904(a) And (t) Related To Marriott's Headquarters.**

In addition to Plaintiffs' D.C. CPPA claims concerning the use of hotel exchange rates,

Plaintiffs also claim under D.C. Code Sections 28-3904(a) and (t) that Marriott has violated the

D.C. CPPA by representing that it is headquartered in Washington, D.C. when it is, as a matter

of fact, headquartered in Maryland.  *See* Second Amended Complaint ¶ 78.  Significantly, the

premise of Plaintiffs' claim is that discovery has confirmed that Marriott is not headquartered in

Washington, D.C., but is, in fact, headquartered in Maryland.  *See id.* ¶ 84; Facts ¶ 3 (citing

Plaintiff Shaw and Charness's admissions that Marriott is headquartered in Maryland).  As

explained above, this now undisputed fact precludes application of the D.C. CPPA to Plaintiffs

Shaw and Charness.  *See supra* Sections II.A.3, II.D.  Additionally, for all of the other reasons

just discussed, Plaintiffs lack standing to pursue these headquarters misrepresentation claims.

Plaintiffs also lack standing with respect to their headquarters claims for the additional

reason that not one of the Plaintiffs received any representations concerning the location of

Marriott's headquarters when reserving rooms at Marriott Russia Hotels.  Facts ¶¶ 8, 70.  Nor

was their decision to stay at a Marriott hotel affected by the location of Marriott's headquarters

or any representations made by Marriott concerning its headquarters.  Facts ¶¶ 8, 70.  Thus, any

alleged injury could not have been caused by Marriott or representations about its headquarters.

*See, e.g.*, *Williams*, 297 F. Supp. 2d at 177; *OCONUS DOD Employee Rotation Action Group*,

140 F. Supp. 2d at 45 (standing requires "a causal connection between the injury and the conduct complained of" (quoting *Lujan*, 504 U.S. at 560-61)); *Bykov*, 2007 U.S. App. LEXIS 3276, at *4 (affirming summary judgment against plaintiff for lack of causation, where neither the plaintiff nor his assistant reviewed the information at issue prior to reserving hotel rooms).

## III.    MARRIOTT IS ENTITLED TO SUMMARY JUDGMENT UNDER THE SEVENTH CIRCUIT'S REASONING IN *SHAW V. HYATT*.

For the same reasons that the Seventh Circuit affirmed entry of summary judgment for Hyatt on materially identical claims brought by Plaintiff Shaw, the Court should grant summary judgment for Marriott.

### A.    The *Shaw v. Hyatt* Litigation.

In 2005, shortly after filing this suit against Marriott, Plaintiff Shaw also filed suit against Hyatt based on a hotel stay at a Russian Hyatt hotel prior to the time he made the Marriott reservation that is at the center of his claims in this suit.  *Shaw*, 2005 U.S. Dist. LEXIS 28250, at *2.  Shaw's suit against Hyatt pertained to a reservation at the Ararat Park Hyatt Moscow, which Shaw made using Hyatt's website "from his residence in London, England."  *Shaw*, 461 F.3d at 899.  The Hyatt website quoted Shaw's room price in U.S. dollars.  *Id.* at 899.

At check-out, Shaw was billed in Russian rubles and he paid with a credit card.  *Id.* at 900.  As in this case, *see* Facts ¶¶ 50-51, "Shaw's hotel bill reflected a hotel exchange rate of 32 Russian rubles per United States dollar, whereas the official exchange rate set by the Central Bank of Russia on the date of check-out was 28.01 Russian rubles per dollar."  *Shaw*, 461 F.3d at 900.  This resulted in a higher payment in U.S. dollars at check-out than the price quoted when Shaw made his reservation.  *Id.*  Based on these facts, Shaw brought a putative worldwide class action under Illinois's consumer protection statute and also alleging unjust enrichment.  *Id.*

The Seventh Circuit affirmed dismissal of Shaw's claims. *Shaw*, 461 F.3d at 902. With respect to the Illinois consumer protection act, the Seventh Circuit determined that it did not need to reach the question of the extraterritorial application of the Illinois statute – a question that the District Court had resolved against Shaw. *Id.* at 900-01.[13] Rather, the Seventh Circuit held that Shaw could not maintain his consumer protection act claim because it was actually an attempt "to enforce contractual promises," but "'[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act.'" *Id.* at 901 (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005)). As the Seventh Circuit explained, Shaw's consumer protection act claim failed because it "relies exclusively on the express promises made by the Hyatt website, which he accepted by booking on its site," and thus should have been brought as a breach of contract claim. *Shaw*, 461 F.3d at 902. The same was true for Shaw's unjust enrichment claim. *Id.* ("[S]haw fails to present a claim for unjust enrichment, because that is unavailable where the claim rests on the breach of an express contract.").

---

[13] Illinois courts allow non-resident plaintiffs to bring suit under Illinois's consumer protection statute only if the transactions at issue occurred "primarily and substantially" within Illinois. *Shaw*, 461 F.3d at 900 (citation omitted). This standard supersedes the overruled Illinois precedent that Plaintiffs previously cited to the Court in this case as a basis for broadly applying the D.C. CPPA to extraterritorial transactions. *See* Plaintiffs' Opp. to Mot. to Dismiss at 22 & n.77 (filed Aug. 3, 2005). According to the Seventh Circuit, "there would appear to be little connection between the legislature's desire to protect against frauds perpetrated in Illinois and a reservation made on the internet from London for a hotel room in Moscow." *Shaw*, 461 F.3d at 900. However, the Seventh Circuit went on to note that certain factors might alter that analysis – such as that Hyatt's headquarters and principal place of business were in Illinois; that Hyatt's website was operated out of Illinois; and that Hyatt's website "provided that Illinois law governs all disputes arising out of its website" and "that exclusive jurisdiction for any claim or action arising out of the website shall be in Illinois." *Id.* at 901. Notably, the factors that the Seventh Circuit viewed as potentially supporting extraterritorial application of the Illinois consumer protection statute do not exist as a matter of fact in Shaw's suit against Marriott.

**B.    As In *Shaw v. Hyatt*, Plaintiffs' Claims Fail Because A Contract Governs.**

As in *Shaw v. Hyatt*, Plaintiffs' claims pertain to an alleged breach of contract and thus fail as consumer protection act and unjust enrichment claims.  With respect to Plaintiffs' unjust enrichment claims, it is firmly established that "'there can be no claim for unjust enrichment when an express contract exists between the parties.'"  *Albrecht v. Comm. on Employee Benefits*, 357 F.3d 62, 69 (D.C. Cir. 2004) (quoting *Schiff v. AARP*, 697 A.2d 1193, 1194 (D.C. 1997)); *see, e.g.*, *Albrecht*, 357 F.3d at 69 ("'Unjust enrichment . . . rests on a contract implied in law, that is, on the principle of quasi-contract.  This . . . form of recovery is possible in the absence of any contract, actual or implied in fact.'" (quoting *United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240, 247 (D.C. Cir. 1996))).  Plaintiffs' claims, like Shaw's claims against Hyatt, present classic allegations of breach of contract:  Plaintiffs allege that, at check-out, they were not charged the room price they contracted for when making a reservation and receiving a confirmation.  *E.g.*, Second Amended Complaint ¶¶ 43, 46.  Thus, Marriott is entitled to summary judgment on all Plaintiffs' unjust enrichment claims.  *See Shaw*, 461 F.3d at 902 ("[S]haw fails to present a claim for unjust enrichment, because that is unavailable where the claim rests on the breach of an express contract."); *Bykov*, 2006 U.S. Dist. LEXIS 12279, at *20.

The same reasoning applies to Plaintiffs' consumer protection act claims, as the Seventh Circuit recognized in *Shaw*:  "Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action."  461 F.3d at 901 (quoting *Avery*, 835 N.E.2d at 844).  However, "a 'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it."  *Id.*  Otherwise, the concept of

"misrepresentation" would be drained of meaning, as "[t]hat type of 'misrepresentation' occurs every time a defendant breaches a contract." *Id.*

Thus, as the Seventh Circuit recognized, a plaintiff may not base a consumer protection act claim solely on an alleged breach of contract. This is so, despite that the Illinois consumer protection statute contemplates actions that relate to contracts in some circumstances. *See, e.g.*, 815 ILCS 505/1(e) (defining "consumer" to include "any person who purchases *or contracts* for" the purchase of certain merchandise (emphasis added)). Similarly, even though the D.C. CPPA contemplates actions related to contracts in some circumstances, such as alleged unconscionability, *see, e.g.*, D.C. Code § 28-3904(r), the D.C. CPPA does not apply to standard breach of contract claims. Under the Seventh Circuit's reasoning in *Shaw v. Hyatt*, Marriott is entitled to summary judgment against Shaw and the other Plaintiffs here.

## IV.    MARRIOTT IS ENTITLED TO SUMMARY JUDGMENT UNDER THE EIGHTH CIRCUIT'S REASONING IN *BYKOV V. RADISSON*.

For the same reasons that the Eighth Circuit affirmed entry of summary judgment for Radisson on materially identical claims brought by Plaintiffs' counsel, the Court should grant summary judgment for Marriott.

### A.    The *Bykov* Litigation.

In 2005, Ilya Bykov's assistant made a reservation for him at the Radisson Slavyanskaya hotel in Moscow using the Radisson website. *Bykov*, 2007 U.S. App. LEXIS 3276, at *2. The website quoted prices in U.S. dollars and stated that the hotel "required charges to be paid in Russian rubles and that the room rate quoted in dollars would therefore be converted to rubles at the time of payment using the hotel's internal exchange rate." *Id.* Neither Bykov nor his assistant reviewed any information other than the quoted rate in U.S. dollars before reserving. *Id.* at *2-3. Bykov never visited the Radisson website prior to his stay in 2005. *Id.*

35

At check-out in Moscow, Bykov was billed in a number of currency units that "matched the dollar amount he had earlier been quoted." *Id.* at *3. The bill also reflected a total amount in rubles that "had been calculated using the hotel's internal exchange rate of 32 rubles to one dollar." *Id.* Subsequently, Bykov received a credit card statement that accurately reflected the check-out price in rubles, but which translated into a higher dollar amount than his initial price quote because the credit card company "converted this ruble amount to dollars using the official exchange rate (approximately 27 rubles to one dollar at the time)." *Id.*

The Eighth Circuit affirmed the District Court's grant of summary judgment to Radisson on Bykov's Minnesota consumer protection act and unjust enrichment claims "for the reasons set forth by the district court." *Id.* at *5. With respect to the Minnesota consumer protection act claims, the Eighth Circuit affirmed because:

> Bykov had failed to establish a causal connection between the defendants' alleged misrepresentations and his alleged injury because 1) Bykov had never examined the Radisson website or the other information regarding the Slavyanskaya's pricing practice prior to staying at the hotel and 2) [Bykov's assistant] did not remember reviewing the other information regarding the hotel's pricing practice, and stated that she would not have paid attention to it even if she had seen it.

*Id.* at *4. In addition, as the District Court had held, Bykov failed to establish an injury-in-fact: "Because Bykov's company suffered the injury claimed rather than Bykov himself, Bykov's statutory claims must fail." 2006 U.S. Dist. LEXIS 12279, at *21 n.7.

With respect to unjust enrichment, the Eighth Circuit affirmed because Bykov "lacked standing because Bykov's company, and not Bykov, paid the hotel bill and suffered the alleged injury." 2007 U.S. App. LEXIS 3276, at *4-5. Additionally, the Eighth Circuit affirmed the District Court's conclusion that Bykov had "not established any of the requisite premises" for an unjust enrichment claim." *Id.* Among other things, Bykov's claim was "governed by an express contract between the parties." *Bykov*, 2006 U.S. Dist. LEXIS 12279, at *20.

36

Because the District Court rejected Bykov's claims on summary judgment, it denied his motion for class certification as moot. *Id.* at \*21. The Eighth Circuit did not disturb that ruling.

**B.    As In *Bykov*, Most Plaintiffs' D.C. CPPA Claims Fail For Lack Of Injury And Causation.**

Just as Bykov's Minnesota consumer protection act claims failed for lack of injury and causation, so do nearly all Plaintiffs' claims fail under the D.C. CPPA. As *Bykov* recognized, to bring consumer protection act claims, a plaintiff must establish the prerequisites of standing – including injury and causation. *Compare, e.g.*, *Bykov*, 2006 U.S. Dist. LEXIS 12279, at \*14-15 (noting that injury and causation are required to bring a private suit, despite that reliance is not a statutory element), *with, e.g.*, *Williams*, 297 F. Supp. 2d at 177 ("The amendment to the CPPA in 2000 did not change the requirements for standing under D.C. law, despite its broad language."). These standing requirements exist regardless of the apparent statutory breadth of the consumer protection acts. *Compare, e.g.*, Minn. Stat. § 325F.69, subd. 1 (providing for unlawful practices "whether or not any person has in fact been misled, deceived, or damaged thereby"), *with, e.g.*, D.C. Code § 28-3904 (setting forth unlawful trade practices "whether or not any consumer is in fact misled, deceived or damaged thereby").

Like most of the Plaintiffs in this case, Bykov failed to satisfy both the injury and causation requirements for bringing a consumer protection act claim and thus lacked standing to sue. With respect to injury-in-fact, "Bykov's statutory claims must fail" because his "company suffered the injury claimed rather than Bykov himself." *Bykov*, 2006 U.S. Dist. LEXIS 12279, at \*21 n.7. The same is true of Plaintiffs Mendelson and Shaw in this lawsuit. *See supra* Sections II.A.1, II.B.1. With respect to causation, Bykov's consumer protection act claims failed because he did not "establish a causal connection between the defendants' alleged misrepresentations and

his alleged injury." *Bykov*, 2007 U.S. App. LEXIS 3276, at *4. The same is true of Plaintiffs

Shaw, Mendelson and CSIS here. *See supra* nn.7, 11; *supra* Section II.B.3.

### C.    As In *Bykov*, Plaintiffs' Unjust Enrichment Claims Fail Because Express Contracts Govern And For Lack Of Standing.

Plaintiffs' unjust enrichment claims also should be rejected as in *Bykov* (and *Shaw v.*

*Hyatt*). First, Plaintiffs' unjust enrichment claims fail because, like Bykov's, they are "governed

by an express contract between the parties." *Bykov*, 2006 U.S. Dist. LEXIS 12279, at *20.

Accordingly, Plaintiffs, like Bykov, have not "established any of the requisite premises" for

unjust enrichment. *Bykov*, 2007 U.S. App. LEXIS 3276, at *4-5. *See supra* Section III.B.

Second, as *Bykov* recognized, the standing requirements of injury and causation also

pertain to a claim of unjust enrichment. *See Bykov*, 2007 U.S App. LEXIS 3276, at *4-5; *Bykov*,

2006 U.S. Dist. LEXIS 12279, at *20-21 & n.7. Thus, for the reasons discussed above, Plaintiffs

Shaw, Mendelson and CSIS lack standing to pursue their unjust enrichment claim against

Marriott. *See supra* nn.7, 11; *supra* Sections II.A.1, II.B.1, II.B.3.[14]

---

[14] Marriott also is entitled to summary judgment against Plaintiffs' unjust enrichment claim under the voluntary payment doctrine. As the Court previously recognized, the voluntary payment doctrine "bars a claim for restitution by a plaintiff 'who volunteer[ed] payment under a claim of right with full knowledge of all relevant facts.'" *Shaw*, 494 F. Supp. 2d at 150-51 (quoting *Avianca, Inc. v. Corriea*, No. 85-3277, 1992 U.S. Dist. LEXIS 4709, at *20 (D.D.C. Apr. 13, 1992)). Because all Plaintiffs settled their hotel bills "with full knowledge of all relevant facts," *id.*, the voluntary payment doctrine bars their claims. Shaw reserved with knowledge of the exchange rate and in anticipation of filing this lawsuit, Facts ¶¶ 47-51; CSIS and Mendelson were aware of the hotel exchange rates and their written confirmations referenced the use of such rates, Facts ¶¶ 59-60, 67, 69; and all Plaintiffs received the information they claim was required once at the Russian hotels – including through signage and on their bills, Facts ¶¶ 18, 33, 49-50, 59-60, 69, 73-76. Moreover, no Plaintiff disputed the bill at the time of payment or any time prior to filing this lawsuit. *E.g.*, Facts ¶¶ 63-64. All tendered full payment. Finally, there is no evidence that Plaintiffs' payments were made under duress, coercion or involuntarily. *Cf. Shaw*, 474 F. Supp. 2d at 151. No Plaintiff felt threatened to dispute the charge or to refuse to pay in excess of the quoted dollar amount.

**V.      PLAINTIFFS' CLAIMS UNDER THE D.C. CPPA FAIL AS A MATTER OF LAW.**

**A.      Summary Judgment Should Be Entered For Marriott On Plaintiffs' Hotel Exchange Rate Claims Postdating Marriott's 2005 Provision To Prospective Guests Of The Information Plaintiffs Claim Was Improperly Omitted.**

As a matter of undisputed fact, as of mid-2005, Marriott provided all prospective guests using reservation channels controlled by Marriott with exactly the information that Plaintiffs' lawsuit claims was lacking:  that the price quote in U.S. dollars was subject to payment in rubles at the hotel's exchange rate.  Facts ¶¶ 34-39.  Accordingly, Marriott is entitled to summary judgment as a matter of law for all claims postdating Marriott's provision of this information for reservation channels operated and controlled by Marriott.

With respect to their exchange rate claims, Plaintiffs allege that the quotation of a room rate in U.S. dollars – in light of the hotels' use of a hotel exchange rate greater than the Central Bank rate to convert the amounts into rubles at check-out – is deceptive and misleading, in violation of three provisions of the D.C. CPPA.  *See, e.g.*, Second Amended Complaint ¶¶ 77, 79-83, 85; D.C. Code § 28-3904(e) ("misrepresent as to a material fact which has a tendency to mislead"); *id.* § 28-3904(f) ("fail to state a material fact if such failure tends to mislead"); *id.* § 28-3904(h) ("advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered").  Under these provisions, there can be no liability unless the representations or omissions at issue have a tendency to deceive.  *See, e.g.*, *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997) (dismissing a claim under these provisions of the D.C. CPPA because "to state a claim based upon an unfair trade practice, the plaintiff must allege that the defendant made a material misrepresentation or omission that has a tendency to mislead," whereas the "billing practices could not mislead a reasonable customer").

It is undisputed that as of August 2005 at the latest, Marriott provided the precise information that Plaintiffs contend was required through all reservation channels controlled by Marriott. Facts ¶¶ 34-39. Specifically, as of August 2005: (1) the hotel personnel taking reservations at the Marriott Managed Hotels began orally advising prospective guests who directly contacted the hotels that the quoted price was in currency units subject to the hotel's exchange rate at check-out, Facts ¶ 34; (2) Marriott inserted language into MARSHA stating that prices quoted in U.S. dollars must be paid at check-out in rubles at the hotel's exchange rate, Facts ¶ 35; (3) the Marriott toll-free reservation agents informed prospective guests that the rate being quoted was in currency units equal to U.S. dollars but that payment must be made in rubles at the hotel's current exchange rate, Facts ¶ 38; and (4) prospective guests reserving via www.marriott.com were informed twice in the reservation process that although prices were quoted in U.S. Dollars, the "[c]harges are payable in local currency at the applicable hotel exchange rate at checkout," Facts ¶ 39.[15] Thus, should the Court find that any of the Plaintiffs have standing, Plaintiffs' D.C. CPPA claims fail on the merits and summary judgment should be entered for Marriott for any hotel reservations and stays postdating Marriott's 2005 provision of information Plaintiffs contend was required.[16]

---

[15] As of May 2005, www.marriott.com users who received email confirmations already were provided with this same information. Facts ¶ 36.

[16] Under the plain terms of their Complaint, Plaintiffs have no claim based on any hotel stays for which prices were quoted in Russian rubles, rather than U.S. dollars – a practice followed by nearly all Marriott Russia Hotels from December 2006 forward. Facts ¶ 16. To the extent Plaintiffs seek relief for any such stays, summary judgment should be granted to Marriott.

In addition, as noted above, the Marriott Franchised Hotels and Marriott Hotels of Moscow, both owned and operated by Interstate, provided the information that Plaintiffs contend was required as early as 2002. *See supra* n.12; *supra* Section II.B.3. Although Marriott neither owns nor controls Interstate and therefore should receive summary judgment on all of Plaintiffs' claims related to the Marriott Franchised Hotels, summary judgment is further warranted for these claims because, with respect to reservations and stays at the Marriott Franchised Hotels, Interstate provided precisely the information that Plaintiffs claim was lacking. *See id.*

**B.      No Plaintiff May Recover Statutory Damages For More Than One Stay.**

For the reasons just discussed, Marriott should be granted summary judgment on all

exchange rate claims related to reservations made through Marriott-controlled channels after

August 2005 (and after May 2005 for www.marriott.com users who provided an email address).

*See supra* Section V.A.  In addition (or in the alternative), Plaintiffs may not recover statutory

damages under the D.C. CPPA for more than one guest stay per Plaintiff.

As Plaintiffs' own witness has testified, approximately 28.4% of guest stays potentially at

issue in this lawsuit are repeat guest stays.  Facts ¶ 40.[17]  It is an undisputed fact that Plaintiffs,

like all class members, received complete information about the hotel exchange rate at the time

of check-out.  *See supra* n.14; Facts ¶¶ 18, 33, 49-50, 59-60, 69, 73-75.  This information was

confirmed by all Plaintiffs' and class members' subsequent receipt of their credit card statements

reflecting the result of the exchange transactions.  *See* Second Amended Complaint ¶ 4.  It is thus

an undisputed fact that, at the latest, all Plaintiffs were aware of the use of hotel exchange rates at

Marriott Russia Hotels after their first hotel stay.  *E.g.*, Facts ¶ 74.[18]  Accordingly, as a matter of

both standing and the expectations of a reasonable consumer under the D.C. CPPA, no individual

may recover statutory damages for any guest stay beyond the first.

**C.      Summary Judgment Should Be Entered For Marriott On Plaintiffs' D.C.
          CPPA Claims Concerning Marriott's Headquarters.**

Marriott is entitled to judgment as a matter of law on Plaintiffs' D.C. CPPA claims

related to Marriott's headquarters.  According to Plaintiffs, Marriott has deceived them by

claiming to be headquartered in Washington, D.C. when Marriott is, in fact, headquartered in

---

[17] This witness also testified that the $1500 statutory damages, *see* D.C. Code § 28-3905(k)(1),
exceeds any alleged actual damages for approximately 99.7% of the proposed class.  Facts ¶ 41.
[18] That all Plaintiffs made subsequent reservations and stays with the same hospitality company
that allegedly deceived them strongly suggests that these guests did not view themselves as
deceived in the first instance.

Maryland.  *See* Second Amended Complaint ¶ 84.  Plaintiffs cite two D.C. CPPA provisions as the basis for this claim.  *See id.* ¶ 78; D.C. Code § 28-3904(a) ("represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have"); *id.* § 28-3904(t) ("use deceptive representations or designations of geographic origin in connection with goods or services").

As explained above, for several reasons, no Plaintiff has standing to pursue these claims against Marriott.  *See supra* Sections II.A-E.  Specifically with respect to Plaintiffs' headquarters misrepresentation claim, all Plaintiffs lack standing because no Plaintiff received any representations concerning the location of Marriott's headquarters when reserving rooms at the Marriott Russia Hotels, and because no Plaintiff's decision to stay at a Marriott hotel was affected by the location of Marriott's headquarters.  Thus, any alleged injury could not have been caused by Marriott or its representations.  *See supra* Section II.E.  In fact, one CSIS representative was aware that Marriott was headquartered in Maryland.  Facts ¶ 8.

Plaintiffs' headquarters misrepresentation claims also fail as a matter of law.  To begin with, Marriott's representations about its headquarters are immaterial to a reasonable consumer and thus not actionable under the D.C. CPPA.  Moreover, as Marriott has briefed previously, Plaintiffs' claims about Marriott's headquarters do not fit within the statutory language of the provisions they cite.  *See* Marriott's Partial Dismissal Briefing.

With respect to D.C. Code Section 28-3904(a), the "services" received by Plaintiffs were accommodations at Marriott hotels in Russia.  Facts ¶¶ 9-10.  Therefore:

- the "source" of the services Plaintiffs received could plausibly refer either to the geographic location of the services (Russia, where the hotel rooms and services are located), or to the identity of the service provider (Marriott), but not the corporate headquarters of the service provider;

- the "sponsorship," "approval," or "certification" of the services, if any, is by Marriott, and there is no allegation that Marriott has misrepresented the services

as having been "sponsor[ed]," "approv[ed]," or "certifi[ed]" by another company; and

- the "accessories, characteristics, ingredients, uses, benefits, or quantities" of the services plainly refer to the qualitative and quantitative aspects of the services provided by Marriott's hotels in Russia, not to the location of its headquarters, and there is no allegation of any misrepresentation concerning any of these factors.

With respect to D.C. Code Section 28-3904(t), the "geographic origin" of the Marriott hotel rooms and the services provided in connection with those rooms is plainly Russia, Facts ¶¶ 9-10, not Maryland or Washington, D.C. Thus, because Marriott's alleged misrepresentations about its headquarters are not covered under the plain terms of D.C. Code Sections 28-3904(a) and (t), Marriott is entitled to summary judgment on Plaintiffs' claims under those provisions.

Notably, no court has recognized the claim made by Plaintiffs here, as the D.C. CPPA, like the Lanham Act and other state consumer protection statutes, does not cover misrepresentations concerning a business's corporate headquarters. For example, like D.C. Code Sections 28-3904(a) and (t), Section 43(a) of the Lanham Act prohibits false designations of "origin, sponsorship, or approval." 15 U.S.C. § 1125(a)(1)(A). However, "[t]ypical claims under [Section 43(a)] would involve a new trademark that was confusingly similar to an already established one, or an attempt by a defendant to 'palm-off' its goods as those of a competitor by use of the competitor's mark," not purported misrepresentations about the location of a company's headquarters. *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 208 (1st Cir. 1996) (Saris, J., concurring).[19] None of the

---

[19] Likewise, "[i]n the typical commercial setting, confusion as to the *source* of goods or services occurs when there is an unacceptably high risk that a buyer may purchase one product or service in the mistaken belief that she is buying a different product or service." *Winship Green*, 103 F.3d at 202 (emphasis added) (citing *Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5, 9 (1st Cir. 1996)). Like the D.C. CPPA, the Lanham Act also prohibits misrepresentations about geographic origin and the "nature, characteristics, [or] qualities" of goods or services, meaning "misrepresentations about the quality of a defendant's own goods . . . as well as

prohibitions of D.C. Code Sections 28-3904(a) and (t) plausibly can be read to include a misrepresentation regarding the location of a company's headquarters.

## VI.   IN THE ALTERNATIVE, SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST ALL MEMBERS OF PLAINTIFFS' PROPOSED CLASS WHOSE CLAIMS SHARE THE SAME DEFICIENCIES AS PLAINTIFFS' CLAIMS.

As Marriott has argued, because Plaintiffs' claims should be rejected on summary judgment, the Court need not reach the issue of class certification.  However, in the alternative, Marriott respectfully submits that summary judgment should be granted against all members of Plaintiffs' proposed class, including all whose claims share the same fatal deficiencies as Plaintiffs' claims, as explained above and summarized below.

First, based on the persuasive rationales of the Seventh and Eighth Circuits in *Hyatt and Bykov*, Plaintiffs' claims under the D.C. CPPA and unjust enrichment fail as a matter of law.  *See supra* Sections III, IV.  Additionally, Plaintiffs' headquarters misrepresentation claims fail as a matter of law.  *See supra* Section V.C.  These same reasons require judgment against all members of Plaintiffs' proposed class.

Second, summary judgment should be entered against all putative class members who are not residents of the District of Columbia or whose "most significant relationship" concerning this dispute is to a jurisdiction other than the District of Columbia.  Both D.C. law and the Constitution require this result.  *See supra* Section II.A.3.

Third, summary judgment should be entered against all putative class members who lack standing to bring the claims at issue here:

- All individuals who did not pay their own bills lack injury-in-fact.  *See supra* Section II.A.1.

---

affirmative misrepresentations about another's products."  *Winship Green*, 103 F.3d at 208 (Saris, J., concurring).

- All individuals who received the Central Bank rate lack injury-in-fact.  *See supra* Section II.B.1.

- All individuals whose stays were for business purposes have no standing.  *See supra* Section II.A.2.

- No corporation has standing.  *See supra* Section II.C.1.

- All individuals who received no representations from Marriott, such as those who reserved though and stayed only at Marriott Franchised Hotels, or those who relied on third parties to make their reservations, lack causation or traceability to Marriott.  *See supra* Section II.B.3.

- All individuals who were aware of the use of the hotel exchange rate lack causation or traceability to Marriott.  *See supra* Section II.B.3.

- Marriott is entitled to judgment for all individuals who were provided by Marriott the information concerning hotel exchange rates that Plaintiffs claim was required, including all individuals whose reservations post-dated Marriott's 2005 provision of such information through all reservation channels it controls.  *See supra* Section V.A.

Fourth, no individual class member may recover for more than one hotel stay, for the reasons articulated above.  *See supra* Section V.B.

## CONCLUSION

For the foregoing reasons, Marriott respectfully requests that this Court grant summary judgment for Marriott on all claims in the Second Amended Complaint.

Dated:  June 2, 2008                              Respectfully submitted,

                                                   /s/ Joel Dewey
                                                  Joel Dewey (Bar No. 358175)
                                                  Holly Drumheller Butler (Bar No. 459681)
                                                  Sonia Cho (Bar No. MD26995)
                                                  DLA Piper US LLP
                                                  6225 Smith Avenue
                                                  Baltimore, Maryland 21209
                                                  410-580-3000
                                                  410-580-3001 (facsimile)

                                                  *Attorneys for Defendant*
                                                  *Marriott International, Inc.*