# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BRITT A. SHAW, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-1138 (GK) |
| v. | ) | Status Conference July 7, 2008 |
| | ) | |
| | ) | |
| MARRIOTT INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON THE ISSUE OF LIABILITY AND MEMORANDUM OF
## <u>POINTS AND AUTHORITIES IN SUPPORT THEREOF</u>

Mark W. Borghesani, D.C. Bar # 426745
c/o THE CULLEN LAW FIRM, PLLC
1101 30th Street, N.W.
Washington, D.C., 20007
*Of Counsel*

Paul D. Cullen, Sr., D.C. Bar # 100230
Joyce E. Mayers, D.C. Bar # 268227
Randall S. Herrick-Stare, D.C. Bar # 482752
Amy M. Lloyd, D.C. Bar # 975887
THE CULLEN LAW FIRM, PLLC
1101 30th Street, N.W.
Suite 300
Washington, D.C., 20007
*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.   Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  MARRIOTT HAS VIOLATED THE DISTRICT OF COLUMBIA
    CONSUMER PROTECTION AND PROCEDURES ACT . . . . . . . . . . . . . . . . . . . . 10

    A.   Liability Under the CPPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.   Marriott's Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.   Marriott's USD Denominated Room Rates are
           Objectively False . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.   Marriott's Failure to Disclose Material Facts Had
           a Tendency to Mislead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        3.   Marriott Has Advertised or Offered Hotel Services
           Without an Intent to Sell Them as Advertised or
           Offered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    C.   The Materiality of Marriott's Misrepresentations and
        Omissions Provide the Linchpin Establishing Causation
        and Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    D.   Case Law in Other Jurisdictions is Not Inconsistent with
        Evidence Demonstrating Marriott's Violation of the CPPA . . . . . . . . . . . . 33

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

**CASES**

*Affiliated Ute Citizens v. United States,*
406 U.S. 128, 153-54 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Alicke v. MCI Communications,*
111 F.3d 909 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 249 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*\*Aspinall v. Phillip Morris Companies,*
813 N.E.2d 476 (Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 30, 31

*Atwater v. District of Columbia Dept. Of Consumer and Reg. Affairs,*
566 A.2d 462 (D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Beattie v. The Trump Shuttle, Inc.,*
758 F.Supp. 30 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Baloch v. Norton,*
\_\_ F. Supp. 2d \_\_\_, 2007 WL 2774507 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Bykov v. Radisson Hotels International,*
2006 WL 752942 (D. Minn.), *aff'd per curiam,* \_\_ F.3d \_\_ (8th Cir. 2007) . . . . . . . . . . . . . . . 34

*\*Byrd v. Jackson,*
902 A.2d 778 (D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25

*Calvetti v. Antcliff,*
346 F. Supp. 2d 92 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

*Collora v. R.J. Reynolds Tobacco Company,*
2003 WL 23139377 (Mo. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Cooper v. First Government Mortgage and* Investors *Corp.,*
238 F. Supp. 2d 50 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Davis v. Powertel, Inc.,*
776 So. 2d 971 (Fla. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 21, 22

*\* The Table of Authorities contains asterisks identifying the cases upon which the Plaintiffs primarily rely.*

*Dean v. American Federation of Government Employees,*
509 F. Supp.2d 39  (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*\*District Cablevision Limited Partnership v. Bassin,*
828 A.2d 714 (D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13, 28, 32, 33, 34, 35

*\*F.T.C. v. Crescent Publishing Group,*
129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 17, 18, 22, 28

*F.T.C. v. Five Star Auto Club, Inc.,*
97 F. Supp. 2d 502 (S.D.N.Y. 2000)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*F.T.C. v. Freecom Communications, Inc.,*
401 F.3d 1192  (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*F.T.C. v. Wilcox,*
926 F. Supp. 1091 (S.D. Fla. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*\*Green v. United States,*
312 A.2d 788 (D.C. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25

*\*Guam v. Marfega Trading co., Inc.,*
1998 WL 689646 (Guam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 22, 25

*In re American Home Products Corp.,*
98 F.T.C. 136 (1981), *aff'd,* 695 F.2d 681 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Cliffdale Assoc., Inc.,*
103 F.T.C. 110 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 32

*Friends of Tilden Park, Inc. v. District of Columbia,*
806 A.2d 1201 (D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Firestone Tire and Rubber Co.,*
1972 WL 127476 (FTC 1976), *aff'd,* 481 F.2d 246 (6th Cir.),
  *cert denied,* 414 U.S. 1112 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Market Development Corp.,*
1980 WL 338982 (FTC 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Thompson Medical Co.,*
104 F.T.C. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 18

*Kraft, Inc. v. FTC,*
970 F.2d 311 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mills v. Electric Autolite Co.,*
396 U.S. 375, 385 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Novartis v. Federal Trade Commission,*
223 F.3d 783 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

*Pelman v. McDonald's Corporation,*
396 F.3d 508 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Osbourne v. Capital City Mortgage Corp.,*
727 A.2d 322, 325  (D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Ramirez v. Midwest Airlines,*
___ F. Supp. 2d ___, 2008 WL 682438 (D.Kan.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*Stutman v. Chemical Bank,*
731 N.E. 2d 608 (NY 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Shaw v. Hyatt International,*
461 F.3d 899 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Shaw v. Marriott International,*
474 F.Supp.2d 141 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 32

*Thompson Medical Co. v. FTC,*
791 F.2d 189 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tyco Industries, Inc. v. Lego Systems, Inc.,*
1987 WL 44363 (D.N.J. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*U.S. ex rel El Amin v. George Washington University,*
___ F. Supp. 2d ___, 2007 WL 3412202 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Varacallo v. Massachusetts Mutual Life Insurance Company,*
752 A.2d 807 (N.J. Super. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wells v. Allstate Insurance,*
210 F.R.D. 1 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 14, 21, 27, 30, 32, 34

iv

*Williams v. The Purdue Pharma Co.,*
297 F. Supp.2d 171 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## **RULES**

Fed. R. Civ. P Rule 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Civ. P Rule 56(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

## **REGULATIONS**

D.C. CPPA § 28-3904(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.C. CPPA § 28-3904(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D.C. CPPA § 28-3904(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 11, 32

D.C. CPPA § 28-3904(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 11, 19, 21, 23, 32

D.C. CPPA § 28-3904(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 11, 23, 24, 32

D.C. CPPA § 28-3905(k)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Federal Trade Commission Act § 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## **OTHER AUTHORITIES**

*FTC Statement on Deception, Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984) . . . . . . . . . 12, 32

Plaintiffs, Britt A. Shaw, Neal M. Charness, Sarah E. Mendelson, and the Center for Strategic and International Studies, Inc., on behalf of themselves and the class they seek to represent, hereby move, pursuant to Rule 56(a) and (d)(2), Fed. R. Civ. P., for partial summary judgment on the issue of liability on Count I of Plaintiffs' Second Amended Class Action Complaint. There are no genuine issues as to any material fact. Plaintiffs are entitled to judgment on the issue of liability as a matter of law. In support of this motion, reference is made to Plaintiffs' Statement of Material Facts as to Which There is No Genuine Dispute filed simultaneously herewith. Plaintiffs incorporate by reference Exhibits 1 - 40 which they previously submitted in support of their Motion for Class Certification. (Doc 62). Additional exhibits numbered 41 - 86 are appended to Plaintiffs' Statement of Material Facts.[1] All exhibits are either declarations, excerpts from depositions that are self-authenticating or business records produced by Marriott.

In further support of their motion, the Plaintiffs submit the following Memorandum of Points and Authorities.

## I.    INTRODUCTION

### A.    Summary of the Argument

Marriott misrepresented the price of rooms in its Russian Hotels. In its advertising on the internet and over its toll free telephone lines, and in its reservation confirmations to its hotel guests, Marriott stated specific per night prices for rooms in U.S. Dollars (USD). At checkout from a Marriott Russian Hotel, the guest was charged in Russian Rubles (RUR), never USD.

---

[1] References to individual paragraphs of Plaintiffs' Statement of Material Facts will be designated as "SMF at ___ ").

1

The per night charge for rooms in RUR was calculated at a hotel exchange rate different from the official Central Bank of Russia. Application of the hotel exchange rate always resulted in a cost to guests in USD higher than the price in USD originally represented by Marriott.  At the time the room was booked, Marriott provided no information to its guests which would have enabled guests to understand room charges or to calculate the actual cost of rooms in either USD or RUR. Marriott was well aware of the discrepancies between the price quoted and the charge to its hotel guests.  Marriott intentionally marked-up the hotel exchange rate over the Central Bank rate by as much as 15 percent, and accounted for the profit from the overcharges as "foreign exchange income."  When forced by this lawsuit to give up its deceptive practices and begin to quote room prices in RUR, Marriott determined to increase its USD prices to protect the profits it was accustomed to receiving.

Marriott's pricing practices are precisely the type of improper trade practices the D.C. Consumer Protection and Procedures Act (CPPA) was enacted to remedy.  Sections 28-3904(e) and (f) prohibit the misrepresentation or omission of a material fact; and section 28-3904(h) prohibits the advertisement or offer of a product or service without the intention to sell as advertised or offered.  The standard of proof under the CPPA rests on a showing that the offending conduct has the tendency or capacity to deceive; no proof of actual reliance or deceit is required. Rather, the information at issue must be "material" in the sense that a reasonable consumer would have found the facts represented or omitted to be important in their choice or conduct regarding a product.   Proof of a violation of the CPPA focuses on "materiality" of the facts misrepresented or omitted.  If the information is material, a causal connection between the wrongful conduct and consumer injury is presumed.  Where consumer choice might have been

different in light of the true facts, injury is established.

Price is always material. Marriott's USD denominated price representations were false. Marriott offered and confirmed rooms at its Russian Hotels for specific amounts in USD. However, guests were always charged for rooms in RUR, calculated at a hotel exchange rate which resulted in a cost to guests that was far more than originally represented. Marriott did not provide information to its guests which would have enabled them to understand or calculate the actual cost of rooms at the Russian Hotels. Marriott's misrepresentations and omissions of fact relating to the cost of rooms goes to the heart of transactions between Marriott and its guests, and directly caused the overcharge to its guests. Marriott's deceptive pricing practices were the result of intentional business planning. Marriott knew when a guest booked a room, that the guest would never pay the price advertised and quoted on the room reservation confirmation. Marriott openly discussed the ethics of its practices, the windfall profits, and its concern over its large exposure to guest claims if its scam was exposed. Before Marriott changed its practice of quoting prices in USD, it raised prices in USD to prevent a loss in revenue when those prices were converted into RUR at Central Bank rates. Marriott understood the implications of its conduct and never intended to sell hotel rooms in Russia as offered.

The record supporting this Motion for Partial Summary Judgment on the Issue of Liability is crystal clear. Each of the Named Plaintiffs was offered a hotel room (or rooms) priced in USD, but was required to pay for the rooms in RUR. None of the Named Plaintiffs could acquire a sufficient number of RUR at the Central Bank exchange rate to pay for their rooms by tendering the amount of USD quoted by Marriott for such rooms. Marriott failed to disclose material facts related to how room charges for guests would actually be calculated and

3

paid.  Marriott never intended to sell rooms at its Russian Hotels as offered in USD.  The Named

Plaintiffs and others similarly situated are entitled as a matter of law to summary judgment on the

issue of liability for each of Marriott's violations under CPPA §§ 28-3904(e), (f) and (h) -

misrepresentation, failure to state material facts and offering services without the intent to sell

them as offered.  Plaintiffs Motion for Partial Summary Judgment on Liability should be granted.

### B.    Standard for Summary Judgment

Rule 56 (c), Fed. R. Civ. P., provides that summary judgment "shall be rendered

forthwith" where the pleadings, depositions, answers to interrogatories, admissions and other

admissible evidence establishes that "there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."[2]  The focus of the analysis by a court

on summary judgment is to determine whether there is sufficient evidence in favor of the non-

moving party to require submission of the issue to a fact finder at trial.[3]  There is no issue for trial

"unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict

for that party."[4]

> The inquiry performed is the threshold inquiry of determining whether there is the
> need for trial – whether in other words, there are any genuine factual issues that
> properly can be resolved only by a finder of fact because they may reasonably be

---

[2]  *See, Baloch v. Norton, ___ F. Supp. 2d ___, 2007 WL 2774507 *4 (D.D.C. 2007); U.S. ex rel El Amin v. George Washington University, ___ F. Supp. 2d ___, 2007 WL 3412202 *3 (D.D.C. 2007); Dean v. American Federation of Government Employees,* 509 F. Supp.2d 39, 51 (D.D.C. 2007); *Cooper v. First Government Mortgage and* Investors *Corp.,* 238 F. Supp. 2d 50, 53 (D.D.C. 2002); *Calvetti v. Antcliff,* 346 F. Supp. 2d 92, 99 (D.D.C. 2004).

[3]  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

[4]  *Id.,* citations omitted.

4

resolved in favor of either party.[5]

Only disputes over "material" facts may raise an issue for trial.  The substantive law governing the claims in the action will identify which facts are material."[6]  The Supreme Court explains:

> Only disputes over facts that might effect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.[7]

The inquiry on a motion for summary judgment is: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law."[8]  Thus, a "*scintilla*" of evidence is not sufficient to preclude a ruling in favor of the moving party.[9]  The determinative question is not:

> whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing [the evidence], upon whom the *onus* of proof is imposed.[10]

Rule 56(d)(2) expressly allows for summary judgment on liability alone: "An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages."[11]

---

[5]  *Id.* at 250.

[6]  *Id.* at 248.

[7]  *Id.*

[8]  *Id.* at 251-52.

[9]  *Id.* at 251 (emphasis in original).

[10]  *Id.* at 251 (emphasis in original; citations omitted).

[11]  Rule 56(d)(2), Fed.R.Civ.P.; *Beattie v. The Trump Shuttle, Inc.*, 758 F.Supp. 30, 32 (D.D.C. 1991) (granting partial summary judgment to plaintiff as to defendant's liability, reserving entry of remedial order pending further proceedings).

5

### C.    Facts

Defendant Marriott International, Inc. controls a system of hotel properties throughout the world which operate under various Marriott Propriety Marks. (SMF ¶¶ 1,2,3). This case involves seven Marriott branded properties located in Russia, four operated directly by Marriott and three operated by Marriott licensees under agreement with Marriott ("Marriott Russian Hotels"). (SMF ¶¶ 2,3). Marriott misrepresented the price for rooms at its Russian Hotels. (SMF ¶¶ 4-8, 33-36, 51-169). Marriott offered rooms for specific amounts of U.S. Dollars ("USD") knowing that guests at its Russian Hotels would never pay the offered price. (SMF ¶¶ 170-179). Guests were charged at checkout in Russian Rubles ("RUR") calculated at an internal hotel exchange rate that always resulted in an actual cost to the guest in USD in excess of the price originally represented by Marriott. (SMF ¶¶ 5, 8, 34-36, 53, 60-63, 74-78, 83-87, 92-97, 100-104, 107-111, 114-118, 121-125, 128-132, 135-139, 142-146, 149-153, 156-160, 165-169).

Marriott operates and controls a centralized, worldwide Reservation System in which all of the Marriott Russian Hotels, including the franchised hotels, participate. (SMF ¶¶ 9-10). The Reservation System employs a database of current and stored information regarding accommodations for its Marriott branded hotels known by the acronym "MARSHA." (SMF ¶¶ 11-20). MARSHA maintains information related to daily room prices and the currency governing the transaction. (SMF ¶¶ 14-17).

Prospective hotel guests may access the reservation system in several ways, including using Marriott's toll-free reservation phone number; online at www.marriott.com; or through a travel agent. (SMF ¶¶ 21, 23). Regardless of the means by which a guest accesses the Marriott reservation system, they are accessing, directly or indirectly, information stored on the MARSHA

database. (SMF ¶¶ 22, 24).   The management of each Marriott branded hotel is required to notify the Marriott Reservation System of the most recent room rates applicable in that hotel property, and of any changes in the room rates.  (SMF ¶ 20).  Marriott franchised hotels may be free to establish their own room rates, but, once those rates are established, franchised hotels are forbidden by their license agreements to charge a "rate higher than the rate specified to the guest by the Reservations System office at the time the guest's reservation was made."  (SMF ¶ 20). Regardless of the means by which a potential guest accesses the data in the MARSHA system, the price represented to the hotel guest is consistent.  (SMF ¶¶ 22, 24-27).

It is Marriott's practice to provide room reservation confirmations to hotel guests reserving rooms through its Reservation System, including reservations made through travel agents.  (SMF ¶¶ 28-29).  Regardless of the method used to make a reservation, a confirmation is generated by the MARSHA database, assigned a confirmation number, and issued to the hotel guest or his travel agent. (SMF ¶¶ 30-31). Each reservation confirmation states the per night room price only in USD. (SMF ¶ 32).

Marriott's USD denominated price confirmations are objectively false. (SMF ¶¶ 33-36). The hotel bill is payable at check-out only in RUR, never USD.  (SMF ¶¶ 34, 60, 75, 84, 93-94, 101, 108, 115, 122, 129, 136, 150, 157, 166).  At check-out, guests are presented with a hotel bill showing a charge for the room in "Units." (SMF ¶ 34). The quantity of Units has the same numeric value as the quantity of USD quoted as the price for the room on Marriott's reservation confirmation. (SMF ¶ 34).  Hotel charges are converted from Units to RUR at a rate of Units to RUR that is always less favorable to the guest than the rate set by the Central Bank of Russia for conversion of USD to RUR. (SMF ¶¶ 36, 59-63, 74-78, 83-87, 92-97, 100-104, 107-111, 114-

118, 121-125, 128-132, 135-139, 142-146, 149-153, 156-160, 164-169).  Marriott itself explains

its business practice this way:

> **Marriott Russia Hotels** would convert the quoted U.S. dollar amount into rubles
> using a hotel exchange rate and a pre-arranged monetary unit called a "currency
> unit" or simply "unit" when a guest checked out and paid for his or her room.  The
> currency unit always equaled the amount quoted in U.S. dollars. . . . **In Russia,
> this practice was followed not just by Marriott Russia Hotels,** but by most
> other hotels and businesses that quoted prices for goods or services in U.S. dollars
> to protect against the ruble's fluctuations in value. . . .  Internal or "house"
> exchange rates were used by businesses in Russia for similar reasons.  ***By setting
> an internal exchange rate above the Central Bank Rate, businesses could better
> protect themselves from fluctuations in the value of the ruble. . . .***[12]

As a result of Marriott's uniform trade practices, the actual price paid at checkout is

always a higher amount in USD than the amount in USD represented in Marriott's reservation

confirmation. (SMF ¶¶ 63, 78, 87, 97, 104, 111, 118, 125, 132, 139, 146, 153, 160, 169).

Marriott provided no information to its guests at its Russian Hotels that would have

enabled the guest to understand the actual per night charge for the hotel room. (SMF ¶¶ 37-50).

Prior to August, 2005, Marriott did not disclose to hotel guests reserving rooms at Marriott

Russian Hotels that their  hotel bill at checkout could be paid only in RUR, not USD, or that the

amount of RUR would be calculated using a conversion of "Units" to RUR at the "hotel

exchange rate." (SMF ¶¶ 38-39).  Prior to August 2005, Marriott did not disclose to hotel guests

reserving rooms at Marriott Russian Hotels that the "hotel exchange rate" is different from the

Central Bank rate for the conversion of USD to RUR.  (SMF ¶ 40).  Nor did Marriott disclose

that conversion of Units to RUR at the hotel rate would require the guest to expend more in USD

to buy enough RUR to pay his room charges than the amount in USD stated in the hotel guest's

---

[12]  Marriott Memorandum in Opposition to Motion for Class Certification (Doc. 75-2) at
5-6 (emphasis added).

reservation confirmation.  (SMF ¶ 41).

Marriott contends that around August 2005, it adopted a practice of including the following language in its room reservation confirmations at its Marriott Russian Hotels: "All prices quoted in U.S. Dollars.  Charges are payable in local currency at applicable hotel exchange rate at checkout." (SMF ¶ 42).  Such a statement, if made, still fails to disclose: what the "hotel exchange rate" is; that the "hotel exchange rate" is different from the Central Bank rate; that its Russian Hotels would charge in Units that would be converted into RUR at a rate per Unit that was higher than the rate used by Russia's Central Bank to exchange USD for RUR; and that the room price in RUR charged at check-out would be greater than the number of RUR that could be bought, at Central Bank exchange rates, with the number of USD quoted as the room price at the time the reservation was booked. (SMF ¶¶ 43-49). After August 2005, hotel guests receiving reservation confirmations created through Marriott's Reservation System still could not determine from the information provided what the price to be paid for the reserved room would be at the time of check-out in either RUR or in USD. (SMF ¶ 50).

Marriott's deceptive pricing structure was a matter of purposeful business planning. (SMF ¶¶ 170-178). Marriott never intended that guests be charged the USD price advertised or confirmed.  *Id.*  Marriott has readily acknowledged that all its Russian Hotels intentionally set the internal hotel exchange rate above the Central Bank rate to protect themselves from fluctuations in the value of the RUR.[13] Marriott understood that its pricing practices created discrepancies between quoted and paid rates.  (SMF ¶¶ 170-172). Marriott documented that mark-ups of the

---

[13]  Marriott Memorandum in Opposition to Motion for Class Certification (Doc. 75-2) at 5-6.

hotel exchange rates over the Central Bank rates ranged from 2.6 to 15.5 percent during the period covered by this litigation. (SMF ¶ 172). During discovery, Marriott produced over 450 guest complaints over this practice. (SMF ¶ 170). Over the years that these pricing practices were in effect, the practices were the subject of discussion at high levels within Marriott's management. (SMF ¶¶ 171, 173, 178). Marriott recognized the benefit of the practices, describing the resulting profit as "real money" and accounting for the profit realized from these practices as "foreign exchange income" or "foreign exchange gain." (SMF ¶¶ 173, 174). In the end, when Marriott determined to abandon these practices, its Director of Revenue Strategy for Eastern Europe recommended that, prior to switching to price quotations in RUR, the Russian Hotels increase the quoted USD price significantly "to achieve a 5% RUB effective rate increase after the conversion." (SMF ¶ 178). Marriott was well aware of the secret "foreign exchange gain" it was making when quoting room rates in USD and charging for rooms in RUR, and it obviously did not plan to give up those profits when this litigation forced them to quote in RUR rather than USD.

## II.    MARRIOTT HAS VIOLATED THE DISTRICT OF COLUMBIA CONSUMER PROTECTION AND PROCEDURES ACT

### A.    Liability Under the CPPA

The Consumer Protection and Procedures Act ("CPPA") is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices.[14] The CPPA expressly provides for its liberal application to promote its intended prophylactic purposes of

---

[14] *District Cablevision Limited Partnership v. Bassin,* 828 A.2d 714, 723 (D.C. 2003)*; Shaw v. Marriott International,* 474 F. Supp. 2d 141, 147 (D.D.C. 2007).

regulating and remedying improper business practices.[15]

Section 28-3904 of the CPPA provides that the conduct enumerated violates the CPPA "whether or not any consumer is in fact misled, deceived or damaged thereby...." *Id.* Among those trade practices specified as improper are misrepresentation, failure to disclose material facts, and advertising the same without intent to sell as advertised.[16] To prove a claim under D.C. Code §§ 28-3904 (e) and (f), the plaintiff must establish: (1) the misrepresentation of a material fact or (2) the failure to disclose a material fact which (3) would tend to mislead.[17] To prove false advertising Plaintiffs must establish that Marriott never intended to sell its Russian hold rooms as advertised or offered.[18]

The standard applied in the District of Columbia, like many other jurisdictions, is whether a material representation or omission has a tendency or capacity to deceive.[19] This standard was modeled after the standard originally adopted by the Federal Trade Commission interpreting the more general language used in Section 5 of the Federal Trade Commission Act.[20] Since the District's standard was embodied in the statutory language itself, the fact that the FTC's standard

---

[15] D.C. Code § 28-3901 (c); *District Cablevision,* 828 A.2d at 723; *Shaw,* 474 F. Supp. 2d at 147.

[16] D.C. Code §28-3904 (e), (f) and (h).

[17] *Calvetti*, 346 F. Supp. 2d at 99.

[18] *Byrd v. Jackson,* 902 A.2d 778 (D.C. 2006); *Green v. United States,* 312 A.2d 788, 791 (D.C. 1974).

[19] *District Cablevision,* 828 A.2d at 725*; Wells v. Allstate Insurance*, 210 F.R.D. 1, 9 (D.D.C. 2002); *Accord, Aspinall v. Phillip Morris Companies,* 813 N.E.2d 476, 487-88 (Mass. 2004); *Davis v. Powertel, Inc.,* 776 So. 2d 971, 974-75 (Fla. App. 2001).

[20] *Matter of Cliffdale Assoc.,* 103 F.T.C. 110, 165 (1984); *Aspinall,* 813 N.E.2d at 487.

under Section 5 of the FTC Act has undergone some later revision is of no consequence.[21]

A statement is "material" where it "involves information that is important to consumers, and hence, is likely to affect their choice of, or conduct regarding, a product."[22]  Price or cost of a product or service is presumed to be material,[23] as are express statements.[24]  "Information concerning prices or charges for goods or services is material, as it is '*likely* to affect a consumer's choice of conduct regarding a product.'"[25]  Where, as here, a material representation is "literally and unambiguously false," no further proof regarding deception is necessary.[26]

Courts have consistently held that the standard of proof under the CPPA is a "reasonable person standard."[27]  The proof necessary is that the facts represented or withheld "be material in the sense that a reasonable [person] might have considered them important in making this

---

[21] The standard of proof under Section 5(a) of the Federal Trade Commission Act is a demonstration that a material representation, omission or practice is **likely** to mislead consumers acting reasonably in the circumstances.  It should be noted that the "likely" to mislead standard is a change from the "tendency" to mislead standard in effect prior to the 1983 Deception Statement published by the FTC. *FTC Statement on Deception, Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984).  The change reflects a more stringent standard of proof than is required under the CPPA.  *F.T.C. v. Crescent Publishing Group*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001).

[22] *Novartis v. Federal Trade Commission,* 223 F.3d 783, 786 (D.C. Cir. 2000), *citing*, *In re Cliffdale Assoc., Inc.,* 103 F.T.C. 110, 165 (1984); *Kraft, Inc. v. FTC,* 970 F.2d 311, 322-24 (7th cir. 1992).

[23] *Id.*

[24] *Crescent Publishing Group*, 129 F. Supp. 2d 311, 321*; In re Thompson Medical Co.,* 104 F.T.C. 648, 788, 818-19 (1984), *aff'd, Thompson Medical Co. v. FTC,* 791 F.2d 189 (D.C. Cir. 1986); *F.T.C. v. Wilcox*, 926 F. Supp. 1091, 1098 (S.D. Fla. 1995); *Kraft,* 970 F.2d at 322.

[25] *Crescent Publishing Group*, 129 F. Supp. 2d at 321 (emphasis added).

[26] *Tyco Industries, Inc. v. Lego Systems, Inc.,* 1987 WL 44363, *9 (D.N.J. 1987).

[27] *Wells v. Allstate Insurance*, 210 F.R.D. 1, 9 (D.D.C. 2002);  *Alicke v. MCI Communications*, 111 F.3d 909 (D.C. Cir. 1997).

decision."[28]  "Reasonable" is measured by the expectation or understanding of the intended

consumer audience.[29]  "Reasonable" is determined by an objective standard.[30]  Moreover, in

considering "a tendency or capacity to deceive, it is appropriate to look not at the most

sophisticated, but the least sophisticated consumer."[31]  Consumer reliance on express claims

regarding price is presumptively reasonable.[32]

Proof of actual consumer deception or reliance is not required to sustain a claim for

misrepresentation or omission of material fact under the CPPA.[33]  Otherwise, such proof would

be "contrary to [the Act's] prophylactic purpose."[34]  The consumer need only prove that the

representation or omission had a tendency or capacity to deceive.[35]  "There is no requirement of

actual deceit.  If a claim is material because likely to deceive, it is not rendered otherwise simply

---

[28]  *Wells*, 210 F.R.D at 9*;  Novartis,* 223 F.3d at 786, (*citing In re Cliffdale Associates,* 103 F.T.C. 110, 165).

[29]  *Alicke, supra.*

[30]  *Davis v. Powertel, Inc.,* 776 S.2d 971, 974 and n.1 (Fla. App. 2001) and cases cited.

[31]  *Crescent Publishing Group*, 129 F. Supp. 2d at 321.

[32]  *Id.*, citing *F.T.C. v. Five Star Auto club, Inc.,* 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

[33]  *District Cablevision Limited Partnership,* 828 A.2d at 725*; Wells*, 210 F.R.D. at 9; *In re American Home Products Corp.,* 98 F.T.C. 136, 368 (1981)*, aff'd,* 695 F.2d 681 (3d Cir. 1982); *Pelman v. McDonald's Corporation,* 396 F.3d 508, 511 (2d Cir. 2005) (applying N.Y. statute governing deceptive trade practices which, similar to the CPPA, is intended to have broad prophylactic purposes); *Novartis,* 223 F.3d 783, 786.

[34]  *F.T.C. v. Freecom Communications, Inc.,* 401 F.3d 1192,1203 (10th Cir. 2005); *District Cablevision,* 828 A.2d at 723.

[35]  *Id.*

13

because it is unsuccessfully advertised."[36]  In cases alleging misrepresentation and a failure to disclose under the CPPA "proof positive of reliance is not a prerequisite to recovery."[37]

### B.    Marriott's Violations

#### 1.    Marriott's USD Denominated Room Rates are Objectively False

D.C. CPPA § 28-3904(e) makes it a violation for any person to "misrepresent as to a material fact which has a tendency to mislead . . . ."  Marriott misrepresents the price of its rooms at its Russian Hotels.  Marriott represents to its guests for its Russian Hotels that the per night price for a room will be a sum certain in USD.  This representation has a tendency to mislead guests into believing that they will be able to pay for their room charges for the USD amount represented by Marriott.  In fact, hotel guests are always charged in RUR, never in USD.  In fact, the RUR charge is calculated using a hotel exchange rate different from the Central Bank rate. Application of the hotel exchange rate always results in a cost in USD greater than the price originally represented by Marriott.  Further, a guest cannot acquire enough RUR to pay for his nightly room charge by exchanging at the official Central Bank of Russia rate the sum in USD confirmed as the per night price for the room.  Marriott's express statements of price in its advertising and in the reservation confirmations it issues to its guests are material misrepresentations of the price of the room.[38]

Every guest who reserves a room through Marriott's worldwide reservation system is

---

[36]  *Novartis,* 223 F.3d at 787.

[37]  *Wells*, 210 F.R.D. at 9.

[38] *Crescent Publishing Group*, 129 F. Supp. 2d at 321*; In re Thompson Medical Co.,* 104 F.T.C. at 788, 818-19; *Wilcox*, 926 F. Supp. at 1098.

issued a reservation confirmation generated through MARSHA, Marriott's centralized

reservation system. (SMF ¶¶ 9-12, 28-30). Every reservation confirmation issued through

MARSHA states a per night room price for the room in a Marriott Russian Hotel for a sum

certain in USD. (SMF ¶¶ 15-16, 32). At checkout, Marriott's Russian Hotel guests are not

permitted to pay the bill in USD. (SMF ¶¶ 34, 60, 75, 84, 93-94, 101, 108, 115, 122, 129, 136,

150, 157, 166). Hotel guests must pay for the room in RUR. *Id.* All charges are listed on the bill

in Units; the numeric value of the Units is always the same as the numeric value of the USD

denominated price quote (SMF ¶¶ 34, 53, 59, 66, 69, 74, 83, 89, 92). Each Unit is valued in

RUR at a hotel exchange rate which is always less favorable to the hotel guest than the rate set by

the Central Bank of Russia for conversion of USD to RUR. (SMF ¶¶ 34-36, 60-61, 75-76, 84-85,

93-95, 101-102, 108-109, 115-116, 122-123, 129-130, 136-137, 150-151, 157-158, 166-167 ).

As a result, it is not possible for a guest to acquire a sufficient number of RUR at the Central

Bank rate to pay his hotel bill with only the amount in USD specified in the reservation

confirmation. (SMF ¶¶ 35, 62, 77, 86, 96, 103, 110, 117, 124, 131, 138, 145, 152, 159, 168). In

fact, the actual charge for a room at a Marriott Russian Hotel is always a higher amount in USD

than the amount in USD stated in the reservation confirmation. (SMF ¶¶ 36, 63, 78, 87, 97, 104,

111, 118, 125, 132, 139, 146, 153, 160, 169).

 The first-hand experience of the Plaintiffs in this action illustrates Marriott's

misrepresentations. Marriott represented to Plaintiff Shaw in his reservation confirmation at the

Renaissance Moscow Hotel that the price of his room would be $425 per night. (SMF ¶ 53). At

checkout, Shaw's bill showed a per night room charge of 425.00 UNT, with an exchange rate of

32 RUR per Unit.(SMF ¶¶ 59, 60). Shaw was charged 13,600 RUR, which resulted in a cost to

Shaw of $490.01 when converted into USD at the prevailing Central Bank rate. (SMF ¶¶ 60-62).

Marriott represented to Plaintiff Charness in his reservation confirmation at the Tverskaya that

the price of his room would be $175 per night. (SMF ¶ 66). At checkout, Charness' bill showed a

per night charge of 175.00 Units with an exchange rate of 32.15 RUR per Unit.(SMF ¶¶ 74-75).

Charness was charged 5,626.25 RUR, which resulted in a cost to Charness of $197.14 per night,

when converted into USD at the prevailing Central Bank rate. (SMF ¶¶ 75-77).  Marriott

represented to Plaintiff Charness in his reservation confirmation at the Grand that the price of his

room would be $205 per night. (SMF ¶ 69). At checkout, Charness' bill showed a charge of 205

Units with an exchange rate of 32.15 RUR per Unit. (SMF ¶¶ 83-84). Charness was charged

6,590.75 RUR, which resulted in a cost to Charness of $234.34 per night when converted into

USD at the prevailing Central Bank rate. (SMF ¶¶ 84-86).  Marriott represented to Paliashvili in

her reservation confirmation at the Tverskaya that the price of her room would be $260 per night.

(SMF ¶ 89). At checkout, Paliashvili's bill showed a per night room charge of 260.00 Units per

night, with an exchange rate of 32 RUR per Unit. (SMF ¶¶ 92-93).  Paliashvili was charged

8,320 RUR per night, which resulted in a cost to Paliashvili of $286.66 per night when converted

into USD at the prevailing Central Bank rate. (SMF ¶¶ 94-96).

     Plaintiff Mendelson stayed at the Marriott Grand hotel on numerous occasions. (SMF ¶¶

98-139).  For example, Mendelson was quoted a per night room price of $173 for a room at the

Marriott Grande on July 9-11, 2002.  (SMF ¶ 100).  At checkout, her bill showed a per night

room charge of 173.00 UNT, with an exchange rate of 33.00 RUR per Unit. (SMF ¶¶ 100-101).

Mendelson was charged 5,709.00 RUR per night, which resulted in a cost to Mendelson of

$180.95 per night  when converted into USD at the prevailing Central Bank rate. (SMF ¶¶ 101-

16

103 ). Mendelson was quoted a per night room price of $195 at the Marriott Grand on September 2-5, 2002. (SMF ¶ 135).  At checkout, Mendelson's bill showed a per night room charge of 195.00 UNT, with an exchange rate of 33.25 RUR per Unit. (SMF ¶¶ 135-136).  Mendelson was charged  6483.75 RUR, which resulted in a cost to Mendelson of $205.12 per night when converted into USD at the prevailing Central Bank rate. (SMF ¶¶ 136-138). Several CSIS employees also stayed at the Marriott Russian hotels. (SMF ¶¶ 140-169).  For example, Robert Einhorn was quoted a per night room price of $255 at the Marriott Royal Aurora hotel on November 16-20, 2004. (SMF ¶¶ 149).  At checkout, Mr. Einhorn's bill showed a per night room charge of 255.00 UNT, with an exchange rate of 32.15 RUR per Unit. (SMF ¶¶ 149-150). Einhorn was charged  8,198.25  RUR, which resulted in a cost to Einhorn of $287.25 per night when converted into USD at the prevailing Central Bank rate. (SMF ¶¶ 150-152). Einhorn was quoted a per night room price of $325 per night at the Marriott Tverskaya hotel on October 30, 2005 to November 4, 2005. (SMF ¶¶ 162, 165).  At checkout, Einhorn's bill showed a per night room charge of 325.00 UNT, with an exchange rate of 32.00 RUR per Unit. (SMF ¶¶ 165-166). Einhorn was charged  10,400.00 RUR, which resulted in a cost to Einhorn of $364.27 when converted into USD at the prevailing Central Bank rate. (SMF ¶¶ 166-168).

Misrepresentation of price alone has been found to violate consumer protection statutes. *Crescent Publishing* involved claims of misrepresentations related to charges resulting from customer access to material contained on adult content websites.[39] The Court found that statements on the defendant's website touting "free tours" misrepresented the point at which the

---

[39]  129 F. Supp. 2d 311.

customer's credit card would be billed for access to the material on the website.[40]  The Court

explained that information regarding the point at which the customer would be charged for

access would be an important basis for the customer's continued exploration of the site.[41]  The

Court found:

> The materiality of such information cannot be denied.  Information concerning
> prices or charges for goods or services is material, as it is "likely to affect a
> consumer's choice of or conduct regarding a product."[42]

The *Crescent Publishing* Court rejected defendant's argument that users acting reasonably would

have known when charges for access would be imposed, finding that consumer reliance on

express claims like the representations at issue are "presumptively reasonable."[43]  The Court

further explained that in "evaluating a tendency or capacity to deceive, it is appropriate to look

not at the most sophisticated, but the least sophisticated consumer."[44]

Similarly, an undisclosed service fee imposed in addition to the represented price for a car

rental was found to violate the prohibition against misrepresentation under a consumer protection

statute.[45]  Defendant represented the car rental charge to be $45.95 but charged an additional

undisclosed fee.[46]  The Court stated: "To a consumer, any additional amount of **money spent** for

---

[40]  *Id.* at 321.

[41]  *Id.*

[42]  *Id.*, citing *In re Thompson Medical Co.,* 104 F.T.C. 648, 816 (1984), *aff'd*, 791 F.2d
189 (D.C. Cir. 1986).

[43]  129 F. Supp. 2d at 321.

[44]  *Id.*

[45]  *Guam v. Marfega Trading co., Inc.,* 1998 WL 689646, *6 (Guam).

[46]  *Id.*

18

a product or service *is material* in choosing which product or service provider to choose."[47]  The

Court also found "material" the misrepresentation that the additional charge was a government

tax, rather than the company's practice.[48]

The facts are undisputed that  Marriott made express statements regarding the price of

rooms in its Russian Hotels in advertising, communications over its telephone lines and in

reservation confirmations to its hotel guests.  Marriott's representations of price were objectively

false.  Marriott published room prices and quoted prices to hotel guests in specific amounts in

USD.  In fact, guests were charged in RUR.  The charges in RUR always resulted in a higher

price in USD than the price represented in Marriott's advertising and reservation confirmations.

Marriott has violated D.C. Code 28-3904(e) and Plaintiffs are entitled to partial summary

judgment on this claim.

### 2.    Marriott's Failure to Disclose Material Facts had a Tendency to Mislead

D.C. CPPA § 28-3904(f) makes it a violation for any person to "fail to state a material

fact if such failure tends to mislead."  Prior to August, 2005, Marriott did not even disclose to

hotel guests reserving rooms that their  hotel bill at checkout could be paid only in RUR, not

USD. (SMF ¶ 38). During this time, Marriott did not disclose to hotel guests reserving rooms at

Marriott Russian Hotels that their final hotel bills would be payable in an amount of RUR that

would be calculated using a hotel exchange rate. (SMF ¶ 39).  Marriott did not inform its hotel

guests the "hotel exchange rate" is different from the Central Bank rate for the conversion of

---

[47]  *Id.* (emphasis added).

[48]  *Id.*

USD to RUR or that the hotel exchange rate is always less favorable to the guest than the rate offered by the Central Bank of Russia. (SMF ¶ 40-41). Marriott did not explain to its guests that the actual charge for the room at a Marriott Russian Hotel would require a larger expenditure of USD to buy RUR than the amount in USD stated in the hotel guest's reservation confirmation. (SMF ¶ 41).

An ordinary member of the traveling public would find information allowing him to calculate the actual price of the room to be important to the decision on where to book hotel accommodations. Marriott's failure to disclose information which would advise its hotel guests of its actual billing practices had a tendency to deceive guests at the Marriott Russian Hotels.

Marriott contends that, after August 4, 2005, its practice was to include the following language in its confirmation of room reservations for rooms at the Marriott Russia Hotels: "All prices quoted in USD. Charges are payable in local currency at applicable hotel exchange rate at checkout." (SMF ¶¶ 42-43). Such a statement, if made, still fails to disclose information material to a hotel guest reserving a room at a Marriott Russian Hotel. Marriott still does not disclose: that the "hotel exchange rate" would be applied to a "units to RUR conversion, not a USD to RUR conversion; that the units to RUR exchange rate would be less favorable to the guest than the USD to RUR exchange rate available from Russia's Central Bank; or that the hotel guest would be charged at check-out a room price in RUR that was greater than the number of RUR that could be bought, at Central Bank exchange rates, with the number of USD quoted as the room price at the time the reservation was booked. (SMF ¶¶ 44-49). After August 2005, hotel guests receiving reservation confirmations created through Marriott's Reservation System still could not determine from the information provided what the price to be paid for the reserved

20

room would be at the time of check-out in either USD or RUR.  (SMF ¶ 50).

Omission of material facts such as Marriott's failure to provide information related to its pricing practices have been found to violate the CPPA.  In *Wells v. Allstate Insurance,* the Court certified a class on the claim that defendant had violated CPPA Section 28-3904(f) for failing to disclose to its policy holders that its claim processing procedures for claimants represented by attorneys would be subject to more stringent standards, delaying settlement of their claims.[49]  The Court equated proof of the causal connection between the offending conduct and injury with a finding that the omitted facts were material.[50]  Reliance is not an element of proof for omission of a material fact.[51]  The Court found that to prove a claim for failure disclose, all that is necessary is a showing that "the facts withheld be material in the sense that a reasonable person might have considered them important in making this decision."[52]  Once causation is established, a plaintiff need not prove actual damages, but may opt for statutory damages.[53]

In *Davis v. Powertel, Inc.,* the complaint sought classwide relief for claims that a wireless communication service provider violated the Florida Deceptive and Unfair Trade Practices Act by selling telephones without disclosing that the phones had been programmed to work only with the provider's wireless service.[54]  Like the standard of proof applicable under the CPPA, the

---

[49]  210 F.R.D. 1.

[50]  *Id.* at 9.

[51]  *Id.*

[52]  *Id.*

[53]  *Id.*

[54]  776 So.2d 971 (Fla. App. 2001).

Court in *Powertel* found that the plaintiff need not prove actual reliance to prove liability.[55]  The Court explained that the applicable standard is an objective test patterned after the standard of proof under the Federal Trade Commission Act, and like the objective test applicable under consumer protection statutes of many other states.[56]  "The question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances."[57] Causation is proved by a demonstration of a "causal nexus between the concealment of the material fact and the loss."[58]

In this action, Marriott's omissions of fact were all directly related to the price of the rooms at its Marriott Russian Hotels.  As discussed above, information regarding the price or charge for goods or services is always material, since it is likely to affect the consumer's choice of the product.[59]  Marriott's failure to provide information necessary for its hotel guests to calculate the actual price of a room is causally connected to Plaintiffs' payment of an overcharge for their guest stays in Marriott Russian Hotels.

It is undisputed that Marriott never disclosed that room charges were subject to an elaborate USD to Units to RUR conversion that would result in a room charge in RUR that exceeded the number of RUR that could be acquired with the amount in USD stated in the hotel

---

[55]  *Id.* At 973.

[56]  *Id.* at 973-74 and n. 1.

[57]  *Id.* at 974.

[58]  *Varacallo v. Massachusetts Mutual Life Insurance Company,* 752 A.2d 807, 814 (N.J. Super. 2000).

[59]  *Crescent Publishing Group*, 129 F. Supp. 2d at 321*; Guam,* 1998 WL 689646 at *6.

guest's reservation confirmation thus violating D.C. Code § 28-3904(f). Plaintiffs are entitled to partial summary judgment on this claim.

### 3.    Marriott has Advertised or Offered Hotel Services Without an Intent to Sell Them as Advertised or Offered

D.C. Code § 28-3904(h) makes it a violation to offer or advertise goods or services without the intent to sell them as offered or advertised. Marriott represented to the traveling public that its guests at its Marriott Russian Hotels would be charged a sum certain in USD, and offered specific rooms to its hotel guests at the sum certain in USD and prepared reservation confirmations for each of its hotel guests confirming the price in USD. In fact, at the time its Russian Hotel rooms were advertised, offered and booked, Marriott knew that the Russian Hotel rooms would be sold to its guests only for RUR, in amounts of RUR that would result in higher cost in USD than advertised and offered. Marriott never intended that hotel rooms would be sold as offered or advertised.

At the same time that Marriott displayed its room prices for its Russian Hotels in USD on its website, communicated room prices on its telephone lines, and incorporated those prices in room confirmations, Marriott knew that its policy was to charge for the rooms only in RUR calculated using an internal hotel exchange rate that was different from the Central Bank exchange rate. (SMF ¶¶ 170-178). Marriott knew that the guests at its Russian Hotels would be charged a higher price in USD than the price advertised and offered. (SMF ¶¶ 170-178). Marriott contends that its policy was to mark-up the RUR to USD rate over the official exchange rate offered by the Central Bank of Russia in order to protect its profitability from currency

fluctuations.[60]  The hotel exchange rate for converting Units to RUR was always less favorable to the hotel guest than the exchange rate offered by the Central Bank of Russia for calculating USD to RUR. (SMF ¶¶ 36, 59-63, 74-78, 83-87, 92-97, 100-104, 107-111, 114-118, 121-125, 128-132, 135-139, 142-146, 149-153, 156-160, 164-169).   Marriott knew that the actual price for a room charged to its Russian Hotel guests would be between 2.6 and 15.5 percent higher than the price advertised and offered. (SMF ¶ 172). At the time that Marriott advertised, offered and booked rooms for its Russian Hotels, Marriott knew that it would charge the guests a higher price in USD than the price quoted. (SMF ¶¶ 170-178).   During the time this practice was in effect, Marriott received hundreds of guest complaints (SMF ¶¶ 170-171), openly discussed the ethics of its practice (SMF ¶¶ 170-171), expressed approval of the windfall profits it created (SMF ¶¶ 174-175), as well as concern over the large amounts that would have to be paid back if its scam was exposed. (SMF ¶175).  Before Marriott shifted from quoting rooms in USD to RUR, its management advised hotels to raise prices in USD so as not to lose revenue when those prices were converted into RUR at Central Bank rates. (SMF ¶ 178). All of this activity within Marriott establishes beyond question that Marriott understood the implications of its conduct and never intended to sell hotel rooms in Russia as offered.

Trade practices similar to Marriott's business practices here have been found to violate the CPPA.  The D.C. Court of Appeals found liability under DC Code § 28-3904(h) where the defendant advertised and offered services as a "foreclosure-avoidance specialist" who would assist the plaintiff in retaining ownership of her home, but instead orchestrated the sale of her

---

[60] Marriott Opposition to Motion for Class Certification (Doc. No. 75-2) at 5-6.

24

property to a partnership he controlled.[61]  The D.C. Court of Appeals held that the defendant

violated the CPPA because he had advertised and offered his services without the intent to sell

the services as advertised and offered; defendant advertised and offered services to save the

plaintiff's home, but instead schemed to gain title to the home for a fraction of its value.[62]

Similarly, the D.C. Court of Appeals upheld a trial opinion finding newspaper advertisements

offering sewing machines were false and misleading because the advertisement "purported to

offer for sale a complete sewing machine unit, although no such unit was tendered for purchase

at the advertised price."[63]  Components for the sewing machine that would in fact make the

machine operable, were offered at the time of sale only for payment of an additional sum.[64]

Under a statute similar to the CPPA, a car rental service was found liable for advertising

the price for a car rental without disclosing that the customer would be charged a service fee in

addition to the quoted price.[65]  The court found that a sign-board displayed at the airport

constituted an "advertisement" and that the defendant advertised the price without the intent to

sell the services at the quoted price because customers were charged an undisclosed fee in

addition to the advertised price.[66]

Here, Marriott published its prices in specific amounts in USD, but never intended that its

---

[61]  *Byrd,* 902 A.2d 778.

[62]  *Id.*at 782.

[63]  *Green,* 312 A.2d at 791.

[64]  *Id.*

[65]  *Guam,* 1998 WL 689646.

[66]  *Id.* at *6.

hotel guests would be charged in accord with the prices advertised and offered to the general

public and travel agents over the internet or as communicated to callers over its toll free

telephone lines.  Marriott contends that it was its practice to mark-up the price actually charged

to its hotel guests by setting a RUR to USD hotel exchange rate above the Central Bank rate to

protect itself from currency volatility.

> **Marriott Russia Hotels** would convert the quoted U.S. dollar amount into rubles
> using a hotel exchange rate and a pre-arranged monetary unit called a "currency
> unit" or simply "unit" when a guest checked out and paid for his or her room.  The
> currency unit always equaled the amount quoted in U.S. dollars. . . . **In Russia,
> this practice was followed not just by Marriott Russia Hotels,** but by most
> other hotels and businesses that quoted prices for goods or services in U.S. dollars
> to protect against the ruble's fluctuations in value. . . .  Internal or "house"
> exchange rates were used by businesses in Russia for similar reasons.  *By setting
> an internal exchange rate above the Central Bank Rate, businesses could better
> protect themselves from fluctuations in the value of the ruble. . . .*[67]

Of course, while a company may take some steps to protect itself from the risks of

currency volatility, it should not be allowed to surreptitiously shift those costs to its customers by

misrepresenting its prices.  The best way to protect oneself from the risks of currency volatility is

to price one's products or services in the same currency as one's costs - here RUR.  That is what

Marriott ultimately did.  Regardless, the result of Marriott's deceptive pricing practices produced

handsome profits that Marriott was determined to keep.  Indeed, just before Marriott finally

changed its policy to advertise and quote room rates in RUR instead of USD, Marriott's Area

Director of Revenue Strategy for Eastern Europe recommended that managers of Marriott's

Russian Properties raise the USD price for rooms significantly so that no revenue would be lost

when those room rates were converted into RUR at the Central Bank rate and thereafter quoted in

---

[67]  Marriott Memorandum in Opposition to Motion for Class Certification (Doc. 75-2) at
5-6.

RUR. (SMF ¶ 178).

The facts are undisputed that Marriott advertised and offered rooms in its Russian Hotels for a sum certain in USD, but never intended to sell the room for that price. Marriott knew that hotel guests would be charged at check-out in RUR at a rate that would result in a charge for the room at a higher price in USD than the price advertised and offered. Marriott has violated D.C. Code § 28-3904(h) and Plaintiffs are entitled to partial summary judgement on liability on this claim.

### C. The Materiality of Marriott's Misrepresentations and Omissions Provide the Linchpin Establishing Causation and Injury

Marriott's misrepresentations and omissions of fact related to the per night price of a room in a Marriott Russian Hotel were indisputably material to a guest's decision to book a room. Proof of a violation of the CPPA requires a demonstration of a causal connection between the wrongful conduct alleged and the injury to the consumer. Proof of causation brings the analysis under the CPPA full circle back to the concept of "materiality."[68] If the misrepresentation or omission is material, the causation requirement is satisfied.[69]

> Causation or proof that a consumer would have acted differently had they known the true facts is based upon a reasonable person standard, not individualized proof. . . . [P]roof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be ***material*** in the sense that a reasonable [person] might have considered them important in making this decision."[70]

---

[68] *Collora v. R.J. Reynolds Tobacco Company*, 2003 WL 23139377 at *2 (Mo. Cir. 2003)

[69] *Id; Wells,* 210 F.R.D. at 9.

[70] *Wells,* 210 F.R.D. at 9, citing, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153-54 (1972)(emphasis added)(Withholding of a material fact establishes the requisite element of causation in fact); *Mills v. Electric Autolite Co.,* 396 U.S. 375, 385 (1970) ("Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship

27

The fact that a consumer might have or did purchase the product – here a room at a Russian Marriott Hotel – even though they understood the consequence of the transaction, is irrelevant to a finding of liability.[71]  In this case, Marriott has suggested that frequent travelers to Russia would have understood Marriott's pricing practices because businesses in Russia commonly mark-up RUR charges to protect themselves from currency volatility.  Marriott has also argued that repeat guests at its Marriott Russian Hotels would have known that they would be overcharged.  So, Marriott has argued, these guests were not deceived by Marriott's pricing practices, and the practices did not cause injury to these guests.[72]  Marriott's contentions are not supportable under the CPPA.

The D. C. Court of Appeals has held that, regardless of whether a consumer relied upon or was deceived by the conduct in violation of the CPPA, or whether the consumer had it within his control to avoid the injury resulting from the offending conduct, the defendant's conduct, in and of itself, is sufficient to establish causation under the CPPA.[73]  In *District Cablevision,* plaintiffs challenged the imposition of excessive late payment fees for cable

---

between the violation and the injury for which he seeks redress.").

[71] *District Cablevision,* 828 A.2d at 725 and n.14;  *In re Firestone Tire and Rubber Co.,* 1972 WL 127476 (FTC 1976), *aff'd,* 481 F.2d 246 (6th Cir.), *cert denied*, 414 U.S. 1112 (1973); *In re Market Development Corp.,* 1980 WL 338982 (FTC 1980); *Crescent Publishing Group*, 129 F. Supp. 2d at 322; *Collora,* 2003 WL 23139377 at *2-3.

[72] We note in passing that Marriott's arguments with respect to sophisticated business travelers and repeat guests are entirely irrelevant to Plaintiffs' claims under (h) where the focus of the violation is exclusively on Marriott and whether it intended that its goods or services be sold as offered.  If not, there is a violation for which anyone accepting Marriott's bogus offer may make a claim.

[73] *District Cablevision,* 828 A.2d at 725 and n.14.

28

television services.  The D.C. Court of Appeals rejected Defendant DCLP's argument that

plaintiffs could not prove injury caused by DCLP's conduct "because they could have avoided

injury by paying their bills on time."[74]   The Court held:

> Whether the plaintiffs could have avoided any injury by paying their bills on time
> is a different question from whether the illegitimate late fee injured them after
> they failed to pay on time. The fact that the members of the plaintiff class were
> delinquent in paying their bills did not make them fair game for over-reaching
> trade practices.  Once they were delinquent, class members were obligated to pay
> the late fee to retain their cable television service, and DCLP caused them actual
> injury by overcharging them.[75]

Similarly, in *Stutman v. Chemical Bank,* the New York Court of Appeals found that the

causation requirement was satisfied in the absence of consumer reliance on the

misrepresentation.  The Court explained:

> Plaintiffs allege that defendant's material deception caused them to suffer a $275
> loss.  This allegation satisfies the causation requirement.  Plaintiffs need not
> additionally allege that they would not otherwise have entered into the transaction.
> Nothing more is required.[76]

Whether or not a guest at a Marriott Russian Hotel understood he would be required to

pay his bill in RUR instead of USD, and that he would be charged more in USD than originally

represented, does not diminish Marriott's culpability for its misrepresentations and omissions of

fact.  Nor does it matter that knowledgeable guests could have booked a room elsewhere, thereby

avoiding injury.  The guests' understanding does not make them fair game for Marriott's

improper pricing practices.  Even sophisticated travelers are entitled to truthful and complete

---

[74]  *Id.*

[75]  *Id.*

[76]  731 N.E. 2d at 30.

disclosures.  Once the guest booked the room at a Marriott, he was required to pay a higher price

for the room than originally represented by Marriott.  These guests were subject to the

overcharge, and were injured by Marriott's improper trade practices.

Marriott has also argued that any guest reimbursed for the cost of the hotel room has

suffered no injury.  Again Marriott is wrong.  Actual economic loss is not an element necessary

to proof of a redressable claim.[77]  The CPPA does not require proof of actual damages to recover

for a violation of its provisions.  "A person . . . may recover or obtain the following remedies:

(A) treble damages, *or* $1,500 per violation. . . ." DC Code § 28-3905(k)(1) (emphasis added).

The CPPA has, since October 2000, provided for the recovery of statutory damages.[78]

> This statutory provision permits class members who are able to show causation,
> but cannot prove the amount of pecuniary damage suffered as a result, to opt for
> the default payment of $1,500.[79]

Applying a similar consumer statutory scheme, the Supreme Judicial Court of Massachusetts

distinguished proof of actual damages and the demonstration of an injury that completes the

proof of causation.[80]  The Court found that the consumer protection statute "creates a legal right,

the invasion of which, without more, constitutes an injury."[81]  The Court continued, explaining

---

[77] *Wells,* 210 F.R.D. at 9; *Williams v. The Purdue Pharma Co.,* 297 F. Supp.2d 171, 177 (D.D.C. 2003); *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1206 (D.C. 2002).

[78] *Wells,* 210 F.R.D. at 9; *Ramirez v. Midwest Airlines,* ___ F. Supp. 2d ___, 2008 WL 682438 (D.Kan.),

[79] *Wells,* 210 F.R.D. at 9;

[80] *Aspinall,* 813 N.E.2d at 490-92.

[81] *Id.* at 490.

that "where there has been an invasion of a legally protected interest, but no harm for which actual damages can be awarded . . . the statute provides for the recovery of minimum damages in the amount of twenty-five dollars."[82]  The Court carefully distinguished the propriety of an award of statutory damages from any argument that the statute intended to confer nominal damages on plaintiffs who had suffered no injury.  The Court confirmed that "causation" is a required element of a successful consumer fraud claim.[83]  Rather, the Court construed "injury" to denote "an invasion of a legally protected interest."[84]  Applying the causation/injury standard to the case before it, the Court held that the deceptive advertising "effected a per se injury on consumers who purchased the cigarettes represented to be lower in tar and nicotine."[85]  The Court explained that "this is so because all purchased (and presumably, smoked) a product that was deceptively advertised, as a matter of law."[86]  The Court then held that as a result of the violation, all class members "will be entitled to statutory damages, without regard to whether the plaintiffs are successful in establishing that consumers were overcharged for the deceptively advertised cigarettes."[87]

Here, the CPPA creates a legally protected interest to be free from improper trade

---

[82]  *Id.* at 490-91.

[83]  *Id.* at 491.

[84]  *Id.*

[85]  *Id.* at 492

[86]  *Id.*

[87]  *Id.*

31

practices.[88]  Guests who booked a room at Marriott Russian Hotels were subject to Marriott's express misrepresentations and omissions regarding the per night price of a room.  Marriott's improper pricing practices directly impaired hotel guests' interests in fair dealing in their transactions with Marriott, causing them injury regardless of whether the funds for the room came from the pocket of the guest or a third party.

In sum, the "materiality" of the offending conduct under the CPPA is the linchpin for proof of liability.  The concept of "materiality" anchors each element of proof on consumer choice.  The FTC explained in its Statement on Deception:

> A finding of materiality is also a finding that injury is likely to exist because of the representation, omission, sales practice, or marketing technique.  Injury to consumers can take many forms.  Injury exists if consumers would have chosen differently but for the deception.  If different choices are likely, the claim is material, and injury is likely as well.  Thus injury and materiality are different names for the same concept.[89]

In this case, Marriott misrepresented the price for rooms in its Russian Hotels in express statements in its advertising and reservation confirmations; and failed to inform its hotel guests of facts that would bear directly on the actual cost of the rooms to guests when they paid at the time of checkout.  Price goes to the heart of the transaction.  Marriott misrepresented and omitted material facts in its advertising and reservation confirmations.  Marriott impaired  Plaintiffs' legally protected interests under the CPPA, §28-3904 (e), (f) and (h).  Plaintiffs are entitled to partial summary judgment finding Marriott liable under these sections.

---

[88] *District Cablevision,* 828 A.2d at 723; *Wells*, 210 F.R.D. at 9; *Shaw,* 474 F. Supp. 2d at 147.

[89] *FTC Statement on Deception, Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984).

**D.    Case Law in Other Jurisdictions is Not Inconsistent With Evidence Demonstrating Marriott's Violation of the CPPA**

Marriott can take no comfort in the dismissal of consumer fraud claims against the Hyatt and Radisson Hotels.  The grounds for dismissal in those actions have no application under the CPPA and the facts as alleged in this case.

In *Shaw v. Hyatt International,*[90] the Seventh Circuit noted that the district court had found that the transaction between the consumer and the hotel formed an express contract. The Court found that the claims had been properly dismissed because the Illinois Consumer Fraud Act did not provide a cause of action for a breach of contractual promise, without more.  By contrast, the CPPA has been found to apply to claims arising under contract law.[91]   The D.C. Court of Appeals has interpreted the CPPA in its broadest possible application, finding that the express purpose of the CPPA is to remedy "*all* improper trade practices,"[92] and that the list of improper practices enumerated in the statute is not exclusive.[93]  The CPPA is intended to reach all improper trade practices, including those that violate other laws, *including the common law.*[94] "The CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices

---

[90]  461 F.3d 899 (7th Cir. 2006).

[91]   *District Cablevision Limited Partnership,* 828 A.2d 714 (validity of liquidated damages provision in cable television service contract); *Osbourne v. Capital City Mortgage Corp.,* 727 A.2d 322 (breach of contract related to loan agreement).

[92]  *District Cablevision Limited Partnership*, 828 A.2d at 723 citing, D.C. Code 28-3901(b)(1)(emphasis in original).

[93]  *Id.*

[94]  *District Cablevision Limited Partnership,* 828 A.2d at 723; *Atwater v. District of Columbia Dept. Of Consumer and Reg. Affairs,* 566 A.2d 462, 465 (D.C. 1989); *Osbourne.,* 727 A.2d at 325-26.

proscribed by § 28-3904, but to all other statutory and common law prohibitions."[95] Thus, the holding of the Seventh Circuit applying Illinois law to the facts before it has no application to the long established precedents of the D.C. courts interpreting the CPPA.[96]

*Bykov v. Radisson Hotels International,*[97] is distinguishable from the instant case both on the facts found by the district court, and the court's application of a requirement under Minnesota law that the plaintiff must have actually relied upon the allegedly false representations. First, the district court held that under Minnesota's private attorney general statute, a person must establish reliance on the wrongful statements or conduct.[98] By contrast, DC CPPA §28-3904 provides for liability without proof that individuals were misled or deceived. Courts applying the D.C. CPPA have consistently held that reliance is not an element of proof of a claim under the DC statute.[99] The D.C. Court of Appeals explained:

> DCLP's alternative claim that the plaintiffs did not establish actual or reasonable reliance on DCLP's violation of the CPPA strikes us as being equally unpersuasive. The plaintiffs paid the excessive late fee.[100]

---

[95] *Osbourne,* 727 A.2d at 325-26.

[96] We also observe in passing that the Seventh Circuit noted that Hyatt's conduct implicated a number of contacts within the State of Illinois, but it specifically declined to rule whether such contacts fell within the reach of Illinois' Consumer Fraud Act. *Hyatt International,* 461 F.3d at 900-901. Thus there is nothing in the *Hyatt* case bearing on the application of D.C. law to Marriott under the facts of this case.

[97] 2006 WL 752942 (D. Minn.)., *aff'd per curiam,* __ F.3d __ (8th Cir. 2007).

[98] *Id.* at *4, 5.

[99] *Wells,* 210 F.R.D at 9; *District Cablevision Limited Partnership,* 828 A.2d at 725 and n. 14.

[100] *District Cablevision Limited Partnership,* 828 A.2d at 725 and n. 14.

Second, the district court pointed to allegedly exculpatory statements on Hyatt's website providing additional language beyond the USD denominated price quotation respecting hotel pricing. It held: "Whether the additional language is sufficient clarification is irrelevant because neither Bykov nor Gubanova relied on it when making their decisions to book a reservation at the Slavyanskaya."[101] The district court never bothered to address the question of whether this additional language was sufficiently exculpatory to correct the misrepresentation created by the basic USD denominated price quotation. If the additional language was not exculpatory, what difference would it make if the plaintiff could not remember seeing it? Of course, it would make no difference. The district court simply erred by not addressing this crucial factual question, and the Eighth Circuit per curiam opinion merely rubber stamped that error. In this case, Plaintiffs have put squarely in issue the efficacy of the language supposedly adopted by Marriott on or after August 4, 2005, which merely informed guests that the final bills would be issued in RUR without disclosing other critical elements and implications of the final calculation of room charges. The post August 4, 2005 language allegedly adopted here by Marriott cannot under any circumstances exculpate transactions completed prior to that date and, as we demonstrate elsewhere, is insufficient as a matter of law to exculpate subsequent transactions.

## IV.    CONCLUSION

Marriott's USD denominated price quotes are objectively false and misrepresent the price of its Russia Hotel rooms. Further, Marriott has failed to disclose material facts that would allow guests to understand what the price of their hotel rooms would be either in USD or RUR. Finally, the record is abundantly clear that Marriott understood exactly what was happening and

---

[101] *Id.*

never intended to sell rooms at its Russia Hotels as offered or advertised.  Plaintiffs and others similarly situated are entitled to summary judgment on the issue of liability for each of their claims.

Respectfully submitted,.


/s/ Paul D. Cullen, Sr.
Paul D. Cullen, Sr., D.C. Bar # 100230

Mark W. Borghesani, Esq., D.C. Bar # 426745     Joyce E. Mayers,  D.C. Bar # 268227
c/o The Cullen Law Firm PLLC                    Randall Herrick-Stare, D.C. Bar # 482752
1101 30th Street NW, Suite 300                  Amy M. Lloyd, D.C. Bar # 975887
Washington, D.C. 20007                          The Cullen Law Firm, PLLC
(202) 944-8600                                  1101 30th Street NW, Suite 300
*Of Counsel*                                    Washington, D.C. 20007
                                                (202) 944-8600
                                                *Counsel for Plaintiffs*


Dated: June 2, 2008