**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRITT A. SHAW, et al.,
on behalf of themselves and all others
similarly situated,

              Plaintiffs,

   v.

MARRIOTT INTERNATIONAL, INC.

             Defendant.

Civil Action No. 05-1138 (GK)

**MARRIOTT INTERNATIONAL, INC.'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Marriott International, Inc. ("Marriott") submits the following statement of undisputed facts in support of its motion for summary judgment:

**A.   GENERAL INFORMATION REGARDING MARRIOTT AND ITS HEADQUARTERS.**

1. Marriott is a hospitality company with more than 2,900 lodging properties in the United States and 67 other countries and territories. Affidavit of Brendan Ross, attached to Marriott's Opposition to Motion for Class Certification as Ex. 3, ¶ 3 (hereinafter "Ross Aff."); *see* Plaintiffs' Second Amended Class Action Complaint and Demand for Jury Trial, ¶ 18 (hereinafter "Second Amended Complaint") (admitting that Marriott is a hospitality company with more than 2,600 lodging properties in the United States and 65 other countries and territories).[1]

---

[1] Marriott attaches to this Statement of Undisputed Facts documents that have not been provided previously to the Court as attachments to prior briefing. Where a referenced document was submitted previously to the Court as an attachment to a pleading, this Statement references both document and the pleading to which it was attached when submitted to the Court.

2.	Marriott is incorporated in Delaware. Affidavit of Juan Carlos Garcia, attached to Marriott's Opposition to Motion for Class Certification as Ex. 4, ¶ 3 (hereinafter "Garcia Aff."); Second Amended Complaint, ¶ 11.

3.	Marriott's headquarters and principal place of business are at 10400 Fernwood Road, Bethesda, Maryland, and have been at all times relevant to this litigation. Garcia Aff., ¶ 3; Second Affidavit of Deborah McGrath, attached hereto as Exhibit 1, ¶¶ 3-5 (hereinafter "McGrath Second Aff."); *see* Shaw First Interrogatory Responses, attached hereto as Exhibit 2, No. 18 (admitting that Marriott "in fact . . . is headquartered in Bethesda, Maryland"); Charness First Interrogatory Responses, attached hereto as Exhibit 3, No. 18 (same).

4.	Marriott annually files a personal property tax return with the Maryland State Department of Assessments and Taxation ("SDAT"). Ross Aff., ¶ 6. Marriott also pays an annual fee to SDAT so that it can maintain its physical existence in the State of Maryland. *Id.*, ¶ 7.

5.	Marriott has a historical connection to Washington, D.C., where Marriott's heritage can be traced to a root beer stand opened in 1927. Second Amended Complaint, ¶ 18; Marriott's Responses to Plaintiffs' First Set of Interrogatories, attached hereto as Exhibit 4, at No. 8 (hereinafter "Marriott's First Interrogatory Responses"). As a result of the company's growth, in 1979, the headquarters were established in Bethesda, Maryland near the founder's home. 14M-03348, attached as Exhibit E to the Affidavit of Reine Blackwell-Moore ("Blackwell-Moore Aff."), attached hereto as Exhibit 5; Marriott's First Interrogatory Responses, No. 8.

6.	Marriott has a Washington, D.C. mailing address in addition to its Bethesda, Maryland corporate headquarters and mailing address, but Marriott does not maintain a corporate

2

office in D.C.  McGrath Second Aff., ¶¶ 3-5.

7.  The servers for Marriott's website – www.marriott.com – are operated out of Frederick, Maryland.  Affidavit of Deborah McGrath, attached to Marriott's Opposition to Motion for Class Certification as Ex. 5, ¶ 4 (hereinafter "McGrath Aff.").  None of Marriott's servers are located in Washington, D.C.  *Id.*

8.  No Plaintiff has stated that he or she was under the impression that Marriott was headquartered in Washington, D.C. at the time of making reservations to stay at the hotels in Russia affiliated with Marriott.  Plaintiffs have stated either that they were not aware of the location of Marriott's headquarters or that they knew that Marriott was headquartered in Maryland.  *See, e.g.,* Deposition of J. Stephen Morrison (CSIS employee), attached hereto as Exhibit 6, at 63 (hereinafter "Morrison Dep.") (testifying that he knew Marriott is headquartered in Maryland, but that the location had no impact on his selection of a hotel in Russia); Mendelson First Interrogatory Reponses, attached to Marriott's Opposition to Motion for Class Certification as Ex. 14, at Nos. 21-23 (hereinafter "Mendelson First Interrogatory Responses") (responding that she is "unfamiliar" with Marriott's representations regarding the location of its headquarters); Deposition of Robert Einhorn (CSIS employee), attached hereto as Exhibit 7, at 53 (hereinafter "Einhorn Dep.") (testifying that he did not know where Marriott is headquartered and that the impact of such information on his decision about where to stay was "none whatsoever"); Deposition of Gregory Broaddus (CSIS corporate representative), attached hereto as Exhibit 8, at 108-09 (hereinafter "Broaddus Dep.") (testifying that no one at CSIS ever relied on a statement that Marriott was headquartered in Washington, D.C. as a reason for staying at a Marriott hotel in Russia, and that he did not know where Marriott was headquartered); *see also* Shaw First Interrogatory Responses, No. 18; Charness First Interrogatory Responses, No. 18.

3

B.     THE MARRIOTT RUSSIA HOTELS.

9.     There are seven hotel properties located in Russia relevant to this litigation which are affiliated with Marriott (collectively, the "Marriott Russia Hotels"). Garcia Aff., ¶ 5.; Affidavit of Mary LoGiudice, attached to Marriott's Opposition to Motion for Class Certification as Ex. 6, ¶ 8 (hereinafter "LoGiudice Aff."). Four of these hotels – the Renaissance Moscow, the Renaissance Samara, the Renaissance St. Petersburg Baltic, and the Courtyard Moscow – are managed by Marriott and have been since they opened for business ("Marriott Managed Hotels"). Garcia Aff., ¶ 6; LoGiudice Aff., ¶ 8. The dates on which these hotels opened are included in the Marriott Russia Hotels Chart, attached hereto as Exhibit 9; *see* Garcia Aff., ¶ 6; Marriott's Responses to Plaintiffs' Fourth Set of Interrogatories, attached hereto as Exhibit 10, at No. 1.

10.    The remaining three hotels – the Moscow Marriott Grand, the Moscow Marriott Royal Aurora, and the Moscow Marriott Tverskaya – are franchised hotels that are neither owned nor operated by Marriott ("Marriott Franchised Hotels"). Garcia Aff., ¶¶ 7-8; LoGiudice Aff. ¶ 8. The dates on which these hotels became Marriott franchises are included in the attached Marriott Russia Hotels chart. *See* Ex. 9; Garcia Aff., ¶ 7.

11.    The Marriott Franchised Hotels are, and have been since opening, owned and operated by wholly-owned subsidiaries of Interstate Hotels and Resorts, Inc. ("Interstate"). Garcia Aff., ¶¶ 7-8; LoGiudice Aff., ¶ 8. Interstate is not owned or controlled by Marriott. Garcia Aff., ¶¶ 8-9; Ross Aff., ¶ 12.

12.    Since May 2002 or earlier, Marriott has had license agreements with Interstate Hotels Corporation ("IHC"); Colony Hotels and Resorts Company ("Colony"); and Interstate Hotels, LLC ("IH"). Ross Aff., ¶ 8; *see, e.g.*, 11M-00052-11M-00057, 11M-00060-11M-00140

4

(Moscow Marriott Royal Aurora License Agreement), attached as Exhibit C to Blackwell-Moore Aff.  Pursuant to these license agreements, IHC, Colony, and IH operate three Marriott-franchised hotels in Russia on Marriott's behalf.  Ross Aff., ¶ 8.  IHC operates the Moscow Marriott Grand, Colony operates the Moscow Marriott Tverskaya, and IH operates the Moscow Marriott Royal Aurora (collectively, the "Marriott Franchised Hotels").  *Id.*

13.     Under the license agreements, IHC, Colony, and IH, as operators of the Marriott Franchised Hotels, are solely responsible for establishing all room prices and other hotel charges in connection with the operation of the Marriott Franchised Hotels.  Ross Aff., ¶ 9.  IHC, Colony, and IH had exclusive control over the currency in which the Marriott Franchised Hotels quoted room rates.  *Id.*, ¶ 10.  The internal exchange rate of the Marriott Franchised Hotels has always been determined by the IHC, IH and Colony, respectively, themselves, as the operators of the Marriott Franchised Hotels; Marriott has never set the hotels' internal exchange rates or otherwise directed IHC, IH, Colony or any other party relating to any such internal exchange rates.  *Id.*, ¶ 11.

14.     Interstate owns and operates "Marriott Hotels of Moscow."  Ross Aff., ¶ 12.  Marriott Hotels of Moscow assists guests in making reservations for the Marriott Franchised Hotels.  *Id.*  Marriott Hotels of Moscow has Russian websites that provide email and telephone contact information for guests wishing to reserve at Marriott Franchised Hotels.  *Id.*; *see* http://www.visitmoscow.ru/english/hotels/grand/booking/, last visited May 31, 2008.  Marriott has no affiliation with Interstate's Marriott Hotels of Moscow or its websites.  Ross Aff., ¶ 12.  Marriott has no control over the information or confirmations that Interstate and Marriott Hotels of Moscow provide to prospective guests.  *Id.*; *see* Garcia Aff., ¶¶ 8-9.

C. **CURRENCY EXCHANGE PRACTICES AT THE MARRIOTT RUSSIA HOTELS AND IN RUSSIA GENERALLY.**

15. The local management of the Marriott Russia Hotels sets their own room rates and decides whether to quote room rates in U.S. dollars or other currency. LoGiudice Aff., ¶¶ 4, 7; Ross Aff., ¶¶ 9-10. During the entire time that Marriott Russia Hotels quoted prices in U.S. dollars, the internal exchange rate applied by the hotels was determined by the hotels themselves, not Marriott. LoGiudice Aff., ¶¶ 9-11; Ross Aff. ¶ 11; *see* Deposition of Linda Ann Bartlett, attached hereto as Exhibit 11, at 136-37, 156 (hereinafter "Bartlett Dep.").

16. The Marriott Russia Hotels no longer quote room prices in U.S. dollars. Garcia Aff., ¶ 13. All seven of the hotels now quote room prices in rubles. *Id.* All hotels except the Renaissance Moscow discontinued this practice in December 2006; the Renaissance Moscow converted to ruble pricing on January 1, 2008. *Id.*, ¶ 10.

17. From 1997 until June 2004, the Marriott Russia Hotels were required to settle guest bills in rubles to comply with Russian law. Affidavit of William Elliott Butler, attached to Marriott's Opposition to Motion for Class Certification as Ex. 7, ¶¶ 6-8 (hereinafter "Butler Aff."); Deposition of William Elliott Butler, attached hereto as Exhibit 12, at 63-64 (hereinafter "Butler Dep.").

18. To comply with this requirement during the time that Marriott Russia Hotels quoted prices in U.S. dollars, at the time of check-out, the hotels would translate the quoted U.S. dollar price into a price in a monetary unit referred to as a "currency unit." Garcia Aff., ¶ 11. One currency unit equaled one U.S. dollar, so the price in currency units always equaled the price quoted in U.S. dollars. *Id.*; CSIS 00047, attached to Marriott's Opposition to Motion for Class Certification as Ex. 9 ("The above rate is quoted in units equal to US Dollars."). Then, the

currency unit price would be converted into a price in rubles using a hotel exchange rate. Garcia Aff., ¶ 12. Guests' bills specified the use of currency units and the hotel exchange rate. *E.g.*, PLF000049, attached to Marriott's Opposition to Class Certification Motion as Ex. 19; PLF000061, attached hereto as Exhibit 13.

19. During the time that the Marriott Russia Hotels converted price quotes in U.S. dollars into rubles using an internal exchange rate, virtually all other hotels and businesses that quoted prices for goods or services in U.S. dollars also followed this practice, which grew out of the volatility of the ruble after the disintegration of the Soviet Union. Butler Aff., ¶¶ 5, 12; Butler Dep. at 63-64; *see also* Deposition of Irina Paliashvili, attached hereto as Exhibit 14, at 23-27, 61-63 (hereinafter "Paliashvili Dep.").[2]

### D. MARRIOTT'S AUTOMATED RESERVATION SYSTEM FOR HOTEL ACCOMMODATIONS ("MARSHA") AND RESERVATION PROCESSES FOR MARRIOTT RUSSIA HOTEL LODGING.

20. Marriott's worldwide automated reservation system is named "MARSHA," which stands for Marriott's Automated Reservation System for Hotel Accommodations. LoGiudice Aff., ¶ 4; Deposition of Mary LoGiudice, attached hereto as Exhibit 15, at 97. Marriott-affiliated hotel properties select their own room rates and currency for quoting those room rates, and then input this information into MARSHA. LoGiudice Aff., ¶¶ 4, 7; McGrath Aff., ¶ 5; *see also*

---

[2] Former class representative Irina Paliashvili testified that, following the dissolution of the Soviet Union in 1991, "there was very high inflation rate and the currency exchange there was unpredictable." Paliashvili Dep. at 25. To cope with the wide fluctuation in exchange rates and a black market for exchange rates, businesses used the dollar "as an informal denominator." *Id*. at 26. Even though businesses were required by law to pay in rubles, they would reach an informal salary agreement in dollars with their employees, and then convert dollars to rubles for each payment period. *Id*. at 25-27. Paliashvili testified that, during the time she ran her law firm in Russia, she had this type of agreement with her employees, where they were guaranteed a certain dollar amount that would be converted into rubles at the time of payment "because [the] dollar was a stable currency then and ruble was not." *Id*. at 62.

LoGiudice Dep. at 167-168; Marriott's First Interrogatory Responses, No. 6.

21. Numerous different reservation channels, most of which are not owned or controlled by Marriott, access the information in MARSHA to assist prospective guests in making reservations. McGrath Aff., ¶¶ 5-6, 10; LoGiudice Dep. at 162-63. Many of the reservation channels provide guests with information that is different from or supplemental to the information provided by MARSHA. McGrath Aff., ¶¶ 7-9.

22. The Marriott Reservation Data Warehouse ("MRDW") is a central repository for data concerning Marriott hotel reservations made through the various reservation channels that access MARSHA. McGrath Second Aff., ¶ 13. The guest data in MRDW pertains to reservations, not actual guest stays. *Id.* Thus, the existence of a guest record in MRDW does not indicate that the guest actually fulfilled the reservation, stayed at the hotel, or paid for the room. *Id.* Approximately 25-30% of reservations in MRDW for the franchised hotels in Russia result in cancellations or no-shows, which is consistent with the cancel rates of North American hotels. *Id.*, ¶ 14.

23. A prospective guest may make a reservation at a Marriott Russia Hotel through any of the following reservation channels: (a) contact the hotel directly; (b) contact Interstate's "Marriott Hotels of Moscow;" (c) call a Marriott toll-free number; (d) contact a third-party travel agent; (e) use an internet site such as Expedia.com; or (f) book a reservation on marriott.com. McGrath Aff., ¶ 6; LoGuidice Aff., ¶ 12; LoGiudice Dep. at 163.

24. If a prospective guest books the rooms by contacting a Marriott Russia Hotel directly, through phone, email, or otherwise, the guest would interact with hotel personnel located in Russia. *See* LoGiudice Aff., ¶ 12; Marriott's First Interrogatory Responses, No. 3.

25. Plaintiffs who made reservations by contacting either Interstate's Marriott Hotels

8

of Moscow or the Marriott Franchised Hotels directly by telephone or otherwise did not receive any representations from Marriott, as these entities are neither owned nor operated by Marriott. *See* Ross Aff., ¶ 12; Garcia Aff., ¶¶ 8-9.

26.     Guests may also book Marriott Russia Hotel lodging through third-party traditional travel and on-line travel agents.  McGrath Aff., ¶ 6.  Although some of these agents receive rate and pricing information from MARSHA, Marriott does not control the information provided to guests by these independent third parties.  McGrath Aff., ¶¶ 9-10; Deposition of Deborah McGrath, attached hereto as Exhibit 16, at 75-76 (hereinafter "McGrath Dep.").

27.     If a prospective guest contacts a toll-free Marriott number, the call is routed to a reservation agent via Marriott Global Reservation Sales, which is operated by Marriott and based in Omaha, Nebraska.  LoGiudice Aff., ¶ 13.  Depending on which toll-free number the guest calls and the call volume, the person would likely speak with a reservation agent in one of the following locations:  Salt Lake City, Utah; Solon, Ohio; San Antonio, Texas; Miami, Florida; Sarnia, Canada; Saskatoon, Canada; London, England; Huntingdon, England; Mexico City, Mexico; or Kuala Lumpur, Malaysia.  *Id.*; Deposition of Tina Wolz, attached to Marriott's Opposition to Motion for Class Certification as Ex. 12, at 58 (hereinafter "Wolz Dep."). Marriott does not, and never has, operated a toll-free call center in the District of Columbia. LoGiudice Aff., ¶¶ 13-14; Wolz Dep. at 58.

28.     On June 7, 2003, Marriott placed a currency calculator on its website so that a prospective guest could convert an amount in one currency into any of approximately 158 different currencies.  8M-01970 (Exhibit 3 to the Deposition of Bill Schallenberg), attached as Exhibit B to Blackwell-Moore Aff.; McGrath Aff., ¶ 15; McGrath Dep. at 50-51.  With the exception of one reservation by Plaintiff Shaw, no Plaintiff used the currency calculator.

Mendelson First Interrogatory Responses, No. 11; Deposition of Sarah Mendelson, attached hereto as Exhibit 17, at 86 (hereinafter "Mendelson Dep."); Deposition of Neal Charness, attached hereto as Exhibit 18, at 75-76 (hereinafter "Charness Dep.").

### E.    MARRIOTT'S WRITTEN CONFIRMATION PRACTICES.

29.    Each reservation channel that accesses MARSHA has its own practice for issuing written confirmations. McGrath Second Aff., ¶ 8.

30.    Marriott does not provide a written confirmation if the reservation is booked through a third-party reservation channel. McGrath Second Aff., ¶ 9. Accordingly, Marriott does not issue a written confirmation if the reservation is booked through direct contact with a Marriott Franchised Hotel, Interstate's "Marriott Hotels of Moscow," or through a traditional or internet travel agency or service. *Id.*, ¶ 10.

31.    Marriott provides written reservation confirmations to prospective guests only if 1) the guest books his lodging through an official Marriott reservation channel (i.e., through Marriott.com, through a Marriott telephone reservation, or directly with a Marriott Managed Hotel); 2) that guest provides an e-mail address or facsimile number; and 3) the rate type booked was not a negotiated group rate (during the time period at issue in this case). McGrath Second Aff., ¶ 11; McGrath Dep. at 100-101. As a result, only a small percentage of guests who stayed at the Marriott Russia Hotels during the relevant time period received written confirmations from Marriott. McGrath Second Aff., ¶ 12.

32.    Since at least 2002, some if not all guests reserving at Marriott Franchised Hotels in Russia, either through Interstate's Marriott Hotels of Moscow or otherwise, received written confirmations informing them that the rate quoted was in currency units equal to U.S. dollars, subject to the hotel's internal exchange rate at check-out. *E.g.*, CSIS-000047, attached to

Marriott's Opposition to Motion for Class Certification as Ex. 9.

### F. INFORMATION PROVIDED TO GUESTS BY MARRIOTT REGARDING CURRENCY EXCHANGE PRACTICES.

33. Marriott Russia Hotels conspicuously displayed hotel exchange rates with signs at multiple locations in the hotel, including the check-in desk. 6M-STP-00011, 6M-S-00009, 6M-RM-00006-7, attached as Exhibits A-D to the Declaration of Pankaj Birla, attached hereto as Exhibit 19; *see also* Bartlett Dep. at 243 (discussing policy for displaying exchange rates).

34. In August 2005, the hotel personnel taking reservations at the Marriott Managed Hotels began orally advising prospective guests that the quoted price was in currency units subject to the hotel's exchange rate at check-out. Garcia Aff., ¶ 16.

35. In August 2005, Marriott inserted language into its automated reservation system, MARSHA, stating that prices quoted in U.S. dollars must be paid in rubles at the hotel's exchange rate at the time of check-out. 9M-001711-001713, attached as Exhibit A to Blackwell-Moore Aff.

36. After May 3, 2005, prospective guests using www.marriott.com who provided an e-mail address received reservation confirmations and pre-arrival e-mails containing this statement: "Rate(s) quoted in US Dollars. All charges are payable in local currency subject to the Hotel's exchange rate at check-out." McGrath Aff., ¶ 19.

37. On or after June 5, 2005, guests who visited the Marriott website and used the currency calculator received this "Hotel Exchange Rate" language: "Converted amount is based on the exchange rate from the close of business of the preceding day and is for comparison purposes only." McGrath Aff., ¶ 19; McGrath Dep. at 144.

38. As of August 5, 2005, Marriott expressly directed its toll-free reservation agents

to inform guests that the rate being quoted was in currency units equal to U.S. dollars but that payment must be made at the hotel's current exchange rate in rubles only. LoGiudice Aff., ¶ 15.

39. Guests who made their reservations on www.marriott.com after August 2005 received the following information at Step 4 ("Review Details") and at Step 6 ("Confirmation") of the reservation process: "All prices Quoted in US Dollars! Charges are payable in local currency at applicable hotel exchange rate at checkout." McGrath Aff., ¶ 19.

### G. CHARACTERISTICS OF GUESTS STAYING AT MARRIOTT RUSSIA HOTELS.

40. According to Plaintiffs' analysis of MRDW data, at least 28.4% of guest stays are repeat guest stays – that is, the guest stayed more than once at the Marriott Russia Hotels during the time frame relevant to this litigation. Second Declaration of Timothy Brickell, attached to Plaintiffs' Reply in Support of Motion for Class Certification as Ex. 36, at ¶¶ 6, 18 (hereinafter, "Second Brickell Declaration").

41. According to Plaintiffs' analysis of MRDW data, at least 99.7% of the proposed class has alleged actual damages under $1500. Third Declaration of Timothy Brickell, attached to Plaintiffs' Reply in Support of Motion for Class Certification as Ex. 40, at ¶ 16.

42. The MRDW contains data regarding the trip purpose as reported by guests for the years 2005 forward. McGrath Second Aff., ¶ 15. For each of these years, trip purpose data was available for between 87% to 90% of the total Marriott Russia Hotel guests stays. *Id.* From this available data, the percentage of business stays is as follows: 89% of guests stays were reported as business travel in 2007; 84% were so reported in 2006; and 79% were so reported in 2005. *Id.*

43. Plaintiffs contend that the putative class includes 402,801 stays by guests at the Marriott Russia Hotels. Second Brickell Declaration, ¶ 18. Of these stays, Plaintiffs state that

only 8,199 were related to guests with District of Columbia addresses. *Id.*, ¶ 17. Thus, as estimated by Plaintiffs, guests with District of Columbia addresses comprise less than 2.1% of the putative class.

### H.  PLAINTIFF BRITT SHAW.

44.   Plaintiff Britt Shaw is an American citizen who has resided in the United Kingdom since 2000; he is domiciled in Florida for tax purposes. Deposition of Britt Shaw, attached hereto as Exhibit 20, at 4, 34, 166-167 (hereinafter "Shaw Dep."); Second Amended Complaint, ¶ 42. His last U.S. residence was New York. *Id.* at 34.

45.   Shaw graduated from Columbia Law School in 1989 and started his own firm in Russia practicing corporate law. Shaw Dep. at 34-38. He lived and worked in Moscow from 1992 through 2000. *Id.* at 34.

46.   Shaw knew as early as 2000 that Russian hotels would make room reservations in U.S. dollars and apply an exchange rate to convert the hotel bill into rubles at checkout. Shaw Dep. at 71-72, 77-80.

47.   From 2000 through 2007, Shaw traveled to Moscow approximately once a month for his client, a Russian company, where his primary role was to hire outside counsel from non-Russian countries to assist in transactions. Shaw Dep. at 55-56, 91. He knew that the normal practice for hotels was to settle bills in local currency using an exchange rate. *Id.* at 70-72, 77. He was knowledgeable about exchange rates and knew that when he exchanged money he would not necessarily get the Central Bank rate. *Id.* at 65-68.

48.   Shaw normally made his travel arrangements through an American Express travel agency. Shaw Dep. at 59. On one occasion in April 2005, he made his hotel reservation on www.marriott.com. *Id.* at 115-117. Shaw made this April 2005 reservation after he had already

met with a lawyer regarding filing suit against Hyatt International Corporation ("Hyatt") concerning Hyatt's exchange rate practices. *Id.* at 108-109, 122-123.

49.     When Shaw checked into the Renaissance Moscow Hotel on April 19, 2005, he signed a registration card stating that the daily rate of $425 was in currency units, Shaw Dep. at 123, and "expected to be charged in rubles," *id.* at 128.

50.     When he received his bill at check-out for the April, 2005 stay, the 425 units charged matched his expectation as to dollar rate for the room. Shaw Dep. at 127. Shaw acknowledged that the exchange rate of 32 rubles to one unit was clearly stated on the bill. *Id.* at 128.

51.     Shaw knew prior to his April 2005 stay at the Renaissance Moscow Hotel that the hotel's exchange rate would be 32 rubles per dollar; he received this same exchange rate on previous stays at the Renaissance Moscow, Shaw Dep. at 96-98, and at the Moscow Hyatt, *id.* at 103-106; *Shaw v. Hyatt,* 461 F.3d 899, 900 (7th Cir. 2006).

52.     Shaw stayed at Marriott Russia Hotels at least eight times after April 2005. Shaw Dep. at 86-87, 90-91; Shaw Dep. Ex. 12, attached to Marriott's Opposition to Motion for Class Certification as Ex. 18.

53.     Shaw's stays at the Marriott Russia Hotels were for business travel. Shaw Dep. at 139-141; Shaw First Interrogatory Responses, Nos. 14-15. Shaw's employer, not Shaw himself, paid for all his hotel stays at the Marriott Russia Hotels. Shaw Dep. at 102-03, 107-08.

**I.      PLAINTIFF SARAH MENDELSON**

54.     Plaintiff Sarah Mendelson is a United States citizen and resident of the District of Columbia. Mendelson Dep. at 3-5.

55.     Mendelson conducted research in the Soviet Union in 1990-1991, worked for a

year in Moscow from 1994-1995, and is fluent in Russian. Mendelson Dep. at 20-22.

56. Since 1999, Mendelson has stayed at Marriott Russia Hotels over twenty times. Mendelson Dep. at 77-79; Mendelson Dep. Ex. 18, attached to Marriott's Opposition to Motion for Class Certification as Ex. 20. She is accustomed to the exchange rate practices at the Marriott Russian Hotels and in Russia, generally. Mendelson Dep. at 23-24.

57. Mendelson did not make her own reservations to stay at a Marriott Russia Hotel; rather, Mendelson's assistant organized her trips and made her room reservations. Mendelson Dep. at 85-86, 75, 100.

58. Neither Mendelson nor her assistant made reservations by contacting Marriott or using www.marriott.com. Mendelson Dep. at 86; Mendelson First Interrogatory Responses, No. 11. During the putative class period, Mendelson stayed only at Marriott Franchised Hotels, which are owned and operated by Interstate, not Marriott. *See* Mendelson's Marriott Rewards Statement, 11M-00001-00002, attached as Exhibit D to Blackwell-Moore Aff. Mendelson's assistant contacted either the franchised hotels directly or Interstate's "Marriott Hotels of Moscow" to make the reservations. Mendelson First Interrogatory Responses, No. 11.

59. Mendelson was advised that the quoted price for her hotel reservations at the Marriott Franchised Hotels was in currency units and that the bills would be settled in rubles at the hotel's exchange rate. CSIS 00045-00065, attached to Marriott's Opposition to Motion for Class Certification as Ex. 9. The reservation confirmations that Mendelson received in 2002 and 2003 stated that "The above rate is quoted in units equal to US Dollars . . . Payment must be made at the hotel's current exchange rate in rubles only." Mendelson Dep. Ex. 20, attached to Marriott's Opposition to Motion for Class Certification as Ex. 21. These reservation confirmations were sent by the Marriott Franchised Hotel or Marriott Hotels of Moscow, not

Marriott. *Id.*; Mendelson Dep. at 90-91.

60.     In making a reservation for a stay at the Marriott Moscow Grand in January, 2004, Mendelson was advised by Interstate's "Marriott Hotels of Moscow" that the hotel's exchange rate was higher than that of the Central Bank Rate. Mendelson Dep. at 102-106; Mendelson Dep. Ex. 26, attached to Marriott's Opposition to Motion for Class Certification as Ex. 22.

61.     For many of her Marriott stays, Mendelson was charged the U.S. Embassy government rate, which applied the Central Bank exchange rate to convert her hotel bill to rubles at checkout. Mendelson Dep. at 102-106, 109, 114, 125, 129; CSIS 00015, attached hereto as Exhibit 21; Mendelson Dep. Ex. 26, attached to Marriott's Opposition to Motion for Class Certification as Ex. 22.

62.     Mendelson did not pay for her rooms at the Marriott Russia Hotels. Mendelson First Interrogatory Responses, No. 11; Mendelson Dep. at 38 ("I personally don't pay anything."). At least since 2003, all of her trips, including all of her stays at the Marriott Russia Hotels, were business related and were paid by her employer. Mendelson First Interrogatory Responses, Nos. 10-11; Mendelson Dep. at 37-38. Mendelson admitted in her deposition that she is not seeking damages in this lawsuit. Mendelson Dep. at 39-40.

63.     Mendelson never complained about her stays at the Marriott Russia Hotels, including during meetings between Interstate and her employer, Plaintiff Center for Strategic and International Studies ("CSIS"), in which she participated to discuss the company's special corporate rates. CSIS 00032-00033, attached hereto as Exhibit 21; Mendelson First Interrogatory Responses, No. 13; Mendelson Dep. at 135-36.

64.     Per CSIS policy, Mendelson had an obligation to advise the Chief Financial

16

Officer or someone else at CSIS if she believed that she was being overcharged by any hotel used by CSIS for business. Broaddus Dep. at 68. Likewise, Mendelson had an obligation to advise the Chief Financial Officer or someone else at CSIS if she believed she was being subject to an improper exchange rate by any hotel used by CSIS for business. *Id.* at 68-69. Mendelson never advised anyone at CSIS of an alleged overcharge. *See* Mendelson First Interrogatory Responses, No. 13.

      **J.**      **PLAINTIFF CSIS.**

65.     Plaintiff CSIS is a Delaware corporation, headquartered in Washington, D.C. Second Amended Complaint, ¶ 15.

66.     CSIS employees, including Plaintiff Mendelson, frequently travel to Russia to further CSIS's business objectives of research and policy analysis. *See* Second Amended Complaint ¶ 15; Broaddus Dep. at 46; Einhorn Dep. at 32. CSIS's projects are funded primarily through grants, and its employees' travel expenses are budgeted into those appropriations. CSIS First Interrogatory Reponses, attached to Marriott's Opposition to Motion for Class Certification as Ex. 23, at No. 25 (hereinafter "CSIS First Interrogatory Responses"); Broaddus Dep. at 52.

67.     CSIS employees stayed at the Marriott Russia Hotels on multiple occasions, Mendelson First Interrogatory Responses, No. 10; CSIS First Interrogatory Reponses, No. 3, and thus were familiar with currency units as well as the requirement that they pay the hotel bill in rubles at the hotel's internal exchange rate.

68.     CSIS regularly received a special government room rate for its employees' stays at Marriott Russia Hotels. CSIS 00024, attached to Marriott's Opposition to Motion for Class Certification as Ex. 9; Mendelson Dep. at 102-106, 109, 114, 125 & 129; CSIS 00001-00005, attached hereto as Exhibit 21; CSIS 00015, attached hereto as Exhibit 21. As part of this rate,

CSIS was given the Central Bank exchange rate – not the hotel exchange rate – when it paid for its employees' rooms. Ex. 21; CSIS 00024, attached to Marriott's Opposition to Motion for Class Certification as Ex. 9; Mendelson Dep. at 102-106, 109, 114, 125, 129.

69. In those instances where the hotel exchange rate was applied, CSIS received confirmations for its employees' stays from the Marriott Franchised Hotels and/or Interstate's Marriott Hotels of Moscow that stated the use of currency units and that settlement would be in rubles at the hotel's exchange rate. CSIS 00045-00065, attached to Marriott's Opposition to Motion for Class Certification as Ex. 9.

70. No one from CSIS relied on any statement by Marriott about the location of its corporate headquarters in making hotel reservations. Mendelson Dep. at 95; Einhorn Dep. at 53; Morrison Dep. at 63; Broaddus Dep. at 108-09. CSIS does not know where Marriott's headquarters are located. Broaddus Dep. at 108-109.

### K. PLAINTIFF NEAL CHARNESS

71. Plaintiff Neal Charness is a Michigan resident. Charness Dep. at 4. He holds a law degree and has extensive worldwide travel experience. *Id.* at 25, 36-48.

72. In booking his stays at issue in this litigation, Charness first accessed www.marriott.com, but completed the reservations by contacting the Marriott toll-free number. Charness Dep. at 12-15, 70-71, 74-75. When Charness called the Marriott toll-free number to make his reservation, *id.* at 12-13, 70-71, 74-75, his call would have been directed to an operator at an international call center – none of which are in the District of Columbia. *See supra* ¶ 27.

73. During his first stay at the Marriott Tverskaya on November 19, 2004, Charness saw a sign at check-in regarding currency units. Charness Dep. at 90-91, 94-95, 101, 103, 164. When he checked into the Marriott Tverskaya, Charness signed the registration form, indicating

that the room price was in units. *Id.* at 83-84. When Charness checked out of the hotel, his check-out folio charged in units an amount equal to the price previously quoted in U.S. dollars. *Id.* at 93-94.

74. Approximately three weeks later, Charness returned to a Marriott Russia Hotel. He was aware of the business practice of quoting prices in U.S. dollars but requiring payment in rubles, Charness Dep. at 149-50, and expected to be charged in currency units subject to the hotel's exchange rate. *Id.* at 150-151.

75. When he checked into the Marriott Grand on December 8, 2004, Charness again signed the registration form, indicating that the room price was in units. Charness Dep. at 147, 148. He again recalled that there was a sign regarding the use of currency units. Charness Dep. at 91, 103, 149.

76. When Charness checked out of the hotel for the December 2004 stay, the units charged equaled the U.S. dollar price previously quoted by a Marriott toll-free reservation agent. Charness Dep. at 153-155; Charness Dep. Ex. 6, attached to Marriott's Opposition to Motion for Class Certification as Ex. 19.

Dated: June 2, 2008                                          Respectfully submitted,

                                                              /s/ Joel Dewey
                                                             Joel Dewey (Bar No. 358175)
                                                             Holly Drumheller Butler (Bar No. 459681)
                                                             Sonia Cho (Bar No. MD26995)
                                                             DLA Piper US LLP
                                                             6225 Smith Avenue
                                                             Baltimore, Maryland 21209
                                                             410-580-3000
                                                             410-580-3001 (facsimile)

                                                             *Attorneys for Defendant*
                                                             *Marriott International, Inc.*