# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BRITT A. SHAW, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-1138 (GK) |
| v. | ) | Status Conference July 7, 2008 |
| | ) | |
| | ) | |
| MARRIOTT INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO MARRIOTT'S MOTION FOR SUMMARY JUDGMENT

Mark W. Borghesani, D.C. Bar # 426745
c/o THE CULLEN LAW FIRM, PLLC
1101 30th Street, N.W.
Washington, D.C., 20007
*Of Counsel*

Paul D. Cullen, Sr., D.C. Bar # 100230
Joyce E. Mayers, D.C. Bar # 268227
Randall S. Herrick-Stare, D.C. Bar # 482752
Amy M. Lloyd, D.C. Bar # 975887
THE CULLEN LAW FIRM, PLLC
1101 30th Street, N.W.
Suite 300
Washington, D.C., 20007
*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.      Each Of The Plaintiffs Has Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.      Plaintiffs Shaw and Mendelson Have Suffered Injury in Fact . . . . . . . . . . . . . . . 1

    B.      CSIS Enjoys Status as a Consumer Under the D.C. CPPA . . . . . . . . . . . . . . . . 8

    C.      Corporate Reimbursement for Personal Expenses Does Not Deprive
        Employees of Their Status as Consumers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.      The Claims of Shaw, Charness and Absent Class Members
        Have Sufficient Connections to the District to Allow Adjudication
        Under D.C. Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.      The Connections with Shaw, Charness and Absent Class Members . . . . 14

        2.      The District Has State Interests in this Controversy Such
            that the Imposition of D.C. Law is Neither Arbitrary Nor
            Fundamentally Unfair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        3.      Marriott Has Not Established That Any Other Jurisdiction
            Has A Greater Interest In This Controversy . . . . . . . . . . . . . . . . . . . . . . . 22

        4.      Marriott Has No Basis To Complain About A Worldwide Class  . . . . . . 24

II.      Marriott's Mid-August 2005 Disclosure Statement Is Inadequate . . . . . . . . . . . . . . . . 27

III.      Marriott Is Liable As A Matter Of Law For Acts Committed "Directly Or Indirectly"
    Through Its Franchised Hotels. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

IV.      Guests with Multiple Stays May Recover for Each Stay . . . . . . . . . . . . . . . . . . . . . . . 33

V.      Material Issues of Fact Remain on Plaintiffs Claims for Misrepresentation of
    Source and Geographic Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

VI.      Remedy and Class Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

**CASES**

*Adam A. Wechsler & Son, Inc. v. Klank*
561 A.2d 1003 (D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

Alicke v. MCI Communications Corp.,
111 F.3d 909 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Allstate Insurance Company v. Hague,*
472 U.S. 797 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Aspinall v. Phillip Morris Companies,*
813 N.E.2d 476 (Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Ass'n of Data Processing Serv. Orgs. v. Camp,
397 U.S. 150 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Athridge v. Aetna Cas. And Sur. Co.,
163 F.Supp.2d 38 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Bowling v. Pfizer, Inc.,
102 F.3d 777 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Clifton Terrace Assoc. v. United Techs Corp.,
728 F.Supp. 24 (D.D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Commonwealth v. Fall River Motor Sales. Inc.,
409 Mass. 302, 565 N.E.2d 1205 (Mass.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Cromer Fin. Ltd. v. Berger,
205 F.R.D. 113 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*District Cablevision Limited Partnership v. Bassin,*
828 A.2d 714 (D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 37

Eli Lilly & Co. v. Home Ins. Co.,
764 F.2d 876 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ford v. ChartOne, Inc.,*
908 A.2d 72 (D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*\* The Table of Authorities contains asterisks identifying the cases upon which the Plaintiffs primarily rely.*

*Fulfillment Services, Inc. v. United Parcel Service, Inc.,*
__ F.3d __, (Case No. 06-15970 9th Cir. June 9, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Green v. United States,*
312 A.2d 788 (D.C. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Howard v. Riggs National Bank,
432 A.2d 701 (D.C. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Hoyte v. Yum Brands, Inc.,
489 F.Supp.2d 24 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Hundred East Credit Corporation v. Eric Schuster Corporation,
515 A.2d 246 (N.J. Super A.D. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Friends of Tilden Park, Inc. v. District of Columbia,*
806 A.2d 1201 (D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Independent Communications Network, Inc. v. MCI Telecommunications Corp.
657 F.Supp. 785 (D.D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re Baan Co. Sec. Litig.,
103 F.Supp.2d 1 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

In re Holocaust Victims Asset Litig.
105 F.Supp.2d 139 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

In re Michael R. Milken and Assoc. Sec.,
No. 92 Civ. 1151, 1993 WL 413673 (S.D.N.Y. Oct. 07, 1993) . . . . . . . . . . . . . . . . . . . . . . . 25

In re Pizza Time Theatre Sec. Litig.,
112 F.R.D. 15 (N.D. Cal. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

In re RoyalAhold N.V. Sec. & ERISA Litig.,
351 F. Supp. 2d 334 (D. Md. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

In re St. Jude Medical, Inc.
425 F.3d 1116 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re St. Jude Medical, Inc.*
2006 WL 2943154 (Oct. 13 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*In re St. Jude Medical, Inc.,*
522 F.3d 836 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re U.S. Fin. Sec. Litig.,*
69 F.R.D. 24 (S.D. Cal. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Mazanderan v. Independent Taxi Owners' Assoc., Inc.,*
700 F. Supp. 588 (D.D.C. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

\*Phillips Petroleum v. Shutts,*
472 U.S. 797 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 18, 19

*Ramirez v. Midwest Airlines,*
___ F. Supp. 2d ___, 2008 WL 682438 (D.Kan.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

\*Shaw v. Marriott International,*
474 F.Supp.2d 141 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 14, 20

\*Snowder v. District of Columbia,*
Case No. 06-cv-959 (June 5, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

\*State v. Cottman Transmissions Systems, Inc.,*
587 A.2d 1190 (Md. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*The Dreier Co., Inc. v. Unitronix Corp.,*
527 A.2d 875 (N.J. Super A.D. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Floersheim,*
(1980-2) CCH Trade Cases P 63,368 (C.D.Cal.1980),
aff'd, 659 F.2d 1090 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

\*United States v. Reader's Digest Association, Inc.,*
662 F.2d 955 (3rd Cir.1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 33, 34

\*United States v. Reader's Digest Association, Inc.,*
494 F.Supp. 770 (D.Del. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Shelton Wholesale. Inc.,*
34 F.Supp.2d 1147 (W.D.Mo.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Vt. Agency of Natural Resources v. U.S. ex rel Stevens,*
529 U.S. 765 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Warth v. Seldin,*
422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Washkoviak v. Student Loan Marketing Ass'n.,*
900 A.2d 168 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 21

*\*Wells v. Allstate Insurance,*
210 F.R.D. 1 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4

*Williams v. The Purdue Pharma Co.,*
297 F. Supp.2d 171 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 5

**RULES**
Fed. R. Civ. P. Rule 37(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**REGULATIONS**
D.C. CPPA § 28-3901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 30

D.C. CPPA §28-3901(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 11, 13

D.C. CPPA §28-3901(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 11, 13

D.C. CPPA § 28-3901(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. CPPA § 28-3901(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.C. CPPA § 28-3901(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. CPPA § 28-3904(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.C. CPPA § 28-3904(t) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.C. CPPA § 28-3904(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

D.C. CPPA § 28-3905(k)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6

D.C. CPPA § 28-3905(k)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**TREATIES**
Treaty of Friendship, Commerce and Navigation, April 2, 1953, U.S.-Japan. . . . . . . . . . 23, 24

Treaty of Friendship, Commerce and Navigation, Jan. 21, 1950, U.S.-Ir. (Ireland) . . . . . . . . 24

Treaty of Friendship, Commerce and Navigation, Oct. 29, 1954, U.S.-F.R.G. (Federal Republic of Germany) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A Convention to Regulate Commerce between the Territories of the United States and of his Britannick Majesty, July 3, 1815, U.S.-Gr. Brit. (Great Britain) . . . . . . . . . . . . . . . . . . . . . . . 24

Treaty of Friendship, Commerce and Navigation, July 27, 1853, U.S.-Arg. (Argentina) . . . . . 24

Treaty of Friendship, Commerce and Consular Rights, June 19, 1928, U.S.-Aus. (Austria) . . 24

Treaty of Friendship, Establishment and Navigation, Feb. 21, 1961, U.S.-Belg. (Belgium) . . 24

Treaty of Friendship, Commerce and Navigation, Nov. 4, 1946, U.S.-P.R.C. (Peoples Republic of China) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Treaty of Friendship, Commerce and Navigation, July 10, 1851, U.S.-Costa Rica . . . . . . . . . 24

Treaty of Friendship, Commerce and Consular Rights, Feb. 13, 1934, U.S.-Fin. (Finland) . . . 24

Convention of Establishment, Nov. 25, 1959, U.S.-Fr. (France) . . . . . . . . . . . . . . . . . . . . . . . 24

Treaty of Amity, Economic Relations and Consular Rights, Aug. 15, 1955, U.S.-Iran . . . . . . 24

Treaty of Friendship, Commerce and Navigation, Aug. 23, 1951, U.S.-Isr. (Israel) . . . . . . . . . 24

Treaty of Friendship, Commerce and Navigation, Nov. 28, 1956, U.S.-Korea . . . . . . . . . . . . . 24

Treaty of Friendship, Commerce and Navigation, Aug. 8, 1938, U.S.-Liber. (Liberia) . . . . . . 24

Treaty of Friendship, Establishment and Navigation, Feb. 23, 1962, U.S.-Lux. (Luxemburg) . 24

Treaty of Friendship, Commerce and Navigation, March 27, 1956, U.S.-Neth. (Netherlands) 24

Treaty of Friendship, Commerce and Navigation, June 5, 1928, U.S.-Nor. (Norway) . . . . . . . 24

Treaty of Amity, Economic Relations and Consular Rights, Dec. 20, 1958, U.S.-Oman, . . . . 24

Treaty of Friendship and Commerce, Nov. 12, 1959, U.S.-Pak. (Pakistan) . . . . . . . . . . . . . . 24

Treaty of Friendship, Commerce and Navigation, Feb. 4, 1859, U.S.-Para. (Paraguay) . . . . . 24

Treaty of Friendship and General Relations, July 3, 1902, U.S.-Spain . . . . . . . . . . . . . . . . . . 24

Convention of Friendship, Reciprocal Establishments and Commerce, Nov. 25, 1850, U.S.-Switz. (Switzerland) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Treaty of Friendship, Commerce and Navigation, Feb. 2, 1948, U.S.-Italy . . . . . . . . . . . . . . 24

**ARGUMENT**

**I.      Each of the Plaintiffs Has Standing**

Except for its assertion that neither Shaw nor Mendelson have experienced injury-in-fact,

Marriott's arguments do not constitute a legitimate attack on standing.  Nevertheless, we deal

with each substantive point raised because they reaffirm important points related to choice of law

and the substantive reach of the D.C. CPPA.

**A.      Plaintiffs Shaw and Mendelson Have Suffered Injury in Fact**

Marriott argues that neither Shaw nor Mendelson have standing to bring a claim because

each was reimbursed by their employers for the cost of their hotel rooms in Russia.   To be clear,

Marriott admits that its pricing practices resulted in a charge to its guests of more in USD than it

represented in its advertising and price confirmations to Plaintiffs.[1]  Nor does Marriott contend

that its misrepresentations and omissions of fact related to its pricing practices did not cause

injury to some person.  Rather, Marriott seeks to excuse its price misrepresentations because the

money to pay the overcharge came from someone other than Shaw or Mendelson.  Marriott

misapprehends the elements necessary to establish "injury in fact."

First, it is not necessary to have economic injury in order to have standing.[2]  Article III

_____

[1]  Marriott Opposition to Motion for Class Certification (Doc. 75-2) at 5-6.

[2]  *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982) ("That the alleged injury results from the organization's noneconomic interest in encouraging open housing does not effect the nature of the injury suffered, and accordingly does not deprive the organization of standing."); *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1207 (D.C. 2002) ("But a concrete and demonstrable injury to the organization's activities is enough for standing whether the injury economic or noneconomic.); *Wells v. Allstate Insurance,* 210 F.R.D. 1, 9 (D.D.C. 2002) (statutory damages provided by CPPA allowed where plaintiffs can show causation, but not pecuniary damages); *Williams v. The Purdue Pharma Co.,* 297 F. Supp.2d 171, 177 (D.D.C. 2003) (Injury in fact requires demonstration of an invasion of legally protected

1

standing "is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."[3]  There are three requirements for constitutional standing  – injury, causation and redressability.[4]  The "injury" required by Article III, "can exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing."[5]  "Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in plaintiffs' position a right to judicial relief."[6] As emphatically demonstrated on Plaintiffs' Motion for Summary Judgment: (1)  Plaintiffs suffered an **injury**  – their right to honest and fair dealing in their transactions with Marriott were impaired; and guests were overcharged for their hotel rooms.  (2) Marriott's improper trade practices **caused** the injury.  (3) Marriott's wrongful conduct is **redressible**  – the CPPA provides for statutory damages for a violation of its provisions, without proof of actual damages.

The CPPA is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices.[7]  The CPPA expressly provides for its liberal application to

interest that is concrete, not hypothetical.)

[3]  *Ass'n of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 151-52 (1970).

[4]  *Fulfillment Services, Inc. v. United Parcel Service, Inc.,* __ F.3d __, (Case No. 06-15970 9th Cir. June 9, 2008), *citing Vt. Agency of Natural Resources v. U.S. ex rel Stevens,* 529 U.S. 765, 771 (2000).

[5] *Id.*, *citing Warth v. Seldin,* 422 U.S. 490, 500 (1975).

[6]  *Id.*

[7]  *District Cablevision Limited Partnership v. Bassin,* 828 A.2d 714, 723 (D.C. 2003)*; Shaw v. Marriott International,* 474 F. Supp. 2d 141, 147 (D.D.C. 2007).

promote its intended prophylactic purposes of regulating and remedying improper business practices.[8] Here, the CPPA creates in Plaintiffs, including Shaw and Mendelson, a legally protected interest to be free from improper trade practices, and provides remedies to consumers whose rights are violated.[9] Section 28-3905(k)(1) provides a remedy to "a person whether acting for the interests of itself, its members, or the general public." The D.C. Court of Appeals recently found that § 28-3905(k)(1) conferred standing on a plaintiff against an automobile towing company for excessive fees and failure to provide adequate notice, even though the insurance company paid for the towing and storage charges, and the plaintiff did not own the car at the time it was towed.[10] "Ms. Garrick's CPPA claim against the towing companies remains. Though she did not own the vehicle at the time of the alleged injury, she can bring a CPPA claim on behalf of the general public."[11]

Actual economic loss is not an element necessary to proof of a redressable claim.[12] The CPPA does not require proof of actual damages to recover for a violation of its provisions. "A person . . . may recover or obtain the following remedies: (A) treble damages, *or* $1,500 per

---

[8] D.C. Code § 28-3901(c); *District Cablevision,* 828 A.2d at 723; *Shaw,* 474 F. Supp. 2d at 147.

[9] DC Code §§ 28-3901 and 28-3905(k)(1); *Shaw,* 474 F.Supp.2d 141, 147 (D.D.C. 2007).

[10] *Snowder v. District of Columbia,* Case No. 06-cv-959, Slip Op. at 19 and n. 10 (June 5, 2008).

[11] *Id.*, citing §28-3905(k)(1).

[12] *Wells,* 210 F.R.D. at 9; *Williams,* 297 F. Supp.2d at 177; *Friends of Tilden Park, Inc.,* 806 A.2d at 1206.

violation. . . ." DC Code § 28-3905(k)(1) (emphasis added).  Since October 2000, the CPPA has

had no provision for single damages but has provided for the recovery of statutory damages as

well as treble damages.[13]

> This statutory provision permits class members who are able to show causation,
> but cannot prove the amount of pecuniary damage suffered as a result, to opt for
> the default payment of $1,500.[14]

Applying a similar consumer statutory scheme, the Supreme Judicial Court of Massachusetts

distinguished proof of actual damages and the demonstration of an injury that completes the

proof of causation.[15]  The Court found that the consumer protection statute "creates a legal right,

the invasion of which, without more, constitutes an injury."[16]  The Court continued, explaining

that "where there has been an invasion of a legally protected interest, but no harm for which

actual damages can be awarded . . . the statute provides for the recovery of minimum damages in

the amount of twenty-five dollars."[17]  The Court carefully distinguished the propriety of an award

of statutory damages from any argument that the statute intended to confer nominal damages on

plaintiffs who had suffered no injury.  The Court confirmed that "causation" is a required

element of a successful consumer fraud claim.[18]  Rather, the Court construed "injury" to denote

---

[13] *Wells,* 210 F.R.D. at 9; *Ramirez v. Midwest Airlines,* ___ F. Supp. 2d ___, 2008 WL 682438 (D.Kan.).

[14] *Wells,* 210 F.R.D. at 9.

[15] *Aspinall v. Phillip Morris Companies,* 813 N.E.2d 476, 490-92 (Mass. 2004).

[16] *Id.* at 490.

[17] *Id.* at 490-91.

[18] *Id.* at 491.

"an invasion of a legally protected interest."[19]  Applying the causation/injury standard to the case before it, the Court held that the deceptive advertising "effected a per se injury on consumers who purchased the cigarettes represented to be lower in tar and nicotine."[20]  The Court explained that "this is so because all purchased (and presumably, smoked) a product that was deceptively advertised, as a matter of law."[21]  The Court then held that as a result of the violation, all class members "will be entitled to statutory damages, without regard to whether the plaintiffs are successful in establishing that consumers were overcharged for the deceptively advertised cigarettes."[22]

The authorities cited by Marriott do not support its standing argument on the facts presented in the instant case. *Williams v. Purdue Pharma,*[23] involved a claim by patients, who were prescribed the pain relief drug Oxycontin, that the manufacturer's allegedly false advertising had inflated the price. The advertising stated that the drug provided 12 hour relief from pain, and was non-addictive.  However, plaintiffs did not allege that any of them had not received 12 hour relief nor that any of them had become addicted to the drug.[24]  The Court rejected claims which accrued before 2000, because the pre-2000 version of § 28-3905(k)(1) provided for recovery only to a "consumer who suffers any damages." The Court found that prior

---

[19]  *Id.*

[20]  *Id.* at 492

[21]  *Id.*

[22]  *Id.*

[23]  297 F.Supp.2d 171 (D.D.C. 2003).

[24]  *Id.* at 172-73.

to the 2000 amendments, a plaintiff must allege actual damages to state a claim.[25]  The Court expressly found that the amendments to §28-3905(k)(1) could not be applied retroactively to conduct occurring before its effective date.[26]  Further, the plaintiffs alleged a "benefit of the bargain" theory of injury, and expressly did not allege that the drug did not provide them effective pain relief or that they suffered any adverse consequences from their use of the product.[27]  As a result, the court found that, as pleaded, the drug worked for plaintiffs and "they got what they paid for."[28]  As to claims that accrued after the 2000 amendments, the Court found that the plaintiffs had failed to allege any defect in the product that would be expected from their ingestion of the drug.[29]  On this record, the Court found that plaintiffs had **failed to claim any harm at all** as a result of the alleged false advertising of defendant.[30]  The Court commented that it was not enough that plaintiffs allege a legal duty owed to some other patients; plaintiffs must show a legal duty owed to them.[31]

Similarly, in *Hoyte v. Yum Brands, Inc.,*[32] plaintiffs alleged that defendant failed to disclose the type of oil used in preparation of its food products, and by its silence, misled

---

[25]  *Id.* at 176.

[26]  *Id.* at 174, *citing, Athridge v. Aetna Cas. And Sur. Co.,* 163 F.Supp.2d 38, 56 (D.D.C. 2001).

[27]  *Id.* at 176.

[28]  *Id.* at 176.

[29]  *Id.* at 178.

[30]  *Id.*

[31]  *Id.* at 178.

[32]  489 F.Supp.2d 24 (D.D.C. 2004).

plaintiffs to believe that the products did not contain harmful trans fats.[33]  The Court noted the allegation to be "questionable at best."[34]  More significantly, the plaintiffs in *Hoyte* made **no allegation of injury to anyone,** stating in the complaint only that healthier oils were available for food preparation.[35]

By contrast, Plaintiffs here have established that in its advertising and reservation confirmations Marriott directly misrepresented the price of rooms in its Russian Hotels, and omitted to disclose facts which would enable its hotel guests to calculate the cost of rooms at checkout.  Shaw and Mendelson each were issued reservation confirmations in their names. Plaintiffs have established that Marriott's deceitful pricing practices resulted in an overcharge for their rooms in USD.[36]  The CPPA was enacted to remedy improper trade practices of just the sort that Plaintiffs prove in this action.  Hotel guests, including Shaw and Mendelson, were injured as a direct consequence of Marriott's violation of the CPPA, regardless of whether the guest ended up out of pocket for the cost of the room.  Plaintiffs have presented a violation of the law, resulting in concrete injury which is redressable by an award of statutory damages as provided under the CPPA.  Shaw and Mendelson have suffered injury in fact, and have standing to adjudicate their claims in this action.

---

[33]  *Id.* at 29.

[34]  *Id.*

[35]  *Id.* at 28.

[36]  Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("SMF") ¶¶ 51-63; 98-139.

## B.    CSIS Enjoys Status as a Consumer Under the D.C. CPPA

Marriott argues that because CSIS is a corporation it cannot be a consumer under the D.C. CPPA.  Marriot Memorandum at 28-29.  The plain language of the statute provides otherwise.  Section 28-3901(a)(2) defines a consumer as "a *person* who does or would purchase...or receive consumer goods or services...including a person who does or would provide the economic demand for a trade practice. . . ."  (Emphasis added).  Section 28-3901(a)(1) defines a "person" to include "an individual, firm, *corporation*, partnership, cooperative, association or any other organization, legal entity or group of individuals however organized."  (Emphasis added).  Since a consumer "means a person" under Section 28-3901(a)(2) and a person includes a corporation under Section 28-3901(a)(1), there is obviously no bar to a corporation *qua* corporation enjoying the status of a consumer under the D.C. CPPA.  The New Jersey consumer protection statute with similar definitions has been interpreted as conferring consumer status on corporations.[37]  Since CSIS can be a consumer under the CPPA, we must now proceed to examine whether the role it plays here is that of a consumer within the meaning of that statute.

The CPPA defines "consumer"as "a person who does or would provide the economic demand for a trade practice."  Under the D.C. CPPA, a "trade practice" includes "an act which does or would . . . effectuate a sale, lease or transfer, of consumer goods or services . . . ."  Section 28-3901(a)(6).  CSIS provides the economic demand for the hotel stays in Russia and therefore the economic demand for Marriott's trade practices at issue here.  CSIS booked the rooms for the personal use of its employees while they were in Russia because its employees

---

[37] *Hundred East Credit Corporation v. Eric Schuster Corporation*, 515 A.2d 246, 249 (N.J. Super A.D. 1986); *The Dreier Co., Inc. v. Unitronix Corp.,* 527 A.2d 875, 882 (N.J. Super A.D. 1986).

needed a place to sleep.  It paid for those rooms either directly when its own credit cards were used at checkout or indirectly when it reimbursed employees for hotel charges.  It obviously provides the economic demand for the trade practices employed by Marriott in the sale of consumer goods or services.

Marriott further ignores the factors found controlling by the D.C. Court of Appeals in determining who is a consumer and what constitutes a consumer transaction under the CPPA. The D.C. Court of Appeals settled these questions in *Adam A. Wechsler & Son, Inc. v. Klank*[38] where it held that the CPPA is intended to address transactions between merchants and consumers, not to provide a cause of action by one merchant against another merchant.[39]  Under the CPPA, a "merchant" includes those "connected with the 'supply side' of a consumer transaction."[40]  In *Weschler,* an individual bought an antique chest as an investment and possibly for later resale.  The court held that the determining factor in the application of the CPPA was where the transaction fell along the distribution chain.  "It is the ultimate retail transaction between the final distributor and the individual member of the consuming public that the Act covers."[41]  In that circumstance, even if a person did make the purchase to seek a financial gain, the transaction is subject to the CPPA because the purchaser "was not in the regular business of

---

[38] *Ford v. ChartOne, Inc.*, 908 A.2d 72, 83 (D.C. 2006), citing  *Adam Wechsler & Son, Inc. v. Klank*, 561 A.2d 1003 (D.C. 1989).  These cases are discussed in greater detail in Plaintiffs' Memorandum in Opposition to Motion to Dismiss Second Amended Complaint (Doc. 67).

[39] *Adam A. Wechsler & Son, Inc. v. Klank*, 561 A.2d at 1005.

[40] *Id., citing Howard v. Riggs National Bank,* 432 A.2d 701, 709 (D.C. 1981).

[41] *Id.* at 1005.

buying and selling such goods.["42]  The Court of Appeals explained:

> [I]t is not the use to which the purchaser ultimately puts the goods or services, but rather the nature of the purchaser that determines the nature of the transaction. If the purchaser is regularly engaged in the business of buying the goods or service in question for later resale to another in the distribution chain, or at retail to the general public, then a transaction in the course of that business is not within the Act. If, on the other hand, the purchaser is not engaged in the regular business of purchasing this type of goods or service and reselling it, then the transaction will usually fall within the Act. Since Klank is not in the regular business of the retail sale of antiques, it follows that the transaction is one within the Act and its protections.[43]

CSIS is in the business of research, analysis and policy development in certain international programs; it is not in the travel, hotel or hospitality business.[44]  CSIS' did not purchase guest stays at the Marriott Russian Hotels for resale in a travel related distribution chain.  It booked the rooms for the personal use of its experts while they were in Russia.  CSIS provided the economic demand for the hotel stay in Russia because its employees needed a place to sleep.  CSIS was in no way connected to the "supply side" of any transaction related to its booking of rooms at the Marriott Russian Hotels.  The purchase of the hotel stay was the ultimate retail transaction by CSIS acting as a member of the consuming public.

The cases relied upon by Marriott do not support a contrary finding.  First, all but one of the cases cited by Marriott pre-date the D.C. Court of Appeals' controlling rulings as to who is a consumer and what constitutes a consumer transaction in the *Wechsler* and *ChartOne* decisions cited above.  Second, the facts and conclusions in Marriott's cited cases are simply not apposite. In *Mazanderan v. Independent Taxi Owners' Assoc., Inc.,* the gasoline purchased enabled the

---

[42]  *ChartOne*, 908 A.2d at 83-84.

[43]  *Weschler*, 561 A.2d at 1005; *ChartOne*, 908 A.2d at 84.

[44]  Second Amended Complaint ¶ 15.

very service provided by the taxi driver in his business.[45]    Additionally, the plaintiff taxi driver and the defendant trade association were both on the supply side of the distribution chain.[46]  In *Independent Communications Network, Inc. v. MCI Telecommunications Corp.,* both plaintiff and defendant were merchants competing in the sale of long distance telephone services.[47]  Both plaintiff and defendant were on the supply side, the merchant side, of the consumer-merchant transaction.[48]  In *Clifton Terrace Assoc. v. United Techs Corp.,*[49] while the court did refer to the status of the plaintiff as a corporation, the Court was apparently not called upon to examine the definitions in Section 3901(a)(1) and (2).  In any event, the *Clifton Terrace* analysis was completely consistent with the distribution chain analysis described in *Weschler*.  In *Clifton Terrace*, the plaintiff managed apartment buildings with 7500 units.  As part of that business, it provided elevator service within apartment buildings.  The court's analysis showed that the plaintiff was not deemed to be a consumer of elevator repair services because it was in the supply side of the elevator service business, not simply because it was a corporation.  By contrast, CSIS is not on the supply side of the distribution chain.  It is in no sense a "merchant" of hospitality services.  CSIS booked the rooms in Marriott's Russian hotels for the personal use of its employees.  CSIS is a "consumer" within the meaning of the CPPA, D.C. Code § 28-3901(a)(2).

Marriott argues that CSIS employees staying in a Marriott hotel in Moscow occupy that

---

[45]  700 F. Supp. 588, 591 (D.D.C. 1988).

[46]  *Id.*

[47]  657 F.Supp. 785, 787-88 (D.D.C. 1987).

[48]  *Id.* at 788.

[49]  728 F.Supp. 24, 34 (D.D.C. 1990).

same status as a taxi driver buying gasoline to propel his taxi, and that since the taxi driver was not considered a consumer in *Manzanderan*, CSIS should not be considered a consumer here. This analysis is flawed. The product in question in *Manzanderan* (gasoline) was so integrally bound up with the taxi business as to be inseparable from it. Without fuel, taxis don't move. The relationship between staying in a hotel and contributing to strategic analysis for CSIS is so attenuated and remote that it shows Marriott's comparison of it with fuel for a taxi to be absurd. Further, the service at issue here – hotel accommodations – is so bound up with the personal life of the employee hotel guest that its status as a consumer service is irrefutable. This is reinforced by the analysis that follows next.

### C.    Corporate Reimbursement for Personal Expenses Does Not Deprive Employees of Their Status as Consumers.

Marriott takes its argument as to the status of CSIS beyond its logical conclusion by applying it to both CSIS as a corporation and to any employee of a corporation traveling on business. Marriott argues that no reimburseable expenditure by an employee traveling on business is covered by the D.C. CPPA. Marriott Memorandum at 18. Marriott cites no cases covering this specific theory and we have found none. Under Marriott's theory, an employee having dinner at a restaurant who is stricken with an allergic reaction after receiving assurances that there was no peanut oil in the salad dressing cannot complain about the misrepresentation under D.C. CPPA § 28-3904(f) if he is reimbursed for meals by his employer because of his travel status. According to Marriott, his travel status as an employee disenfranchises him as a consumer. Likewise, an employee on travel status cannot be heard to complain if the hotel dry cleaner burns a hole in his suit because the guest's employer reimburses him for drycleaning

12

expenses while in travel status. We know intuitively that this has to be wrong where the connection between the product or service provided and the business of the employer is remote and attenuated.

Where a product or service is primarily for personal use of the employee, rather than for the direct use of the employer in its business, the employee does not lose his status as a consumer merely because he receives reimbursement for personal expenses while in travel status. This conclusion is buttressed by the definitional provisions in D.C. CPPA § 28-3901(a)(1) and (2) specifying that a corporation can be a consumer. If a corporation can be a consumer, certainly a corporate employee purchasing personal products and services while in travel status can be a consumer as well.

**D.    The Claims Of Shaw, Charness And Absent Class Members Have Sufficient Connections To The District To Allow Adjudication Under D.C. Law.**

**1.    The Connections with Shaw, Charness and Absent Class Members.**

Marriott argues that both Shaw and Charness lack standing because their claims are unconnected to the District. Marrriott Memorandum at 19-26 and 30-31. Although cloaked under the rubric of standing, Marriott's argument in nothing more than a thinly disguised effort to revisit its choice of law argument.

There are several problems with Marriott's argument. First, the law is quite clear that a forum state's ability to assert its own law depends primarily upon the relationship between the forum state and the *controversy*. The relationship between a plaintiff or absent class members and the forum state may be relevant, but it is certainly not controlling. In *Phillips Petroleum v. Shutts* the Supreme Court specifically held that "a forum state may exercise jurisdiction over the

13

claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum

contacts with the forum which would support personal jurisdiction over a defendant."[50]  In its

prior holding denying Marriott's motion to dismiss, this Court recognized that the courts in the

District of Columbia have already concluded that the policies of the CPPA are advanced by its

application to "non-District of Columbia consumers, merchants and transactions."[51]  It is also

clear that the D.C. CPPA applies to claims against non-residents.  Defendants cannot avoid

responsibility under D.C. law "simply by locating themselves across the District line...."[52]

### 2. The District Has State Interests In This Controversy Such That The Imposition Of D.C. Law Is Neither Arbitrary Nor Fundamentally Unfair.

In *Allstate Insurance Company v. Hague,*[53] the plurality opinion by Justice Brennan

recognized what it termed a long-established principle that an issue or a set of facts in a lawsuit

"may justify, in constitutional terms, application of the law of more than one jurisdiction."[54]

Where the laws of more than one jurisdiction may reasonably be applied, the Court held that ". . .

for a State's substantive law to be selected in a constitutionally permissible manner, that State

must have a significant contact or significant aggregation of contacts, creating state interests,

such that choice of its law is neither arbitrary nor fundamentally unfair."[55]  Justice Stevens filed a

---

[50] 472 U.S. 797, 811 (1985).

[51] *Shaw*, 474 F.Supp. at 150.

[52] *Id.* at 150.

[53] 449 U.S. 302 (1981).

[54] *Id* at 638.

[55] *Id*. at 312-313.

concurring opinion wherein he noted that "the [Full Faith and Credit] Clause does not rigidly require a forum state to apply foreign law whenever another State has a valid interest in the litigation."[56]  Justice Stevens went on to find that "Petitioner has failed to establish that Minnesota's refusal to apply Wisconsin law poses any direct or indirect threat to Wisconsin's sovereignty,"[57] and that a forum state's application of its own law would not violate the Due Process clause unless it were "totally arbitrary or fundamentally unfair to either litigant."[58] Marriott concedes that the conflicts between various state consumer protection laws do not preclude the application of the law of one of those states where it can be shown that State has a significant relationship to the controversy:

> Because there are significant conflicts in state consumer protection laws, the Court may apply the DC CPPA to the entire class only if it determines that the District of Columbia has the "most significant relationship to the dispute." *Washkoviak v. Student Loan Marketing Ass'n.,* 900 A.2d 168, 180 (D.D.C. 2006); *Eli Lilly & Co. v. Home Ins. Co.,* 764 F.2d 876, 882 (D.C. Cir. 1985).

Doc. 75-2 at page 51 of 60.

In its pending motion for summary judgment Marriott points to only two of its contacts with the District - the root beer stand operated by its founder in 1927 and its mailing address to support its conclusion that the District does not have the "most significant relationship" to the Plaintiffs' claims.[59]  Marriott Memorandum at 4-5.  Like an ostrich with its head buried deeply in the sand, Marriott ignores and fails to address facts which have been in the record since the

---

[56] *Id.* at 322-323.

[57] *Id.* at 325 (citations omitted).

[58] *Id.* at 326.

[59] Doc. 106-2 at 32 of 53.

beginning.  PCSMF ¶¶ 180-187.

Marriott has previously admitted a number of crucial facts which it now ignores.  Marriott admits that its website contains numerous representations that its corporate headquarters is at One Marriott Drive in Washington, D.C. 20058.  PCSMF ¶ 181.  Marriott's annual report to its shareholders for the years 2000 - 2006 all contain similar representations.  PCSMF ¶ 182.  From 2002 to 2007, Marriott's annual meeting of shareholders was held at the J.W. Marriott Hotel, 1331 Pennsylvania Ave., N.W., Washington, D.C. 20008.  PCSMF ¶ 183.  Marriott admits that Exhibit 99 attached to its Form 8-K Report dated February 8, 2005, filed with the Securities and Exchange Commission, shows Corporate Headquarters address as Marriott Drive, Washington, D.C., 20058.  PCSMF ¶ 184.  All of Marriott's formal press releases prior to August 8, 2007 (found on its website) recite that it is headquartered in Washington, D.C.  PCSMF ¶ 185.  Marriott admits that its General Counsel is identified in Martindale Hubbell as being located at One Marriott Way, Washington, D.C. 20058.  PCSMF ¶ 186.  When asked to produce documents containing representations that its corporate headquarters is in the District of Columbia, Marriott objected on the grounds that such documents are too burdensome to produce.  Response to Plaintiffs' First Set of Interrogatories, ¶ 34; Exhibit 7 to Doc. No. 62.

Marriott tacitly admits that the thousands of representations to the general public through press releases, potential guests of its hotel properties and others through its website, the investing public through its annual reports and SEC filings, and the legal community through its General Counsel's Martindale Hubbell listing are false.  Marriott has filed two sworn declarations in this proceeding stating that its headquarters and principal place of business are actually located at

10400 Fernwood Road, Bethesda, MD, 20817.[60]

Marriott's representations that it is headquartered and maintains its principal place of business within the District of Columbia were made for its own personal gain. In their opposition to Marriott's Motion to Dismiss the First Class Action Complaint, Plaintiffs submitted the Declaration of Dr. Checkitan S. Dev of the Cornell University School of Hotel Administration. Doc. 11-13. The Dev Declaration concluded that Marriott's representations that it is headquartered in Washington, D.C. had the effect of enhancing its brand identity, brand image and brand positioning thus significantly enhancing the value of its brand. Dev Declaration at ¶ 9.

Marriott has never challenged or even commented upon the Dev Declaration. Indeed, Marriott has admitted that it promotes the identification of its brand with the District of Columbia for its own commercial advantage. Marriott's Answer to paragraph 22 of plaintiffs First Amended Class Action Complaint is noteworthy:

> Marriott admits that it has stated on its website that "the perpetuation of a company's culture has proven a positive financial impact." Marriott states that its historic roots to the District of Columbia date back to 1927 when the Company's founders began their business operations in the District of Columbia.

Marriott Answer Doc. 26, ¶ 22. Thus, Marriott concedes that its misrepresentations as to the location of its corporate headquarters has in fact had a "positive financial impact" on it.

Finally, records disclosed by Marriott show over seven thousand guests with D.C.

---

[60] Affidavit of Brendan Ross, Esq. (Exhibit 2 to Marriott's Opposition to Class Certification); Declaration of Jeff B. Stant, filed in support of Marriott's Motion to Dismiss First Class Action Complaint. Doc. 7.

addresses.[61]  Two of the named Plaintiffs - CSIS and Mendelson, reside in the District.  Marriott

argues that guests with D.C. addresses represent only two percent of the proposed class - a

number that it contends is insufficient to justify the imposition of D.C. law on it.  Marriott

Memorandum at 1.  On an absolute basis 7,000 D.C. victims is more than ample to create an

important state interest for the District in this controversy.  The fact that Marriott's conduct

touched upon thousands of others outside of the District does not change the equation showing

that the District has important state interests in this controversy.

Marriott continues to rely on *In re St. Jude Medical, Inc.*[62] in support of its contention that

a separate choice of law analysis must be conducted for each individual class member. As noted

in the Reply on class certification, the Eighth Circuit did not make such holding.  Rather, the

Court found that the district court had failed to perform any conflicts of law analysis at all,

instead relying on a provision of state law allowing any person injured by a violation of

Minnesota consumer protection statutes to bring suit in Minnesota.[63]  The Eighth Circuit

commented that the application of Minnesota law to the 11,000 member nationwide class might

indeed be appropriate, and remanded to the district court, directing the court to conduct a

conflicts analysis consistent with *Phillips Petroleum v. Shutts.*[64]  On remand, the district court

---

[61] Exhibit 41 (computer disc) In Plaintiffs' original submission in support of their motion
for class certification, they identified what they believed were 8,199 such addresses.  Brickell
Second Declaration at ¶ 17, Exhibit 36.  Upon closer examination, Plaintiffs found 789
questionable records, still leaving over 7,000 guest records with D.C. addresses.

[62] 425 F.3d 1116 (8th Cir. 2005).

[63] *Id.* at 1120.

[64] *Id.* at 1121.

determined the application of Minnesota law to be fair, finding that "Minnesota has significant contacts with each class member by virtue of the domicile and claims related activities of defendant."[65]  In explaining its analysis, the district court stated that it "need not specifically discuss Minnesota's contacts to each of over 11,000 class members' claims because each class member's claims have in common the following contacts with Minnesota."[66] The district court then analyzed the defendant's aggregation of contacts with Minnesota and found that the expectations of individual class members "would have expected a plainly Minnesota based corporation to be subject to the requirements of Minnesota statutes."[67]

In addition to the constitutional analysis concluding that the application of Minnesota law was "fundamentally fair," the district court analyzed the consumer protection laws of the fifty states to determine, under the Minnesota conflicts of law standard, if the application of Minnesota law was preferable to that of another jurisdiction.  The court noted that the laws of the various jurisdictions were substantially different, and that the laws of numerous states were in substantive conflict with Minnesota law on outcome determinative issues including requirements for proof of scienter and/or individual reliance; whether the jurisdiction provided for a private right of action; and whether material omissions are prohibited.[68] Marriott prepared a similar survey of the consumer protection statutes of the fifty states in this action.[69]  Not surprisingly,

---

[65]  *In re St. Jude Medical, Inc.,* 2006 WL 2943154 at *3 (Oct. 13 2006).

[66]  *Id.*

[67]  *Id.* at *4.

[68]  *Id.* at *5.

[69]  Exhibit 30 to Marriott Opposition to Motion for Class Certification (Doc. 75-2).

Marriott identified differences in the consumer laws of the various jurisdictions. Plaintiffs accept that analysis, but note that it contains nothing that would change the modified governmental analysis that this Court has already performed.

Once conflict among potentially applicable laws of competing jurisdictions has been identified, Marriott acknowledges that the consequence is a requirement that the court conduct a conflicts of law analysis.[70] This is precisely the analysis that this Court completed in deciding Marriott's Motion to Dismiss First Amended Complaint.[71] Conducting the same type of choice of law analysis performed by this Court in *Shaw v. Marriott*,[72] the Minnesota court in *St. Jude* determined that Minnesota had a stronger interest than other interested jurisdictions to apply its law to the claims at issue. Like this Court, the *St. Jude* Minnesota court found that Minnesota has significant contacts with each plaintiff's claim by virtue of the domicile and claims-related activities of defendant and that Minnesota has a strong interest in policing the conduct of its own corporations.[73] The Minnesota court further found, like this Court, that although other jurisdictions have an interest in applying their own laws to protect local consumers, but not to deprive them from the benefit of participation in a common action.[74] Also like this Court, the Minnesota court found that although the location of the injury is a factor in tort actions, that factor should be discounted in consumer protection actions because such statutes "focus on the

---

[70] Marriott Opposition to Motion for Class Certification (Doc. 75-2) at 38.

[71] *Shaw,* 474 F.Supp.2d 141.

[72] *Id.*

[73] 2006 WL 2943154 at *6.

[74] *Id.*

behavior of the defendant, and therefore it is appropriate to apply the law from where the defendant has the most contacts."[75]

Defendant in *St. Jude* appealed the application of Minnesota law to the nationwide class. The Eighth Circuit reversed certification on predominance grounds, but left in tact the district court's choice of law analysis.[76]

### 3. Marriott Has Not Established That Any Other Jurisdiction Has A Greater Interest In This Controversy.

Marriott contends that this Court must conduct "an individualized choice-of-law analysis for each Plaintiff, citing *Washkoviak v. Student Loan Marketing Ass'n.*[77]  The actual language in *Washkoviak* refers to a choice-of-law analysis with respect to the *claims* of each member of the class - the same approach taken by the district court on remand in *St. Jude* discussed above.[78] Each member of the putative class here raises four identical claims - misrepresentation, failure to disclose material facts that have a tendency to mislead, offering hotel services without the intent to sell them as offered and misrepresentation of origin.  The relationship between these claims and the District is measured largely by the relationship between the perpetrator of the actions

---

[75]  *Id.,* citing Restatement (Second) Conflicts of Laws §145 cmt'e (explaining that in cases of misrepresentation or fraud the place of injury has little importance).

[76]  *In re St. Jude Medical, Inc.,* 522 F.3d 836, 840 (8th Cir. 2008) (the district court eliminated the diversity of legal issues by applying Minnesota law to all claims.)

[77] 900 A.2d 168, 176 n11. (D.D.C. 2006).

[78] In any event, Marriott's misreading of this statement in *Washkoviak* is of little consequence because the statement itself was clearly dicta.  *Washkoviak*, 900 A.2d at 176 (the plaintiffs had not moved for class certification and the court specifically stated that "[it expresses] no opinion about the availability of class certification at this stage in the proceedings").

giving rise to the claims (Marriott) and the District.

Marriott never addresses nor does it attempt to evaluate the relative interest of the District of Columbia in this controversy compared with that of other jurisdictions. This Court conducted appropriate analysis under the District's modified government interest test in denying Marriott's motion to dismiss.[79] While this Court left open the possibility that discovery might uncover evidence indicating that another jurisdiction has greater interest in the resolution of this controversy than that of the District of Columbia, Marriott has produced no such evidence. The only thing Marriott has done in this regard is to offer its personal property tax bill from the state of Maryland as an exhibit and a second declaration which, if believed, confirms that its prior representations that it was headquartered in the District were false. But its Maryland personal property tax bill is of no consequence in evaluating Maryland's relative interest in this controversy. Further, this court was already aware of Marriott's inconsistent statements as to the location of its headquarters when it issued its earlier opinion. Marriott continues to keep its head in the sand, we suppose in the hope that the Court will forget that it boasted about its connections with the District for years prior to this litigation and it did so in order to gain commercial advantage. Marriott never tells us why this Court was wrong when it observed that its inconsistent positions on where its headquarters is located further support the application of the District of Columbia law in this case.[80] Marrriott's longstanding, widespread and systemic representations that it is headquartered in the District provides a glue that is stronger that the foundation of any building it might occupy here.

---

[79] *Shaw*, 474 F.Supp.2d at 149-150.

[80] *Shaw*, 474 F.Supp.2d at 148.

####    4.    Marriott Has No Basis To Oppose A Worldwide Class.

Marriott complains loudly of the Plaintiffs' proposal for an "unprecedented worldwide class."  Marriott Memorandum at 1.  But Marriott has never answered the Plaintiffs' argument raised in their opposition to Marriott's first motion to dismiss: once it is determined that the CPPA applies to non-resident plaintiffs, it would violate longstanding treaty obligations of the United States to deny those protections to citizens of our trading partners.  The United States has entered into bilateral treaties of Friendship, Commerce and Navigation with its principal trading partners. These treaties provide nationals of both countries access to each country's courts on terms no less favorable than those applicable to the nationals of the forum country. Under these treaties, a foreign plaintiff's right to pursue or have its rights pursued in a United States forum is equal to that of a United States citizen.

For example, Article IV.1 of the Treaty of Friendship, Commerce and Navigation with Japan[81] provides:

> Nationals and companies of either Party shall be accorded *national treatment* and most-favored nation treatment *with respect to access to the courts* of justice and to administrative tribunals and agencies within the territories of the other Party, in all degrees of jurisdiction, both *in pursuit and in defense of their rights*. It is understood that companies of either Party not engaged in activities within the territories of the other Party shall enjoy such access therein without registration or similar requirements.  (Emphasis Added).

Article XXII (1) defines national treatment:

> The term "national treatment" means treatment accorded within the territories of a Party upon terms no less favorable than the treatment accorded therein, in like situations, to nationals, companies, products, vessels or other objects, as the case

---

[81] Treaty of Friendship, Commerce and Navigation, April 2, 1953, U.S.-Japan, 4 U.S.T. Art VI.1.

may be, of such Party.[82]

Treaties of Friendship, Commerce and Navigation between the United States and numerous other

countries include substantially similar provisions granting national treatment and thereby

mandating equal access to courts.[83]  Given these long-standing treaty obligations, it should come

as no surprise that a number of reported class actions include foreign plaintiffs among the absent

---

[82]  *Id*., Art XXII (1).

[83]  See Treaty of Friendship, Commerce and Navigation, Jan. 21, 1950, U.S.-Ir. (Ireland), Art. VI, 1 U.S.T. 785; Treaty of Friendship, Commerce and Navigation, Oct. 29, 1954, U.S.-F.R.G. (Federal Republic of Germany), Art.VI, 7 U.S.T. 1839; A Convention to Regulate Commerce between the Territories of the United States and of hisBritannick Majesty, July 3, 1815, U.S.-Gr. Brit. (Great Britain), Art. 1, 8 Stat. 228; Treaty of Friendship, Commerce and Navigation, July 27, 1853, U.S.-Arg. (Argentina), Art. VIII, 10 Stat. 1005; Treaty of Friendship, Commerce and Consular Rights, June 19, 1928, U.S.-Aus. (Austria), Art. I, 47 Stat. 1876; Treaty of Friendship, Establishment and Navigation, Feb. 21, 1961, U.S.-Belg. (Belgium), Art. 3, 14 U.S.T. 1284; Treaty of Friendship Commerce and Navigation, Nov. 4, 1946, U.S.-P.R.C. (Peoples Republic of China), Art. VI.4, 63 Stat. 1299; Treaty of friendship, Commerce and Navigation, July 10, 1851, U.S.-Costa Rica, Art. VII, 10 Stat. 916; Treaty of Friendship, Commerce and Consular Rights, Feb. 13, 1934, U.S.-Fin. (Finland), Art. I, 49 Stat. 2659; Convention of Establishment, Nov. 25, 1959, U.S.-Fr. (France), Art. III, 11 U.S.T. 2398; Treaty of Amity, Economic Relations and Consular Rights, Aug. 15, 1955, U.S.-Iran, Art. III, 8 U.S.T. 899; Treaty of Friendship, Commerce and Navigation, Aug. 23, 1951, U.S.-Isr. (Israel), Art. V, 5 U.S.T. 550; Treaty of Friendship, Commerce and Navigation, Nov. 28, 1956, U.S.-Korea, Art. V, 8 U.S.T. 2217; Treaty of Friendship, Commerce and Navigation, Aug. 8, 1938, U.S.-Liber. (Liberia), Art. I, 54 Stat. 1739; Treaty of Friendship, Establishment and Navigation, Feb. 23, 1962, U.S.-Lux. (Luxemburg), Art. III.2, 14 U.S.T. 251; Treaty of Friendship, Commerce and Navigation, March 27, 1956, U.S.-Neth. (Netherlands), Art. V.1, 8 U.S.T. 2043; Treaty of Friendship, Commerce and Navigation, June 5, 1928, U.S.-Nor. (Norway), Art. I, 47 Stat. 2135; Treaty of Amity, Economic Relations and Consular Rights, Dec. 20, 1958, U.S.-Oman, Art. III.2, 11 U.S.T. 1835; Treaty of Friendship and Commerce, Nov. 12, 1959, U.S.-Pak. (Pakistan), Art. V, 12 U.S.T. 110; Treaty of Friendship, Commerce and Navigation, Feb. 4, 1859, U.S.-Para. (Paraguay), Art. IX, 12 Stat. 1091; Treaty of Friendship and General Relations, July 3, 1902, U.S.-Spain, Art. VI, 33 Stat. 2105; Convention of Friendship, Reciprocal Establishments and Commerce, Nov. 25, 1850, U.S.-Switz. (Switzerland), Art. I, 11 Stat. 587; Treaty of Friendship, Commerce and Navigation, Feb. 2, 1948, U.S.-Italy, Art. Art. V.4, 63 Stat. 2255.

class members.[84]  Marriott conducts its business on a worldwide scale and has nothing to

complain about when it is asked to account for itself on the same worldwide basis.

## II.    Marriott's Mid-August 2005 Disclosure Statement Is Inadequate.

Marriott contends that after mid-August 2005, "Marriott provided all prospective guests

using reservation channels controlled by [it] with exactly the same information that Plaintiffs

lawsuit claims was lacking: that the price quote in U.S. dollars was subject to payment in rubles

at the hotel's exchange rate."  Marriott Memorandum at 39.  Marriott goes on to claim that it

"provided the precise information that plaintiffs contend was required . . . ."  *Id.* at 40.

The exact statement to which Marriott refers reads:  "All prices quoted in USD.  Charges

are payable in local currency at applicable hotel exchange rate at checkout." (SMF ¶ _).  Such a

statement, if made, still fails to disclose information material to a hotel guest reserving a room at

a Marriott Russian Hotel.  Marriott still does not disclose: that the "hotel exchange rate" would

be applied to a "units" to RUR conversion, not a USD to RUR conversion; that the units to RUR

exchange rate would be less favorable to the guest than the USD to RUR exchange rate available

_____

[84]*See e.g., Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779 (6th Cir. 1996)(noting in appeal on attorneys' fees that appeals arose from "worldwide class-action settlement involving an allegedly defective heart valve implant"); *In re RoyalAhold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 355 (D. Md. 2004)(denying motion to dismiss claims of foreign class members who purchased on foreign exchange); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 126(S.D.N.Y. 2001)(jurisdiction proper where named plaintiffs were foreign and it was possible that entire class would be foreign); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 9 n.11 (D.D.C. 2000)(holding that defendants could not challenge subject matter jurisdiction over foreign class members who purchased securities on American exchanges); *In re Holocaust Victims Asset Litig.*105 F. Supp. 2d 139 (E.D.N.Y. 2000)(approving worldwide settlement); *In re Michael R. Milken and Assoc. Sec.*, No. 92 Civ. 1151, 1993 WL 413673 (S.D.N.Y. Oct. 07, 1993)(approving settlement of worldwide class); *In re Pizza Time Theatre Sec. Litig.*¸ 112 F.R.D. 15, 20 (N.D. Cal. 1986)(applying Shutts analysis to class including members from 28 states and 15 foreign countries); *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. 24, 32 (S.D. Cal. 1975)(named plaintiff class reps are "foreign entities that operate abroad.").

from Russia's Central Bank; or that the hotel guest would be charged at check-out a room price in RUR that was greater than the number of RUR that could be bought, at Central Bank exchange rates, with the number of USD quoted as the room price at the time the reservation was booked. (SMF ¶¶ 44-49). After August 2005, hotel guests receiving reservation confirmations created through Marriott's Reservation System still could not determine from the information provided what the price to be paid for the reserved room would be at the time of check-out in either USD or RUR. (SMF ¶ 50). An ordinary member of the traveling public would find information allowing him to calculate the actual price of the room to be important to the decision on where to book hotel accommodations. Marriott's failure to disclose information (both before and after August 2005) which would advise its hotel guests of its actual billing practices had a tendency to deceive guests at the Marriott Russian Hotels.

The legal authority supporting this position is set forth in Plaintiffs' own summary judgment motion and supporting brief at 19-23. Marriott relies on *Alicke v. MCI Communications Corp.*,[85] to support its position. In *Alicke*, the plaintiff challenged MCI's practice of rounding up the time of long distance calls to the nearest minute as the basis for its charges. The appeals court found that because no reasonable consumer could actually believe that each and every call terminated at the end of a full minute, no reasonable consumer could have been deceived by MCI's practice.[86] The facts in the case at bar can in no way support the same conclusion here as was reached by the *Alicke* court. Marriott's August 2005 disclosure links the USD price quotation to payment in RUR. That so-called disclosure makes no reference

---

[85] 111 F.3d 909 (D.C. Cir. 1997).

[86] *Id.* at 912.

to "currency units" – just USD and RUR. William Elliott Butler, Marriott's own expert, declares

that, under such circumstances, Russian law requires that the conversion be made at the official

rate:

> Article 317 of the Civil Code of the Russian Federation contains a general
> authorization to use foreign currency equivalents or prearranged monetary or
> "currency" units (so-called "CUs") in transactions for the purpose of determining the
> amount of payment obligations. The ruble amount of the actual payment, *when
> stated in foreign currency equivalents or CUs, is calculated on the basis of the
> official rate of the respective currency* set by the Central Bank of the Russian
> Federation, *unless otherwise provided* by Russian legislation or by agreement of the
> parties. In instances when the CU is not tied to any particular currency, the rate is
> determined by agreement of the parties.[87]

In Marriott's August 2005 disclosure statement, the payment in RUR is tied to the USD price

quote. Therefore, according to Mr. Butler's declaration, the only inference available under

Russian law is that the official exchange rate would be used. To be fair, Mr. Butler states that the

parties may agree to another exchange rate, but only when "the CU is not tied to any particular

currency."[88] Here, the reference to RUR is tied to 'a particular currency'- USD. According to

Mr. Butler, the parties would have no option except to use the official rate. Even if the parties

could agree otherwise, at the time this disclosure is made, the parties had no opportunity to make

another agreement. Under Mr. Butler's analysis, the reference to a hotel exchange rate is

inconsistent with Russian law and, at best, only adds to the confusion.

The immediate question before us is whether Marriott's August 2005 disclosure

statement is adequate to prevent a reasonable consumer from being misled. The statement is

---

[87] Declaration of William Elliott Butler, ¶11, Exhibit 7 to Marriott's Opposition to Class
Certification. (Doc. 75-2).

[88] *Id.*

27

inadequate by any measure.  The fact that the Russia hotel may have signs posted at the front

desk that mention currency units in Cyrillic script or that the bill at checkout identifies currency

units is simply too little too late to rehabilitate Marriott's failure to make proper disclosures

during the reservation process.

### III.    Marriott Is Liable As A Matter Of Law For Acts Committed "Directly Or Indirectly" Through Its Franchised Hotels.

The claims in this action arise from representations and omissions related to Marriott's

pricing practices for rooms at its Marriott Russian Hotels.  The pricing representations all issue

from Marriott through its centralized reservation system.  PCSMF ¶¶ 188-193.  The reservation

system is controlled by Marriott.  PCSMF ¶ 189.  Marriott's Franchised Russian Hotels are

required to participate in the Reservation System, and their participation is evidenced by records

maintained in MARSHA.  PCSMF ¶¶ 188-192, 197-198.  MARSHA data confirm that of

402,801 guest stays recorded in MARSHA, 133,611 records are for guest stays at one of the

Franchised Hotels.  Of these 133,611 guest stays, 12,162 were booked directly by one of the

Franchised Hotels, and then entered into MARSHA.[89]

Certain License Agreements govern the operation of the Marriott Franchised Hotels under

the Marriott System represented to the public through the Marriott Proprietary Marks.[90]  The

License Agreements require operation of the Franchised Hotels in strict conformity with the

Marriott System, including the Marriott Reservation System.  The License Agreement expressly

---

[89] Exhibit 57, 41.  The supporting data was provided by Marriott and is included on a computer disc marked Exhibit 41.  The undersigned counsel identified the records referred to above using an off-the-shelf program called FileMaker Pro, available to anyone in most computer stores.

[90]  License Agreement, Exhibit 2.

28

provides that "strict conformity with the Marriott System is essential in order to maintain the exceptional quality and guest service of MHRS Hotels and enhance public acceptance of and demand for MHRS Hotels."[91]  The goodwill associated with the Proprietary marks and the Marriott System is the exclusive property of Marriott and inures to sole benefit of Marriott.[92] Each Franchised Hotel is subject to periodic inspections to ensure that the Franchised Hotel is operated in compliance with the System, including procedures, standards, specifications and controls.[93]  Failure to comply with the quality assurance program constitutes a material default which could result in termination of the Agreement.[94]  The Marriott Reservation System is an integral part of the System, and the unified quality represented to the public by the Marriott brand.  The License Agreement requires participation in the Reservation System.[95]  Each Franchised Hotel is required to enter its room rates in the Reservation System.[96]  The Reservation System in turn specifies the room rates entered in the System to the hotel guest at the time the reservation is made.[97] The Franchised Hotel is prohibited from charging "any Hotel guest a rate higher than the *rate specified to the guest by the Reservation System office* at the time the

---

[91]  License Agreement ¶ Recitals, F.

[92]  *Id.*  Article 10.

[93]  *Id.* ¶ 6.7

[94]  *Id.*

[95]  *Id.* ¶ 7.1

[96]  *Id.*

[97]  *Id.*

guest's reservation was made."[98]

Marriott controls the operation of the Franchised Hotels through the enforcement of the Marriott System.  Marriott's contention that it is absolved from liability to consumers who stayed at  Marriott Franchised Hotels ignores the plain language of D.C. CPPA 28-3901 defining "merchant" as:

> a person ... who in the ordinary course of business does or would sell ... *either directly or indirectly*, consumer goods or services ....

*Id*.  In *State v. Cottman Transmissions Systems, Inc*.,[99] the Maryland Court of Special Appeals ruled that a franchisor could be held liable for acts committed through its franchisee under the similar - and even less expansive - Maryland consumer protection statute which likewise holds merchants liable for acts committed "directly or indirectly." As pertinent here, the court ruled:

> The Legislature, by its inclusion of the word "'indirectly'" in its description of the acts which make one a merchant, strongly indicates that a merchant is not only one who has face to face dealings with consumers, but also one who substantially participates in the process, as Cottman did.[100]

The Court found that the franchisor, acting directly or indirectly, may be held liable for the deceptive practices of its franchisees.[101]  The Court explained:

> When its deceptive practices result in violations, the correct penalty determination would be based on the franchisees' furtherance of the franchisor's deceptive practice with respect to individual consumers. Thus, each contact by the franchisees that perpetuates the franchisor's deception is a prohibited act, for

---

[98]  *Id.*

[99]  587 A.2d 1190 (Md. App. 1991).

[100]  *Id.* at 1197.

[101]  *Id.* at 1198.

which either merchant may be held accountable.[102]

Marriott controlled the reservations made at its Franchised hotels through its Reservation System. Marriott issued the price representations to its hotel guests at Franchised Hotels through its Reservation System. Marriott's MARSHA data establish that 133,611 of the reservations recorded were for rooms in one of the Marriott Franchised Hotels. Marriott is liable for the violations of the CPPA resulting from representations and omissions related to its pricing practices as applied and implemented by its Franchised Hotels in Russia.

### IV.    Guests with Multiple Stays May Recover for Each Stay

Marriott argues that no Plaintiffs or class members may recover damages for more than one stay. Marriott Memorandum at 41. Marriott does not cite a single legal authority to support this position - and for good reason - there are none. The weight of legal authority is all on the other side of this proposition.

The D.C. CPPA provides for $1,500 **per violation** of the statute.[103] There is no support for the proposition that each *type* of deceptive trade practice is a single violation no matter how many times it is repeated with different consumers. Rather, the plain language of the statute itself[104] and the wealth of cases holding that each transaction involving an unlawful method constitutes a separate violation supports plaintiffs' position that class members are entitled to statutory damages for *each transaction* (hotel stay) involving a violation of the DC CPPA.

In *United States v. Reader's Digest Association, Inc.*, the Third Circuit upheld the lower

---

[102]  *Id.*

[103]  §28-3905(k)(1)(A).

[104]  *Id.*

31

court's decision that each *piece* of mail in a direct-mail solicitation constituted a separate

violation.[105]   Reader's Digest unsuccessfully argued that the trial court erroneously determined

the number of violations of the order and that each bulk mailing, and not, as the district court

concluded, each piece of mail constituted a separate violation.[106]   The district court held that

Reader's Digest had been guilty of 17,940,521 violations because *each letter* distributed in

Reader's Digests' mass mailings constituted a separate violation.[107]   The appellate court noted

that there was ample support for this holding in several district court decisions as well as the

legislative purpose underlying the penalty provision of the statute.[108]   For example, in *United*

*States v. Floersheim*[109] the Government sought civil penalties for violations of a consent order

prohibiting the sale of misleading and deceptive business forms. The court found that the sale of

approximately 300,000 copies of the forms constituted 300,000 violations of the order because

"(e)ach individual form sold constituted a separate violation of the order and is therefore a

separate offense subject to penalties."[110]

        The Reader's Digest court noted that defendants "position that one bulk mailing-no

matter how large-comprises only one violation would eviscerate any punitive or deterrent effect

---

[105] *United States v. Reader's Digest Association, Inc.*,**,** 662 F.2d 955, 966-67 (3rd
Cir.1981).

[106]  *United States v. Reader's Digest Association, Inc.,* 494 F.Supp. 770 (D.Del. 1980).

[107] *Id.*

[108] 15 U.S.C. s 45(l) (1976).

[109] *United States v. Floersheim*, (1980-2) CCH Trade Cases P 63,368 (C.D.Cal.1980),
aff'd, 659 F.2d 1090 (9th Cir. 1981).

[110] *Id.*

of FTC penalty proceedings."[111]  The court rejected the Reader's Digest's argument that substantial penalties were not warranted because there was no evidence that anyone had been misled.  The Third Circuit noted that the purpose of the law was to prevent deceptive material from reaching the public, and "whenever such promotional items reach the public, that in and of itself causes harm and injury."[112]  Just as Reader's Digest sent a mailing to each individual consumer, Marriott provided each member of the proposed class with a reservation confirmation. Therefore, each such dollar denominated reservation confirmation constitute a separate violation of the DC CPPA whether or not the consumer was actually misled.

In *Green v. U. S.*, the District of Columbia Court of Appeals upheld a lower court finding that *each daily publication* of a fraudulent advertisement in newspaper was a separate offense.[113] The advertisement at issue ran daily for 60 days.  Green argued that there were not sixty offenses but only one, because the statute prohibits a course of conduct.  The Court of Appeals soundly rejected this argument noting that the statute at issue was intended to prevent the dissemination of false advertising in the District of Columbia:

> If we adopt appellant's view, however, that only a course of conduct is proscribed under s 22-1411, we would frustrate rather than effectuate this congressional purpose. Unethical businessmen, for example, would be undeterred from engaging in false advertising in the District of Columbia for prolonged periods of time resulting in thousands of dollars in additional profit, if they knew that $500 was the maximum fine that could be imposed.  A $500 fine would then become nothing more than a slight business expense.  This is a result Congress obviously did not intend.[114]

---

[111] *U. S. v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955, 966-67 (C.A.Del., 1981).

[112] 662 F.2d at 955.

[113] *Green v. U. S.*, 312 A.2d 788 (D.C. 1973).

[114] *Id.* at 792.

In *United States v. Shelton Wholesale. Inc.* the court analyzed various methods of calculating the appropriate fine for fireworks importers' violations of the Federal Hazardous Substances Act and determined that *each defective firework device* constituted a separate violation. The Court rejected defendants arguments that each *shipment* of fireworks devices should be calculated as a separate violation and stated, "As the products at issue here demonstrate, a particular product may be comprised of anywhere from several hundred to several million individual devices. The potential harm to the end users varies with the number of devices in a particular shipment."[115]

In *Commonwealth v. Fall River Motor Sales. Inc.*, the Massachusetts Supreme Judicial Court held that each day an advertisement appeared in a newspaper constituted a separate violation.[116] The court rejected the argument that there should be only one civil penalty, instead finding that "[e]ach time the advertisement appeared in the newspaper, the public was exposed to confusing and deceptive advertising practices....

> If only one violation were found, as the defendant suggests, because the advertisements were identical and were purchased in a single transaction, the effect of the penalty proceeding under the statute could be substantially diminished. Automobile dealers could place multiple contumacious advertisements for which there would be only a single penalty. In such a circumstance, the maximum $10,000 penalty might not be an adequate deterrent in the face of the size of the profits that could be earned by disregard of a judgment.[117]

---

[115] *United States v. Shelton Wholesale. Inc.,* 34 F.Supp.2d 1147, 1165-66 (W.D.Mo.1999).

[116] *Commonwealth v. Fall River Motor Sales. Inc.*, 409 Mass. 302, 565 N.E.2d 1205, 1213 (Mass.1991).

[117] *Id.,* citing *Reader's Digest,* 662 F.2d at 966-967.

34

The court rejected defendant's argument that consumers were not misled or harmed and explained that the "principal purpose of a cease and desist order [in a consumer protection case] is to prevent material having a capacity to confuse or deceive from reaching the public ... Thus, whenever such promotional items reach the public, that in and of itself causes harm and injury."

## V.    Material Issues of Fact Remain on Plaintiffs Claims for Misrepresentation of Source and Geographic Origin

Marriott's public representations strongly associating its brand with the District of Columbia raise issues of fact material to whether a reasonable consumer would have considered the brand identification important in their choice of hotel accommodations.  Marriott has engaged in an admitted longstanding, widespread and unambiguous promotion of its historic roots in the District of Columbia. Marriott's ties to the Nation's Capitol form an important part of its brand identification and consumer franchise.[118]  Marriott represents in its public statements and promotion of its Marriott brand, that  the perpetuation of the company's culture has a proven positive financial impact.  Marriott's origins in and its continuing ties to the District of Columbia form an integral part of Marriott's corporate culture and persona.[119]  Marriott represents that it is headquartered in Washington, D.C., and provides an address located in Washington, D.C. pervasively throughout its website;[120] Marriott's required regulatory filings with the Securities and Exchange Commission report its corporate headquarters as located in Washington, D.C;[121]

---

[118]   Defendant Marriott International, Inc.'s Answer to Plaintiffs' First Amended Class Action Complaint ("Marriott Answer") at ¶ 18.

[119]   *Id.* ¶ 22.

[120]   *Id.* ¶¶ 23-26.

[121]   *Id.* ¶¶ 27-28.

Marriott's general counsel states his business address to be in Washington, D.C.;[122] Marriott

repeats in all its press releases that it is headquartered in Washington, D.C.[123]

> Further, Marriott affirmatively states:
>
> Marriott admits that it has made, and continues to make, representations that its
> headquarters are located in Washington D.C. Marriott further states that its historic
> roots to the District of Columbia date back to 1927 when the Company's founders
> began their business operations in the District of Columbia. Until 1979, when the
> Company moved its headquarters to Bethesda, Maryland, Marriott was in fact
> headquartered in Washington D.C. Thus, to honor Marriott's historical roots and
> connections to Washington, D.C., the company at times represents that it is
> headquartered there.[124]

And yet further Marriot promotes the identification of its Marriott brand with the District of

Columbia  for its own commercial advantage:

> Marriott admits that it has stated on its website that "the perpetuation of a
> company's culture has proven a positive financial impact."  Marriott states that its
> historic roots to the District of Columbia date back to 1927 when the Company's
> founders began their business operations in the District of Columbia. [125]

By Marriott's own emphatic affirmative statements and actions, Marriott itself has made

the identification of its brand with D.C., the Nation's Capital, a factor in the decision of a

reasonable consumer  in booking a Marriott branded hotel room in Russia.  For customers

traveling to places like Russia where the environment may not be particularly stable, an

association with the capital of the only remaining world superpower might convey a sense of

---

[122] *Id.* ¶ 29.

[123] *Id.* ¶ 31.

[124] *Id.* ¶¶ 32, 33.

[125] Marriott Answer ¶ 22.

36

security not otherwise available.[126]  Further, Marriott admits that the perpetuation of its own corporate culture, including its historic roots in the District of Columbia, has had a "positive financial impact."[127]  That positive financial impact came from its hotel guests who learned of its corporate culture at least in part from the representations, or misrepresentations, at issue.

Marriott argues that no case has ever held that misrepresenting the location of a corporation's headquarters is actionable as a misrepresentation of source or geographic origin. Just because neither § 28-3904(a) and (t), nor any similar statute, has yet been applied to misrepresentations as to the location of a company, does not mean that such provisions are not applicable.  As discussed previously in this submission, and in Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, enumeration of the various prohibited unfair trade practices in §28-3904 is not exhaustive.[128]  The D.C. Court of Appeals has interpreted the CPPA in its broadest possible application, finding that the express purpose of the CPPA is to remedy "*all* improper trade practices,"[129] and that the list of improper practices enumerated in the statute is not exclusive.[130]  Thus, whether or not Marriott's misrepresentation of its location, and its false association of its brand with the District of Columbia fit neatly within one of the categories listed in the CPPA is of no consequence.

---

[126]  See, Declaration of Dr. Chekitan S. Dev, attached as Exhibit 2 to Plaintiffs' Opposition to Marriott's Motion to Dismiss First Amended Complaint (Doc.11).

[127]  Marriott Answer ¶ 22.

[128]  *District Cablevision Limited Partnership*, 828 A.2d at 723.

[129]  *Id.*, citing, D.C. Code 28-3901(b)(1)(emphasis in original).

[130]  *Id.*

Marriott represents to the world  that it is headquartered in the District of Columbia on its website, in its press releases, in its SEC filings, in its reports to its stockholders, and in all aspects of its description of its "Marriott" brand.[131]  Yet, in this lawsuit, Marriott has sworn that its headquarters are, in truth, located in Bethesda, Maryland.[132]  *If* Marriott is not headquartered in the District of Columbia, Marriott has been untruthful, consistently and pervasively, in all of its public statements and regulatory filings.  Marriott's own inconsistent statements raise issues of fact which preclude summary judgment on these issues.

### VI.    Remedy and Class Certification

Marriott argues that this Court should rule on the dispositive motions before addressing class certification.  This is a decision that Plaintiffs are content to leave to the sound discretion of the Court.

Plaintiffs did not address directly issues related to class certification in their Motion for Partial Summary Judgment on the Issue of Liability.  Marriott's Motion for Summary Judgment seems to intrude upon issues related to both remedy and class certification.  Further, because the issue has now been joined on Plaintiffs' merits claims, additional implications for class certification and remedy begin to emerge.

First, the earlier briefing on class certification seemed to focus mostly on Plaintiffs misrepresentation and failure to disclose claims.  Those claims were centered largely on Marriott's reservation and confirmation systems and how misrepresentations and failures to disclose were implicated in those systems.  Plaintiffs third claim - offering hotel services without

---

[131]  *Id.*; Marriott Answer ¶¶ 18, 22 - 29, 31 - 33.

[132]  Marriott Answer ¶ 2.

38

the intent to sell as offered - is not tied so much to the reservation confirmation process. Rooms in all of Marriott's Russian Hotel properties were offered and/or advertised in USD through MARSHA. Those who accepted such offers were overcharged at checkout and should be entitled to recover without detailed reference to the reservation/confirmation process itself. A slight adjustment to the class definition may be necessary to accommodate such individuals. Further, while Plaintiffs contend that Marriott had sufficient control over room offerings booked directly through its three franchised hotels so as to bring stays at those hotels within its misrepresentation/failure to disclose claims, Plaintiffs' third claim does not implicate that argument. Rooms at all of Marriott's Russian hotels (including franchised hotels) were offered in USD through Marriott's worldwide Reservation System without the intent to sell them as offered. Guests who accepted those offers have a claim irrespective of whether the hotel was franchised or operated by Marriott.

During discovery, Plaintiffs asked Marriott to produce information specifically related to guest stays at its Russian hotels. Marriott responded with MARSHA data informing Plaintiffs that this data represented guest stays. Plaintiffs' Response to MSUF ¶ 22. Now, long after discovery has closed, Marriott attempts to offer evidence that MARSHA data covers reservations, not stays. Such evidence, which Marriott was obliged to produce long ago, should be stricken from the record pursuant to Fed. R. Civ. P. 37(c)(1).

The Court should be aware that further discovery of guest information will be needed to provide notice to class members and to calculate statutory damages. Plaintiffs are quite certain that the MARSHA data produced this far is incomplete and does not identify the names and addresses of all absent class members. We are equally confident that Marriott has good data

which it has not yet produced, including information on names and addresses of guests. Marriott is also likely to have credit card information that could be vital during the remedy phase of this proceeding.

**CONCLUSION**

With one exception, Marriott seeks summary judgment on jurisdictional issues, not the merits of Plaintiffs' claims. For the reasons established in this Opposition, as well as pleadings previously filed in this action, Marriott's contentions are baseless. Plaintiffs' have established adverse claims against Marriott, directly connected to Marriott's conduct in violation of the CPPA, and for which the CPPA provides a statutory remedy. Plaintiffs are consumers within the meaning of the CPPA, and qualify to bring the claims asserted here under that statute. There are no constitutional obstacles to the imposition of D.C. law on a class-wide basis. Marriott's long standing association and pervasive contacts with the District of Columbia are sufficient to create state interests that preclude a finding that application of D.C. law to Marriott's conduct is arbitrary or fundamentally unfair. This is true irrespective of whether Marriott's misrepresentations of the location of its headquarters is separately actionable. Marriott's equivocation regarding the true location of its headquarters raises material issues of fact which preclude summary judgment on Plaintiffs' claims related to the source or geographic origin of Marriott's services. Beyond those disputed facts, although there may be disagreement on certain details, the facts related to Marriott's Motion raise no genuine issue for trial. As a matter of law, Marriott's Motion for Summary Judgment should be denied.

Respectfully submitted,.

40

/s/ Paul D. Cullen, Sr.

Mark W. Borghesani, Esq., D.C. Bar # 426745      Paul D. Cullen, Sr., D.C. Bar # 100230
c/o The Cullen Law Firm PLLC      Joyce E. Mayers,  D.C. Bar # 268227
1101 30th Street NW, Suite 300      Randall Herrick-Stare, D.C. Bar # 482752
Washington, D.C. 20007      Amy M. Lloyd, D.C. Bar # 975887
(202) 944-8600      The Cullen Law Firm, PLLC
*Of Counsel*      1101 30th Street NW, Suite 300
     Washington, D.C. 20007
     (202) 944-8600
     *Counsel for Plaintiffs*

Dated: June 13, 2008