# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRITT A. SHAW, et al.,<br>on behalf of themselves and all others<br>similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>MARRIOTT INTERNATIONAL, INC.<br><br>        Defendant. | Civil Action No. 05-1138 (GK)<br>Status Conference – July 7, 2008 |

**MARRIOTT INTERNATIONAL, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION .................................................................................................... 1

COUNTERSTATEMENT OF FACTS .................................................................... 4

    A.    UNDISPUTED FACTS AND PLAINTIFFS' KEY FACTUAL ERRORS ........... 4

        1.    Facts Concerning Marriott And Marriott Russia Hotels .............................. 4

        2.    Facts Concerning Plaintiffs ...................................................................... 11

    B.    DISPUTED FACTS THAT PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFFS ................................................................................................ 13

ARGUMENT ......................................................................................................... 13

    I.    PLAINTIFFS LACK STANDING, WHICH IS THEIR BURDEN TO ESTABLISH, REQUIRING SUMMARY JUDGMENT FOR MARRIOTT ....... 13

        A.    Plaintiffs Must Establish Article III Standing And The Applicability Of The D.C. CPPA To Prevail On Summary Judgment ........................... 14

        B.    No Plaintiff Has Standing, Requiring The Denial Of Plaintiffs' Motion And Entry Of Summary Judgment For Marriott ........................... 16

            1.    Plaintiff Shaw Lacks Standing ....................................................... 17

            2.    Plaintiff Mendelson Lacks Standing .............................................. 22

            3.    Plaintiff CSIS Lacks Standing ....................................................... 24

            4.    Plaintiff Charness Lacks Standing ................................................. 25

    II.    PLAINTIFFS ARE WRONG THAT THE UNSUCCESSFUL *SHAW V. HYATT* AND *BYKOV V. RADISSON* LAWSUITS "HAVE NO APPLICATION" HERE ................................................................................ 26

        A.    The Seventh Circuit's Ruling In *Shaw v. Hyatt* Supports Marriott's Arguments For Summary Judgment ....................................................... 26

i

         B.     The Eighth Circuit's Ruling In *Bykov v. Radisson* Supports
                Marriott's Arguments For Summary Judgment .........................................29

III.     PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
       THEIR CLAIMS UNDER D.C. CODE SECTIONS 28-3904(e), (f) AND
       (h) ....................................................................................................................31

         A.     Summary Judgment Should Be Entered For Marriott On Plaintiffs'
                Hotel Exchange Rate Claims Post-dating Marriott's 2005 Provision
                Of Additional Information During the Reservation Process.....................31

         B.     No Plaintiff May Recover Statutory Damages Under The D.C.
                CPPA For More Than One Hotel Stay ......................................................33

         C.     Summary Judgment Should Be Denied With Respect To Plaintiffs'
                D.C. CPPA Claims In All Other Respects Because Disputed
                Questions Of Fact Require A Trial On Plaintiffs' Pre-2005 D.C.
                CPPA Claims ............................................................................................34

IV.     BECAUSE MARRIOTT IS ENTITLED TO SUMMARY JUDGMENT,
       CLASS CERTIFICATION IS A MOOT ISSUE; IN ANY EVENT,
       PLAINTIFFS' ATTEMPT TO EXPAND THE CLASS DEFINITION
       SHOULD BE REJECTED .......................................................................................42

         A.     Because No Plaintiff Has Standing, And Because Marriott Is
                Otherwise Entitled To Summary Judgment, Class Certification Is
                Moot ...........................................................................................................42

         B.     Plaintiffs' Attempt To Expand The Class Definition Should Be
                Rejected.....................................................................................................42

         C.     In The Alternative, No Proposed Class Member Is Entitled To
                Summary Judgment, Which Should Be Entered Against All
                Members Of The Proposed Class Whose Claims Share The Same
                Deficiencies As Plaintiffs' Claims...........................................................44

CONCLUSION.....................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Albrecht v. Comm. on Employee Benefits*, 357 F.3d 62 (D.C. Cir. 2004) ....................................26

*Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909 (D.C. Cir. 1997) ............................................33, 34

*Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981)....................................................................21, 22

*Amfac Resorts, L.L.C. v. DOI*, 282 F.3d 818 (D.C. Cir. 2002)....................................................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................................35

*Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476 (Mass. 2004)....................................................17

*Atwater v. DCRA*, 566 A.2d 462 (D.C. 1989)......................................................................27, 28

*Bykov v. Radisson Hotels Int'l, Inc.*, No. 05-1280, 2006 U.S. Dist. LEXIS
    12279 (D. Minn. Mar. 22, 2006)........................................................2, 27, 29, 30, 31, 38

*Bykov v. Radisson Hotels Int'l, Inc.*, No. 06-2102, 2007 U.S. App. LEXIS
    3276 (8th Cir. Feb. 12, 2007)...........................................................2, 18, 29, 31

*Byrd v. Jackson*, 902 A.2d 778 (D.C. 2006)....................................................................40, 41, 42

*Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 103-06 (D.D.C. 2004) ...................................................40

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................16

*Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018 (D.C. 2007)......................................15, 20

*Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970)...............36

*Clifton Terrace Assoc., Ltd. v. United Techs. Corp.*, 728 F. Supp. 24 (D.D.C. 1990),
    *vacated in part on other grounds*, 929 F.2d 714 (D.C. Cir. 1991) ...................................24

*Curtin v. United Airlines, Inc.*, 275 F.3d 88 (D.C. Cir. 2001) ......................................................42

*Cruz v. Am. Airlines*, 150 F. Supp. 2d 103 (D.D.C. 2001) ...........................................................42

*District Cablevision Limited Partnership v. Bassin*, 828 A.2d 714 (D.C. 2003) ...................27, 30

*Ford v. ChartOne, Inc.*, 908 A.2d 72 (D.C. 2006)......................................................................18

*Forth Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055 (D.C. 2008) ..........36

*Freeland v. Iridium World Commc'ns, Ltd.*, No. 99-1002, 2008 U.S. Dist. LEXIS 27152 (D.D.C. Apr. 3, 2008) ......................................................................................36

*Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201 (D.C. 2002) ......................15

*FTC v. Crescent Publishing Group*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001) ..........................38, 40

*Giant Food Inc. v. FTC*, 322 F.2d 977 (D.C. Cir. 1963) ..............................................................36

*Green v. Freight Liquidators*, 312 A.2d 788 (D.C. 1973) ......................................................40, 42

*Guam v. Marfega Trading Co.*, 1998 Guam 4 (1998) ....................................................................40

*Howard v. Riggs National Bank*, 432 A.2d 701 (D.C. 1981) ........................................................24

*Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24 (D.D.C. 2007)................................................15, 18

*Independent Communications Network, Inc. v. MCI Telecommunications Corp.*, 657 F. Supp. 785 (D.D.C. 1987) ..........................................................................................24

*Int'l Bhd. of Teamsters v. TSA*, 429 F.3d 1130 (D.C. Cir. 2005)...............................................15, 16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................................14, 24

*Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418 (D.C. 2006)......................................................35

*Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F. Supp. 588 (D.D.C. 1988) ......................19

*Miami Bldg. & Constr. Trades Council v. Sec'y of Def.*, 493 F.3d 201 (D.C. Cir. 2007)............14

*In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163 (D.D.C. 1996)....................................36

*OCONUS DOD Employee Rotation Action Group v. Cohen*, 140 F. Supp. 2d 37 (D.D.C. 2001) .................................................................................14, 18, 22, 24, 25

*Oglala Sioux Tribe v. United States Army Corps of Eng'rs*, 537 F. Supp. 2d 161 (D.D.C. 2008) ...........................................................................................................14

*Osbourne v. Capital City Mortgage Co.*, 727 A.2d 322 (D.C. 1999)...............................27, 28, 35

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...........................................................21, 22

*Rainbow/PUSH Coal. v. FCC*, 396 F.3d 1235 (D.C. Cir. 2005) ...................................................14

*Schiff v. AARP*, 697 A.2d 1193 (D.C. 1997)................................................................................26

*Shaw v. Hyatt Int'l Corp.*, No. 05-5022, 2005 U.S. Dist. LEXIS 28250 (N.D. Ill. Nov. 15, 2005) ................................................................................................................2

*Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899 (7th Cir. 2006) ...............................................2, 26, 27, 28

*Shaw v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 141 (D.D.C. 2007)...................................20

*In re St. Jude Med., Inc.*, 425 F.3d 1116 (8th Cir. 2005)................................................21

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ......................................................15

*Sierra Club v. Morton*, 405 U.S. 727 (1972) .................................................................17

*State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)..........................................22

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)...........................................14

*In re Swine Flu Immunization Prods. Liab. Litig.*, 880 F.2d 1439 (D.C. Cir. 1989)....................14

*Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986) ..........................................40

*Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168 (D.C. 2006)............................20, 21

*Wells v. Allstate*, 210 F.R.D. 1 (D.D.C. 2002)...............................................................30

*Wiggins v. Avco Fin. Servs.*, 62 F. Supp. 2d 90 (D.D.C. 1999)................................34, 35

*Williams v. First Government Mortgage & Investors Corp.*, 225 F.3d 738 (D.C. Cir. 2000) ..................................................................................................................40

*Williams v. The Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003) ...........................................................15, 17, 18, 20, 22, 24, 25, 30, 34

## STATUTES AND RULES

D.C. Code § 28-3901(a)(2) ...........................................................................18, 19, 24

D.C. Code § 28-3901(a)(6) ................................................................................18, 19

D.C. Code § 28-3901(b)(2) ....................................................................................20

D.C. Code § 28-3904 ................................................................................15, 18, 19, 30

D.C. Code § 28-3904(a)............................................................................................1

D.C. Code § 28-3904(e)....................................................................................................1

D.C. Code § 28-3904(f) ...................................................................................................1

D.C. Code § 28-3904(h)...............................................................................................1, 41

D.C. Code § 28-3904(r) .................................................................................................27

D.C. Code § 28-3904(t) ...................................................................................................1

D.C. Code § 28-3904(k)................................................................................................15

D.C. Code § 28-3905(k)(1)........................................................................................18, 19

815 ILCS 505/1(e) ........................................................................................................27

Minn. Stat. § 325F.69, subd. 1 .....................................................................................30

## OTHER SOURCES

FTC Statement on Deception, *In re Cliffdale Assoc., Inc.*, 103 F.T.C. 110, 182 (1984).........38, 39

Marriott International, Inc. ("Marriott"), by its attorneys, hereby submits this Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Partial Summary Judgment on the Issue of Liability.[1]

## INTRODUCTION

Plaintiffs have moved for summary judgment on their claims under the District of Columbia Consumer Protection Procedures Act ("D.C. CPPA") related to the Marriott Russia Hotels'[2] former use of hotel exchange rates to convert prices quoted in U.S. dollars into rubles. *See* D.C. Code §§ 3904(e), (f), (h). Plaintiffs have not moved for summary judgment on their "headquarters misrepresentation" claims. *See id.* §§ 3904(a), (t). Nor have they moved for summary judgment on unjust enrichment. For the reasons discussed herein and in Marriott's separate motion for summary judgment and supporting memoranda, Plaintiffs' Motion for Partial Summary Judgment should be denied in full. Summary judgment should be granted to Marriott.

Plaintiffs continue to confuse the critical threshold inquiry of <u>standing</u> with the contingent <u>liability</u> inquiry under the D.C. CPPA.[3] Plaintiffs' memorandum in support of summary judgment ("Plaintiffs' SJ Mem.") immediately dives into issues concerning liability under the D.C. CPPA without even acknowledging – let alone addressing – Marriott's weighty arguments grounded in this Court's precedent that Plaintiffs lack standing to maintain this

---

[1] Marriott hereby incorporates its Memorandum in Support of Marriott's Motion for Summary Judgment ("Marriott SJ Mem.") and accompanying Statement of Undisputed Facts ("Facts"). With this Opposition, Marriott submits a Statement of Genuine Issues ("Counterstatement") that responds to Plaintiffs' Statement of Undisputed Facts and sets forth genuine issues for trial that preclude Plaintiffs from obtaining summary judgment.

[2] As elaborated in Marriott's affirmative summary judgment briefing, *see* Marriott SJ Mem. at 5, there are seven Marriott Russia Hotels – four managed by Marriott ("Marriott Managed Hotels"), and three neither owned nor operated by Marriott, but owned and operated by wholly owned subsidiaries of Interstate Hotels and Resorts, Inc. ("Interstate") ("Marriott Franchised Hotels").

[3] This same confusion exists in Plaintiffs' class certification briefing. *See* Plaintiffs' Class Cert. Reply at 32-34.

lawsuit, both as a matter of Article III of the Constitution and D.C. law. Plaintiffs have been put on notice by Marriott of these standing issues for months – first on Marriott's Motion for Partial Dismissal, and then on Plaintiffs' Motion for Class Certification. Where, as here, Plaintiffs move for summary judgment, it is settled law that it is <u>Plaintiffs' burden</u> to present evidence supporting Plaintiffs' standing to sue. As summarized below and explained in Marriott's affirmative summary judgment briefing, Plaintiffs lack standing for several independent reasons. In light of Marriott's unrebutted showing that Plaintiffs lack standing, not only must Plaintiffs' summary judgment motion be denied, but Marriott's summary judgment motion must be granted.

Although the standing issues resolve Plaintiffs' summary judgment motion against them, Plaintiffs' arguments with respect to liability under the D.C. CPPA are incorrect and do not support summary judgment for either the Plaintiffs or the proposed class. First, Plaintiffs seek to sweep aside the highly pertinent decisions in two other materially identical class actions, which the Seventh and Eighth Circuits resolved against Plaintiffs, including Plaintiff Shaw and Plaintiffs' counsel here.[4] As explained below, far from having "no application" here, Plaintiffs' SJ Mem. at 33, the Seventh and Eighth Circuit decisions set forth persuasive reasoning that the Court should follow in denying Plaintiffs' motion and granting summary judgment for Marriott.

Moreover, in claiming that they are entitled to summary judgment under the D.C. CPPA, Plaintiffs overlook that – assuming standing exists – a trial is not required on the great majority of Plaintiffs' substantive claims because Marriott is entitled to summary judgment on: (1) Plaintiffs' claims under D.C. Code Sections 3904(e), (f) and (h) that post-date Marriott's

---

[4] *Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899 (7th Cir. 2006) (affirming dismissal in *Shaw v. Hyatt Int'l Corp.*, No. 05-5022, 2005 U.S. Dist. LEXIS 28250 (N.D. Ill. Nov. 15, 2005)); *Bykov v. Radisson Hotels Int'l, Inc.*, No. 06-2102, 2007 U.S. App. LEXIS 3276 (8th Cir. Feb. 12, 2007) (affirming grant of summary judgment in *Bykov v. Radisson Hotels Int'l, Inc.*, No. 05-1280, 2006 U.S. Dist. LEXIS 12279 (D. Minn. Mar. 22, 2006)).

provision in 2005 of the allegedly required information concerning payment in rubles and hotel exchange rates; (2) Plaintiffs' "headquarters misrepresentation" claims under D.C. Code Sections 3904(a) and (t); and (3) Plaintiffs' unjust enrichment claims.

With respect to the remaining claims – Plaintiffs' pre-2005 challenges under D.C. Code Sections 28-3904(e), (f) and (h) – Plaintiffs critically misstate facts and gloss over individualized and disputed issues of fact that preclude summary judgment. As explained below, key liability questions that must be resolved at trial with respect to Plaintiffs' D.C. CPPA claims that pre-date Marriott's provision of additional information to prospective guests in mid-2005 include:

- what representations were in fact made to each Plaintiff by Marriott;

- what constitutes a reasonable consumer of Marriott Russia Hotels;

- whether the representations or omissions at issue for each Plaintiff were deceptive to a reasonable consumer of Marriott Russia Hotels;

- whether the representations or omissions at issue for each Plaintiff were material to a reasonable consumer of Marriott Russia Hotels; and

- whether Marriott intended to sell rooms at the Marriott Russia Hotels as offered.

All of these disputed factual questions must be resolved by the trier of fact. In any event, because the standing issues are dispositive, the Court need not reach issues of liability.

Finally, Plaintiffs prematurely seek summary judgment on behalf of a proposed class, which has not yet been certified and which Plaintiffs once again have redefined. The proper focus of this summary judgment motion is on the individual Plaintiffs, and whether each of their claims require a trial. As Marriott argues, if summary judgment is granted for Marriott, the issue of class certification becomes moot. Moreover, in arguing for summary judgment on behalf of the proposed class, Plaintiffs attempt to retreat from their final proposed class definition in their

class certification briefing, greatly expanding the scope of the proposed class. Plaintiffs should

not be permitted to re-expand their proposed class, which is limited to individuals who received

written confirmations from Marriott (and which, as Marriott has argued previously, should not be

certified). In any event, Plaintiffs cannot prevail on summary judgment with respect to the class,

both for lack of standing and the existence of disputed material issues of fact.

**COUNTERSTATEMENT OF FACTS**

Marriott previously submitted a Statement of Undisputed Facts in support of its Motion

for Summary Judgment, which Marriott incorporates herein by reference. Marriott's

Memorandum in Support of its Motion for Summary Judgment also sets forth the relevant

undisputed factual issues, *see* Marriott SJ Mem. at 4-14, and Marriott incorporates that

discussion by reference. So as not to burden the Court with a duplicative recitation of the facts,

Marriott's presentation here centers on (1) rebutting Plaintiffs' factual presentation with an

explanation of actually undisputed facts (first with respect to the Marriott Russia Hotels, and

then with respect to the individual Plaintiffs), and (2) highlighting the disputed issues precluding

summary judgment for Plaintiffs on their claims under D.C. Code Sections 3904(e), (f) and (h).

**A.    UNDISPUTED FACTS AND PLAINTIFFS' KEY FACTUAL ERRORS.**

**1.    Facts Concerning Marriott And Marriott Russia Hotels.**

Marriott Is Not Headquartered In Washington D.C. And Does Not Have A Significant Connection To The District. Plaintiffs' summary judgment presentation is notable for the

absence of any evidence or argument concerning the location of Marriott's corporate

headquarters or other business operations. As explained below and in Marriott's affirmative

summary judgment briefing, Marriott's location in Maryland is critically important because it

precludes application of the D.C. CPPA to several Plaintiffs' claims and to the great majority of

4

the proposed class.  It is undisputed that Marriott is incorporated in Delaware; that its headquarters and principal place of business are in Bethesda, Maryland; and that Marriott does not maintain a corporate office in Washington D.C.  Facts ¶¶ 2-3, 6.  Plaintiffs Shaw and Charness have admitted that Marriott is headquartered in Maryland.  *Id.* ¶ 3.  Marriott has a historical connection to Washington, D.C. and a Washington, D.C. mailing address, but mail sent to that address is routed directly to Marriott's Maryland headquarters.  *Id.* ¶ 6.  The servers for Marriott's website, www.marriott.com, are operated out of Frederick, Maryland, and no Marriott servers are located in Washington, D.C.  *Id.* ¶ 7.  Likewise, no Marriott Global Reservation Sales locations, which service Marriott's toll-free number, are in Washington, D.C.  *Id.* ¶ 27.

<u>Marriott Does Not Operate Or Control The Franchised Properties in Russia.</u>  Plaintiffs repeatedly makes the erroneous claim that Marriott controls and thus is responsible for the actions of the three Marriott Franchised Hotels in Russia.[5]  *See, e.g.*, Plaintiffs' SJ Mem. at 6 (claiming that Marriott "controls a system of hotel properties throughout the world").  Marriott does not own, operate or control the relevant actions of the Marriott Franchised Hotels, which are, and have been since opening, owned and operated by wholly owned subsidiaries of Interstate Hotels and Resorts, Inc. ("Interstate").  Facts ¶¶ 10-13.  Interstate is not owned or controlled by Marriott.  *Id.* ¶ 11.  Marriott's license agreements with the Interstate entities that operate the Marriott Franchised Hotels provide that the Interstate entities are solely responsible for establishing all hotel charges, including room prices and hotel exchange rates.  *Id.* ¶¶ 12-13.

<u>Marriott Does Not Operate Or Control Several Of The Reservation Channels At Issue, Including With Respect To Pricing Information Provided To Guests.</u>  Plaintiffs incorrectly claim that Marriott controls all of the reservation channels by which prospective guests reserve rooms

---

[5] Marriott does not dispute that the other four Marriott Russia Hotels at issue in this case are managed by Marriott.  Facts ¶ 9.

at Marriott Russia Hotels and that prospective guests received uniform pricing information in the proposed class period. *See, e.g.*, Plaintiffs' SJ Mem. at 6-7. Marriott does operate a worldwide automated reservation system named "MARSHA." Facts ¶ 20. However, Marriott-affiliated hotel properties select their own room rates and currency for quoting those room rates and input this information into MARSHA. *Id.* ¶¶ 15, 20. Moreover, numerous different reservation channels – most of which are not owned or controlled by Marriott – access the information in MARSHA to assist prospective guests in making reservations. *Id.* ¶ 21. Channels not owned or controlled by Marriott include the Interstate-owned and operated Marriott Franchised Hotels and Marriott Hotels of Moscow website and reservation agency, as well as third-party traditional and online travel agencies. *Id.* ¶¶ 23, 25, 30. These non-Marriott channels provide prospective guests with information that is different from or supplemental to the information provided by MARSHA. *Id.* ¶ 21. For example, as early as 2002, Interstate and Marriott Franchised Hotels informed prospective guests in their written confirmations that the price quoted was subject to payment in rubles at a hotel exchange rate. *Id.* ¶ 59. Thus, it is erroneous for Plaintiffs to claim that "[r]egardless of the means by which a potential guest accesses the data in the MARSHA system, the price represented to the hotel guest is consistent." Plaintiffs' SJ Mem. at 7.

  Marriott Does Not Issue Written Confirmations To All Guests At Marriott Russia Hotels.
In their class certification briefing, Plaintiffs ultimately settled on a proposed class definition limited to individuals who received written price confirmations from Marriott. Plaintiffs' Class Cert. Reply at 9 ("Under Plaintiffs' theory of the case, the key factor is whether the guest received a written price confirmation from Marriott"). This new limitation, which was formulated in response to Marriott's opposition to class certification, is presumably intended to ensure a connection between the proposed class and representations from Marriott and to avoid

individualized standing and liability issues involving relevant representations beyond those in the written confirmations. Now, however, in an attempt to shoehorn hundreds of thousands of people into their new proposed class definition, Plaintiffs erroneously claim that Marriott issues written confirmations to all hotel guests whose reservations were processed through MARSHA. *See, e.g.*, Plaintiffs' SJ Mem. at 7, 14-15. That contention is wrong.

It is an undisputed fact that each reservation channel that accesses MARSHA has its own practice for issuing written confirmations. Facts ¶ 29. Contrary to Plaintiffs' claim, *see, e.g.*, Plaintiffs' SJ Mem. at 7, Marriott does not provide written price confirmations to all hotel guests. Marriott does not provide a written confirmation if the reservation is booked through a third-party channel – such as an Interstate entity or a third-party travel agent. Facts ¶ 30. Even with respect to Marriott-controlled reservation channels (such as Marriott's toll-free number and www.marriott.com), Marriott issues written confirmations only if guests provide an email address or facsimile number and did not book through a negotiated group rate (during the time period at issue in this case). *Id.* ¶ 31. Thus, only a small percentage of guests at Marriott Russia Hotels during the relevant time period received written confirmations from Marriott. *Id.*

Not All Guests At Marriott Russia Hotels Received A Hotel Exchange Rate Higher Than The Central Bank Rate. Plaintiffs repeatedly claim that Marriott Russia Hotels converted prices from U.S. Dollars to rubles with a hotel exchange rate "that is always less favorable to the guest than the rate set by the Central Bank of Russia." Plaintiffs' SJ Mem. at 7; *see, e.g.*, *id.* at 2, 14, 15. That is incorrect, as Plaintiffs' own experiences show. It is undisputed that for many of Plaintiff Mendelson's stays at the Marriott Russia Hotels (she stayed at the Franchised Hotels not controlled by Marriott), she was charged the Central Bank rate. Facts ¶ 61. Other CSIS

employees similarly received the Central Bank rate, *id.* ¶ 69, as did other guests at Marriott

Russia Hotels with negotiated corporate rates, *see* Counterstatement ¶¶ 34, 177.

As Early As 2002, Guests At Marriott Franchised Hotels Received Written Confirmations

Informing Guests Of The Use Of Hotel Exchange Rates.  Plaintiffs assert that prior to 2005, no

guests reserving rooms at Marriott Russia Hotels were informed that their bills would be payable

in rubles and that a hotel exchange rate would be used for the conversion.  *See, e.g.*, Plaintiffs' SJ

Mem. at 8.  That claim simply ignores that as early as 2002, many guests at Marriott Russia

Hotels – including some Plaintiffs – were informed by written confirmations from Interstate

entities that "[t]he above rate is quoted in units equal to US dollars . . . Payment must be made at

the hotel's current exchange rate in rubles only."  Facts ¶ 59.  Marriott respectfully submits that

room pricing in U.S. dollars was not deceptive or otherwise unlawful absent this additional

information, and at the least, presents a question for the trier of fact.  *See infra* Section III.C.

However, what is clear is that many Plaintiffs and proposed class members were receiving this

allegedly withheld information in their written confirmations as early as 2002.

As Of August 2005, All Reservation Channels Controlled By Marriott Informed Guests

Of Hotel Exchange Rates And Payment In Rubles During The Reservation Process.  Plaintiffs'

submission appears to recognize the undisputed fact that as of August 2005, all reservation

channels controlled by Marriott informed guests during the reservation process that the price

quote in U.S. dollars was subject to payment in rubles at the hotel's exchange rate, Facts ¶¶ 34-

39.  *See, e.g.*, Plaintiffs' SJ Mem. at 8, 20-21.  Specifically, as of August 2005 at the latest,[6] this

information was provided during the reservation process to:  individuals reserving by calling the

Marriott Managed Hotels in Russia directly, individuals reserving via the Marriott toll-free

---

[6] As of May 2005, this information was provided in email confirmations to guests who reserved
via www.marriott.com.  Facts ¶ 36.

number, and individuals reserving via www.marriott.com.[7]  Facts ¶¶ 34, 38-39.  Moreover,

although Marriott does not control the information dispensed by third parties accessing

MARSHA for rate information, as of August 2005, Marriott inserted this same information into

MARSHA so as to inform third-party reservation channels.  *Id.*¶ 35.  As Marriott argues, it is

entitled to summary judgment for all claims post-dating the provision of this allegedly necessary

information.  *See* Marriott SJ Mem. at 39-40.  With respect to claims pre-dating the provision of

this information, Marriott respectfully submits that a trial is necessary.  *See infra* Section III.C.

At All Times, The Hotel Exchange Rate Was Displayed At The Marriott Russia Hotels And Disclosed On Guests' Bills.  Plaintiffs ignore the critical and undisputed fact that the hotel

exchange rate was conspicuously displayed at the Marriott Russia Hotels during the time period

at issue in this lawsuit.  Facts ¶ 33.  Guests' bills also specified the hotel exchange rate, *id.* ¶ 18,

as indicated by Plaintiffs' own submission, *see* Plaintiffs' Exs. 43, 44, 77, 56, 74-79, 81, 83, 85.

In addition, the registration cards that guests signed at check-in indicated that the room prices

were in currency units.  Facts ¶¶ 49, 73, 75; Plaintiffs' Ex. 53.  That Marriott Russia Hotels

clearly informed guests on property and guests receiving bills at the time of check-out of the

exchange rate by which the U.S. dollar price quotes were being converted to rubles will indicate

at trial that there was no "secret" charge, and thus no actual or intended deception.

Russian Law Required Bills To Be Settled In Rubles, And It Was A Widespread And Longstanding Practice Of Hotels And Other Businesses In Russia To Quote Prices In U.S. Dollars And Settle Bills Using An Internal Exchange Rate.  Plaintiffs do not acknowledge the

undisputed fact that until 2004, Russian law required services purchased in Russia, including

---

[7] Prior to mid-2005, some individuals who called the Marriott Managed Hotels in Russia directly may also have been provided additional information regarding hotel exchange rates.  *See* Facts ¶¶ 21, 24.  An individualized inquiry is necessary to identify those guests.

hotel lodging, to be paid for in rubles only.  Facts ¶ 17.  By omitting this fact, Plaintiffs

repeatedly suggest, incorrectly, that it was Marriott's decision to bill hotel customers in rubles at

check-out.  *See, e.g.*, Plaintiffs' SJ Mem. at 1, 6, 7, 14.  Marriott agrees that it was the decision of

the individual Marriott Russia Hotels to quote hotel room prices in U.S. dollars during the time

period at issue.  Facts ¶¶ 15, 18.  However, Plaintiffs incorrectly and repeatedly claim and

suggest that charging in U.S. dollars against the backdrop of the use of hotel exchange rates was

a nefarious practice and unique to Marriott – "[Marriott's] scam," Plaintiffs' SJ Mem. at 3.

Plaintiffs' presentation completely ignores the undisputed evidence that during the time that

Marriott Russia Hotels converted prices quoted in U.S. dollars into rubles using a hotel exchange

rate, virtually all hotels and businesses in Russia that quoted prices for goods or services in U.S.

dollars also followed this practice, which grew out of the volatility of the ruble after the

disintegration of the Soviet Union.  Facts ¶ 19.[8]  As Plaintiffs are aware, this same practice was

used by the two other hospitality companies, Hyatt and Radisson, which Plaintiffs' counsel (and

Plaintiff Shaw) unsuccessfully sued.  *See* Marriott SJ Mem. at 32-41.

     There Was No "Scam" By Marriott.  Plaintiffs' evidence does not support their claim that

the practices at issue were part of a "scam" and "intentional business planning."  Plaintiffs' SJ

Mem. at 3.  To the contrary, evidence cited by Plaintiffs indicates that Marriott personnel

attempted to understand and respond to occasional customer discontent and to the changing

Russian legal and financial landscape and did so as efficiently as possible, given the expectations

of independent hotel owners not controlled by Marriott but whose properties Marriott manages.

---

[8] Indeed, former Plaintiff Paliashvili, whose experiences Plaintiffs rely upon to support their
summary judgment arguments, *see* Plaintiffs' SJ Mem. at 16, testified that due to inflation and
unpredictable currency exchange in Russia after the fall of the Soviet Union, companies such as
Paliashvili's law firm used the dollar "as an informal denominator" and then converted U.S.
dollar amounts into rubles using an exchange rate.  Facts ¶¶ 19 & n.2

*See, e.g.*, Counterstatement ¶ 170.[9]  Despite Plaintiffs' repeated attacks, there is simply no evidence to support Plaintiffs' claim that Marriott deliberately set forth on a scheme to deceive its customers.  To the contrary, Marriott Russia Hotels provided information about hotel exchange rates on customers' bills, by signage at the hotels, on written reservation confirmations for some hotels since at least 2002, during the reservation process for all Marriott-controlled reservation channels since 2005, and when asked or questioned by customers.  *See, e.g.*, Counterstatement ¶¶ 4-49, 170-78.  Finally, Marriott did not reap "handsome profits" from the use of internal exchange rates, Plaintiffs' SJ Mem. at 9-10, 26.  Marriott <u>manages</u> four of the hotels under agreements and would have received only a small percentage of any revenue generated from hotel exchange rates.  *See* Counterstatement ¶174.

### 2. Facts Concerning Plaintiffs.

<u>The Claims Of Shaw And Charness Have No Connection To D.C. Other Than This Lawsuit.</u>  It is undisputed that Shaw is a resident of the United Kingdom, where he has lived for the entire time at issue in this case; that Shaw generally made reservations for Marriott Russia Hotels from the United Kingdom using a travel agent; that his last known U.S. residence was New York; and that he is domiciled in Florida for tax purposes.  Facts ¶¶ 44, 47-48.  It is further undisputed that Charness is a resident of Michigan who made reservations for Marriott Russia Hotels from Michigan.  *Id.* ¶¶ 71-72.  None of Marriott's activities underlying Shaw's or Charness's claims took place in the District of Columbia.  *Id.* ¶¶ 2-8, 27.

---

[9] Plaintiffs claim that Marriott received "over 450 guest complaints" about the use of hotel exchange rates.  Plaintiffs' SJ Mem. at 10.  Even assuming that this is not an overstatement (which it likely is), this number amounts to less than 0.1% of the reservations at issue in this case according to Plaintiffs' own calculations, indicating a lack of widespread confusion.  *See* Counterstatement ¶ 170, Facts ¶ 43.  Marriott took complaints seriously when it received them, often finding a satisfactory resolution.  *See* Counterstatement ¶ 170.

<u>Shaw And Mendelson Did Not Pay For Their Hotel Stays, But Were Reimbursed By Their Employers.</u>  It is undisputed that Shaw's employer paid for all of his stays at Marriott Russia Hotels.  Facts ¶ 53.  The same is true for Plaintiff Mendelson.  *Id.* ¶ 62.

<u>Shaw's and Mendelson's Hotel Stays Were For Business Purposes, As Were CSIS Employees' Stays.</u>  It is undisputed that the stays at Marriott Russia Hotels of Shaw, Mendelson and all CSIS employees were for business purposes.  Facts ¶¶ 53, 62, 66-67.

<u>Plaintiff Mendelson Stayed Only At Marriott Franchised Hotels, As Did CSIS Employees.</u>  It is undisputed that Mendelson and other CSIS employees stayed only at Marriott Franchised Hotels in Russia, Facts ¶¶ 58, 69, which are not owned or controlled by Marriott and which provided their own information to hotel guests, *id.* ¶¶ 10-14, 25, 30.

<u>CSIS Is A Corporation.</u>  It is undisputed that CSIS is a corporation.  Facts ¶ 65.

<u>Shaw, Mendelson And CSIS Were Aware Of The Use Of Hotel Exchange Rates.</u>  It is undisputed that Shaw knew as early as 2000 that Russian hotels converted U.S. dollar price quotes into rubles at check-out using an exchange rate.  Facts ¶¶ 46-47.  Moreover, at the time that he made the April 2005 reservation at a Marriott Russia Hotel that Plaintiffs claim is a "representative example of the transactions at issue" in this case, Second Amended Complaint ¶ 48, Shaw had received the precise hotel exchange rate of 32 rubles per dollar during stays at the Renaissance Moscow and Moscow Hyatt, Facts ¶¶ 51, and he had already discussed filing suit against Hyatt for the use of a hotel exchange rate, *id.* ¶ 48.  It is further undisputed that Mendelson and CSIS had both actual and constructive notice that a hotel exchange rate would be applied to the price quoted in U.S. dollars.  *Id.* ¶¶ 59-60, 69.  Among other things, CSIS employees had email discussions with Interstate personnel regarding the use of a hotel exchange

rate and Mendelson's written confirmations from Interstate informed her both of the need for

payment in rubles and the use of a hotel exchange rate for conversion to rubles.  *Id.*

**B.     DISPUTED FACTS THAT PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFFS.**

Setting aside the dispositive standing issues, discussed below, key issues of fact related to

liability, which preclude summary judgment for Plaintiffs on their pre-2005 claims, include:

- what representations were in fact made to each Plaintiff by Marriott;

- what constitutes a reasonable consumer of Marriott Russia Hotels;

- whether the representations or omissions at issue for each Plaintiff were deceptive to a reasonable consumer of Marriott Russia Hotels;

- whether the representations or omissions at issue for each Plaintiff were material to a reasonable consumer of Marriott Russia Hotels; and

- whether Marriott intended to sell rooms at the Marriott Russia Hotels as offered.

Plaintiffs have incorrectly identified these issues as undisputed in their favor.  *See, e.g.*,

Plaintiffs' SJ Mem. at 6-10.  However, as discussed below, these issues must be determined by

the trial of fact and are not properly resolved on summary judgment.  *See infra* Section III.C.

**ARGUMENT**

**I.     PLAINTIFFS LACK STANDING, WHICH IS THEIR BURDEN TO ESTABLISH, REQUIRING SUMMARY JUDGMENT FOR MARRIOTT.**

Plaintiffs continue to turn a blind eye to fundamental threshold issues of standing.

Plaintiffs confuse the D.C. CPPA's standards regarding liability (and whether reliance and

damages must be established) with the clear injury and causation requirements for standing to

sue in the first place.  Fortunately, as Marriott has elsewhere briefed, and as discussed below, this

Court and other courts have addressed this precise area of confusion.  Plaintiffs must establish

standing not only to prevail on – but to survive – summary judgment.  Prior to Plaintiffs'

summary judgment filings, Marriott repeatedly put Plaintiffs on notice of the substantial standing

barriers to their claims – including in Marriott's partial dismissal and class certification briefing.

Because Plaintiffs' briefing ignores standing issues and fails to establish standing, and because,

in any event, Plaintiffs lack standing, Marriott is entitled to summary judgment.

### A.    Plaintiffs Must Establish Article III Standing And The Applicability Of The D.C. CPPA To Prevail On Summary Judgment.

Standing – under both Article III of the Constitution and the D.C. CPPA – is an essential

prerequisite to Plaintiffs' case.  "It is the plaintiff's burden to establish that the court has subject

matter jurisdiction to hear the case."  *Oglala Sioux Tribe v. United States Army Corps of Eng'rs*,

537 F. Supp. 2d 161, 167 (D.D.C. 2008) (citing *In re Swine Flu Immunization Prods. Liab.

Litig.*, 880 F.2d 1439, 1442-43 (D.C. Cir. 1989)).  "Whether a plaintiff has standing to pursue his

or her claim is a threshold question of subject matter jurisdiction."  *Oglala Sioux Tribe*, 537 F.

Supp. 2d at 169 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)).

"'The "irreducible constitutional minimum of standing contains three elements":  (1)

injury-in-fact, (2) causation, and (3) redressability.'"  *Miami Bldg. & Constr. Trades Council v.

Sec'y of Def.*, 493 F.3d 201, 205 (D.C. Cir. 2007) (quoting *Rainbow/PUSH Coal. v. FCC*, 396

F.3d 1235, 1240 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992))); *see, e.g.*, *OCONUS DOD Employee Rotation Action Group v. Cohen*, 140 F. Supp. 2d

37, 45 (D.D.C. 2001) ("To have standing, Plaintiffs must allege: (1) an injury in fact that is

concrete and particularized and 'actual or imminent, not conjectural or hypothetical,' (2) 'a

causal connection between the injury and the conduct complained of' and (3) that it is 'likely'

rather than merely speculative that the injury will be redressed by the relief requested." (quoting

*Lujan*, 504 U.S. at 560-61)).  These limits exist in federal courts as a matter of Article III of the

Constitution, but also are recognized as part of substantive D.C. law. *See, e.g.*, *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1206 (D.C. 2002).

As this Court has observed, these standing principles apply to claims brought under the D.C. CPPA. Although language in the D.C. CPPA[10] "might suggest that a plaintiff could pursue a claim under the DCCPPA without an actual or threatened injury, the cases hold otherwise." *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 28 (D.D.C. 2007); *see Williams v. The Purdue Pharma Co.*, 297 F. Supp. 2d 171, 177-78 (D.D.C. 2003) ("The amendment to the CPPA in 2000 did not change the requirements for standing under D.C. law, despite its broad language."). In addition to these constitutional requirements, a Plaintiff seeking to sue under the D.C. CPPA must demonstrate that the D.C. CPPA actually applies to him or her, as a matter of choice of law and statutory standing, before an inquiry on the merits is appropriate. *See, e.g.*, *Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018, 1024 (D.C. 2007).

As the D.C. Circuit has made clear, a "plaintiff moving for summary judgment" – such as Plaintiffs here – "'must support each element of its claim to standing "by affidavit or other evidence."'" *Int'l Bhd. of Teamsters v. TSA*, 429 F.3d 1130, 1134 (D.C. Cir. 2005) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (in turn, quoting *Lujan*, 504 U.S. at 561)). Among other things, a plaintiff moving for summary judgment must "show a 'substantial probability' that it has been injured, that the defendant caused its injury, and that the court could redress that injury." *Int'l Bhd. of Teamsters*, 429 F.3d at 1134 (citations omitted). The plaintiff "'must either identify in [the] record evidence sufficient to support its standing'" or "'submit

---

[10] *See* D.C. Code § 28-3904 ("[i]t shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby"); *id.* § 28-3905(k) (authorizing claims by any person, "whether acting for the interests of itself, its members, or the general public").

additional evidence.'" *Int'l Bhd. of Teamsters*, 429 F.3d at 1134 (citing *Amfac Resorts, L.L.C. v. DOI*, 282 F.3d 818, 830 (D.C. Cir. 2002)).

Moreover, because Marriott has moved for summary judgment against all Plaintiffs and has demonstrated each Plaintiff's lack of standing, Marriott is entitled to summary judgment as to each, unless each Plaintiff establishes standing. As the Supreme Court has emphasized:

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Plaintiffs' motion for summary judgment should be denied, and summary judgment should be granted for Marriott because no Plaintiff has standing to bring the claims in this lawsuit. Based on the undisputed facts developed in discovery, all Plaintiffs have failed to show the injury-in-fact or causation required for standing, or have not established the prerequisites for standing to sue under the D.C. CPPA, or both.

**B.      No Plaintiff Has Standing, Requiring The Denial Of Plaintiffs' Motion And Entry Of Summary Judgment For Marriott.**

Marriott's affirmative summary judgment briefing thoroughly explained that, based on the undisputed facts, no Plaintiff has standing to maintain this suit. For the great majority of issues, Plaintiffs have failed to address Marriott's standing arguments at all. For other issues, Plaintiffs conflate underlying liability issues concerning damages and causation with the important threshold standing issues that Marriott has flagged. *See, e.g.*, Plaintiffs' SJ Mem. at 27-32 (discussing causation and injury/damages, but with respect to liability under the D.C. CPPA, not standing). So as not to burden the Court with duplicative argument, Marriott

incorporates its affirmative summary judgment briefing, and below briefly summarizes why

Plaintiffs lack standing, responding to Plaintiffs' non-standing arguments as appropriate.

### 1.    Plaintiff Shaw Lacks Standing.

_Shaw Lacks Standing Because He Did Not Pay For His Hotel Stays And Thus Has_

_Suffered No Injury-In-Fact._  To "have standing to raise his DCCPPA claims," _Hoyte_, 489 F.

Supp. 2d at 29, each Plaintiff must establish a "particularized and specific injury in fact

suffered." _Williams_, 297 F. Supp. 2d at 177.  Each Plaintiff must "be himself among the

injured." _Id._ at 178 (quoting, inter alia, _Sierra Club v. Morton_, 405 U.S. 727, 734-35 (1972)).

Plaintiff Shaw lacks standing because he has suffered no injury-in-fact.

It is undisputed that Shaw's employer paid for all of his stays at Marriott Russia Hotels,

and thus he has suffered no economic harm based on his claims in this case.  Facts ¶ 53.  As

Marriott's affirmative summary judgment brief anticipated, Plaintiffs have not disputed this fact

and have conceded lack of economic loss for Shaw.  _See, e.g._, Plaintiffs' SJ Mem. at 30.

Now, in an effort to overcome this fatal undisputed fact,  Plaintiffs argue (based on a

citation to one Massachusetts case that does not address Article III standing) that "[a]ctual

economic loss is not an element necessary to proof of a redressable claim," and that standing

exists where a "consumer protection statute 'creates a legal right, the invasion of which, without

more, constitutes an injury.'"  Plaintiffs SJ Mem. at 30 (quoting _Aspinall v. Philip Morris Cos._,

813 N.E.2d 476, 490-92 (Mass. 2004)).  However, Plaintiffs' Massachusetts argument directly

contradicts District of Columbia precedent.  This Court has expressly rejected such an argument

for standing under the D.C. CPPA:  "The invasion of a purely legal right without harm to the

consumer," such as "freedom from alleged false and misleading advertising," does not confer

standing to bring suit and "can be addressed through the administrative process of the

Government of the District of Columbia." *Williams*, 297 F. Supp. 2d at 178 (emphasis added);

*accord, e.g.*, *Hoyte*, 489 F. Supp. 2d at 28-29; *Bykov*, 2007 U.S. App. LEXIS 3276, at *5

(affirming summary judgment where Bykov "lacked standing because Bykov's company, and

not Bykov, paid the hotel bill and suffered the alleged injury"). As both *Hoyte* and *Williams*

recognize, some injury beyond an asserted right "to be free from improper trade practices,"

Plaintiffs' SJ Mem. at 31-32, is required for standing under the D.C. CPPA. Were it otherwise,

the plaintiffs in *Hoyte* and *Williams* would have had standing to sue.[11]

Shaw Lacks Standing Under the D.C. CPPA Because His Hotel Stays Were For Business

Purposes. The "trade practices" outlawed by the D.C. CPPA and enforceable by private litigants,

*see* D.C. Code §§ 28-3904, 28-3905(k)(1), are only those that pertain to "consumer goods or

services," *id.* § 28-3901(a)(6) (defining "trade practices"). In turn, "consumer" goods or services

are defined under the D.C. CPPA as goods or services that are "primarily for personal,

household, or family use." *Id.* § 28-3901(a)(2) (emphasis added). Thus, the protections of the

D.C. CPPA do not extend to purchases that are for business or commercial use. *See, e.g.*, *Ford v.*

*ChartOne, Inc.*, 908 A.2d 72, 81, 82 n.10, 84 n.12 (D.C. 2006) (explaining that the D.C. CPPA

"does not apply to commercial dealings outside the consumer sphere," and thus that "[a]

purchase of supplies or equipment for a business operation," such as "an attorney's purchase of,

---

[11] Even under Plaintiffs' argument, Shaw lacks standing because he was not subject to any
deception: he expected to pay in rubles subject to an exchange rate at the time he made his hotel
reservations, including the reservation that forms the centerpiece of this lawsuit. Facts ¶¶ 46-47,
51. Thus, he was not deceived or misled by any representations or omissions of Marriott. *See,*
*e.g.*, *Williams*, 297 F. Supp. 2d at 177 (rejecting a D.C. CPPA claim where a plaintiff was not "in
any way deceived"); *OCONUS DOD Employee Rotation Action Group*, 140 F. Supp. 2d at 45.
     Ignoring Marriott's standing arguments, Plaintiffs argue that the fact that a consumer
"understood the consequence of the transaction is irrelevant to a finding of liability." Plaintiffs'
SJ Mem. at 28. As explained below, the level of sophistication of the consumers at issue and the
typical consumer's past experiences are relevant to the assessment of a reasonable consumer for
purposes of D.C. CPPA liability. *See infra* Section III.C. In any event, as *Williams* and related
cases make clear, with respect to standing, every Plaintiff must establish causation.

say, office supplies on his own behalf" would fall outside of the D.C. CPPA's coverage);

*Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F. Supp. 588, 591 (D.D.C. 1988) (holding

that a taxi operator's purchase of gasoline and supplies did not fall within the CPPA's coverage

because it was "made in connection with his role as an independent businessman").

It is undisputed that Shaw's employer paid for his stays at the Marriott Russia Hotels,

which were for business purposes rather than "primarily for personal, household, or family use,"

D.C. Code § 28-3901(a)(2). *See* Facts ¶ 53. Shaw's claims thus do not pertain to a "trade

practice" outlawed by the D.C. CPPA or enforceable by a private litigant. *See* D.C. Code §§ 28-

3901(a)(6), 28-3904, 28-3904(k)(1). Despite months of notice, Plaintiffs have failed to address

this "business purpose" standing issue. Because the undisputed evidence establishes that Shaw

lacks standing to pursue his D.C. CPPA claims, Marriott is entitled to judgment against Shaw.

Shaw Lacks Standing To Bring Claims Under The D.C. CPPA Because His Claims Lack
The Necessary Connection To The District Of Columbia. Shaw has resided in the United

Kingdom for the entire time at issue in this case. The only connection between his claims and

the District of Columbia is this lawsuit. As detailed by Marriott's affirmative summary

judgment briefing, he thus lacks standing to pursue claims under the D.C. CPPA, for at least

three additional reasons: (1) the D.C. CPPA does not apply to his claims; (2) other jurisdictions

have a more significant relationship to Shaw's claims; and (3) Shaw's claims do not have the

constitutionally required nexus to the District. Plaintiffs' summary judgment briefing has

ignored these critical issues, which preclude summary judgment for Shaw and require summary

judgment to be granted for Marriott on Shaw's D.C. CPPA claims. Marriott hereby incorporates

its affirmative summary judgment arguments on these points, but briefly summarizes them here.

First, because Shaw's claims against Marriott have no connection to the District of Columbia, the D.C. CPPA does not apply to his claims. Where "District of Columbia law does not apply to the circumstances presented, there is no choice of law to be made" and judgment should be entered for the defendant. *Chamberlain*, 931 A.2d at 1024. Although "[t]he CPPA was adopted by the D.C. Council to protect local consumers from improper and fraudulent trade practices," *Williams*, 297 F. Supp. 2d at 174; *see, e.g.*, D.C. Code § 28-3901(b)(2), the D.C. CPPA has been held to apply extraterritorially where a direct and substantial nexus to the District exists. *Shaw v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 141, 149-50 (D.D.C. 2007). The undisputed evidence indicates that Shaw's claims do not fit within these circumstances for at least two reasons: (1) Shaw is a resident of the United Kingdom and he has no relationship to the District other than this lawsuit, Facts ¶ 44; and (2) Marriott is not incorporated or headquartered in the District of Columbia (which Shaw has admitted, *id.* ¶ 3); nor is the District its principal place of business or the location of any corporate office; nor did any activities related to the claims in this case (including Internet or phone activity) take place in the District of Columbia, *id.* ¶¶ 2-6, 7-10, 27, 47-53. Accordingly, the D.C. CPPA does not apply to Shaw's claims.

Second, choice of law principles dictate that the District's law does not apply to Shaw's claims.[12] The controlling standard is the "most significant relationship" analysis, *Shaw*, 474 F. Supp. 2d at 147-48 (quoting *Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168, 180 (D.C. 2006)), which entails "determin[ing] which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review," guided by the four Restatement factors: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and

---

[12] Courts must perform "an individualized choice-of-law analysis" for each Plaintiff's claims. *Washkoviak v. Student Loan Marketing Ass'n*, 900 A.2d 168, 176 n.11 (D.C. 2006).

place of business of the parties; and (d) the place where the relationship is centered." *Shaw*, 474

F. Supp. 2d at 148 (quoting *Washkoviak*, 900 A.2d at 180).  As detailed in Marriott's affirmative

summary judgment briefing, the laws potentially applicable to Shaw's claims include those of

the District (alleged by Shaw, despite no connection), Maryland (where Shaw has admitted

Marriott is headquartered, Facts ¶ 3), Delaware (where Marriott is incorporated, *id.* ¶ 2), New

York (Shaw's last U.S. residence, *id.* ¶ 44), Florida (where Shaw is domiciled, *id.* ¶ 44), the

United Kingdom (where Shaw resides and made reservations, *id.*), or other jurisdictions.

As Marriott's analysis revealed, based on the undisputed facts, the District of Columbia

does not have the most significant relationship to Shaw's claims.  Marriott SJ Mem. at 21-24.

Unlike at the motion to dismiss stage, the evidence now conclusively establishes that Marriott is

headquartered in Maryland, which is also its physical location, its principal place of business,

and the location of its principal computer servers for its reservation website.  Facts ¶¶ 2-6, 7-10,

27.  Plaintiffs have not and cannot assert facts to the contrary, and in fact Shaw and Charness

have admitted that Marriott is headquartered in Maryland.  Facts ¶ 3.  Therefore, because

discovery has "uncover[ed] evidence indicating that another jurisdiction has a greater interest

than the District of Columbia in the resolution of this controversy," *Shaw*, 474 F. Supp. 2d at 150

n.11, the D.C. CPPA does not apply to Shaw's claims.

Third, the D.C. CPPA cannot constitutionally apply to Shaw's claims because they lack a

"'significant aggregation of contacts'" to the District to "ensure that the choice of [D.C.] law is

not arbitrary or unfair."  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985) (quoting

*Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)).[13]  It is settled that "if a State has only

---

[13] As with choice of law, each Plaintiff's claims must be analyzed individually.  *See, e.g.*,
*Washkoviak*, 900 A.2d at 176 n.11; *see, e.g.*, *Shutts*, 472 U.S at 821-22; *In re St. Jude Med., Inc.*,
425 F.3d 1116, 1120 (8th Cir. 2005) ("The Supreme Court has held an individualized choice-of-

an insignificant contact with the parties and the occurrence or transaction, application of its law is unconstitutional." *Allstate*, 449 U.S. at 310-11; *see, e.g.*, *Shutts*, 472 U.S. at 821; *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 421-22 (2003). Among other concerns, "[a] basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *Id.* at 422. As explained above, there is no connection between the District of Columbia and Shaw's dispute with Marriott, other than Plaintiffs' incorrect allegation that Marriott is headquartered in Washington, D.C. Under these circumstances, it would violate due process to apply D.C. law to Shaw's claims against Marriott. *See State Farm*, 538 U.S. at 421-22; *Allstate*, 449 U.S. at 309-11.

## 2. Plaintiff Mendelson Lacks Standing.

Mendelson Lacks Standing Because She Did Not Pay For Her Hotel Stays And Thus Has Suffered No Injury-In-Fact. For the same reason that Shaw lacks injury-in-fact, so does Mendelson: her employer paid for her hotel stays, Facts ¶ 62, and Mendelson has admitted that she is not seeking damages in this case, *id.* Plaintiffs' argument that injury is conferred by mere exposure to alleged deception (*see* Plaintiffs' SJ Mem. at 30-32) has been expressly rejected by this Court in *Williams* and *Hoyte*, and thus fails for Mendelson as for Shaw.[14] Additionally, Mendelson lacks injury-in-fact for the frequent stays for which she received the Central Bank rate that Plaintiffs claim should have applied, *id.* ¶ 61, debunking Plaintiffs' claim that the

---

law analysis must be applied to each plaintiff's claim in a class action.").

[14] Like Shaw, Mendelson also was never even exposed to any alleged deception because since 2002 at the latest, she had clear notice that a hotel exchange rate would apply to the price quoted in U.S. dollars. Facts ¶ 59. As Plaintiffs ignore, Mendelson received written confirmations from Interstate entities expressly informing her that "[t]he above rate is quoted in units equal to US Dollars . . . Payment must be made at the hotel's current exchange rate in rubles only." *Id.* Mendelson also interacted directly with Interstate about the exchange rate to be applied at check-out. Facts ¶¶ 58-61. Based on this undisputed evidence, Mendelson lacks standing to sue. *See, e.g.*, *Williams*, 297 F. Supp. 2d at 177 (rejecting a D.C. CPPA claim where a plaintiff was not "in any way deceived"); *OCONUS DOD Employee Rotation Action Group*, 140 F. Supp. 2d at 45.

exchange rate used by Marriott Russia Hotels was <u>always</u> higher than the Central Bank rate, *see* Plaintiffs' SJ Mem. at 2, 7, 14, 15. Absent injury-in-fact, Mendelson lacks standing and may not receive summary judgment, which should be granted for Marriott.

<u>Mendelson Lacks Standing Under The D.C. CPPA Because Her Hotel Stays Were For Business Purposes.</u> For the same reasons discussed above with respect to Shaw, Mendelson also lacks standing to pursue claims under the D.C. CPPA because her stays at the Marriott Russia Hotels were undisputedly for business purposes. Facts ¶ 62.

<u>Mendelson Lacks Standing Against Marriott Because She Stayed Only At Marriott Franchised Hotels Not Owned Or Controlled By Marriott.</u> Plaintiffs' briefing is replete with the erroneous claim that Marriott owns, controls and is responsible for representations related to reservations at all Marriott Russia Hotels. *See, e.g.*, Plaintiffs' SJ Mem. at 6-8, 14-15, 19-20, 23-24. These claims are contrary to the undisputed record, which establishes (1) that Marriott does not own or control the Marriott Franchised Hotels, which are controlled by Interstate entities and (2) that several reservation channels for Marriott Russia Hotels are not controlled by Marriott, but by third parties who make their own representations to guests. Facts ¶¶ 10-13.

Because Mendelson's stays at Marriott Russia Hotels were limited to Interstate's Marriott Franchised Hotels, which are not owned or controlled by Marriott, *id.*, Marriott did not cause any of her alleged harm. The record establishes that all representations or omissions that Mendelson received in the reservation process came from Interstate or its subsidiaries – either from Interstate's "Marriott Hotels of Moscow," or from the Franchised Hotels themselves. *Id.* ¶¶ 14, 25, 30, 58-60. Mendelson's written confirmations also came from Interstate or its subsidiaries, not Marriott. *Id.* ¶¶ 14, 25, 30, 58-60. Absent a showing of causation as to Marriott, Mendelson lacks standing to maintain this suit against Marriott, which is entitled to summary judgment.

*See, e.g.*, *Lujan*, 504 U.S. at 560-61 (the challenged action must not be "the result [of] the

independent action of some third party not before the court" (citation omitted)); *OCONUS DOD*

*Employee Rotation Action Group*, 140 F. Supp. 2d at 45; *Williams*, 297 F. Supp. 2d at 177.

### 3.    Plaintiff CSIS Lacks Standing.

CSIS Lacks Standing Under The D.C. CPPA Because It Is Not A "Consumer" Under The

Act.  It is undisputed that CSIS is a corporation.  Facts ¶ 65.  As this Court has held previously, it

is therefore not a "consumer" subject to the protections of the D.C. CPPA:

> This Court has held that the legislative history of the CPPA, along with a
> consistent reading of its provisions, unequivocally indicates that ***the CPPA was
> intended to protect consumer-plaintiffs only, and not corporations***.  *Independent
> Communications Network, Inc. v. MCI Telecommunications Corp.*, 657 F. Supp.
> 785, 787 (D.D.C. 1987) (Gasch, J.); *see also Howard v. Riggs National Bank*, 432
> A.2d 701, 709 (D.C. 1981) (CPPA designed to police trade practices arising only
> out of consumer-merchant relationships).

*Clifton Terrace Assoc., Ltd. v. United Techs. Corp.*, 728 F. Supp. 24, 34 (D.D.C. 1990)

(emphasis added), *vacated in part on other grounds*, 929 F.2d 714 (D.C. Cir. 1991).[15]  As

elaborated in Marriott's affirmative summary judgment briefing, as well as Marriott's Motion for

Partial Dismissal briefing, the undisputed evidence establishes that CSIS lacks standing to

maintain claims under the D.C. CPPA.  Plaintiffs have not addressed this issue in their summary

judgment presentation.  Summary judgment should be granted to Marriott.

CSIS Lacks Standing Under The D.C. CPPA Because Its Employees' Hotel Stays Were

For Business Purposes.  Although CSIS's corporate status is dispositive, CSIS also lacks

standing under the D.C. CPPA because its employees' stays at the Marriott Russia Hotels were

---

[15] The CPPA defines the noun "consumer" to mean "a person who does or would purchase, lease
(from), or receive *consumer goods or services*" or "a person who does or would provide the
economic demand for a trade practice."  D.C. Code § 28-3901(a)(2) (emphasis added).  As an
adjective, "consumer" "describes anything, without exception, which is *primarily for personal,
household, or family use*."  *Id.* (emphasis added).

for business purposes.  Facts ¶¶ 65-66.  The D.C. CPPA does not apply in such circumstances, rendering summary judgment for Marriott appropriate.  *See supra* Section I.B.1.[16]

### 4.    Plaintiff Charness Lacks Standing.

Charness Lacks Standing To Bring Claims Under The D.C. CPPA Because His Claims Lack The Necessary Connection To The District Of Columbia.  Charness's claims have no connection to the District of Columbia other than this lawsuit.  He is a resident of Michigan, where he made his reservations to stay at Marriott Russia Hotels, via the Internet and the Marriott toll-free number, Facts ¶¶ 71-72, neither of which are serviced in the District, *id.* ¶¶ 7, 27.  It is undisputed that Marriott is incorporated in Delaware and is headquartered in Maryland, which is its principal place of business.  *Id.* ¶¶ 2-3.  Charness has admitted that Marriott is headquartered in Maryland.  *Id.* ¶ 3.  Thus, for the reasons discussed above with respect to Shaw, Charness lacks standing because:  (1)  the D.C. CPPA does not apply to his claims; (2)  the District does not have the "most significant relationship" to his claims; and (3) application of the D.C. CPPA would violate the Constitution.  Because Charness lacks standing, Marriott is entitled to summary judgment and Plaintiffs' summary judgment motion should be denied.[17]

---

[16] Moreover, CSIS employees, including Mendelson, commonly received the Central Bank exchange rate that Plaintiffs erroneously claim never applied at Marriott Russia Hotels.  Facts ¶ 68.  CSIS employees also reserved and stayed mostly, if not exclusively, at Marriott Franchised Hotels controlled by the non-Marriott Interstate entities, *id.* ¶¶ 11-14, 25, 30, 69.  Finally, CSIS was not deceived by the use of a hotel exchange rate, which was described to CSIS employees both in written confirmations and in discussions with Interstate.  *Id.* ¶¶ 59-60, 69.  For these additional reasons, CSIS – like Shaw and Mendelson – lack standing against Marriott.  *See, e.g.*, *Williams*, 297 F. Supp. 2d at 177 (rejecting a D.C. CPPA claim where a plaintiff was not "in any way deceived"); *OCONUS DOD Employee Rotation Action Group*, 140 F. Supp. 2d at 45.

[17] Marriott's affirmative summary judgment briefing explained additional standing and substantive barriers to Plaintiffs' "headquarters misrepresentation" claims under the D.C. CPPA.  Plaintiffs have not moved for summary judgment on those claims, and for the reasons set forth in Marriott's summary judgment briefing, Marriott is entitled to summary judgment under D.C. Code Section 3904(a) and (t).  *See* Marriott SJ Mem. at 31-32, 41-42.

II.    **PLAINTIFFS ARE WRONG THAT THE UNSUCCESSFUL *SHAW V. HYATT* AND *BYKOV V. RADISSON* LAWSUITS "HAVE NO APPLICATION" HERE.**

As Marriott explained in its affirmative summary judgment briefing, for many of the same reasons that two materially identical lawsuits against hospitality companies with Russian hotels failed, Marriott is entitled to summary judgment against Plaintiffs on their D.C. CPPA and unjust enrichment claims. *See* Marriott SJ Mem. at 32-38. Plaintiffs attempt to minimize these previous cases – one of which was brought by a Plaintiff in this case, and both of which were brought by Plaintiffs' counsel – as having "no application" to this case. Plaintiffs' SJ Mem. at 33. The opposite is true. Plaintiffs' claims fail for reasons similar to those that led the Seventh and Eighth Circuits to rule in favor of the defendants.

A.    **The Seventh Circuit's Ruling In *Shaw v. Hyatt* Supports Marriott's Arguments For Summary Judgment.**

The *Shaw v. Hyatt* litigation was materially identical to this case, with Plaintiff Shaw claiming, based on hotel stays in Russia, that Hyatt violated Illinois' consumer protection statute by quoting a hotel room rate in U.S. dollars, despite application of a hotel exchange rate at check-out. *See* Marriott SJ Mem. at 32-33. The Seventh Circuit ruled that Shaw could not maintain his consumer protection act claim because it was an attempt "to enforce contractual promises," and "[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." 461 F.3d at 901 (citation omitted). The same was true for Shaw's unjust enrichment claim. *See id.* at 902. For these same reasons, Plaintiffs' D.C. CPPA and unjust enrichment claims also fail. Marriott SJ Mem. at 34-35.[18]

---

[18] Plaintiffs have not moved for summary judgment on unjust enrichment. However, Marriott is entitled to summary judgment on that claim, among other reasons, because it is firmly established that "'there can be no claim for unjust enrichment when an express contract exists between the parties.'" *Albrecht v. Comm. on Employee Benefits*, 357 F.3d 62, 69 (D.C. Cir. 2004) (quoting *Schiff v. AARP*, 697 A.2d 1193, 1194 (D.C. 1997)); *see* Marriott SJ Mem. at 34;

Plaintiffs do not dispute that their claims present classic allegations of breach of contract: they allege that, at check-out, they were not charged the room price they contracted for when making a reservation and receiving a confirmation.  *E.g.*, Second Amended Complaint ¶¶ 43, 46; *see* Plaintiffs' SJ Mem. at 33-34.  Nonetheless, Plaintiffs claim that "the CPPA has been found to apply to claims arising under contract law" and that the D.C. CPPA "is intended to reach all improper trade practices," including those that violate "*the common law*."  Plaintiffs' SJ Mem. at 33 (emphasis in original).  Although it is true that some common law prohibitions (such as fraud and misrepresentation) are covered by the D.C. CPPA's prohibitions, as the Seventh Circuit explained in *Shaw*, "a 'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it."  461 F.3d at 901 (citation omitted).  Thus, even though the D.C. CPPA contemplates actions related to contracts in some circumstances (as does the Illinois statute[19]), such as alleged unconscionability, *see, e.g.*, D.C. Code § 28-3904(r), the D.C. CPPA does not apply to standard breach of contract claims.

Plaintiffs have not cited any authority for the proposition that the D.C. CPPA applies to standard breach of contract claims.  Rather, Plaintiffs' cited cases each pertain to something more than the straightforward breach alleged here.  For example, in *District Cablevision Limited Partnership v. Bassin*, 828 A.2d 714 (D.C. 2003), heavily relied upon by Plaintiffs, the claim did not pertain to a simple breach of contract, but rather whether the late fee at issue violated the common law prohibition against penalty clauses.  *Id.* at 722.  Similarly, neither *Atwater v. DCRA*, 566 A.2d 462 (D.C. 1989), nor *Osbourne v. Capital City Mortgage Co.*, 727 A.2d 322 (D.C. 1999), hold that simple breach of contract claims may be adjudicated under the D.C.

---

*Shaw*, 461 F.3d at 902; *Bykov*, 2006 U.S. Dist. LEXIS 12279, at *20.

[19] *See, e.g.*, 815 ILCS 505/1(e) (defining "consumer" to include "any person who purchases *or contracts* for" the purchase of certain merchandise (emphasis added)).

CPPA.  Rather, *Atwater* pertains to the scope of the DCRA's jurisdiction over the common law and statutes other than the D.C. CPPA, and does not address whether a private litigant may maintain a breach of contract claim under the D.C. CPPA.  *See* 566 A.2d at 465-66.  *Osbourne*, which pertained to the heightened standard of proof required for misrepresentation claims under the D.C. CPPA, did not address the issue of whether a private litigant may maintain a simple breach of contract claim under the D.C. CPPA.  *See* 727 A.2d at 322-23, 325.  Thus, this Court should follow the Seventh Circuit's persuasive reasoning in *Shaw v. Hyatt.*

Plaintiffs also incorrectly claim with an "observ[ation] in passing" that the *Shaw v. Hyatt* case does not undercut their arguments that the D.C. CPPA applies to a worldwide class – including the claims of individuals with no connection to the District, such as Shaw and Charness.  Plaintiffs' SJ Mem. at 34 n.6.  According to Plaintiffs, "the Seventh Circuit noted that Hyatt's conduct implicated a number of contacts within the State of Illinois, but it specifically declined to rule whether such contacts fell within the reach of" the Illinois statute.  *Id.*  As Marriott has observed, however, *see* Marriott SJ Mem. at 33 n.13, the Seventh Circuit's discussion is telling because the factors that the Seventh Circuit viewed as potentially supporting extraterritorial application of the Illinois consumer protection statute <u>do not exist</u> as a matter of fact in this case.  *E.g.*, Facts ¶¶ 2-6, 7-10, 27.  For example, Hyatt's headquarters and principal place of business were in Illinois; Hyatt's website was operated out of Illinois; and Hyatt's website "provided that Illinois law governs all disputes arising out of its website" and "that exclusive jurisdiction for any claim or action arising out of the website shall be in Illinois."  461 F.3d at 901.  Yet, despite all of these factors connecting Hyatt to Illinois, the Seventh Circuit still was not prepared to rule that extraterritorial application of the Illinois consumer protection

statute was appropriate. Where, as here, <u>no</u> such factors exist as a matter of undisputed fact, it follows that the D.C. CPPA does not have extraterritorial application.

**B.    The Eighth Circuit's Ruling In *Bykov v. Radisson* Supports Marriott's Arguments For Summary Judgment.**

Like *Shaw v. Hyatt*, the *Bykov* case presents claims materially identical to those at issue in this litigation. Bykov sued Radisson based on its quote of the price for a Russian hotel room in U.S. dollars, because Bykov was charged at check-out in Russian rubles based on a hotel exchange rate. *See* Marriott SJ Mem. at 35-38. Like Plaintiffs here, Bykov lacked standing and thus the Eighth Circuit affirmed the District Court's grant of summary judgment to Radisson. 2007 U.S. App. LEXIS 3276, at *5. With respect to the Minnesota consumer protection act claims, the Eighth Circuit affirmed because "Bykov had failed to establish a causal connection between the defendants' alleged misrepresentations and his alleged injury": Bykov did not review any Radisson pricing information prior to his hotel stay and Bykov's assistant did not review all representations at issue in the reservation process. *Id.* at *4. In addition, Bykov failed to establish injury-in-fact: "Because Bykov's company suffered the injury claimed rather than Bykov himself, Bykov's statutory claims must fail." 2006 U.S. Dist. LEXIS 12279, at *21 n.7.[20]

As Marriott's affirmative summary judgment briefing sets forth, just as Bykov's Minnesota consumer protection act claims failed for lack of injury and causation, so do nearly all Plaintiffs' claims fail under the D.C. CPPA for lack of injury and causation (and thus standing). As *Bykov* recognized, to bring consumer protection act claims, a plaintiff must establish the

---

[20] The Eighth Circuit also affirmed summary judgment for Radisson on Bykov's unjust enrichment claims because Bykov "lacked standing because Bykov's company, and not Bykov, paid the hotel bill and suffered the alleged injury," 2007 U.S. App. LEXIS 3276, at *4-5, and because Bykov's claim was "governed by an express contract between the parties," *Bykov*, 2006 U.S. Dist. LEXIS 12279, at *20. As noted above, *see supra* n.18, and in Marriott's affirmative summary judgment briefing, Marriott is entitled to summary judgment on unjust enrichment.

prerequisites of standing – including injury and causation. *Compare, e.g.*, *Bykov*, 2006 U.S. Dist. LEXIS 12279, at *14-15 (noting that injury and causation are required to bring a private suit, despite that reliance is not a statutory element), *with, e.g.*, *Williams*, 297 F. Supp. 2d at 177 ("The amendment to the CPPA in 2000 did not change the requirements for standing under D.C. law, despite its broad language.").[21]  Plaintiffs incorrectly state that *Bykov* hinged on the District Court's ruling that under the Minnesota consumer protection statutes, unlike the D.C. CPPA, "a person must establish reliance on the wrongful statements or conduct."  Plaintiffs' SJ Mem. at 34.  To the contrary, the *Bykov* District Court held that "Plaintiff has failed to satisfy the causation element" required under Minnesota law, which bears some resemblance to reliance, but, at base, requires a "causal nexus between Defendants alleged misrepresentations and his alleged injury."  2006 U.S. Dist. LEXIS 1227, at *16. (emphasis added).  Analogously under D.C. law, as recognized in *Williams* and *Hoyte*, a D.C. CPPA plaintiff must establish "standing under D.C. law," including injury and causation.  *Williams*, 297 F. Supp. 2d at 177.  Plaintiffs again simply ignore *Williams*, *Hoyte*, and related standing jurisprudence, focusing instead on cases interpreting the substantive requirements for liability under the D.C. CPPA.  *See* Plaintiffs' SJ Mem. at 34 (citing *District Cablevision* and *Wells v. Allstate*, 210 F.R.D. 1 (D.D.C. 2002), neither of which are standing cases).  As Marriott has explained, standing and liability are two separate arguments.  Marriott's point is that, as recognized in *Williams*, *Hoyte*, and related standing cases, a plaintiff without injury or causation may not sue under the D.C. CPPA.

---

[21] These standing requirements exist regardless of the apparent statutory breadth of the consumer protection acts.  *Compare, e.g.*, Minn. Stat. § 325F.69, subd. 1 (providing for unlawful practices "whether or not any person has in fact been misled, deceived, or damaged thereby"), *with, e.g.*, D.C. Code § 28-3904 (setting forth unlawful trade practices "whether or not any consumer is in fact misled, deceived or damaged thereby").

Like most of the Plaintiffs in this case, Bykov failed to satisfy both the injury and causation requirements for bringing a consumer protection act claim and thus lacked standing to sue. With respect to injury-in-fact, Bykov – like Shaw and Mendelson – lacked standing because his "company suffered the injury claimed rather than Bykov himself." *Bykov*, 2006 U.S. Dist. LEXIS 12279, at *21 n.7. With respect to causation, Bykov – like Shaw, Mendelson, and CSIS (all of whom were aware of or on notice of the use of hotel exchange rates) – lacked standing because he did not "establish a causal connection between the defendants' alleged misrepresentations and his alleged injury." *Bykov*, 2007 U.S. App. LEXIS 3276, at *4. Accordingly, the claims of Shaw, Mendelson and CSIS fail for the same reasons as in *Bykov.*

## III.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR CLAIMS UNDER D.C. CODE SECTIONS 28-3904(e), (f) AND (h).

### A.    Summary Judgment Should Be Entered For Marriott On Plaintiffs' Hotel Exchange Rate Claims Post-dating Marriott's 2005 Provision Of Additional Information During the Reservation Process.

It is a matter of undisputed fact that, as of mid-2005, Marriott provided all prospective guests using Marriott-controlled reservation channels with exactly the information that Plaintiffs have claimed was lacking: that the price quote in U.S. dollars was subject to payment at check-out in rubles at the hotel's exchange rate. Facts ¶¶ 34-39. Specifically, as of August 2005 at the latest,[22] this information was provided during the reservation process to individuals: reserving by calling the Marriott Managed Hotels in Russia directly, reserving via the Marriott toll-free number, and reserving via www.marriott.com. *Id.* ¶¶ 34, 38-39. Thus, Marriott is entitled to summary judgment for all D.C. CPPA claims post-dating Marriott's provision of this information for reservation channels controlled by Marriott. *See* Marriott SJ Mem. at 39-40.

---

[22] As of May 2005, this information was provided in email confirmations to guests who reserved via www.marriott.com. Facts ¶ 36.

Plaintiffs acknowledge that Marriott implemented changes to its reservation information in 2005, but misrepresent these changes in arguing that they did not provide the relief sought by Plaintiffs.  Plaintiffs claim that the August 2005 language "merely informed guests that the final bills would be issued in RUR [rubles] without disclosing other critical elements and implications of the final calculation of room charges."  Plaintiffs' SJ Mem. at 35.  This description is contrary to undisputed fact.  As of August 2005, Marriott informed all prospective guests using Marriott reservation channels that prices were quoted in U.S. dollars or currency units, but that charges would be payable at check-out in local currency at the hotel's exchange rate.  *See* Facts ¶¶ 34-39.

Elsewhere, while acknowledging that, as of 2005, Marriott did inform all prospective guests using Marriott-controlled reservation channels about both payment in rubles and the use of a hotel exchange rate, Plaintiffs argue that Marriott should have provided even more specific information.  *See* Plaintiffs' SJ Mem. at 9, 20-21.  Plaintiffs' complaints about Marriott's 2005 information all center on the claim that Marriott should have expressly informed guests making reservations of what the hotel exchange rate would be at check-out.  *See id.*  Plaintiffs' critique is premised on an unrealistic expectation that Marriott predict the future of worldwide currency values in order to assign an exchange rate to a written confirmation for future guest stays, sometimes months away.  *See, e.g.*, Counterstatement ¶¶ 45, 49-50.  Plaintiffs' critique also ignores the critical undisputed facts that the hotel's daily exchange rate was conspicuously displayed at the Marriott Russia Hotels during the entire time period at issue, and that the hotels always relayed the daily hotel exchange rate to guests on property and guests receiving bills at the time of check-out.  *Id.* ¶¶ 18, 33; Plaintiffs' Exs. 43, 44, 77, 56, 74-79, 81, 83, 85.

Thus, regardless whether Marriott could have provided additional information, it is clear that as of August 2005, Marriott provided information that – as a matter of law – alleviated any

confusion that allegedly was created by the mere quote of a U.S. dollar price without more. As of August 2005, based on Marriott's express statement – payment <u>in rubles</u> at the <u>hotel's exchange rate</u> – no reasonable consumer could have assumed that they would be paying for the room at check-out in U.S. dollars or at the Central Bank rate. *See, e.g.*, *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997) (dismissing a claim where the "billing practices could not mislead a reasonable consumer"). Accordingly, Marriott is entitled to summary judgment for claims post-dating Marriott's provision of this information in 2005.

B.     **No Plaintiff May Recover Statutory Damages Under The D.C. CPPA For More Than One Hotel Stay.**

Although other issues are dispositive, Plaintiffs may not recover statutory damages under the D.C. CPPA for more than one guest stay per Plaintiff. It is an undisputed fact that Plaintiffs, like all class members, received complete information about the hotel exchange rate while on property and/or at the time of check-out. Facts ¶¶ 18, 33, 49-50, 59-60, 69, 73-75. This information was confirmed by all Plaintiffs' and class members' subsequent receipt of their credit card statements. *See* Second Amended Complaint ¶ 4. It is thus an undisputed fact that, at the latest, all Plaintiffs were aware of the use of hotel exchange rates at Marriott Russia Hotels after their first hotel stay. *E.g.*, Facts ¶ 74. Thus, as a matter of <u>both</u> standing and liability under the D.C. CPPA (which hinges on the expectations of a reasonable consumer, *see, e.g.*, *Alicke*, 111 F.3d at 912), no Plaintiff may recover statutory damages for any guest stay beyond the first.

Plaintiffs claim that "repeat guests" can show causation and injury because regardless of reliance or whether a consumer can avoid an injury, "the defendant's conduct, in and of itself, is sufficient to establish causation under the CPPA." Plaintiffs' SJ Mem. at 28. Plaintiffs misapprehend Marriott's "repeat stay" argument, which is not based on a claim that the D.C. CPPA requires a showing of reliance. Marriott's arguments concerning standing and the

behavior of reasonable consumers under the D.C. CPPA also are not – as Plaintiffs allege – grounded in a claim that Plaintiffs have no injury or claim because they could have stayed somewhere else in Russia. *Cf.* Plaintiffs' SJ Mem. at 29. Rather, as Marriott has argued, <u>first</u>, repeat guests lack standing because they were not "in any way deceived," *Williams*, 297 F. Supp. 2d at 177; they received complete information concerning the use of a hotel exchange rate by the end of their first stay (confirmed by subsequent receipt of a credit card statement, *see* Second Amended Complaint ¶ 4). <u>Second</u>, repeat guests cannot prevail on a D.C. CPPA claim because a reasonable return customer would be aware of the use of a hotel exchange rate from the first visit, and thus, as a matter of law, could not be deceived. *See, e.g.*, *Alicke*, 111 F.3d at 912. Thus, no Plaintiff should be permitted to recover statutory damages for more than one guest stay.

### C.    Summary Judgment Should Be Denied With Respect To Plaintiffs' D.C. CPPA Claims In All Other Respects Because Disputed Questions Of Fact Require A Trial On Plaintiffs' Pre-2005 D.C. CPPA Claims.

The bulk of Plaintiffs' brief is devoted to arguing for summary judgment under the D.C. CPPA (D.C. Code Sections 28-3904(e), (f), and(h)), ignoring the standing and other dispositive issues discussed above. The Court need not reach issues of liability under the D.C. CPPA to resolve the parties' summary judgment motions, because Plaintiffs lack standing and Marriott is entitled to summary judgment. Moreover, as explained above, Marriott is entitled to prevail as a matter of law with respect to claims post-dating the 2005 information provided by Marriott.

In no event, however, should Plaintiffs prevail on summary judgment concerning their pre-2005 D.C. CPPA claims.[23] Settled precedent establishes that Marriott is entitled to a trial on those claims based on several disputed issues, including:

---

[23] In addition to the generally applicable summary judgment standards, to the extent Plaintiffs allege intentional violations of the D.C. CPPA, Plaintiffs bear the burden of proving their claims by clear and convincing evidence. *See, e.g.*, *Wiggins v. Avco Fin. Servs.*, 62 F. Supp. 2d 90, 98

- what representations were in fact made to each Plaintiff by Marriott;

- what constitutes a reasonable consumer of Marriott Russia Hotels;

- whether the representations or omissions at issue for each Plaintiff were deceptive to a reasonable consumer of Marriott Russia Hotels;

- whether the representations or omissions at issue for each Plaintiff were material to a reasonable consumer of Marriott Russia Hotels; and

- whether Marriott intended to sell rooms at the Marriott Russia Hotels as offered.

Critically, this case is not about "literally and unambiguously false" price quotes or "express" claims, as Plaintiffs argue. Plaintiffs' SJ Mem. at 12, 17-18. Plaintiffs' pre-2005 claims pertain to the intersection between truthful price quotes in U.S. dollars with an exchange rate mechanism in Russia that converts the dollar price quote to rubles. That mechanism was fully revealed to customers at check-in and prior to payment, *see* Facts ¶¶ 18, 33; Plaintiffs' Exs. 43, 44, 77, 56, 74-79, 81, 83, 85, but not all Plaintiffs were expressly informed of the mechanism at the time of confirmation. As explained below, that practice would not have been surprising or material to a reasonable consumer, particularly given the basic economics and logistics of international travel and the sophisticated nature of Marriott's audience of international travelers. It is an economic reality that exchange rates for future travel may be estimated but are never

---

n.9 (D.D.C. 1999) ("The District of Columbia Court of Appeals has determined that plaintiffs bear the burden of proving by clear and convincing evidence claims of intentional misrepresentation under the DCCPPA."); *Osbourne*, 727 A.2d at 325-26 (holding that "the clear and convincing evidence standard applies to claims of intentional misrepresentation under the CPPA"). That heightened burden of proof greatly increases the already high bar for Plaintiffs to obtain summary judgment. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating that where the "'clear and convincing'' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant" (emphasis added)); *Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 424 (D.C. 2006) (where an issue requires "clear and convincing" proof, "whether summary judgment on the issue is appropriate must take into account that heightened standard of proof").

known.  *See, e.g.*, Counterstatement ¶¶ 45, 49-50.  Consequently, no reasonable consumer can

claim that an unknown future exchange rate is a material factor in choosing a hotel product.

      <u>D.C. Code §§ 28-3904(e) and (f).</u>  Although Plaintiffs argue these two provisions

separately, *see* Plaintiffs' SJ Mem. at 19-23, they both pertain to the same core issues – whether

Marriott made "a material representation or omission that has a tendency to mislead."  *Alicke*,

111 F.3d at 912 (citing D.C. Code §§ 28-3904(e), (f)).  Under both provisions, with respect  to

the pre-2005 time period, the factfinder will be required to assess Marriott's representations for

both (1) tendency to mislead and (2) materiality, with respect to a reasonable consumer.  Both

"tendency to mislead" and "materiality" are factual questions for the jury.  *See, e.g.*, *Cinderella*

*Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 586 (D.C. Cir. 1970) (recognizing that

"tendency or capacity to deceive are questions of fact"); *Giant Food Inc. v. FTC*, 322 F.2d 977,

982 n.12 (D.C. Cir. 1963) ("The meaning of advertisements or other representations to the

public, and their tendency or capacity to mislead or deceive, are questions of fact . . . .");

*Freeland v. Iridium World Commc'ns, Ltd.*, No. 99-1002, 2008 U.S. Dist. LEXIS 27152, at *46

(D.D.C. Apr. 3, 2008) ("Materiality is generally a question of fact for the jury to decide."); *In re*

*Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1170 (D.D.C. 1996) ("whether failure to

disclose" . . . "is an omission causing statements to be misleading is now a factual determination

left to the jury"); *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055,

1075 (D.C. 2008) (under Sections 28-3904(e) and (f), it is "for the jury" to determine whether

the omissions and representations at issue "were actually material and tended to mislead").

      Deceptiveness and materiality are but two of the several liability issues that the jury will

need to resolve for Plaintiffs' pre-2005 claims.  First, for each Plaintiff, the jury will have to

determine precisely what representations are at issue.  Although Plaintiffs suggest in their

briefing that Plaintiffs received uniform representations from Marriott and other parties, *e.g.*, Plaintiffs' SJ Mem. at 8, 14-15, they did not. Plaintiffs used a variety of reservation channels – some controlled by Marriott and others not – and received a variety of representations prior to mid-2005. *See, e.g.*, Facts ¶¶ 14, 21, 23-27, 48, 58-59, 68-69, 72. In addition to receiving a price quote in U.S. dollars for their stays at Marriott Russia Hotels, some Plaintiffs (Mendelson and CSIS) received written confirmations as early as 2002 stating that the U.S. dollar price quote would be subject to payment in rubles at a hotel exchange rate, *see id.* ¶ 59; some Plaintiffs (Shaw, Mendelson and CSIS) were previously informed through transactions and representations that a hotel exchange rate would be used, even though the price was quoted in U.S. Dollars, *see id.* ¶¶ 46-47, 51, 58-61; and all Plaintiffs were informed of the hotel exchange rate through prominent signage at Marriott Russia Hotels, where Plaintiffs reviewed hotel bills at check-out that indicated the use of a hotel exchange rate, *see id.* ¶¶ 18, 33; Plaintiffs' Exs. 43, 44, 77, 56, 74-79, 81, 83, 85.[24] Any findings regarding tendency to mislead and materiality with respect to a reasonable consumer must result from <u>all</u> of the actual representations made to each Plaintiff.

Plaintiffs' pre-2005 claims pertain to the intersection between truthful price quotes in U.S. dollars with an exchange rate mechanism in Russia that converts the dollar price quote to rubles. Plaintiffs cite no authority, as there is none, for the claim that a truthful price quote in U.S. dollars in these circumstances constitutes a per se violation of the D.C. CPPA. Indeed, as in

---

[24] As explained above, each Plaintiff's individual circumstances also demonstrates a lack of standing to pursue claims against Marriott. Although Marriott respectfully submits that standing issues should be resolved in its favor based on the undisputed facts, *see supra* Section I, at the very least, Plaintiffs are not entitled to summary judgment and Marriott is entitled to a trial on any disputed standing issues, such as whether Plaintiffs' claims are sufficiently connected to the District, whether Plaintiffs actually paid for their stays and whether those stays were for business purposes, whether Plaintiffs received representations from Marriott (as opposed to third parties), what information Plaintiffs received other than a price quote in U.S. Dollars, and whether Plaintiffs were aware that an exchange rate would be used and that payment would be in rubles.

*Bykov*,[25] Plaintiffs' argument improperly attempts to isolate the quote of a price in U.S. dollars not only from the exchange rate context of this case, but from all other representations and information received by each Plaintiff, claiming that "[m]isrepresentation of price alone has been found to violate consumer protection statutes." Plaintiffs' SJ Mem. at 17; *see id.* at 12, 22. As the leading FTC pronouncement on the topic makes clear, however, Plaintiffs' effort to isolate one statement from all other information received by each Plaintiff should be rejected, because all such information must be considered by the factfinder in determining whether there has been a materially misleading representation or omission, judged by the reasonable consumer. *See, e.g.*, FTC Statement on Deception, *In re Cliffdale Assoc., Inc.*, 103 F.T.C. 110, 182 (1984) (the factfinder must "evaluate the entire advertisement, transaction, or course of dealing in determining how reasonable consumers are likely to respond").[26] Because these factual inquiries must be performed for each Plaintiff, Plaintiffs are not entitled to summary judgment.

In addition to resolving precisely what representations are at issue for each Plaintiff, and whether, in context, any representation or omission would be both deceptive and material to a reasonable consumer, the jury will be required to determine exactly what constitutes a reasonable consumer of Marriott Russia Hotel rooms. Plaintiffs incorrectly latch on to the statement in *FTC v. Crescent Publishing Group*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001), that the audience to assess is the "least sophisticated consumer." *See* Plaintiffs' SJ Mem. at 18. However, that standard is not supported by D.C. precedent or the FTC's own definitive statement on the topic,

---

[25] *See* 2006 U.S. Dist. LEXIS 12279, at *19 (responding to Plaintiff's attempt, as here, to isolate the quote of a price U.S. dollars from all other information presented: "Plaintiff cannot selectively extract a single piece of information from Defendants' website out of context and rely on it, excluding the other information displayed").

[26] Although Plaintiffs rely on FTC cases and cases citing FTC cases throughout their brief, they incorrectly suggest that the FTC's standards are more exacting than that of the D.C. CPPA. *See* Plaintiffs' SJ Mem. at 12 n.21. Plaintiffs present no D.C. precedent to support this point, and the FTC's authoritative statements in *In re Cliffdale* and elsewhere should be followed here.

which makes clear that alleged misrepresentations or omissions ordinarily are judged by the "average consumer" – not a "foolish or feeble-minded" one.  FTC Statement on Deception, *In re Cliffdale*, 103 F.T.C. at 177-181.  Moreover, where – as here – "a practice or representation" is "directed to a well-educated group," the FTC has made clear that the practice or representation must be "judged in light of the knowledge and sophistication of the group."  *Id.* at 181.[27] Throughout this case, Plaintiffs have claimed to be representative consumers with representative transactions.  *See, e.g.*, Second Amended Complaint ¶ 48 (describing Shaw's April 2005 transaction as a "representative example of the transactions at issue").  Yet, as Plaintiffs' experiences make clear, all are sophisticated international travelers with knowledge and understanding of fluctuating currency values, the use of exchange rates and payment in foreign currencies.  *See* Facts ¶¶ 46, 56, 66.[28]  Indeed, Marriott's own data indicates that an overwhelming proportion of guests at Marriott Russia Hotels are business travelers.  *Id.*  ¶ 42. Even for the "average consumer," future exchange rates are an understood unknown, and no Plaintiff was surprised at check-out to be paying in rubles, subject to an exchange rate.  *See, e.g.*, *id.* ¶¶ 46-47, 49, 59, 69; Counterstatement ¶ 45, 49-50.   Because this case pertains to the experiences of sophisticated international travelers, like Plaintiffs, the finder of fact will be required to incorporate that reality into the assessment of whether any representations or omissions by Marriott had a tendency to deceive a reasonable consumer.

For these reasons, and as D.C. authorities (including those cited by Plaintiffs) make clear, summary judgment is not appropriate on any Plaintiff's pre-2005 D.C. CPPA claims because it is

---

[27] To the extent that *Crescent Publishing* articulates a different standard, it is contradicted by the FTC and should not apply in this case.

[28] Even Plaintiff Charness, the only non-business traveler among Plaintiffs, knew "that exchange rates fluctuate and they can vary," Charness Dep. at 46 (attached to Facts as Ex. 18), and that such rates "change daily," *id.* at 38, including in Russia, *see id.* at 50-51.

the factfinder's role to determine what representations were made to each Plaintiff and whether a reasonable consumer would have found any representations deceptive or material. *See, e.g.*, *Williams v. First Gov't Mortgage and Investors Corp.*, 225 F.3d 738 (D.C. Cir. 2000) (appeal after jury trial); *Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986) (administrative fact-finding); *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 103-06 (D.D.C. 2004) (denying summary judgment under the D.C. CPPA for jury resolution); *Byrd v. Jackson*, 902 A.2d 778 (D.C. 2006) (bench trial); *Green v. Freight Liquidators*, 312 A.2d 788 (D.C. 1973) (criminal trial); *cf. Crescent Publishing Group*, 129 F. Supp. 2d 311 (preliminary injunction hearing).[29]

D.C. Code § 28-3904(h).  Plaintiffs argue that their "advertising without intent to sell as offered" claim under D.C. Code § 28-3904(h), *see* Plaintiffs' SJ Mem. at 23-27, is different from their other two claims because the focus is exclusively on Marriott – not a reasonable consumer, *id.* at 28 n.72.  Although summary judgment is unwarranted on Plaintiffs' Section 28-3904(h) claim for all of the reasons discussed with regard to the other claims, even if the focus were exclusively on Marriott, disputed factual issues preclude summary judgment for Plaintiffs.

According to Plaintiffs, Marriott's quotation of prices in U.S. dollars was part of an orchestrated "scam," intentionally designed to deceive customers into believing that they would pay a lower price for their hotel rooms than they ultimately would be required to pay.  Plaintiffs'

---

[29] Notably, Plaintiffs' key authorities could not be more different from those at issue here.  For example, in *Crescent Publishing*, the defendant pornography website baldly lied to consumers by claiming that they would receive "free tours" and that their credit card "will not be billed," when in fact the defendant debited the consumers cards without authorization.  129 F. Supp. 2d at 313.  Significant to the court's resolution of *Guam v. Marfega Trading Co.*, 1998 Guam 4 (1998), was that the defendant lied to customers by claiming that the undisclosed fee was a government tax. *Id.* at 18.  Marriott never lied to customers about exchange rates or represented a hotel exchange rate as the Central Bank rate when it was not.  Moreover, unlike in *Guam*, Marriott Russia Hotels prominently displayed the hotel exchange rate and clearly set forth that rate on customers' bills at check-out.  *Id.* ¶¶ 18, 33.  In any event, the hotel exchange rates are not undisclosed fees – they are established mechanisms for converting prices quoted in U.S. dollars to rubles.  Facts ¶ 19.  Neither of these cases supports Plaintiffs' claim for summary judgment.

SJ Mem. at 3, 23-24, 26.  Plaintiffs' factual support for those claims is slim at best, and, at most, reveals a disputed issue for trial.  As Marriott has explained, there was no corporate scheme, there was no bad intent, and there were no massive profits for Marriott.  *See* Counterstatement ¶¶ 4-49, 170-78.  To the contrary, Marriott's decisions regarding exchange rate practices resulted from a variety of market forces.  The exchange rate practices – like those at virtually all hotels and businesses in Russia that quoted prices in U.S. dollars – grew out of the volatility of the ruble after the disintegration of the Soviet Union.  Facts ¶ 19.  Moreover, in its capacity as a hotel manager working under agreements with hotel owners, Marriott received only a tiny percentage of any proceeds from exchange rate transactions.  *See* Counterstatement ¶ 174.  Alerted to customer discontent, Marriott began providing notice to customers of the use of a hotel exchange rate and the requirement that bills be paid in rubles.  *See* Facts ¶¶ 34-39.  As changes in the law, combined with an awareness of the evolving stability of the ruble, created a market shift toward quoting in rubles, Marriott moved with the market toward this practice and, when necessary, persuaded its hotel owners to quote hotel rooms in rubles.  *See, e.g.*, *id.* ¶ 16; Counterstatement ¶ 45.  Marriott respectfully submits that the evidence does not support Plaintiffs' claim that Marriott "advertise[d] or offer[ed] goods or services without the intent to sell them or without the intent to sell them as advertised or offered."  D.C. Code § 28-3904(h).  At a minimum, Marriott is entitled to a trial on Plaintiffs' pre-2005 claims under Section 28-3904(h), due to disputed issues discussed above, including Marriott's intent.

The authorities cited by Plaintiffs as supposedly pertaining to "[t]rade practices similar to Marriott's business practices here," Plaintiffs' SJ Mem. at 24, show that Marriott's actions are a far cry from a Section 28-3904(h) violation.  For example, in *Byrd* – the only D.C. CPPA authority cited by Plaintiffs with respect to this Section, *see* Plaintiffs' SJ Mem. at 23-27 – a self-

proclaimed "foreclosure-avoidance" specialist advertised that he would "help people keep their homes," whereas his "real purpose" was "to buy [a customer's] home for an insignificant sum of money." 902 A.2d at 782 (quoting bench trial findings). Similarly inapposite is *Green*, *see* Plaintiffs' SJ Mem. at 25, in which the defendant advertised sewing machines for sale but tendered only sewing machine parts. *See* 312 A.2d at 790-91. Both cases concern a true "scam" and are plainly different from the practices of Marriott and the Marriott Russia hotels. Here, Plaintiffs received the product they expected, at the promised price, and that product (as should be expected) was subject to a currency exchange transaction at check-out that was not deceptive or unfair to reasonable consumers. In any event, the claims in both *Byrd* and *Green* were resolved by a trial, as Plaintiffs' claims here should be. Summary judgment should be denied.

## IV.    BECAUSE MARRIOTT IS ENTITLED TO SUMMARY JUDGMENT, CLASS CERTIFICATION IS A MOOT ISSUE; IN ANY EVENT, PLAINTIFFS' ATTEMPT TO EXPAND THE CLASS DEFINITION SHOULD BE REJECTED.

### A.    Because No Plaintiff Has Standing, And Because Marriott Is Otherwise Entitled To Summary Judgment, Class Certification Is Moot.

As Plaintiffs' affirmative summary judgment briefing explained, *see, e.g.*, Marriott SJ Mem. at 14-15, this Court should consider Marriott's summary judgment motion prior to ruling on class certification in order to "spare[] both the parties and the court a needless, time-consuming inquiry into certification." *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 92-93 (D.C. Cir. 2001); *see, e.g.*, *Cruz v. Am. Airlines*, 150 F. Supp. 2d 103, 111 (D.D.C. 2001). Because Marriott is entitled to summary judgment against Plaintiffs (as shown above and in Marriott's affirmative class certification briefing), the class certification issue is moot.

### B.    Plaintiffs' Attempt To Expand The Class Definition Should Be Rejected.

The proper focus of summary judgment is on Plaintiffs – not the proposed class, which has not been certified. Notably, however, Plaintiffs' summary judgment briefing attempts to

vastly expand the proposed class from that ultimately settled on by Plaintiffs in their class certification briefing. Plaintiffs initially sought to certify a class of all persons who reserved rooms at a Marriott-affiliated hotel in Russia through the Marriott Reservation System, who received a rate confirmation in U.S. Dollars, and whose final bill was in rubles. Plaintiffs' Class Cert. Mem. at 10. Faced with Marriott's arguments in response that such a class would be massively overbroad and unworkable – containing individuals with no arguable connection to representations from Marriott and requiring individualized determinations of what representations each proposed class member received – Plaintiffs sharply limited their class definition. According to Plaintiffs, their proposed class is now limited to guests "receiv[ing] a written price confirmation from Marriott." Plaintiffs' Class Cert. Reply at 9. According to Plaintiffs, a written confirmation from Marriott is the "key factor" to class membership. *Id.*

As Marriott has briefed, even Plaintiffs' more limited proposed class should not be certified under controlling standards. *See generally* Marriott Class Cert. Opp.; Marriott Class Cert. Surreply. However, not only does Plaintiffs' summary judgment filing prematurely attempt to seek summary judgment for the class, but it also attempts to vastly re-expand the class beyond only those individuals receiving written confirmations from Marriott. Now, according to Plaintiffs, class members include an undefined group of all "others similarly situated" to Plaintiffs. Plaintiffs' SJ Mem. at 4. As described in Plaintiffs' briefing, this new proposed class apparently includes all individuals who stayed a Marriott Russia hotel, were quoted a price in U.S. dollars, and paid in rubles – regardless whether the individual received a written confirmation from Marriott; regardless whether the individual actually received any representations from Marriott (as opposed to Interstate or other third parties); regardless whether the individual received additional written or oral representations concerning pricing, in addition

43

to the U.S. dollar price quote; regardless whether the individual received the Central Bank rate; regardless whether the individual actually paid for the room charges; regardless whether the individual was aware of the use of a hotel exchange rate (from information obtained in the reservation process or otherwise); and regardless whether the stay was for business purposes.

For the reasons described with respect to Plaintiffs above, many of these proposed class members would lack standing and thus cannot be part of any class, and they are not otherwise entitled to summary judgment. In any event, Plaintiffs should be held to their proposed class definition in their class certification briefing, pursuant to which the "key factor is whether the guest received a written price confirmation from Marriott." Plaintiffs' Class Cert. Reply at 9.

### C. In The Alternative, No Proposed Class Member Is Entitled To Summary Judgment, Which Should Be Entered Against All Members Of The Proposed Class Whose Claims Share The Same Deficiencies As Plaintiffs' Claims.

Although the Court need not reach issues related to Plaintiffs' proposed class, in the alternative, Marriott would be entitled to summary judgment against most if not all of the proposed class, for the same reasons that Plaintiffs' claims fail.

First, based on the persuasive rationales of the Seventh and Eighth Circuits in *Hyatt and Bykov*, Plaintiffs' claims under the D.C. CPPA and unjust enrichment fail as a matter of law. Plaintiffs' headquarters misrepresentation claims also fail as a matter of law. These same reasons require judgment against all members of Plaintiffs' proposed class.

Second, summary judgment should be entered against all proposed class members who are not D.C. residents or whose "most significant relationship" concerning this dispute is to another jurisdiction. Both D.C. law and the Constitution require this result.

Third, summary judgment should be entered against all proposed class members who lack standing to bring the claims at issue here:

- All individuals who did not pay their own bills lack injury-in-fact.

- All individuals who received the Central Bank rate lack injury-in-fact.

- All individuals whose stays were for business purposes have no standing.

- No corporation has standing.

- All individuals who received no representations from Marriott, such as those who reserved through and stayed at Marriott Franchised Hotels, or those who relied on third parties to make reservations, lack causation or traceability to Marriott.

- All individuals who were aware of the use of the hotel exchange rate lack causation or traceability to Marriott.

- Marriott is entitled to judgment for all individuals who were provided by Marriott the information concerning hotel exchange rates that Plaintiffs claim was required, including all individuals whose reservations post-dated Marriott's 2005 provision of such information through all reservation channels it controls.

Fourth, no Plaintiff or proposed class member may recover for more than one hotel stay.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment on the Issue of Liability should be denied in full, and, as explained further in Marriott's affirmative summary judgment briefing, summary judgment should be entered for Marriott.

Dated:  June 16, 2008                                Respectfully submitted,

                                        /s/ Joel Dewey
                                        Joel Dewey (Bar No. 358175)
                                        Holly Drumheller Butler (Bar No. 459681)
                                        Sonia Cho (Bar No. MD26995)
                                        Jennifer Skaggs (Bar No. 500014)
                                        DLA Piper US LLP
                                        6225 Smith Avenue
                                        Baltimore, Maryland 21209
                                        410-580-3000
                                        410-580-3001 (facsimile)

                                        *Attorneys for Defendant*
                                        *Marriott International, Inc.*