EXHIBIT
93

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


BRITT A. SHAW, et al.,          )

              Plaintiffs  )

vs.                             ) Civil Action

MARRIOTT INTERNATIONAL,         ) No. 05-1138(GK)

INC.,                           )

              Defendant    )

              -    -    -    -    -    -


      The Deposition of SARAH E. MENDELSON was

taken on Wednesday, January 16, 2008, commencing

at 9:40 a.m., at the offices of the Center for

Strategic and International Studies, 1800 K

Street, Northwest, Washington, D.C., before

Brenda Smonskey, a Notary Public within and for

the District of Columbia.

              -    -    -    -    -    -

```
 1                 A P P E A R A N C E S

 2


 3 On behalf of the PLAINTIFF:


 4             THE CULLEN LAW FIRM
       By:  Randall Herrick-Stare, Esquire
 5           Amy Lloyd, Esquire
             1101 30th Street, N.W.,
 6           Suite 300
             Washington, D.C.  20007
 7           (202) 944-8600
             RHS@cullenlaw.com
 8


 9

10 On Behalf of the DEFENDANT:

11             DLA PIPER US LLP
       By:  Joel A. Dewey, Esquire
12           The Marbury Building
             6225 Smith Avenue
13           Baltimore, Maryland  21209-3600
             (410) 580-4135
14           Joel.dewey@dlapiper.com

15                  and

16           Theresa A. Coetzee, Esquire
             Marriott International
17


18


19     (Index appears following the transcript.)


20


21
```

1              P R O C E E D I N G S

2              -    -    -    -    -

3 Whereupon --

4                   SARAH E. MENDELSON

5 was called as a witness and, having first been

6 duly sworn, was examined and testified as

7 follows:

8                   EXAMINATION

9              BY MR. DEWEY:

10    Q.    Do you prefer Dr. Mendelson or

11 Ms. Mendelson?

12              What do you normally go by?  Because

13 I will need to refer to you by one of those

14 terms.

15    A.    You don't want to use my first name?

16    Q.    Not during the deposition.

17    A.    Then go by Dr. Mendelson.

18    Q.    That's fine.

19              Tell us your full name, please.

20    A.    Sarah Elizabeth Mendelson.

21    Q.    Where do you live?

1      A.      I live in Washington, D.C.

2      Q.      Where?

3      A.      3815 Van Ness Street, Northwest.

4      Q.      And what is your Social Security

5 number?

6      A.      Can I ask why my Social Security

7 number is needed?

8              MR. HERRICK-STARE:  Good question.

9              MR. DEWEY:  It is a question I ask

10 of every witness.

11             MR. HERRICK-STARE:  That may be

12 true.  But in this day of security concerns, it

13 is not quite so readily turned over as it

14 otherwise would be.

15             Why do you need it?

16             MR. DEWEY:  Just as part of

17 discovery.

18             BY MR. DEWEY:

19     Q.      Are you refusing to answer that

20 question, Doctor?

21             MR. HERRICK-STARE:  I would instruct

1 a commentary you did with regard to Boris

2 Yeltsin's death?

3     A.    Yes.

4     Q.    And then if you look at page 2, I

5 guess we have already talked about this.  But

6 there is a reference to the collapse of the ruble

7 in 1998.

8     A.    Correct.

9     Q.    And is that reference referring to

10 what we have already talked about in August of

11 1998?

12    A.    Correct.

13         (Mendelson Deposition Exhibit 14 was

14 marked for identification.)

15         BY MR. DEWEY:

16    Q.    Let me show you what we marked as

17 Exhibit 14.  Do you recognize that?

18    A.    It looks like our standard operating

19 procedure.

20    Q.    Is that the travel policy for CSIS?

21    A.    I believe it is.

1      Q.      Has this always been the policy?

2      A.      I think they revise it from time to

3 time.  But it is one version of a standard

4 operating procedure that's been on the Web.

5      Q.      Now, if you look at page Bates

6 number 135 of this, of Exhibit 14, there is a

7 section 1.5.6 on hotel payment procedures.

8      A.      Yes.

9      Q.      It indicates that hotel costs should

10 be paid using the employee's personal charge card

11 or the employee's CSIS American Express corporate

12 card.

13      A.      Correct.

14      Q.      What card did you use when you were

15 traveling on behalf of CSIS?

16      A.      For the majority of the travel, I

17 have used the American Express corporate card.

18             The card was issued to me after I

19 had already traveled to Russia as a CSIS

20 employee.  I can't recall exactly when I got a

21 card.

1                I know there were one or two trips

2 that were on my card I believe in spring '02.

3 But the vast majority of the travel has been on

4 American Express.

5       Q.     And then if you look at page 139,

6 section 1.7.5, it talks about personal travel and

7 vacation travel.  Correct?

8       A.     Correct.

9       Q.     And it indicates that personal

10 billing cannot be placed on the CSIS corporate

11 card.  Is that correct?

12       A.     That's correct.

13       Q.     So if it was personal travel

14 pursuant to the CSIS policy, you could not use

15 the CSIS card?

16       A.     That's correct.

17       Q.     And all of your travel to Moscow

18 since the spring of 2002 has been charged to the

19 CSIS card?

20       A.     I can't say precisely when I

21 received the American Express card.  It may have

1 been early 2003.

2           That's something that other people

3 at CSIS would know exactly.  But I don't know.

4           Certainly since 2003, all of it has

5 been on American Express.  None of it has been

6 for personal travel.

7      Q.     When you charge it on the CSIS

8 American Express, that just gets billed directly

9 to CSIS?

10     A.     That's correct.

11     Q.     You don't pay anything?

12     A.     No.

13     Q.     And with regard to --

14     A.     I personally don't pay anything.  My

15 accounts pay something.

16     Q.     But you personally.  Yes, that was

17 my question, you personally.

18     A.     Right.

19     Q.     And with regard to the travel you

20 did for CSIS before you got the corporate card,

21 did CSIS reimburse you for that?

1      A.      Yes, although not entirely.  But

2 yes.

3      Q.      When you say "not entirely," what do

4 you mean?

5      A.      I think there was -- it is not

6 really relevant to these proceedings, but I think

7 there was one trip where I know I recall that I

8 ate some of the cost.

9      Q.      Why was that?

10      A.      Oh, we were building a program, and

11 it was not clear -- it was basically an

12 investment.

13              It was also -- there wasn't as much

14 guidance in the early period about how to do the

15 finance and accounting.

16      Q.      Was that before you left Tufts that

17 those --

18      A.      It was before I left Tufts.

19      Q.      What damages are you personally

20 trying to recover in this case?

21      A.      None.

1 people that were -- Svetlana and Alyona are

2 people who worked with Nelly.

3             It is not the practice of all CSIS

4 travelers.

5      Q.      So it would be the practice of you

6 and your team that works in Russia --

7      A.      Right.

8      Q.      -- to contact Nelly Trufan?

9      A.      Or whoever was working for her.

10 This is the government relations person.

11     Q.      When did you first learn of that

12 practice?

13     A.      Nelly Trufan was a colleague of --

14 was a consultant that I used.

15             She I believe started coming here in

16 2003 maybe or maybe 2004.  She basically said

17 that she would get us the government rate,

18 although CSIS is not a government organization,

19 as sort of a courtesy.

20             I mean between 2002 and 2004, when I

21 was on a USAID grant, a lot of the reservations

1 were made by the AID mission.  And then after

2 2004 to 2006, 2007, they were made by first

3 contacting Nelly or whoever succeeded Nelly in

4 her job.

5      Q.    Okay.  Let's talk about the first

6 window of time.

7           You said 2002 to 2004 you were on a

8 USAID grant.

9      A.    Yes.

10      Q.    How would you make reservations to

11 stay in Moscow?

12      A.    Typically we would tell the mission

13 that we were coming.

14           There was a contact person.  He

15 would contact the Marriott with our names and

16 passport numbers and the dates for the travel.

17 And that's how we had that rate.

18      Q.    And when you say "the mission," what

19 do you mean?

20      A.    The USAID mission in Moscow.  USAID

21 has an office.  It is called a mission.

1     Q.     Who at the USAID office in Moscow

2 did you deal with?

3     A.     There is a record of it somewhere in

4 here.  I don't recall the person's name.

5     Q.     Is it Alexander Petroff?

6     A.     Yes.

7     Q.     And was Mr. Petroff the person you

8 were dealing with in Moscow on this project?

9     A.     He was just a person at the USAID

10 mission who would help us with this particular

11 logistical arrangement.

12     Q.     And then do you know what he would

13 do in order to get a reservation?

14     A.     I think he either faxed or phoned.

15 But I couldn't say for sure.

16     Q.     And was there a particular office

17 that he dealt with to get the reservation?

18     A.     I assume he was dealing with Nelly

19 Trufan.

20           He would have been a USAID employee

21 calling the Marriott to book on a government

1 rate.  Presumably he would be contacting the

2 government relations people.

3     Q.    When you say "the government

4 relations people," who are they?

5     A.    Well, Nelly's title I believe was --

6 I don't have her card handy.  But I think she was

7 the person in Moscow who was dealing with

8 Washington and Washington visitors.

9          The U.S. government brings a huge

10 amount of business to the Marriott.

11    Q.    When you say "Washington visitors,"

12 you mean people from the United States

13 government?

14    A.    Not only.  Think tanks as well as

15 USG, U.S. government.

16    Q.    You mentioned that she was able to

17 get you the government rate even though you

18 weren't a government entity?

19    A.    Correct.

20    Q.    So she was giving you a better deal?

21    A.    Well, the AID people were getting us

Page 84

 1 a government rate.

 2              We were an AID -- I can't remember

 3 if it was a cooperative agreement.  So that made

 4 -- it made total sense.

 5              And then Nelly was extending to us a

 6 specific rate.  It happened to be the same as the

 7 government rate, I believe.  Not being a

 8 government employee, it is hard to say for sure.

 9      Q.    So from 2002 to 2004, the standard

10 practice of you and those working in your group

11 on Russian affairs was to make the reservation

12 through the USAID.  Correct?

13      A.    Correct.

14      Q.    And then from roughly 2004 until

15 2007, it was to make it through Nelly Trufan in

16 the government relations group?

17      A.    Or whoever succeeded her.

18      Q.    Now, currently you have Jessica

19 Scholes who is your assistant.  Has she been your

20 assistant the entire time?

21      A.    No.

1      Q.      Who was your assistant when you

2 first started out at CSIS?

3              THE WITNESS:  Is it --

4              MR. HERRICK-STARE:  Her name

5 probably appears in the documents you have

6 already produced.

7              THE WITNESS:  Eva Savich was my

8 assistant from August, September 2001 through

9 July 2003.

10             Then Nancy Lord was my assistant

11 from August '03 to August '04.

12             And then Alana Torkova was my

13 assistant from -- these are approximate dates.

14 But I think about August '04 to '06.

15             And then Jessie joined us in July

16 '06, and she will probably be with us until at

17 least September.

18             BY MR. DEWEY:

19     Q.      Now, was it the practice of you and

20 your group that whomever your assistant was at

21 the time would make the reservation?

1      A.      Yes, correct.

2      Q.      Did you or your assistant ever use

3 Marriott.com to make these reservations?

4      A.      Not to my knowledge.

5      Q.      Did you or your assistant ever view

6 the currency converter on Marriott.com?

7      A.      Not to my knowledge.

8      Q.      Now, during 2002 to 2004, when you

9 are making reservations through the USAID, how

10 would you get reservation confirmations?

11     A.      They would fax them.

12             (Mendelson Deposition Exhibits 19

13 and 20 were marked for identification.)

14             BY MR. DEWEY:

15     Q.      Let me show you what we have marked

16 as Exhibits 19 and 20.

17             First, Exhibit 19, is this the

18 e-mail where you found Exhibit 20?

19     A.      Yes.

20     Q.      When these documents were produced,

21 this was numbered 45 and this was numbered 46

1 through I think 55.

2       A.       Yes.

3       Q.       So it looks like Exhibit 19 was the

4 cover e-mail, and then you click on the

5 attachment and that's the fax we marked as

6 Exhibit 20.  Is that correct?

7       A.       Correct.

8       Q.       This came from your computer or a

9 CSIS computer?

10      A.       Yes.

11      Q.       And then looking at Exhibit 20,

12 let's turn to the second page, and we have marked

13 that Exhibit 20A, just for brevity purposes.

14               Do you recognize that document?

15      A.       Yes.

16      Q.       And is that a reservation

17 confirmation that you got from Mr. Petroff?

18      A.       Yes.

19      Q.       And then looking at the first page

20 of Exhibit 20, this is a fax cover sheet.  It

21 looks like Mr. Petroff at the USAID office faxes

Page 88

1  it to you.  Correct?

2      A.    Correct.

3      Q.    And then looking at the second page,

4  which we have marked as Exhibit 20A, it is a

5  reservation for you to stay July 22nd through 24,

6  2002 at the Marriott Grand.  Correct?

7      A.    Correct.

8      Q.    Now, was that reservation as well as

9  the other reservations that are marked 20A, B, C,

10  D and E, those were all made in the manner that

11  you have just described for us, where your

12  assistant would call Mr. Petroff and then he

13  would go make the reservation?

14      A.    Or e-mail him, correct.

15      Q.    Was there a particular reason why

16  you were staying at the Marriott Grand for this

17  trip in July of 2002?

18      A.    Convenient and pool and the rate.

19      Q.    Also as part of Exhibit 20, there

20  are reservations for a person named Ted Gerber.

21      A.    Correct.

Page 89

1    Q.    He was?

2    A.    A consultant.

3    Q.    He was traveling with you?

4    A.    Correct.

5    Q.    Also working on CSIS's business?

6    A.    Correct.

7    Q.    Now, looking at the top of Exhibit

8 20A, there is a fax line from Marriott Hotels of

9 Moscow.  Do you know what that organization is?

10    A.    I couldn't say for sure.  But it

11 must be the -- presumably it's the fax for the

12 Moscow Grand.

13    Q.    Did you ever have any discussions

14 with Mr. Petroff to find out how he got these

15 particular rates?

16    A.    This was at the time the standard

17 rate for anybody traveling -- for anybody making

18 a reservation from the U.S. government, for

19 people who were working on government business,

20 any grants that were supported by U.S. government

21 funds.

Page 90

1      Q.      And I note that the fax, Exhibit

2 20A, is addressed to Mr. Petroff at the U.S.

3 Embassy?

4      A.      Yes.   The USAID mission and the

5 Embassy are connected.   It is on one compound.

6      Q.      Was there a special rate that people

7 in the U.S. Embassy got?

8      A.      There is a special rate for U.S.

9 government employees, and it would have applied

10 to AID grantees.

11      Q.      And the rate that you received was,

12 looking at Exhibit 20A, 173?

13      A.      Dollars.

14      Q.      Was that a good price for a hotel in

15 Moscow?

16      A.      That was a good price.

17      Q.      And talking about July of 2002.

18      A.      Yes.

19      Q.      And then looking at the reservation

20 confirmation, Exhibit 20, there is a section

21 marked "Payment Procedures."   Correct?

1    A.    Correct.

2    Q.    And it states, "The above rate is

3 quoted in units equal to U.S. dollars.  All major

4 credit cards are accepted.  Payment must be made

5 at the hotel's current exchange rate in rubles

6 only."

7         Did I read that correctly?

8    A.    You did.

9    Q.    Does that same payment procedure

10 language and disclosure appear on Exhibits 20B,

11 C, D and E?

12    A.    It does.

13    Q.    And Mr. Gerber's disclosures, do

14 they also -- his reservation confirmations, do

15 they also have that same disclosure language?

16    A.    Yes.

17    Q.    Now, in this trip, you booked I

18 guess five separate reservations.

19    A.    Right.

20    Q.    Was that because you were traveling

21 to other places?

Page 92

1      A.      Exactly.

2      Q.      So do you recall when you were

3 checking in on any of these occasions in July of

4 2002, when you stayed at the Marriott Grand, any

5 discussion at the front desk about your room rate

6 in units?

7      A.      No.

8      Q.      Do you recall seeing any signs on

9 the front desk?

10      A.      No.

11      Q.      When you checked out, were you

12 charged in dollars or were you charged in rubles?

13      A.      I don't recall.

14      Q.      Do you know whether there was an

15 exchange rate applied to convert your dollar room

16 rate to rubles?

17      A.      I don't recall.

18              MR. HERRICK-STARE:  Objection; form.

19              BY MR. DEWEY:

20      Q.      Well, do you know whether an

21 exchange rate was applied to convert dollars to

1 rubles that was higher than the central bank

2 exchange rate?

3              MR. HERRICK-STARE:  Objection to

4 form.

5              BY MR. DEWEY:

6     Q.    You can answer.

7     A.    Because I had been given a rate of

8 $173, so I assumed that that was what we were

9 paying for, that whatever payment we were making

10 was the ruble equivalent of $173.

11    Q.    My question is do you know whether

12 you were charged an exchange rate when you

13 checked out of the Marriott Grand on any of those

14 occasions in July 2002 that was higher than the

15 central bank exchange rate?

16             MR. HERRICK-STARE:  Objection to

17 form.

18             THE WITNESS:  I don't recall.

19             BY MR. DEWEY:

20    Q.    Did you make any complaint to anyone

21 at the Marriott Grand about what you were charged

Page 94

1 when you checked out on any of those occasions in

2 July 2002?

3      A.     No.

4             (Mendelson Deposition Exhibits 21

5 and 22 were marked for identification.)

6             BY MR. DEWEY:

7      Q.     Let me show you what we marked as

8 Exhibits 21 and 22.

9             21 looks like sort of the e-mail

10 cover page, and 22 is the attachment to that

11 e-mail.  Correct?

12     A.     Correct.

13     Q.     And then 22 appears to be fax

14 confirmations for a trip that you were taking to

15 Moscow and staying at the Marriott Grand in March

16 of 2003?

17     A.     Correct.

18     Q.     And were these reservations made in

19 the same way you have described, where Mr.

20 Petroff at USAID through the U.S. Embassy would

21 get the government rate?

Page 95

1      A.      Correct.

2      Q.      And then he faxed this confirmation

3 to you, Exhibit 22?

4      A.      That's correct.

5      Q.      Did you ever rely on any advertising

6 by Marriott to stay at their hotels?

7      A.      No.

8      Q.      And were you ever aware of any

9 representations made by Marriott as to where its

10 headquarters were or any of that?

11      A.      No.

12      Q.      Now, looking at Exhibit 22, what was

13 the price?

14      A.      173 U.S. dollars.

15      Q.      And what was the disclosure that you

16 received in this reservation confirmation on the

17 payment procedures?

18      A.      "The above rate is quoted in units

19 equal to U.S. dollars.  All major credit cards

20 are accepted.  Payment must be made at the

21 hotel's current exchange rate in rubles only."

Page 96

1      Q.      The last page of Exhibit 22,

2 Mr. Gerber's reservation.

3      A.      Same thing.

4      Q.      He got the same disclosure.

5 Correct?

6      A.      Correct.

7              (Mendelson Deposition Exhibits 23

8 and 24 were marked for identification.)

9              BY MR. DEWEY:

10     Q.      Then let me show you what we marked

11 as Exhibits 23 and 24.

12             23, it appears, is the cover e-mail.

13 And the attachment to 23 is Exhibit 24.  Is that

14 correct?

15     A.      Correct.

16     Q.      Looking at Exhibit 24, that appears

17 to be reservations you made for a trip in July of

18 2003 to Moscow?

19     A.      Correct.

20     Q.      And the trips we have talked about

21 so far have all been CSIS trips.

1      A.      Correct.

2      Q.      And the rate that you were charged

3 on that occasion?

4      A.      On that occasion, it was 167 U.S.

5 dollars.

6      Q.      What was the disclosure as to

7 payment procedures?

8      A.      It is the same as before.

9              "The above rate is quoted in units

10 equal to U.S. dollars.  All major credit cards

11 are accepted.  Payment must be made at the

12 hotel's current exchange rate in rubles only."

13     Q.      When you checked in on these two

14 occasions, that is, March of 2003 and July of

15 2003, do you recall any discussion with anyone at

16 the Marriott Grand about units?

17     A.      No.

18     Q.      When you checked out in March of

19 2003, do you recall whether your bill was settled

20 in dollars or in rubles?

21     A.      I don't recall.

1      Q.      Based on what you know, though,

2  about Russia and practices in Russia, would it be

3  your assumption that the bill would have been

4  settled in rubles?

5      A.      It would be.

6      Q.      Do you know whether the hotel

7  applied an exchange rate to settle the bill in

8  rubles in March of 2003 that was higher than the

9  central bank exchange rate?

10             MR. HERRICK-STARE:  Objection, form.

11             THE WITNESS:  I don't know.

12             BY MR. DEWEY:

13     Q.      And with regard to your stay in July

14  of 2003, when the bill was settled in rubles, do

15  you know if the hotel applied an exchange rate

16  that was higher than the central bank exchange

17  rate?

18             MR. HERRICK-STARE:  Objection to

19  form.

20             THE WITNESS:  I don't know.

21             (Mendelson Deposition Exhibit 25 was

1 marked for identification.)

2            BY MR. DEWEY:

3      Q.    Let me show you what we marked as

4 Exhibit 25.

5            It is two pages of a document.  It

6 is part of a bill that was produced.  It is CSIS

7 104-105.

8            There appears on the second page of

9 Exhibit 25 a charge on October 12, 2003 at the

10 Marriott Moscow Grand.  Do you recall staying at

11 the Marriott Moscow Grand on that occasion?

12     A.    No.

13            MR. HERRICK-STARE:  I may have

14 misheard.  When you asked that question, I

15 thought you asked about a date in March.  Did I

16 misunderstand?

17            THE WITNESS:  Previously we were

18 talking about March.  He is asking now did I stay

19 -- I did stay.

20            I was on an election -- I was the

21 expert for the needs assessment mission for the

1 OSCE.  I was a consultant to an international

2 organization.

3            MR. HERRICK-STARE:  While I was

4 scratching notes, I thought your question asked

5 about a date in March.

6            THE WITNESS:  Previous was March.

7 He asked if I did stay in Moscow in October '03.

8 And I did.

9            MR. HERRICK-STARE:  Then it is my

10 mistake.  I apologize.

11            BY MR. DEWEY:

12    Q.    Do you recall how you made the

13 reservation for that stay?

14    A.    The OSCE would have made the

15 reservation.  The Organization for Security and

16 Cooperation in Europe would have made the

17 reservation.

18            I was there as an expert consultant.

19 Rather than pay me directly, they reimbursed

20 CSIS.  So we just did it through the American

21 Express corporate card.

1     Q.    So that was a unique, specific

2 arrangement?

3     A.    It was.  It was part of my overall

4 duties and expertise as a CSIS consultant.  So I

5 wanted to handle it that way.

6     Q.    So for that one charge, you put it

7 on the CSIS corporate card, and then the OSCE

8 reimbursed CSIS?

9     A.    Right.  There was a wire transfer.

10     Q.    Do you recall anything about the

11 room rate on that occasion?

12     A.    No.  I have no idea.

13     Q.    And do you recall whether the hotel

14 charged you an exchange rate at check-out that

15 was higher than the central bank exchange rate?

16          MR. HERRICK-STARE:  Objection to

17 form.

18          THE WITNESS:  I don't know.

19          BY MR. DEWEY:

20     Q.    I know -- and we will get to them a

21 little later in the deposition -- there are some

1 reservation confirmations from 2007 for hotel

2 stays you made.

3      A.      Yes.

4      Q.      Do you have reservation

5 confirmations for hotel stays you made in 2001

6 through 2006 other than Exhibits 20, 22 and 24?

7      A.      I don't know.

8              (Mendelson Deposition Exhibit 26 was

9 marked for identification.)

10             BY MR. DEWEY:

11     Q.      Let me show you what we have marked

12 as Exhibit 26.

13             This is CSIS 24-25, which appears to

14 be a series of e-mails that actually start kind

15 of at the bottom on page 2 chronologically and

16 then move upward.

17             (Witness examined the document.)

18     A.      Okay.

19     Q.      With regard to Exhibit 26, is this a

20 series of e-mails back and forth between you and

21 Nelly Trufan?

1     A.     It is.

2     Q.     It looks like the first e-mail is on

3 page 2, where you e-mailed Ms. Trufan January 21,

4 2004?

5     A.     Correct.

6     Q.     And you were asking Ms. Trufan if

7 she would get you -- well, you told her that you

8 were there on a USAID project, so you could go

9 through the Embassy the way on Exhibits 22

10 through 24, but you said can we just make it

11 directly through you.  Is that correct?

12     A.     Yes.

13     Q.     Ms. Trufan e-mails back on January

14 22 and says, "I will make the reservations for

15 you at the Embassy's rate of 189."  Is that

16 correct?

17     A.     Yes.

18     Q.     That same day, you respond to

19 Ms. Trufan, but then you are questioning as to

20 the rate, and you say it was 173, can you check

21 on it, basically is what you are asking her to

1 do.

2        A.        Uh-huh.

3        Q.        On January 28, Ms. Trufan sent you

4 an e-mail where she told you, quote, "The U.S.

5 Embassy rate has not gone up."

6        A.        January 23rd.

7        Q.        You are right.   Thank you.

8                  Ms. Trufan e-mailed you on January

9 23rd of 2004 and told you that, quote, "The U.S.

10 Embassy rate has not gone up.   When the $173 rate

11 was quoted, it was calculated based on the

12 hotel's exchange rate, which is higher than the

13 central bank's exchange rate, and we allow a

14 difference between the rate and the U.S.

15 government per diem of $189.   But since last

16 fall, we have started to calculate the U.S.

17 Embassy rate based on the central bank exchange

18 rate as a special deal for the U.S. Embassy only.

19 So the rate is $189, including full buffet

20 breakfast.   I hope that answers your question."

21                  Is that what she e-mailed you?

1      A.      It is what she e-mailed me.

2      Q.      Did you get a confirmation for this

3 hotel stay?

4      A.      Probably, but I can't say for

5 certain.  We may just have used that as

6 confirmation.  I can't recall.

7      Q.      So in this e-mail, at the time of

8 this e-mail in January of 2004, you knew that the

9 hotel's exchange rate was higher than the central

10 bank rate?

11              MR. HERRICK-STARE:  Objection to

12 form.

13              BY MR. DEWEY:

14      Q.      Correct?

15      A.      To be honest, it is very hard for me

16 to understand that e-mail.  What she said in the

17 e-mail I read.

18      Q.      The e-mail indicates the price you

19 got for this reservation where she gave you the

20 U.S. Embassy reservation was calculated on the

21 central bank exchange rate and not the hotel bank

1 exchange rate.  Correct?

2            MR. HERRICK-STARE:  Objection to

3 form.

4            THE WITNESS:  I think the e-mail is

5 ambiguous.

6            BY MR. DEWEY:

7    Q.    Did you get the U.S. Embassy rate

8 when you made this hotel stay?

9    A.    We got the embassy rate.

10            (Mendelson Deposition Exhibit 27 was

11 marked for identification.)

12            BY MR. DEWEY:

13    Q.    Let me show you what has been marked

14 as Exhibit 27.

15            This is CSIS 97 through 100, which

16 is an Amex bill, February of 2004.  And it

17 indicates some charges at the Marriott Moscow

18 Grand that you made in February of 2004.

19    A.    Uh-huh.

20    Q.    I'm sorry, ma'am.  Yes or no?

21    A.    Yes.